**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

JOSEPH F. FARIS, Individually and On Behalf of  )  11 CIV 3658
All Others Similarly Situated,                  )
                                                )
                    Plaintiff,                  )  CLASS ACTION
                                                )
vs.                                             )
                                                )
LONGTOP FINANCIAL TECHNOLOGIES                  )  **COMPLAINT FOR VIOLATION OF**
LIMITED, HUI KUNG KA a/k/a XIAOGONG             )  **THE FEDERAL SECURITIES LAWS**
JIA, WAI CHAU LIN a/k/a WEIZHOU LIAN, and,      )
DEREK PALASCHUK,                                )
                                                )  JURY TRIAL DEMANDED
                    Defendants.                 )

By and through his undersigned counsel, Plaintiff Joseph F. Faris ("Plaintiff") alleges the following against Longtop Financial Technologies Limited ("Longtop" or the "Company") and certain of the Company's executive officers and directors. Plaintiff makes these allegations upon personal knowledge as to those allegations concerning Plaintiff and, as to all other matters, upon the investigation of counsel, which included, without limitation: (a) review and analysis of public filings made by Longtop and other related parties and non-parties with the U.S. Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications disseminated by certain of the Defendants and other related non-parties; (c) review of news articles, shareholder communications, and postings on Longtop's website concerning the Company's public statements; and (d) review of other publicly available information concerning Longtop and the Individual Defendants.

## I.  NATURE OF THE ACTION

1.      This is a federal securities class action against Longtop and certain of its officers and/or directors for violations of the federal securities laws. Plaintiff brings this action on behalf of all persons or entities that purchased Longtop American Depository Shares ("ADS's")

between June 29, 2009 and May 17, 2011, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act"). The Exchange Act claims allege that Defendants engaged in a fraudulent scheme to artificially inflate the Company's stock price. As a result of the fraud described below, the Company has lost a substantial portion of its value.

2.      Longtop is a provider of software and information technology ("IT") with services targeting the financial services industry in China.

3.      Plaintiff alleges that, throughout the Class Period, Defendants failed to disclose material adverse facts regarding the Company's accounting policies and overall financial condition and well-being.

4.      Due to Defendants' course of conduct, the New York Stock Exchange ("NYSE") has halted trading in Longtop ADS's, and the Company's registered independent accounting firm, Deloitte Touche Tohmatsu CPA Ltd. ("DTT"), has resigned. In addition, the Company's Chief Financial Officer, Derek Palaschuk, also resigned as of May 19, 2011, and the SEC has started an official inquiry into the Company.

5.      Defendants' wrongful acts, and false and misleading statements and omissions, have caused a precipitous decline in the market value of the Company's ADS's. Plaintiff and other Class members have suffered significant losses and damages.

## II.      <u>JURISDICTION AND VENUE</u>

6.      This action arises under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b 5).

7.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1307, and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

8.      Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act. Many of the false and misleading statements were made in or issued from this district.

Many acts charged herein, including the preparation and/or dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District.

9.      In connection with the acts and omissions alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

### III.   PARTIES

#### A.   Plaintiff

10.     Plaintiff purchased the publicly traded ADS's of Longtop at artificially inflated prices during the Class Period and has been damaged thereby.

#### B.   Defendants

##### i.   The Company

11.     Defendant Longtop is a corporation incorporated under the laws of the Cayman Islands with principal executive offices located at Flat A, 10/F., Block 8, City Garden, 233 Electric Road, North Point, Hong Kong.

##### ii.   The Individual Defendants

12.     Defendant Hui Kung Ka a/k/a Xiaogong Jia ("Ka") is one of the Company's founders, and has served as Chairman since the Company's inception in June 1996.

13.     Defendant Wai Chau Lin a/k/a Weizhou Lian ("Lin") has served as director and Chief Executive Officer of the Company since its inception in June 1996.

14.     Defendant Derek Palaschuk ("Palaschuk") served as Chief Financial Officer of the Company from September 2006, until his resignation on May 19, 2011.

15.     Defendants Ka, Lin and Palaschuk are collectively referred to herein as the "Individual Defendants."

16.     Longtop and the Individual Defendants are referred to herein as "Defendants."

17.     During the Class Period, the Individual Defendants, as senior executive officers and/or directors of Longtop, were privy to confidential, proprietary and material adverse non-public information concerning Longtop, its operations, finances, financial condition and present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof, and via reports and other information provided to them in connection therewith.  Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

18.     The Individual Defendants are liable as direct participants in the wrongs complained of herein.  In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of §20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein.  Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of Longtop's business.

19.     The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts and through them, to the investing public.  The Individual Defendants were provided with copies of the Company's reports and publicly disseminated documents alleged herein to be misleading, prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

20.     As senior executive officers and/or directors and as controlling persons of a publicly traded company whose securities were, and are, registered with the SEC pursuant to the

Exchange Act, and were traded on the NYSE and governed by the federal securities laws, the Individual Defendants had a duty to disseminate promptly accurate and truthful information with respect to Longtop's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings, and present and future business prospects, to correct any previously issued statements that had become materially misleading or untrue, so the market price of Longtop's securities would be based on truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

21.     The Individual Defendants are liable as participants in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Longtop's publicly traded ADS securities by disseminating materially false and misleading statements and/or concealing material adverse facts.

## IV.   SUBSTANTIVE ALLEGATIONS

### A.    Factual Background of Longtop

22.     Longtop was originally organized in the British Virgin Islands, on October 18, 2000 under the name Latest New Technology Limited. The Company was subsequently renamed Longtop Financial Technologies Limited ("Longtop BVI"), and became a wholly owned subsidiary of Longtop. The Company's ADS's were listed on the New York Stock Exchange on October 25, 2007.

23.     Longtop provides software and IT services to the financial services industry in China. The Company's software solutions are broadly classified into four categories: (i) Channel, (ii) Business, (iii) Management, and (iv) Business Intelligence. While Longtop sells both custom-designed and standardized software solutions, it also provides services such as ATM maintenance, system integration, and IT maintenance services to its clients.

24.     The Company's Channel category offers ATM services, such as teller systems, online banking, customer relationship management solutions, and Enterprise Customer Information Facilities.  The Business category offers services for international trade finance, payment and settlement, credit card operations, and intermediary businesses, while the Management category offers enterprise and resources management services for credit, administrative, human resource, and regulatory compliance management.  Lastly, the Business Intelligence category offers decision support systems, enterprise data warehousing, operational data storage, data mining, and reporting.

25.     In addition to offering software product solutions, the Company operates six delivery centers in Xiamen, Beijing, Shanghai, Chengdu, Guangzhou, and Tianjin, and three research centers in Xiamen, Shanghai, and Guangzhou.  Longtop also has 84 ATM service centers located in 27 out of 31 provinces in China, and sales offices in Xiamen, Beijing, Shanghai, and Guangzhou.

26.     As the main focus for Longtop is design and development of software solutions, the Company's revenues since 2004 from software development have accounted for a large portion of overall revenues.  For instance, software development contributed 77.1% to revenues in 2006, 79% in 2007, 83.7% in 2008, and 84.3% in 2009.

27.     The software development operation at Longtop can be divided into three main categories: (i) custom-designed software development, whereby the Company works one on one with clients to tailor software solutions to their specific needs; (ii) standardized software equipment, whereby Longtop markets standardized software solutions to financial institutions of varying sizes and needs, and (iii) software maintenance, offering standard twelve month warranties for maintenance and repairs of any software solution defects.

**B.**  **False and Misleading Statements**

28.   The Class Period commences on June 29, 2009.  On that date, the Company filed its Form 20-F with the SEC for the fiscal year ended March 31, 2009.  The 2009 Form 20-F was signed and certified by Defendants Lin and Palaschuk, and stated the following regarding the Company's staffing and employment model:

**Employees**

The following table sets forth the number of our employees and contractors categorized by function as of the dates indicated:

|  | March 31, 2009 | March 31, 2008 | March 31, 2007 | December 31, 2006 |
|---|---|---|---|---|
| Software development | 1,310 | 913 | 402 | 267 |
| Revenue other services | 559 | 253 | 125 | 117 |
| Research and Development | 208 | 164 | 63 | 62 |
| Sales and Marketing | 287 | 129 | 76 | 64 |
| General and Administration | 238 | 200 | 124 | 113 |
| **Total** | **2,602**\*\* | **1,659**\* | **790** | **623** |

\* ***This number includes 1,496 contracted employees provided by Xiamen Longtop Human Resource Services Co., Ltd, an unrelated party, pursuant to a human resource service agreement with us.*** Under this agreement, *we have agreed to pay a monthly service fee to Xiamen Longtop Human Resource Services Co., Ltd to cover the cost of those contracted employees as well as operational expenses.* We consider these 1,496 persons to be employees.

\*\* ***This number includes 2,039, 35 and 57 contracted employees, respectively, provided by Xiamen Longtop Human Resource Services Co., Ltd, Beijing Foreign Enterprise Human Resources Service Co., Ltd., or Beijing FESCO, Randstad Shanghai Temporary Staffing, each an unrelated party pursuant to a human resource service agreement with us. Under each applicable agreement, we have agreed to pay a monthly service fee to Xiamen Longtop Human Resource Services Co., Ltd., Beijing FESCO, and Randstad Shanghai Temporary Staffing to cover the cost of those contracted employees as well as operational expenses.*** We consider these 2,131 persons to be employees.

***General and administrative expenses.*** General and administrative expenses primarily include costs related to our finance, legal, human resources and executive office functions, gains or losses on fixed assets and provisions for other

receivables less government subsidies related to directly to our operating expenses. These departmental costs are primarily professional fees and expenses related to headcount. *Headcount-related expenses include payroll, bonuses, employee benefits, share-based compensation, travel and entertainment and overhead costs that are allocated based on headcount…*

Our general and administrative expenses decreased by 52.3% from $19.6 million in fiscal 2008 to $9.4 million in fiscal 2009, representing 29.8% and 8.8% of total revenues, respectively. General and administrative expenses in fiscal 2008 included $14.0 million of share-based compensation expenses, primarily associated with the cancellation by Well Active during fiscal 2008 of principal and interest under promissory notes issued to it in 2006 in payment for ordinary shares Well Active had transferred to our officers and employees, as described above under "Share-Based Compensation Expenses." *Excluding the impact of share-based compensation expenses of $14.0 million and $1.9 million in fiscal 2008 and fiscal 2009, respectively, our general and administrative expenses would have increased by approximately 32.1% primarily due to additional headcount, which increased from 200 at March 31, 2008 to 238 at March 31. 2009, and additional professional fees and public company expenses.*

29.    The Form 20-F for 2009 also stated the following in regards to the Company's

gross margin figures:

*The portion of our overall revenues attributable to standardized software solutions which deliver substantially higher gross margins.*

Standardized software solutions as a percentage of software development revenues were 23.1%, 32.7% and 31.5% for the three months ended March 31, 2007 and for the years ended March 31, 2008 and 2009, respectively. *As standardized software involves significantly less development and implementation time while commanding similar prices, the increased standardized software sales increase our gross margin and allow us to more efficiently utilize our software development, delivery and sales resources.*

*Gross Margin; Cost of Revenues. Our gross margins increased by 4.8% to 65.8% in fiscal 2009 from 61.0% in fiscal 2008. The increase in gross margin was primarily due to the factors explained below.*

• *Software development services costs and gross margin*

 • *Software development costs.* These consist of design, implementation, delivery and maintenance costs of our software solutions and amortization of acquired intangible assets. Software development costs are primarily headcount-related costs, including payroll, employee benefits, bonuses, travel and entertainment and share-based compensation to our development staff, and overhead costs allocated based on headcount. Allocated overhead primarily includes office rental, communication costs and depreciation. We consider most of our software development costs to be variable and will increase as our sales grow. Of our total

software development costs, substantially all relates to the cost of developing and implementing our customized software solutions.

 • *Software development gross margin. Our software development services gross margin increased by 8.9% to 70.6% in fiscal 2009 compared to fiscal 2008. The increase in gross margin was due to higher share-based compensation expenses in fiscal 2008, which were $7.8 million as compared to $1.6 million in fiscal 2009.* The higher share-based compensation in fiscal 2008 was due to the cancellation by Well Active of principal and interest under promissory notes issued to it in 2006 in payment for ordinary shares Well Active had transferred to our officers and employees, as described above under "Share-Based Compensation Expenses." *Excluding the impact of the share-based compensation expenses, fiscal 2009 gross margin would have been approximately 3.4% lower than fiscal 2008. This 3.4% decline was due primarily to a higher mix of our software revenue coming from customized solutions, with 65.1% of software development revenue from customized solutions in fiscal 2009 as compared to 58.3% in fiscal 2008, as well as inflation-driven increases in salaries without corresponding increases in pricing.* Customized solutions, which typically involve more manpower in development and implementation, have substantially lower gross margins than standardized solutions. *Our acquisition of FEnet in October 2007, which primarily delivers customized solutions, also negatively impacted our gross margins in fiscal 2009 compared to fiscal 2008.*

In fiscal 2009, we hired a significant number of new personnel to meet customized solutions' demand. As of March 31, 2009, we had 1,310 software development engineers, compared to 913 as of March 31, 2008.

 • Other Services costs and gross margin.

 • *Other Services costs. Costs associated with ATM maintenance include headcount-related costs for our maintenance staff and spare parts inventory costs. Costs related to ancillary services include headcount-related expenses and amortization of backlog arising from acquisitions.*

 • Other Services gross margin. *Gross margins from our Other Services revenue declined by 18.6% during fiscal 2009 to 39.5% due to ATM maintenance and ancillary services segment gross margins decline.*

 • ATM maintenance services segment. *Gross margins from our ATM maintenance services segment declined by14.6% to 38.9% in fiscal 2009 from 53.5% in 2008 due to lower gross margins on Huayuchang Tongchuang, which we acquired during fiscal 2009.*

 • Ancillary services segment. *Gross margins from our ancillary services segment declined by 21.1% to 40.0% in fiscal 2009 from 61.1% in 2008 due to an approximately 20.0% gross margin on LTI revenues and higher wage costs without corresponding increases in the ancillary services revenue.*

30.     On August 18, 2009, the Company held a conference call to discuss the financial results for the first quarter of fiscal year 2010.  Defendants Palaschuk and Lin participated on the call.  Defendant Palaschuk discussed Longtop's gross margin outlook with analyst Donald Liu from Goldman Sachs, which included the following comments:

**Donald Liu - Goldman Sachs**
That's the adjustment? Great. And the next question is on the standard products -- as I remember correctly, Longtop had some standardized products, new standard products in the pipeline and what is the outlook there? And also what is the growth margin outlook for the next year or two?

**Derek Myles Palaschuk**
Donald, let me just take the gross margin question first and then Lian will talk about his plans for --  [Technical Difficulties] -- *we're looking at 67%,* so let me have Lian answer your question about the standardized products and pipeline.

31.     On August 19, 2009, the Company issued a press release announcing financial results for the fiscal quarter ended June 30, 2009, which stated the following regarding gross margins:

### *Gross Margins*

|  | Three months ended | | |
|---|---|---|---|
|  | June 30, 2008 | June 30, 2009 | Change (Decrease) |
| Adjusted Software Development Gross Margin % | 66.4% | 69.1% | 2.7% |
| Adjusted Other Services Gross Margin % | 72.5% | 20.2% | (52.3%) |
| ***Adjusted Total Gross Margin %*** | ***67.4%*** | ***62.6%*** | ***(4.8%)*** |

*Adjusted Software Development Gross Margin was 69.1% in the first quarter ended June 30, 3009, as compared to 66.4% a year ago.* For the three months ended June 30, 2009, 63.5% of software development revenue was from customized solutions as compared to 62.7% in the previous year. *Adjusted Other Services Gross Margin declined to 20.2% from 72.5% a year ago due to a YoY decline in system integration revenues, which are recorded on a net basis, while system integration department costs, consisting primarily of headcount and allocated overhead, were stable; investment in additional headcount; and a higher mix of lower gross margin ATM revenues resulting from our acquisition during the 2009 fiscal year of Huayuchang, a provider of ATM maintenance services.  As a result of the decline in Adjusted Other Services Gross Margin, Adjusted Total Gross Margin declined to 62.6% in the first quarter from 67.4% a year ago.*

As the first quarter is expected to be the lowest revenue quarter in fiscal 2010, Adjusted Total Gross Margin is expected to increase in future quarters and full year Adjusted Total Gross Margin, including the impact of the Sysnet acquisition, which is dilutive to margins but accretive to earnings, *is expected to reach the Company's previous guidance of 67.0%.*

32.     In discussing these financial results, Defendant Lin stated the following:

We are off to a strong start with the results of our first fiscal quarter demonstrating healthy demand from Longtop's customers, which has allowed us to increase our full year guidance. We are seeing strong demand across all customer and product segments and we see this trend continuing. Longtop is especially pleased to be recently ranked as the #1 market share leader by IDC for banking solutions and # 2 in the insurance IT solution market in China for calendar year 2008. As we did in calendar 2008, we are working hard to continue to expand our market share and market leadership in China's rapidly growing financial IT solution market.

33.     On November 16, 2009, the Company filed a Form 6-K with the SEC, which included an update of certain business developments since the fiscal year ended March 31, 2009, and unaudited condensed consolidated financial information for the three and six months ended September 30, 2009. The Form 6-K was signed by Defendant Palaschuk, and discussed gross margin figures and human resources costs for the three and six months ended September 30, 2009, the Form 6-K stated as follows:

### *Gross Margin*

| | Three months ended | | | | | Six months ended | | | | |
| | September 30, 2008 | | September 30, 2009 | | Change (Decrease) | | September 30, 2008 | | September 30, 2009 | | Change (Decrease) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Software Development Gross Margin % | 74.7 | % | 70.7 | % | (4.0 | %) | 70.3 | % | 69.0 | % | (1.3 | %) |
| Other Services Gross Margin % | 44.8 | % | 35.5 | % | (9.3 | %) | 52.4 | % | 25.7 | % | (26.7 | %) |
| Total Gross Margin % | 69.8 | % | 65.9 | % | (3.9 | %) | 67.3 | % | 63.1 | % | (4.2 | %) |

*Software development gross margin for the three months ended September 30, 2009 was 70.7% compared to 74.7% in the same prior year period, due primarily to our Sysnet acquisition, which has lower gross margins. Software development gross margin for the six months ended September 30, 2009 of 69.0%, was largely unchanged from the year ago period of 70.3% with the slight decline due to the Sysnet acquisition. Other Services Gross Margin for three and six months ended September 30, 2009 declined to 35.5% and 25.7%, respectively, from 44.8% and 52.4% in corresponding year ago periods*, primarily due to investment in additional headcount and a higher mix of lower gross margin ATM revenues resulting from our acquisition during the 2009 fiscal year of Huayuchang, a provider of ATM maintenance services.

General and administrative expenses primarily include costs related to our finance, legal, human resources and executive office functions, gains or losses on fixed assets and provisions for other receivables less government subsidies directly related to our operating expenses. These departmental costs are primarily professional fees and expenses related to headcount. ***Headcount-related expenses include payroll, bonuses, employee benefits, share-based compensation, travel and entertainment and overhead costs that are allocated based on headcount.*** Allocated overhead to general & administrative primarily includes office rental, communication costs and depreciation. Our general and administrative expenses increased by 16.9% and 24.0%, respectively, for the three and six months ended September 30, 2009, to US$2.7 million and US$5.5 million, respectively, from US$2.3 million and US$4.4 million, respectively, for the corresponding year ago periods.

34.     On November 18, 2009, the Company issued a press release announcing that it had priced the SPO at $31.25 per ADS, and that it had granted underwriters a 30-day option to purchase up to an additional 555,000 ADS's.  In discussing the purpose of the SPO, the press release stated, in part:

> Longtop plans to use the net proceeds of the offering for potential acquisitions and for general corporate purposes. The Company's management will retain broad discretion over the use of proceeds, and the Company may ultimately use the net proceeds for different purposes.

35.     On November 23, 2009, the Company issued a press release announcing that the November 2009 Offering had closed, and had resulted in net proceeds of approximately $127,000,000, after deducting underwriting discounts and commissions, but before deducting expenses payable by the Company.

36.     On February 10, 2010, the Company issued a press release announcing financial results for the quarter ended December 31, 2009, which was the third quarter of the Company's fiscal year ending March 31, 2010.  In discussing gross margin figures, the press release stated, in part:

### ***Gross Margins***

| | Three months ended | | | Nine months ended | | |
|---|---|---|---|---|---|---|
| | December 31, 2008 | December 31, 2009 | Change (Decrease) | December 31, 2008 | December 31, 2009 | Change (Decrease) |
| Adj. Software Development Gross | 76.4% | 75.1% | (1.3%) | 74.2% | 73.1% | (1.1%) |

| | | | | | | |
|---|---|---|---|---|---|---|
| Margin % | | | | | | |
| Adj. Other Services Gross Margin % | 33.8% | 50.6% | 16.8% | 51.9% | 40.3% | (11.6%) |
| *Adj. Total Gross Margin %* | *71.2%* | *71.4%* | *0.2%* | *70.9%* | *68.4%* | *(2.5%)* |

*Adjusted Total Gross Margin was 71.4% and 68.4% for the three and nine months ended December 31, 2009, as compared to 71.2% and 70.9% in the corresponding year-ago periods.* Approximately one percentage point of the 2.5% YoY decline in Adjusted Total Gross Margin for the nine months ended December 31, 2009, was due to a decline in Adjusted Software Development Gross Margin associated with: (i) the inclusion of Sysnet, which has lower gross margins than Longtop, (ii) Longtop is investing in its software development consulting and professional services business which has lower incremental gross margins than Longtop's existing Adjusted Software Development Gross Margin, and (iii) in order to meet customer requirements a larger percentage of the workforce are being located in higher cost centers such as Beijing. The remaining 1.5 percentage point decline in Adjusted Total Gross Margin for the nine months ended December 31, 2009 was primarily attributable to a gross margin reduction of ATM maintenance and system integration business lines which are included as Other Services. Full year 2010 Adjusted Total Gross Margin is expected to be approximately 67%, equal to the Company's previous guidance.

37.   In discussing the results for the third quarter of fiscal year 2010, Defendant Lin

stated:

> I'm pleased to report that on the back of solid execution from our management and employees, once again our third quarter financial results exceeded our top and bottom line guidance. We see ongoing strong demand from our customers that execute on their long-term IT development plans irrespective of short-term changes in macroeconomic factors. Based on our sales pipeline and ongoing discussions with customers about their IT spending plans, Longtop's growth prospects remain strong for fiscal 2011. I believe Longtop's competitive position is strengthening and we are taking market share from our competitors. Furthermore, this quarter's results underscore the successful integration of Sysnet with insurance being our fastest growing customer segment. I believe the recent acquisition of Giantstone, a leading core banking solution provider in China will offer us new growth opportunities.

38.   Also commenting on the results for the quarter ended December 31, 2009,

Defendant Palaschuk stated:

> In the third quarter revenue and Adjusted Net Income once more substantially exceeded guidance. A robust third quarter cash flow from operations of US$39.2 million and US$50.1 million for the first nine months together with the proceeds from the November 2009 secondary offering will allow us to continue to invest intelligently in our existing operations and grasp further consolidation

opportunities through acquisitions that will help extend our leading position in China's financial technology industry.

39.     On May 24, 2010, the Company held a conference call with analysts to discuss financial results for the fourth quarter and full year of 2010.  Defendants Lin and Palaschuk participated on the call.  In discussing gross margin results for the 2010 fiscal year, Defendant Palaschuk stated:

> The 100 basis point year-on-year decline in adjusted operating margin is at the **gross margin level where we expect adjusted gross margins of 66% as compared to 67% in 2010**. The adjusted gross margin decline is due to the acquisition of Giantstone and other investments we're making, including annual salary increase of around 10%.
>
> **We expect software development adjusted gross margin in 2011 of slightly over 69% as compared to 71.4% in 2010. Our adjusted quarterly margin is expected to be 62%, 66%, 71% and 63%.**

40.     On May 25, 2010, the Company issued a press release announcing financial results for the quarter and full year ended March 31, 2010, the fourth quarter of fiscal year 2010. In discussing gross margins for the quarter, the press release stated:

### *Gross Margins*

|  | Three months ended | | | Twelve months ended | | |
|---|---|---|---|---|---|---|
|  | March 31, 2009 | March 31, 2010 | Change (Decrease) | March 31, 2009 | March 31, 2010 | Change (Decrease) |
| US GAAP Software Development Gross Margin % | 65.9% | 62.3% | (3.6%) | 70.6% | 68.4% | (2.2%) |
| US GAAP Other Services Gross Margin % | 32.9% | 0.7% | (32.2%) | 39.5% | 26.8% | (12.7%) |
| US GAAP Total Gross Margin % | 59.7% | 53.8% | (5.9%) | 65.7% | 62.5% | (3.2%) |
| Adjusted Software Development Gross Margin % | 68.6% | 66.4% | (2.2%) | 72.9% | 71.4% | (1.5%) |
| Adjusted Other Services Gross Margin % | 42.0% | 31.1% | (10.9%) | 49.0% | 38.0% | (11.0%) |
| *Adjusted Total Gross Margin %* | *63.6%* | *61.5%* | *(2.1%)* | *69.2%* | *66.7%* | *(2.5%)* |

> **Adjusted Software Development Gross Margin for fiscal 2010 declined 150 basis points from fiscal 2009 to 71.4%.**  This slight decline was primarily due to the following factors: (i) the inclusion of Sysnet, which has lower gross margins than Longtop, (ii) Longtop is investing in its software development consulting and professional services business which has lower incremental gross margins than Longtop's historical Adjusted Software Development Gross Margin, (iii) in order to meet customer requirements a larger percentage of the workforce are being located in higher cost centers such as Beijing and (iv) cost of revenue associated with the Giantstone acquisition which closed in January 2010 without any

corresponding revenue from Giantstone.  Customized software solutions as a percentage of Software Development revenue was 64.2% in fiscal 2010 and basically unchanged from 65.1% in fiscal 2009.   At March 31, 2010, Longtop had 2,492 software delivery staff including Giantstone, as compared to 1,310 at March 31, 2009.

***Adjusted Other Services Gross Margin for fiscal 2010 declined to 38.0% from 49.0% in 2009*** due primarily to a gross margin reduction from the ATM physical maintenance business.

41.     In discussing the financial results for the fourth quarter and fiscal year 2010, Defendant Lin stated:

> I am very pleased to report that we have concluded fiscal 2010 with another quarter of solid results. We look back at a year in which our business flourished due to significant organic business expansion in the financial IT industry, and the synergies of the Sysnet acquisition that further boost our presence in the insurance IT solution market. This quarter's results once more indicate that Longtop's business is based on the indispensable and recurring nature of our software and solutions.  ***Our outlook for 2011 is strong based on our sound business fundamentals*** and feedback from our customers. With the acquisition of Giantstone, we feel we are better positioned to capitalize on the long-term growth opportunity in China's financial technology market.

42.     On July 16, 2010, the Company filed a Form 20-F with the SEC, for the full year ending March 31, 2010.  The Form 20-F was signed and certified by Defendants Lin and Palaschuk.  In discussing Employees and staffing at the Company for the 2010 fiscal year in comparison to 2009 and 2008, the Form 20-F stated the following:

**Employees**
The following table sets forth the number of our employees and contractors categorized by function as of the dates indicated:

|  | March 31, 2008 | March 31, 2009 | March 31, 2010 |
| --- | --- | --- | --- |
| Software development | 913 | 1,310 | 2,492 |
| Revenue other services | 253 | 559 | 747 |
| Research and Development | 164 | 208 | 279 |
| Sales and Marketing | 129 | 287 | 437 |
| General and Administration | 200 | 238 | 303 |

| | Total | 1,659* | 2,602** | 4,258*** |

*\* This number includes 1,496 contracted employees provided by Xiamen Longtop Human Resource Services Co., Ltd, an unrelated party, pursuant to a human resource service agreement with us. Pursuant to this agreement we have agreed to pay a monthly service fee to Xiamen Longtop Human Resource Services Co., Ltd to cover the cost of those contracted employees as well as operational expenses. From a management point of view, we consider these 1,496 persons to be our employees.*

*\*\* This number includes 2,039, 35 and 57 contracted employees, respectively, provided by Xiamen Longtop Human Resource Services Co., Ltd,* Beijing Foreign Enterprise Human Resources Service Co., Ltd., or Beijing FESCO, and Randstad Shanghai Temporary Staffing, *each an unrelated party, pursuant to human resource service agreements with us. Pursuant to these agreements, we have agreed to pay a monthly service fee to Xiamen Longtop Human Resource Services Co., Ltd.,* Beijing FESCO, and Randstad Shanghai Temporary Staffing *to cover the cost of those contracted employees as well as operational expenses. From a management point of view, we consider these 2,131 persons to be our employees.*

*\*\*\* This number includes 3,235, 79, 62, 31 and 6 contracted employees, respectively, provided by Xiamen Longtop Human Resource Services Co., Ltd*, Beijing FESCO, Randstad Shanghai Temporary Staffing, China International Intellectech (Shanghai) Corporation, and China Star Corporation for International Economic and Technical Cooperation, *pursuant to human resource service agreements with us. Pursuant to these agreements, we have agreed to pay a monthly service fee to these companies to cover the cost of those contracted employees as well as operational expenses. From a management point of view, we consider these 3,413 persons to be our employees.*

43.    In discussing gross margins for the 2010 fiscal year, the 20-F stated the following:

*The portion of our overall revenues attributable to standardized software solutions which deliver substantially higher gross margins.* We introduced our first suite of standardized software solutions in 2003 and need to be constantly updating our standardized software solutions. *These standardized solutions contributed substantially to our revenue growth and operating margins.* In the near term, we expect our revenue growth to be driven by our customized software solutions in response to changes in client demands and to a lesser extent by growth in our standardized solutions.

Gross Margin; Cost of Revenues. *Our gross margins decreased by 320 basis points to 62.5% in fiscal 2010 from 65.7% in fiscal 2009.* The decrease in gross margin was primarily due to the factors explained below.

• Software development services costs and gross margin

• Software development costs…

• Software development gross margin. ***Our software development services gross margin decreased by 220 basis points to 68.4% in fiscal 2010 compared to 70.6% in fiscal 2009.*** The decrease in gross margin was primarily due to (i) our acquisition of Sysnet, which has lower gross margins than we do, (ii) our investment into our software development consulting and professional services business, which has lower incremental gross margins than our software development business, (iii) the location of an increased percentage of our work force in higher cost cities such as Beijing, in order to satisfy customer requirements, and (iv) our acquisition in January 2010 of Giantstone, which incurred expenses but did not contribute revenue in fiscal 2010.

As of March 31, 2010, we had 2,492 software development engineers, compared to 1,310 as of March 31, 2009.

• Other Services costs and gross margin.

• Other Services costs. Costs associated with ATM maintenance include headcount-related costs for our maintenance staff and spare parts inventory costs. Costs related to ancillary services include headcount-related expenses and amortization of backlog arising from acquisitions and an impairment charge of intangible assets.

• Other Services gross margin. Gross margins from our Other Services revenue declined by ***1270 basis points to 26.8% in fiscal 2010 compared to 39.5% in fiscal 2009***, primarily due to a decline in the gross margin of the ATM maintenance and ancillary services segments.

• ATM maintenance services segment. ***Gross margins from our ATM maintenance services segment declined by 1,660 basis points to 22.3% in fiscal 2010 from 38.9% in 2009*** due to lower gross margins on Huayuchang Tongchuang, which we acquired during fiscal 2009, lower revenue per ATM due to competition in the market and additional spare parts purchases associated with maintaining additional ATM brands.

• Ancillary services segment. ***Gross margins from our ancillary services segment declined by 1,060 basis points to 29.4% in fiscal 2010 from 40.0% in 2009 due primarily to a $1.6 million impairment of intangible assets recorded in cost of revenues for fiscal 2010*** and, to a lesser extent, higher wage costs without corresponding increases in the ancillary services revenue.

44.     On August 17, 2010, the Company issued a press release announcing financial

results for the quarter ended June 30, 2010, for the first quarter of fiscal year 2011 ending March

31, 2011.  The press release stated the following regarding gross margins for the first quarter of

fiscal year 2011:

***<u>Gross Margins</u>***

| | Three months ended | | |
| --- | --- | --- | --- |
| | June 30, 2009 | June 30, 2010 | Change (Decrease) |
| Adjusted Software Development Gross Margin % | 69.1% | 63.7% | (5.4%) |
| Adjusted Other Services Gross Margin % | 20.2% | 38.0% | 17.8% |
| Adjusted Total Gross Margin % | 62.6% | 58.4% | (4.2%) |
| US GAAP Software Development Gross Margin % | 66.3% | 59.8% | (6.5%) |
| US GAAP Other Services Gross Margin % | 10.6% | 36.1% | 25.5% |
| US GAAP Total Gross Margin % | 59.0% | 54.9% | (4.1%) |

Adjusted Total Gross Margin in the first quarter was 58.4%, which was less than guidance of 62.0% primarily due to the inclusion of Zhongbo, which was acquired in Q1 2011 and had not been included in the guidance. ***Excluding the impact of the Zhongbo acquisition, the Adjusted Total Gross Margin would have been 60.7% and in line with guidance.***

The YoY decline in Adjusted Software Development Gross Margin was primarily due to the (i) the inclusion of Giantstone, which has a lower gross margin than Longtop and (ii) in order to meet customer requirements, a larger percentage of the workforce are being located in Beijing where costs per employee are higher.  ***As the first quarter is expected to be the lowest revenue quarter in fiscal 2011, Adjusted Total Gross Margin is expected to increase in future quarters, and full year Adjusted Total Gross Margin, excluding the impact of the Zhongbo acquisition, is expected to reach the Company's previous guidance of 66.0%.***

45.     In discussing the financial results for the first quarter of fiscal year 2011,

Defendant Palaschuk stated:

We have delivered sound top and bottom line financial results during the first fiscal quarter, which is traditionally our lowest revenue and net income quarter in the fiscal year. The strong outlook, evidenced by a healthy backlog and pipeline in our core software development business, has allowed us to increase guidance, and for the first time in our history we expect to achieve US$100 million in Adjusted Net Income.  ***As in previous years, in Q2 and Q3 2011 we expect significant improvements from this quarter in our margins as well as from cash flow from operations.***

46.     Defendant Lin also commented on the results for the quarter, stating:

We have commenced our 2011 fiscal year with solid first quarter results. I am pleased to see the continuing strong demand for Longtop's solutions due to long-term and structural technology growth trends in the financial services industry, which tend to be independent of the macroeconomic environment. Once again, our company-wide effort to extend Longtop's market leadership was rewarded with strong independent endorsement by IDC, ranking us #1 for banking solutions

18

and #2 in the insurance IT solution market in China during calendar year 2009.  In consideration of our growth momentum, we increase revenue and net income guidance for fiscal 2011.

47.    On November 15, 2010, the Company issued a press release announcing financial results for the quarter ended September 30, 2010, which was also the second quarter of its fiscal year ending March 31, 2011.  In regards to gross margins, the press release stated the following:

### ***Gross Margins***

| | Three months ended | | | Six months ended | | |
|---|---|---|---|---|---|---|
| | September 30, 2009 | September 30, 2010 | Change (Decrease) | September 30, 2009 | September 30, 2010 | Change (Decrease) |
| Adjusted Software Development Gross Margin % | 73.3% | 68.4% | (4.9%) | 71.6% | 66.5% | (5.1%) |
| Adjusted Other Services Gross Margin % | 38.7% | 17.9% | (20.8%) | 31.4% | 31.4% | - |
| Adjusted Total Gross Margin % | 68.5% | 64.3% | (4.2%) | 66.2% | 61.6% | (4.6%) |
| US GAAP Software Development Gross Margin % | 70.7% | 45.4% | (25.3%) | 69.0% | 51.3% | (17.7%) |
| US GAAP Other Services Gross Margin % | 35.5% | (171.0%) | (206.5%) | 25.7% | (32.2%) | (57.9%) |
| US GAAP Total Gross Margin % | 65.9% | 27.6% | (38.3%) | 63.1% | 39.8% | (23.3%) |

Adjusted Software Gross Margin was 68.4% and 66.5% for the three and six months ended September 30, 2010, as compared to 73.3% and 71.6% in the corresponding year ago period. The YoY decline in Adjusted Software Gross Margin was primarily due to: i) the inclusion of newly acquired companies including Giantstone, which have  lower gross margins than Longtop; (ii) in order to meet customer requirements, a larger percentage of the workforce are being located in Beijing where costs per employee are higher; and (iii) additional investments in delivery capabilities for Longtop's expanded solution offerings.

48.    In discussing the Company's financial results for the second quarter of fiscal year 2011, Defendant Palaschuk stated:

Our Company performance has once more exceeded guidance for both top and bottom line results. Our order intake, margins and cash flow from operations which was US$31.6 million significantly improved in the second quarter as we had anticipated. On the back of strong demand and execution, we are now raising

our fiscal 2011 revenue guidance to US$242.5 million up from 225.0 million at the beginning of our fiscal year and Adjusted Earnings Per Share of US$1.76 up from US$1.64.

49.     Defendant Lin also commented on the financial results for the second quarter of

fiscal year 2011, stating:

> The financial results of the second fiscal quarter have exceeded our Company guidance. I am pleased to see the ongoing strength in demand from across the full spectrum of our customer base. The outstanding revenue contribution from Other Banks reaffirms the success over the past four years in diversifying and expanding our customer base as well as last year's acquisition of Giantstone and its core banking capabilities. We continue to be highly positive on our outlook for the second half of the 2011 fiscal year. Longtop's growth momentum and expanding market leadership are based on customers' trust in our quality solutions and service, and we will work hard to continue to deserve their loyalty.

50.     On January 31, 2011, the Company issued a press release announcing financial

results for the quarter ended December 31, 2010, which was the third quarter of fiscal year 2011

ending March 31, 2011.  In discussing gross margin figures, the press release stated:

### *Gross Margins*

|  | Three months ended | | | Nine months ended | | |
|---|---|---|---|---|---|---|
|  | December 31, 2009 | December 31, 2010 | Change (Decrease) | December 31, 2009 | December 31, 2010 | Change (Decrease) |
| Adjusted Software Development Gross Margin % | 75.1% | 71.3% | (3.8%) | 73.1% | 68.6% | (4.5%) |
| Adjusted Other Services Gross Margin % | 50.6% | 28.0% | (22.6%) | 40.3% | 30.6% | (9.7%) |
| Adjusted Total Gross Margin % | 71.4% | 68.8% | (2.6%) | 68.4% | 64.6% | (3.8%) |
| US GAAP Software Development Gross Margin % | 72.5% | 68.4% | (4.1%) | 70.5% | 58.8% | (11.7%) |
| US GAAP Other Services Gross Margin % | 46.9% | 25.2% | (21.7%) | 35.5% | (19.2%) | (54.7%) |
| US GAAP Total Gross Margin % | 68.6% | 66.0% | (2.6%) | 65.5% | 50.6% | (14.9%) |

Adjusted Total Gross Margin of 68.8% for the three months ended December 31, 2010, was in line with guidance.   Adjusted Software Gross Margin was 71.3% and 68.6% for the three and nine months ended December 31, 2010, as compared to 75.1% and 73.1% in the corresponding year ago period. The YoY decline in Adjusted Software Gross Margin was primarily due to: i) the inclusion of newly acquired companies including Giantstone, which have lower gross margins than Longtop; (ii) in order to meet customer requirements, a larger percentage of the workforce are being located in Beijing where costs per employee are higher; and

(iii) additional headcount investments in delivery capabilities for Longtop's expanded solution offerings.

51.    Defendant Palaschuk commented on these financial results, stating:

Improving our accounts receivable management was an important objective for us this year.   I am particularly pleased to see record high operating cash flow of US$43.9 million in the third quarter and US$75.0 million for the first nine months which further underscores the solidity of business demand and overall management execution at Longtop.  During the fiscal third quarter order intake continued to be very strong, the Company was once again able to report  higher-than-guided top and bottom line results and *our industry leading margins give us significant room for additional investments in our business.*

52.    Defendant Lin also commented on the financial results for the third quarter of

fiscal year 2011, stating:

I am very pleased to report that we have delivered the strongest cash flow from operations to date since our IPO in 2007 on the back of outstanding execution from our management and employees. The momentum has accelerated during fiscal 2011 with our organic growth rate for software development revenue of approximately 40% in the first nine months significantly higher than the 30% guidance we gave at the outset of the year while maintaining a relatively stable organic operating margin.  With this momentum, we are once again raising guidance for the fiscal fourth quarter of 2011.  For fiscal 2012 we continue to see strong demand from our customers that execute on their long-term IT development plans irrespective of short-term changes in macroeconomic factors. Based on our sales pipeline and ongoing discussions with customers about their IT spending plans, Longtop's growth prospects remain bright for fiscal 2012. I believe Longtop's competitive position is stronger than ever and we continue to take market share from our competitors.

## C.    The Truth Comes to Light

53.    On April 26, 2011, analysts from Citron Research published a report exposing

multiple indicia of fraud and questionable accounting practices at the Company.  The report

stated the following, in part:

**Margins Far in Excess of Competitors**
LFT reports spectacularly high margins — much greater than any peer company. In the fiscal year March 2010 LFT reported gross margins of 69% and non-GAAP operating margins of 49%. Peers report gross margins between 15-50% and operating margins of 10-25% or even lower.

Management's explanation for the high margins is that they have more standardized software sales then peers and standardized software has very high

gross margins of around 90%. The company claims that these solutions and modules can be deployed to new customers with fewer man-hours and expenses.

Furthermore, even if you believe the standardized software gross margin is 90%, then this implies that LFT is generating 60-65% gross margins on customized software development which is still much higher than peers.  If the China space has taught us anything, it is that when something seems too good to be true, it probably is.  So what is the real reason for these supersized margins?

**Unconventional Staffing Model**
Until recently, the vast majority of LFT's employees were not directly employed by the company. As of March 31, 2010 LFT had 4,258 employees of which 3,413 (80%) were employed by third-party HR staffing companies.

Of the employees at staffing companies, 95% (3,235) were from a single firm called Xiamen Longtop Human Resources Services Co (XLHRS), but this entity has no verifiable business presence except for LFT.  (The remaining 5% were being serviced by Beijing FESCO and Randstad Shanghai Temp Staffing, both of which do have a verifiable business presence beyond LFT).

LFT has consistently claimed that (XLHRS) is an unrelated party.  ***The existence of Longtop Staffing has allowed LFT to transfer the majority of its cost structure off-balance sheet which creates opportunities for massive accounting fraud.***  Does any of this sound unrelated to you?

- Xiamen Longtop Human Resources (XLHRS) shares a name with its only customer:  Longtop Financial.
- XLHRS was formed in May of 2007, just months before LFT's IPO
- Even though it is its largest line item expenditure by far, XLHRS is never mentioned in filings until the annual report filed July 2008.
- XLHRS has no website and does not seem to be soliciting any customers, even though they just lost their only customer
- LFT did not have any long term contract and did not have to pay any penalties or minimums in their relationship with XLHRS
- XLHRS used the same email server as their only client — as evidenced by these help wanted ads placed by them that ask perspective employees to contact them at "longtop.com.  For example, this is a 2009 job listing listing for XLHRS using a Longtop.com email address:
  **http://www.xmjob.com.cn/web/temp/sh.aspx?ID=101114**
- As of writing of this report, Citron has reason to believe that XLHRS has for months been located in the same building as Longtop Financial.
- When the outsourcing agency relationship was challenged, the company's response was to terminate it, and take all the employees in-house.

54.     Other analysts also began to question the Company's financial results and

accounting.  For example, the same day that the Citron report came out, analyst John Hempton of

Bronte Capital published an article questioning why the Company had made over $120,000,000 in the SPO, when Longtop already had over $200,000,000 on hand.

55.     As a result of these disclosures, Longtop's stock price decreased drastically from $25.54 per share at closing on April 25, 2011, to $17.13 per share on April 27, 2011, an approximate 33% loss on heavy volume.

56.     On April 28, 2011, the Company held a conference call with investors and analysts to discuss Citron's report.  Defendant Palaschuk was on the call, and responded to analyst concerns stating, in relevant part:

> Thank you, everyone. Thanks for joining us today. Although it is LongTop's practice not to respond to market rumors, especially when the company is in our quiet period ahead of earnings, **management believes that in this case it is appropriate to have this call to rebut the absolutely false allegations of fraud and other alleged wrongdoings in an April 26th report posted in Citron reports.**

> The report starts with the allegations that every financial statement from IPO to date is fraudulent. **There is absolutely no basis to support this allegation, and we are deeply outraged that anyone purporting to conduct reputable market research would make such a statement without basis**.

> LongTop is a well managed company that has completed Sarbanes-Oxley 404 with no material weaknesses every year after becoming a public company, never has had a financial restatement, and has consistently had normal earnings reportings and 20-F filing schedules. These earnings are supported by the strongest cash flows in the industry. We are on schedule to report our Q4 2011 financial results on May 23, 2011 and plan to file our 20-F in July 2011 as normal.

> You can see from this report, it's also attacked, Deloitte, our auditors, who audit a number of public companies around the world. **We have a very close dialogue with our auditors and we have been communicating with them regularly on market rumors of fraud since these attacks on LongTop first surfaced well over a year ago.** These rumors and allegations, which are repeated almost verbatim in the Citron reports, have become predictable in their timing. They always fall in our quiet period leading up to our earnings announcement.

> People have asked whether our auditors can attend a public conference call with yourselves. However, that is not a practice for any public company. **The best evidence of our auditors' support is when they sign the 20-F, which will be filed in July 2011**. Also before we announce our May 23rd results, we will have had our audit committee's clearance as well as verbal clearance from the auditors. **We want to emphasize that we will not have to restate our financial results**.

(Emphasis added).

57.     In discussing Citron's allegations regarding fraudulent and outrageously high

reported gross margins in comparison to industry peers, Palaschuk went on to state how

Longtop's business model was different, which permitted it to achieve the gross margin figures:

> Citron compares our margins to number of Chinese IT outsourcing companies
> with lower margins. **We believe none of the company's names are direct**
> **competitors of LongTop because we focus only on the FinTech vertical and**
> **have a significantly different business model, as the named companies are**
> **predominantly IT outsourcing companies.** As we have explained since the IPO
> and even on our most recent conference call, there are several reasons for our high
> margin structure, which we believe are sustainable.
>
> Let me briefly repeat the points we made in the past. One, LongTop was a very
> early adaptor of the IT services and software model in China, so we made the
> transition in the year 2001, which gave us a very big head start. Our core
> competency is to focus on one industry vertical, FinTech, and do IT services and
> software. **Our business model is different** from outsourcing companies, who bill
> the customers based on a time and material basis.

(Emphasis added).

58.     Turning his attention to the allegations made in the Citron report regarding the

Company's staffing model, Defendant Palaschuk also stated:

> Turning now to the next point raised in the Citron report, the staffing model.
> **Flatly contrary to what Citron alleges**, we have explained this a great deal on
> public conference calls and consistently disclosed it in our 20-F filings. Even the
> contractual agreements are on public record with the SEC.
>
> We have recently begun to move away from it to be in line with industry practice.
> I can inform you that as of today, over 80% of LongTop staff are already directly
> employed with LongTop. **Let me emphasize once here, that none of the**
> **allegations in the Citron report suggesting improper practices hold any**
> **ground. Specifically, I want to reiterate that all costs were recorded in**
> **LongTop, there has no – been no off balance sheet accounting.** And lastly,
> transferring the employees to be direct employees of LongTop will be margin
> neutral.

(Emphasis added).

59.     Analysts on the conference call also questioned Palashuk regarding the staffing

model and Citron's allegations, stating the following:

**<Q - Karl Keirstead>**: Yes. Hi, thanks. If we could return to this Citron report for a second, Derek, one of the allegations with respect to the staffing model is that the external staffing company shares the same email server, they hear the same building and therefore there is concerns that it's in fact an affiliated or related party. Could you specifically address that concern?

**<A - Derek Myles Palaschuk>**: Certainly, Karl. So we would – we prefer, for security reasons, **for the staffing company to use our email server for security purposes.** That's one point. But the second point is – and that's again related to information they're sending for LongTop. **The second thing is actually our HR department did check on the specific link that they mentioned and that person has never been employed or involved in recruiting for LongTop**.

With respect to the building, they have their own office premises. They certainly do have people coming into LongTop because that's where our HR department is and **this is definitely an unrelated party**. We disclosed the shareholders publicly in the past and these are also sorts public documents in China with the industrial and commercial bureau.

(Emphasis added).

60.     Further, Palaschuk discussed his close relationship with the Company's auditors, and the auditors' likelihood on signing off on the Company's financial statements:

**<Q - Glenn Greene CFA, MBA>**: Okay. Then finally, I'm sure you've had pretty extensive conversations with Deloitte in the last 12, 48, 72 hours. I don't know what you can say, but what's their reaction to this and obviously they signed off on last year's statements. How do you – you sort of have conviction – just want to get to, sort of, conviction level on sort of them signing off on this year's statements?

**<A - Derek Myles Palaschuk>**: So you mentioned that we've had close discussions with Deloitte, our auditors, in the last 48 hours. **I've been having very close discussions with our auditors since the day I joined the company. For me, I'm a professionally trained accountant; the most important relations I have other than with my family, my CEO, and then the next on the list is Deloitte as our auditor, because their trust and their support is extremely important.** And it's not just because this has happened, it's been important for the last five years.

Deloitte is a great firm, and the same thing for this report to be criticizing the integrity of one of the top accounting firms in the world that audits so many Fortune 500 companies, it's baseless. So the communication with our audit – and if you ask me three months from now, **we have a very close communication**. From our side, it's the fact that we announced that May 23rd is when we're going to release our results. That was discussed with our auditors and we believe that we'll finish our field work before then and **there will be no problems**. **There will be absolutely no problems in filing our 20-F, no matter kind of additional reports come out.**

**So I'm very, very comfortable and very confident that there will be none of these accounting irregularities that are being alleged and that we will file our 20-F on time**. And I just ask for investors' understanding is that our auditors cannot get on a conference call and talk to the public. **And at the end of the day the most important thing that we get from our auditor is when they sign the report**.

When we announce on the 23rd of May, **we will have their verbal clearance but we will not have had signed reports and when we get – when we file the 20-F, which will be in July, we will have received their signed reports.** And the other thing I would say is that if there was any – if the company thought there was any real issues, if we couldn't issue our financial statements, we would have a legal obligation to immediately notify our investors.

(Emphasis added).

61.     On May 3, 2011, analyst John Hempton filed another report on the Company, discussing even more concerns over Longtop's public disclosures.  For example, Hempton stated that while Longtop had previously claimed to provide a petabyte's worth of cloud-based storage services, the Company actually did not provide a cloud based storage service.  Longtop did not build a cloud-based infrastructure, and did not build a petabyte data storage solution for anyone. Similarly, Hempton argued that while cloud computing is hugely capital intensive, Longtop somehow managed to launch its purported cloud services, with almost no capital expenditures whatsoever.  As a result, Hempton concluded that the Company had lied in its press releases.

62.     Moreover, another research firm, OLP Global, also published a report on Longtop, setting forth additional allegations regarding the Company's true financial condition and accounting figures.

63.     On May 9, 2011, Citron filed a second report on the Company's financial irregularities, this time with more evidence of a related-party relationship between Longtop and XLHRS.  In its second report, Citron provided links to XLHRS's Chinese SAIC filings from 2007, 2008, and 2009, which were actually signed by employees of Longtop's legal department, who were handling and signing off on filings for XLHRS during that time.

64. Furthermore, Citron's second report also pointed out that in Longtop's 20-F filing with the SEC, XLHRS was supposed to receive a service fee for all 3,200 purported employees that it "handled" for Longtop, amounting to approximately 400 million to 500 million RMB. Yet, on XLHRS's SAIC documents filed with Chinese authorities, the total revenue/service fee was merely 5.1 million RMB – a drastically different number.

65. The analyst reports regarding the financial condition of the Company caused Longtop's stock to drop again on May 9, 2011, to $18.54 per share.

66. On May 10, 2011, the Company issued a statement in response to the Citron and OLP reports stating, in part:

> HONG KONG, May 10, 2011 /PRNewswire-Asia/ -- Longtop Financial Technologies Limited ("Longtop") (NYSE: LFT), today issued a statement in response to a purported research report published by OLP Global. The report claimed, among other things, that Longtop and a Xiamen-based HR company, Xiamen Longtop Human Resource Service Co. Ltd. (XLHRS), are related parties, that Longtop under-contributed employee benefits, and that it conducted questionable acquisitions. As discussed in detail below, Longtop management refutes these allegations, and, in view of similarly specious allegations published by Citron Research on May 9, 2011, wishes to express concern that Longtop appears to be a target of efforts to attack the integrity of its business and its financial statements as the time for the announcement of its fiscal 2011 earnings approaches.

67. The Company went on to refute each of Citron's and OLP Global's claims, stating that Longtop "requested the authorization to sign and submit certain filings on behalf of XLHRS as a protective measure," and that "Longtop's Human Resource Service Contract with XLHRS…was amended … to give Longtop the contractual right to approve certain matters…".

68. In response to the Company's press release, Longtop's stock price decreased from its pre-disclosure high of $25.54 to about $20 per share.

69. On May 16, 2011, the Company's stock price closed even lower, at $18.93 per share.

70. On May 17, 2011, NYSE Regulation Inc. announced that it was halting trading in the Company's ADS's on the NYSE, pending release of material news. In response, an article

posted by *Dow Jones Newswires* discussed the halt in trading, and the recent barrage against Chinese companies trading in the U.S., but specifically quoted analysts stating that "Longtop's case was especially disconcerting…".

71.     On May 23, 2011, the Company issued a press release announcing that: (i) the Company's auditor, Deloitte Touche Tohmatsu had resigned, and (ii) SEC was conducting an inquiry into the company, and (iii) Defendant Palaschuk was resigning as well.  The press release stated, in relevant part:

> **Longtop Financial Technologies Limited Announces Resignation of Independent Auditor and Chief Financial Officer, Initiation of Independent Investigation, SEC Inquiry and COO Appointment**
>
> HONG KONG, May 23, 2011 /PRNewswire-Asia/ -- Longtop Financial Technologies Limited ("Longtop" or the "Company") (NYSE: LFT) announced today that the Company's registered independent accounting firm, Deloitte Touche Tohmatsu CPA Ltd. ("DTT"), has resigned as auditor of the Company by letter dated May 22, 2011.  The Company also announced that Derek Palaschuk, the Company's Chief Financial Officer, tendered his resignation by letter, dated May 19, 2011, and the Board has taken his resignation under advisement.
>
> **In its letter, DTT stated that it was resigning as the result of, among other things (1) the recently identified falsity of the Company's financial records in relation to cash at bank and loan balances (and possibly in sales revenue); (2) the deliberate interference by certain members of Longtop management in DTT's audit process; and (3) the unlawful detention of DTT's audit files.  DTT further stated that DTT was no longer able to rely on management's representations in relation to prior period financial reports, that continued reliance should no longer be placed on DTT's audit reports on the previous financial statements, and DTT declined to be associated with any of the Company's financial communications in 2010 and 2011**.
>
> Longtop's Audit Committee has retained US legal counsel and authorized the retention of forensic accountants to conduct an independent investigation into the matters raised by DTT's resignation letter.  The Audit Committee has also initiated a search for a new auditor.  **Further, Longtop was advised by the United States Securities and Exchange Commission ("SEC") that the SEC was conducting an inquiry regarding related matters.**  Longtop intends to cooperate fully with the SEC's inquiry.
>
> Longtop is unable to determine the full effect of these matters, including whether any restatement of its historical financial statements will be required, until the Audit Committee completes its review.  **Longtop cannot predict when it will announce its financial results for Q4 2011, or when it will file its Form 20F for the fiscal year ended March 31, 2011.**

Further, the Company announced that Wei Dong, Senior Vice President since April 1, 2009, assumed the responsibility of Chief Operating Officer of the Company.

(Emphasis added).

## V.  THE INDIVIDUAL DEFENDANTS' LIES AND OMISSIONS

72.    Longtop's statements and filings during the Class Period were materially false and misleading because they failed to disclose and misrepresented: (1)  that Xiamen Longtop Human Resources Services Co ("XLHRS"), was a company that was actually owned and legally controlled by Longtop and was not an independent entity; (2) that the Company was using XLHRS to transfer its cost structure and write its liabilities off of its balance sheet; (3) that XLHRS was an entity created to hide Longtop's expenses, and/or underpay employee social welfare benefits; (4) that the Company's high gross margins, as compared to industry peers, were not justified by its unconventional staffing model and were fictitious; (5) that as a result of the Company's gross margins being inaccurate, there were multiple instances of accounting fraud and irregularities present in the Company's financial statements and SEC filings; (6) that the Company's service fees purportedly paid to XLHRS as reported in XLHR's SAIC filings were completely different from what was reported to the SEC in Longtop's Form 20-F filings; (7) that the Company's financial statements were not prepared in accordance with Generally Accepted Accounting Principles ("GAAP"); (8) that the Company lacked adequate internal and financial controls; and, (9) as a result of the foregoing, the Company's financial statements were false and misleading at all relevant times.

73.    In addition to the false and misleading statements described in detail herein, Defendants also failed to disclose the truth regarding Longtop's financial condition. Specifically, and in addition to the other omissions described herein, Defendants failed to tell the public the true risks the Company was faced with, and failed to disclose that the Company was

engaged in fraudulent and deceptive accounting practices.  As a result, Longtop's reported

financial results were materially false and misleading at all relevant times.

## VI.    UNDISCLOSED ADVERSE INFORMATION

74.    The market for Longtop's securities was an open, well-developed and efficient

market at all relevant times.  As a result of the materially false and misleading statements and

failures to disclose described herein, Longtop's securities traded at artificially inflated prices

during the Class Period.  Plaintiff and the other members of the Class purchased or otherwise

acquired Longtop's securities relying upon the integrity of the market price of Longtop's

securities and market information related to Longtop, and have been damaged thereby.

75.    During the Class Period, Defendants materially misled the investing public,

thereby inflating the price of Longtop's securities, by publicly issuing false and misleading

statements and omitting to disclose material facts necessary to make Defendants' statements, as

set forth herein, not false and misleading.  Such statements and omissions were materially false

and misleading in that they failed to disclose material adverse non-public information and

misrepresented the truth about the Company, as well as its business, accounting, and financial

operations, as alleged herein.

76.    At all relevant times, the material misrepresentations and omissions particularized

herein directly or proximately caused or were a substantial contributing cause of the damages

sustained by Plaintiff and the other members of the Class.  As described herein, during the Class

Period, Defendants made or caused to be made a series of materially false and misleading

statements about Longtop's financial condition and accounting.

77.    These material misstatements and omissions had the cause and effect of creating

in the market an unrealistically positive assessment of Longtop and its financial condition, thus

causing the Company's ADS's to be overvalued and artificially inflated at all relevant times.

Defendants' false and misleading statements during the Class Period resulted in Plaintiff and

other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

## VII.   GAAP AND SEC RULE VIOLATIONS

78.     Longtop's financial statements and reports during the Class Period were materially false and misleading.  Defendants stated that such statements were prepared in conformity with GAAP and SEC accounting rules.  However, the statements identified above were not prepared in conformity with GAAP and the financial information included in such statements did not provide a fair presentation of the Company's financial conditions and operations due to Longtop's improper and inadequate accounting and disclosures, all in violation of GAAP.

79.     GAAP consists of those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time. Regulation S-X (17 C.F.R. § 210.4 01(a) (1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate.  Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure which would be duplicative of disclosures accompanying annual financial statements. 17 C.F.R. § 210.10-01(a).

80.     SEC Rule 12b-20 requires that financial reports contain such further information as is necessary to make the required statements, in light of the circumstances under which they are made, not misleading.

81.     Item 303 of Regulation S-K requires that, for interim periods, the Management Division and Analysis Section must include, among other things, a discussion of any material changes in the registrant's results of operations with respect to the most recent fiscal year-to-date period for which an income statement is provided.  Instructions to Item 303 require that this

discussion identify any significant elements of a registrant's income or loss from continuing operations that are not necessarily representative of the registrant's ongoing business.

82.    The GAAP requirement for recognition of an adequate provision for foreseeable costs and an associated allowance applies to interim financial statements as required by APB Opinion No. 28.

83.    Longtop's financial statements contained in its reports filed with the SEC throughout the Class Period were presented in a manner that violated GAAP, including the following principles:

a.    The principle that "interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements" was violated (APB No. 28, ¶10);

b.    The principle that "financial reporting should provide information that is useful to present to potential investors and creditors and other users in making rational investment, credit, and similar decisions" was violated (FASB Statement of Concepts No. 1, ¶34);

c.    The principle that "financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events, and circumstances that change resources and claims to those resources" was violated (FASB Statement of Concepts No. 1, ¶40);

d.    The principle that "financial reporting should provide information about an enterprise's financial performance during a period" was violated (FASB Statement of Concepts No. 1, ¶42);

e.    The principle that "financial reporting should provide information about how management of an enterprise has discharged its stewardship

responsibility to owners (stockholders) for the use of enterprise resources entrusted to it" was violated (FASB Statement of Concepts No. 1, ¶50);

    f.    The principle that "financial reporting should be reliable in that it represents what it purports to represent" was violated (FASB Statement of Concepts No. 2, ¶¶ 58-59);

    g.    The principle that "completeness, meaning that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions" was violated (FASB Statement of Concepts No. 2, ¶79); and

    h.    The principle that "conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered" was violated (FASB Statement of Concepts No. 2, ¶95).

84.    In addition, Longtop's filings during the Class Period violated SEC disclosure rules in that:

    a.    Defendants failed to disclose the existence of known trends, events or uncertainties that they reasonably expected would have a material, unfavorable impact on net revenues or income or that were reasonably likely to result in the Company's liquidity decreasing in a material way, in violation of Item 303 of Regulation S-K under the federal securities laws, and that failure to disclose material information rendered the statements that were made during the Class Period materially false and misleading; and

    b.    Defendants failed to file with the SEC financial statements that conformed to the requirements of GAAP, and by doing so such financial statements

were presumptively misleading and inaccurate pursuant to Regulation S-X, 17 C.F.R. 210.4-01(a)(1).

85.     Accordingly, the adverse information concealed by Defendants during the Class Period was in violation of Item 303 of Regulation S-K under the federal securities laws (17 C.F.R. § 229.303).  Defendants were required to disclose, and failed to disclose, in the Company's financial statements the existence of material facts described herein.  Defendants failed to appropriately recognize and report assets, revenues and expenses in conformity with GAAP.  Defendants failed to make such disclosures and to account for and to report its financial statements in conformity with GAAP.

## VIII.  SCIENTER ALLEGATIONS

86.     As alleged herein, the Individual Defendants acted with scienter in that Individual Defendants knew that the public documents and statements issued or disseminated in the name of the Company during the Class Period were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

87.     As set forth herein, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Longtop, their control over, receipt and/or modification of Longtop's allegedly materially misleading statements and omissions, and/or their positions with the Company which made them privy to confidential information concerning Longtop, participated in the fraudulent scheme alleged herein.

88.     The ongoing fraudulent scheme described herein could not have been perpetrated over a substantial period of time, as has occurred, without the knowledge and complicity of the personnel at the highest level of the Company, including the Individual Defendants.

IX.    **STATUTORY SAFE HARBOR**

89.    The federal statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded herein. Furthermore, many of the statements pleaded herein were not identified as "forward-looking statements" when made, or indicated that actual results "could differ materially from those projected." Nor were there any meaningful cautionary statements identifying important factors that could cause actual results to differ materially from the statements made therein.

90.    Defendants are liable for the statements pleaded because, at the time each of those statements was made, Defendants knew the statement was false and the statement was authorized and/or approved by an executive officer of Longtop who knew that such statement was false when made.

X.    **LOSS CAUSATION**

91.    During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of Longtop's securities and operated as a fraud or deceit on Class Period purchasers of Longtop's securities by failing to disclose to investors that the Company's financial results were materially misleading and misrepresented material information. When Defendants' misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the prices of Longtop's securities fell precipitously as the prior inflation came out of the Company's stock price. As a result of their purchases of Longtop's securities during the Class Period, Plaintiff and the other Class members suffered economic loss.

92.    By failing to disclose the true state of the Company's financial statements, investors were not aware of the true state of the Company's financial status. Therefore, Defendants presented a misleading picture of Longtop's business practices and procedures.

Thus, instead of truthfully disclosing during the Class Period the true state of the Company's business, Defendants caused Longtop to conceal the truth.

93.     Defendants' false and misleading statements had the intended effect and caused Longtop's common stock to trade at artificially inflated levels throughout the Class Period. The stock price drops discussed herein caused real economic loss to investors who purchased the Company's securities during the Class Period.

94.     The decline in the price of Longtop's common stock after the truth came to light was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market. The timing and magnitude of Longtop's common stock price decline negates any inference that the loss suffered by Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the Defendants' fraudulent conduct. The economic loss suffered by Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the prices of Longtop's securities and the subsequent decline in the value of Longtop's securities when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## XI.   APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE

95.     At all relevant times, the market for Longtop stock was an efficient market for the following reasons, among others:

   a.     Longtop  securities met the requirements for listing, and were listed and actively traded on the NYSE, a highly efficient market;

   b.     As a regulated issuer, Longtop filed periodic public reports with the SEC and the NYSE;

   c.     Longtop securities were followed by securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain

customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace; and

    d.  Longtop regularly issued press releases which were carried by national newswires.  Each of these releases was publicly available and entered the public marketplace.

96.  As a result, the market for Longtop securities promptly digested current information with respect to the Company from all publicly-available sources and reflected such information in Longtop's stock price.  Under these circumstances, all purchasers of Longtop ADS's during the Class Period suffered similar injury through their purchase of stock at artificially inflated prices and a presumption of reliance applies.

## XII. CLASS ACTION ALLEGATIONS

97.  Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of all persons who purchased or otherwise acquired Longtop securities during the Class Period and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, members of the immediate family of each of the Individual Defendants, any subsidiary or affiliate of Longtop and the directors, officers and employees of the Company or its subsidiaries or affiliates, or any entity in which any excluded person has a controlling interest, and the legal representatives, heirs, successors and assigns of any excluded person.

98.  The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are thousands of members of the Class located throughout the United States.  Throughout the Class Period, Longtop securities were actively traded on the NYSE (an open and efficient market) under the symbol "LFT".  As of July 16, 2010, the Company had approximately 53.2 million shares outstanding.   Record owners and other members of the Class may be identified from

records maintained by Longtop and/or its transfer agents and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

99.     Plaintiff's claims are typical of the claims of the other members of the Class as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

100.     Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

101.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

a.     whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein;

b.     whether Defendants participated in and pursued the common course of conduct complained of herein;

c.     whether documents, press releases, and other statements disseminated to the investing public and the Company's shareholders during the Class Period misrepresented material facts about the business, finances, financial condition and prospects of Longtop;

d.     whether statements made by Defendants to the investing public during the Class Period misrepresented and/or omitted to disclose material facts about the business, finances, value, performance and prospects of Longtop;

e.     whether the market price of Longtop common stock during the Class Period was artificially inflated due to the material misrepresentations and failures to correct the material misrepresentations complained of herein; and

f.      the extent to which the members of the Class have sustained damages and the proper measure of damages.

102.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this suit as a class action.

## XIII.   COUNTS AGAINST DEFENDANTS UNDER THE EXCHANGE ACT

### COUNT I
**For Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against Defendants**

103.    Plaintiff repeats and realleges the allegations set forth above as though fully set forth herein.  This claim is asserted against Defendants.

104.    During the Class Period, Longtop and the Individual Defendants, and each of them, carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Longtop common stock; and (iii) cause Plaintiff and other members of the Class to purchase Longtop stock at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

105.    These Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Longtop securities in violation of §10(b) of the

Exchange Act and Rule 10b-5.  Defendants are sued as primary participants in the wrongful and illegal conduct charged herein.  The Individual Defendants are also sued herein as controlling persons of Longtop, as alleged herein.

106.     In addition to the duties of full disclosure imposed on Defendants as a result of their making of affirmative statements and reports, or participation in the making of affirmative statements and reports to the investing public, they each had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S X (17 C.F.R. § 210.01 et seq.) and S-K (17 C.F.R. § 229.10 et seq.) and other SEC regulations, including accurate and truthful information with respect to the Company's operations, financial condition and performance so that the market prices of the Company's publicly traded securities would be based on truthful, complete and accurate information.

107.     Longtop and the Individual Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, business practices, performance, operations and future prospects of Longtop as specified herein.  These Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Longtop's value and performance and substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Longtop and its business, operations and future prospects, in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of

business which operated as a fraud and deceit upon the purchasers of Longtop's securities during the Class Period.

108.   Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) each of the Individual Defendants was a high-level executive and/or director at the Company during the Class Period; (ii) each of the Individual Defendants, by virtue of his responsibilities and activities as a senior executive officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's operational and financial projections and/or reports; (iii) the Individual Defendants enjoyed significant personal contact and familiarity with each other and were advised of and had access to other members of the Company's management team, internal reports, and other data and information about the Company's financial condition and performance at all relevant times; and (iv) the Individual Defendants were aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

109.   These Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were readily available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Longtop's operating condition, business practices and future business prospects from the investing public and supporting the artificially inflated price of its stock.  As demonstrated by their overstatements and misstatements of the Company's financial condition and performance throughout the Class Period, the Individual Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were severely reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

110.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Longtop securities was artificially inflated during the Class Period.  In ignorance of the fact that the market price of Longtop shares was artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by these Defendants during the Class Period, Plaintiff and the other members of the Class acquired Longtop securities during the Class Period at artificially inflated high prices and were damaged thereby.

111.    At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known of the true performance, business practices, future prospects and intrinsic value of Longtop, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired Longtop securities during the Class Period, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

112.    By virtue of the foregoing, Longtop and the Individual Defendants each violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

113.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

<u>**COUNT II**</u>
**For Violations of Section 20(a) of the Exchange Act**
**Against the Individual Defendants**

114.     Plaintiff repeats and realleges the allegations set forth above as if set forth fully herein.  This claim is asserted against the Individual Defendants.

115.     The Individual Defendants were and acted as controlling persons of Longtop within the meaning of §20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions with the Company, participation in and/or awareness of the Company's operations and/or intimate knowledge of the Company's actual performance, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.  Each of the Individual Defendants was provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

116.     In addition, each of the Individual Defendants had direct involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

117.     As set forth above, Longtop and the Individual Defendants each violated §10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their controlling positions, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act.  As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## XIV.  **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of the Class, prays for judgment as follows:

a)    Declaring this action to be a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

b)    Awarding Plaintiff and the other members of the Class damages in an amount which may be proven at trial, together with interest thereon;

c)    Awarding Plaintiff and the members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' and experts' witness fees and other costs; and

**d)**    Awarding such other relief as this Court deems appropriate.

## XV.   **JURY DEMAND**

Plaintiff demands a trial by jury.

Dated:  May 27, 2011                                    By: _____

**LAW OFFICES OF CURTIS V. TRINKO,
LLP**
Curtis V. Trinko (CT-1838)
Jennifer Traystman (JT-7583)
16 West 46th Street, 7th Floor
New York, New York 10036
Tel: 212 490-9550
Fax: 212 986-0158
Email: Ctrinko@trinko.com

**SAXENA WHITE P.A.**
Joseph E. White III
Christopher S. Jones (CJ-4131)
Lester R. Hooker
2424 N. Federal Highway, Suite 257
Boca Raton, FL 33431
Tel: 561 394-3399
Fax: 561 394-3082

**RYAN & MANISKAS, LLP**
Katharine M. Ryan
Richard A. Maniskas
995 Old Eagle School Rd., Ste. 311
Wayne, PA 19087
Tel:  (484) 588-5516
Fax:  (484) 450-2582

*Attorneys for Plaintiff*

### CERTIFICATION

I, JOSEPH F FARIS, CPA ("Plaintiff") declare, as to the claims asserted under the federal securities laws that

1.      Plaintiff has reviewed the complaint and authorizes its filing.

2.      Plaintiff did not purchase the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in any private action.

3.      Plaintiff is willing to serve as a representative party on behalf of the class, either individually or as part of a group, including providing testimony at deposition or trial, if necessary.  I understand that is not a claim form, and that my ability to share in any recovery as a member of the class is not dependent upon execution of this Plaintiff Certification.

4.      Plaintiff's purchase and sale transaction(s) in the Longtop Financial Technologies (NYSE: LFT) security that is the subject of this action during the Class Period is/are as follows:

| Type of Security (common stock, preferred, option, or bond) | Number of Shares | Bought | Sold | Date | Price per share |
|---|---|---|---|---|---|
|  |  |  |  |  |  |
|  | — SEE ATTACHED | — |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |

(Please list additional purchase and sale information on a separate sheet of paper, if necessary)

5.      Plaintiff has complete authority to bring a suit to recover for investment losses on behalf of purchasers of the subject securities described herein (including Plaintiff, any co-owners, any corporations or other entities, and/or any beneficial owners).

6.      During the three years prior to the date of this Certification, Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws, except as described below_____.

7.      Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 23 day of MAY , 2011.

Joseph F Faris
_____                          JOSEPH F FARIS
Signature                                                              Print Name

SCHEDULE A TO CERTIFICATION OF JOSEPH F. FARIS
LONGTOP FINANCIAL TECHNOLOGIES

| BUY/SELL | DATE | # SHARES | PRICE PER SHARE |
|----------|------|----------|-----------------|
| Buy | 08/03/09 | 100 | $28.32 |
| Buy | 08/03/09 | 100 | $28.32 |
| Buy | 08/03/09 | 100 | $28.27 |
| Buy | 08/26/09 | 125 | $26.75 |
| Buy | 08/26/09 | 125 | $26.75 |
| Buy | 08/27/09 | 53 | $25.50 |
| Buy | 08/27/09 | 100 | $25.50 |
| Sell | 04/01/10 | 25 | $33.87 |
| Sell | 04/01/10 | 60 | $33.86 |
| Sell | 04/01/10 | 40 | $33.86 |
| Buy | 11/15/10 | 50 | $39.01 |
| Buy | 11/15/10 | 50 | $38.99 |
| Buy | 05/09/11 | 200 | $17.40 |