UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------X

JOSEPH F. FARIS, Individually and on
Behalf of All Others Similarly Situated,

                  Plaintiff,

      - against -

LONGTOP FINANCIAL TECHNOLOGIES
LIMITED, HUI KUNG KA a/k/a
XIAOGONG JIA, WAI CHAU LIN a/k/a
WEIZHOU LIAN, and DEREK
PALASCHUK,

              Defendants.

------------------------------------------------------X
------------------------------------------------------X

BRADLEY D. KAIR, on behalf of himself
and all others similarly situated,

                  Plaintiff,

      - against -

LONGTOP FINANCIAL TECHNOLOGIES
LIMITED, WAI CHAU LIN (a/k/a LIN
WAI CHAU and WEIZHOU LIAN), and
DEREK PALASCHUK,

              Defendants.

------------------------------------------------------X

**OPINION AND ORDER**

**11 Civ. 3658 (SAS)**

**11 Civ. 3661 (SAS)**

SHIRA A. SCHEINDLIN, U.S.D.J.:

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 10/4/11

## I.    INTRODUCTION

These federal securities class actions are brought pursuant to sections 10(b) and 20(a)[1] of the Securities Exchange Act of 1934 (the "Exchange Act"), as amended by the  Private Securities Litigation Reform Act of 1995 ("PSLRA"),[2] and Securities and Exchange Commission ("SEC") Rule 10b-5.[3]  Defendants include Longtop Financial Technologies Limited ("Longtop" or the "Company") and certain officers and/or directors of Longtop (collectively, the "defendants"). Plaintiffs bring these actions on behalf of themselves and all persons who purchased Longtop securities, including Longtop American depository shares ("ADS's"), between October 25, 2007 and May 17, 2011 (the "Class Period"). Plaintiffs seek remedies under the Exchange Act.

On July 22, 2011,[4] the following six groups of movants submitted competing applications seeking appointment as lead plaintiff and approval of their

---

[1]    15 U.S.C. §§ 78j(b) and 78t(a).

[2]    *Id.* § 78u-4(a)(3)(B).

[3]    17 C.F.R. § 240.10b-5.

[4]    July 22, 2011, was the due date for the filing of motions for consolidation, appointment of lead plaintiff, and approval of lead plaintiff's selection of lead counsel.  Opposition papers were due by August 5, 2011, and reply papers were due by August 12, 2011.  *See* Memo-endorsed letter dated July 11, 2011, from David A. Rosenfeld of Robbins Geller Rudman & Dowd LLP (Docket Entry # 6).

respective selection of lead counsel: Danske Invest Management A/S ("Danske") and Pension Funds of Local No. One, I.A.T.S.E. ("Local One") (collectively "Danske-Local One"); Joseph Kowalczyk, Platinum Partners Value Arbitrage Fund, L.P. ("Platinum Arbitrage"), Platinum Partners Liquid Opportunity Master Fund, L.P. ("Platinum Opportunity") (together, the "Platinum Funds"), and James Casolo (collectively the "Kowalczyk Group"); Ramesh Patel;[5] Norfolk County Retirement System ("Norfolk");[6] Bradley D. Kair and Peter Yahr ("Kair and Yahr");[7] and the City of Pontiac General Employees' and Police and Fire Retirements Systems (the "Retirement Systems").[8]

---

[5]     Patel withdrew his motion for appointment as lead plaintiff and approval of lead counsel.  Patel now supports the appointment of Danske-Local One as lead plaintiff.  *See* 8/8/11 Notice of Withdrawal of Motion for Appointment as Lead Plaintiff.

[6]     Norfolk concedes that several other movants assert larger financial interests than Norfolk but is able and willing to serve as lead plaintiff if this Court declines to appoint one of the other movants.  *See* 8/4/11 Memorandum of the Norfolk County Retirement System in Response to Competing Motions for Appointment as Lead Plaintiff.

[7]     Kair and Yahr concede that they do no possess the largest financial interest in the relief sought by the class. Kair and Yahr recognize that Danske-Local One possesses the largest financial interest.  Kari and Yahr remain able and willing to serve as lead plaintiff if this Court declines to appoint one of the other movants.  *See* 8/5/11 Response of Movants Bradley D. Kair and Peter Yahr to Competing Motions for Appointment as Lead Plaintiff.

[8]     The Retirement Systems concede that they do not possess the largest financial interest in the relief sought by the class but are able and willing to serve

In light of the concessions made by Patel, Norfolk, Kair and Yahr, and the Retirement Systems, the Court must decide between Danske-Local One, its selection of the law firm of Kessler Topaz Meltzer & Check LLP as lead counsel, and its selection of the law firm of Grant & Eisenhofer P.A. as liaison counsel, and the Kowalczyk Group and its selection of The Rosen Law Firm, P.A. and Wohl & Fruchter LLP as co-lead counsel.[9]  Both movants argue that the other is subject to unique defenses, thereby rendering each group incapable of adequately representing the class.  For the reasons stated below, Danske-Local One is appointed lead plaintiff and its selection of the law firm of Kessler Topaz Meltzer & Check LLP as lead counsel is approved as is its selection of the law firm of Grant & Eisenhofer P.A. as liaison counsel.

## II.   BACKGROUND

### A.   Facts[10]

Longtop is a Cayman Islands corporation with principal executive

---

as lead plaintiff if this Court declines to appoint one of the other movants.  *See* 8/5/11 City of Pontiac General Employees' and Police and Fire Retirement Systems' Response to Competing Motions for Appointment as Lead Plaintiff.

[9]    The Kowalczyk Group did not select a law firm to serve as liaison counsel.

[10]    The facts in this section are taken from the Complaint and are presumed true for purposes of this motion.

4

offices in Hong Kong and a principal operations office located in the People's

Republic of China ("China").  Longtop, together with its subsidiaries, provides

software and information technology products and services to financial institutions

operating in China.  Until the Company's trading was suspended on May 16, 2011,

Longtop's ADS's traded on the New York Stock Exchange under the ticker symbol

"LFT."

       The Complaints allege that during the Class Period, defendants

misrepresented and overstated the financial condition of the Company  and issued

materially false and misleading statements regarding the Company's financial

statements and related filings.  The Company made materially false and misleading

statements to investors by misrepresenting and failing to disclose that: (1)

defendants falsified certain financial records in relation to cash reserves, loan

balances, and sales revenue; (2) management interfered with the audit process and

improperly detained audit files of the Company's auditor; (3) defendants

improperly understated expenses, thereby artificially inflating profit margins; and

(4) the Company's financial statements were not presented in accordance with

Generally Accepted Accounting Principles ("GAAP") and were false and

misleading at all relevant times.  As a result of defendants' false and misleading

statements, Longtop securities traded at artificially inflated prices during the Class

Period, reaching a high of $42.73 per share on November 10, 2010.

On April 26, 2011, a financial analysis firm called Citron Research released a report, *Citron Reports on Longtop Financial (NYSE:LFT)* (the "Citron Report"). The Citron Report raised serious issues regarding the legitimacy of Longtop's financial statements dating back to its initial public offering. Specifically, the Citron Report stated that the Company's high profit margins were the result of fraudulent and improper balance sheet transfers with a related party, Xiamen Longtop Human Resources Services Co. ("XLHRS"), a staffing company. The Citron Report attributed the Company's success to its use of an "unconventional staffing model" whereby the Company used XLHRS to take its largest expenditure, staffing costs, off the Company's books in an improper off-balance sheet transaction. The Citron Report also called into question the integrity of Longtop's key management, pointing to various undisclosed misdeeds. For example, the Citron Report revealed that Longtop's Chairman and its Chief Executive Officer had been found liable for violations of Chinese unfair competition law and other deceptive conduct. In response to the negative news revealed in the Citron Report, the price of Longtop shares declined substantially, closing at $22.24 per share.

The next day, April 27, 2011, another financial analysis firm, Bronte Capital, issued a report that questioned Longtop's representations and financial statements. Longtop's ADS price continued to plummet, dropping more than twenty percent to close at $17.73 per share. Analysts continued issuing negative reports on Longtop; on May 3, 2011, Bronte Capital reported that Longtop's purported fifty percent revenue growth was highly questionable. Then, on May 9, 2011, Citron Research published a follow-up report, *Longtop Financial (NYSE: LFT) Final Proof of Undisclosed Related Party Transactions* (the "Second Citron Report"). The Second Citron Report indicated that a research company named OLP Global determined that Longtop used an off-balance-sheet transaction with a related party to hide certain expenses. The Second Citron Report further revealed the Company's connection to XLHRS and how that connection materially impacted Longtop's financial condition. Longtop's stock price continued its dramatic fall.

On May 10, 2011, Longtop issued a press release that refuted the allegations of both Citron Research and OLP Global. On May 17, 2011, all trading in Longtop's ADS's was halted. At the time trading was suspended, Longtop's stock was trading at $18.93 per share. On May 19, 2011, Longtop issued another press release announcing that the Company would not announce its

7

fourth quarter and fiscal year 2011 financial results as previously scheduled.  Then, on May 23, 2011, Longtop issued a third press release announcing that its independent auditor had resigned and that the SEC was conducting an investigation of the Company.  The Company also announced that its Chief Financial Officer had tendered his resignation several days earlier.

In sum, plaintiffs allege that statements made by defendants regarding the Company's financial performance and expected earnings were false and misleading and lacked a reasonable basis when made.  As a result of defendants' materially false statements, Longtop's securities traded at inflated levels during the Class Period.  Because of the precipitous decline in the market value of Longtop's securities, plaintiffs and the putative class members suffered significant losses and damages.

## B.    Procedural History

On May 27, 2011, two similar class actions were filed in this district on behalf of all persons who purchased Longtop securities during the Class Period: *Faris v. Longtop Financial Technologies Limited*, 11 Civ. 3658 (SAS), and *Kair v. Longtop Financial Technologies Limited*, 11 Civ. 3661 (DAB) (hereinafter referred to as the "Actions").  Three similar actions, including the first-filed action, are

pending in the United States District Court for the Central District of California.[11]

In both Actions, plaintiffs allege that Longtop and certain of its officers and/or

directors violated sections 10(b) and 20(a) of the Exchange Act, as amended by the

PSLRA, and Rule 10b-5 promulgated thereunder.

Following the filing of the first-filed action in the Central District of

California, the first notice that a class action had been initiated against the

defendants was published on May 23, 2011, on *Business Wire*, a widely circulated

national business-oriented wire service.[12]  The notice advised members of the

proposed class of their right to move to be appointed lead plaintiff.  All movants

filed their lead plaintiff motions within the sixty-day period following publication

of the May 23, 2011 notice.

## III.   LEGAL STANDARDS

### A.   Lead Plaintiff

The PSLRA establishes procedures for selecting the lead plaintiff in

---

[11]     *Mikus v. Longtop Financial Technologies Limited*, Case No. 2:11-cv-04402 (C.D. Ca. May 23, 2011); *Washtenaw v. Longtop Financial Technologies Limited*, Case No. 2:11-cv-04714 (C.D. Ca. June 2, 2011); and *Sanjay Maadan v. Longtop Financial Technologies Limited*, Case No. 2:11-cv-05182 (C.D. Ca. June 21, 2011).

[12]     *See* 15 U.S.C. § 78u-4(a)(3)(A)(i).

class action lawsuits alleging violations of the federal securities laws.[13]  Under the

PSLRA, the movant or group of movants with the largest financial interest in the

relief sought by the class, who also makes a prima facie showing of typicality and

adequacy, is the presumptively "most adequate plaintiff."[14]  The PSLRA requires

that the "most adequate plaintiff" be determined by a two-step competitive

process.[15]  The process is sequential and does not leave any room for a relative

comparison of the movants by the court.[16]

The first step establishes the presumptively most adequate plaintiff as

the "person or group of persons" who meet(s) the following three criteria:  (1) the

candidate must have "filed the complaint or made a motion in response to a

notice;"[17] (2) the candidate must have "the largest financial interest in the relief

sought by the class,"[18] and (3) the candidate must "otherwise satisf[y] the

---

[13]     *See Sgalambo v. McKenzie*, 268 F.R.D. 170, 173 (S.D.N.Y. 2010).

[14]     *See In re eSpeed, Inc. Sec. Litig.*, 232 F.R.D. 95, 97 (S.D.N.Y. 2005).

[15]     *See* 15 U.S.C. § 78u-4(a)(3)(B)(iii).

[16]     *See In re eSpeed, Inc.*, 232 F.R.D. at 98-99 ("The lead plaintiff
determination does not depend on the court's judgment of which party would be
best lead plaintiff for the class, but rather which candidate fulfils the requirements
of the Act.").

[17]     15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)(aa).

[18]     *Id.* § 78u-4(a)(3)(B)(iii)(I)(bb).

requirements of Rule 23 of the Federal Rules of Civil Procedure."[19]  At the lead

plaintiff stage of the litigation, in contrast to the class certification stage, "a

proposed lead plaintiff need only make a 'preliminary showing' that it will satisfy

the typicality and adequacy requirements of Rule 23."[20]  "Typicality 'requires that

the claims of the class representatives be typical of those of the class, and is

satisfied when each class member's claim arises from the same course of events,

and each class member makes similar legal arguments to prove the defendant's

liability.'"[21]  "The adequacy requirement is satisfied where the proposed Lead

Plaintiff does not have interests that are antagonistic to the class that he seeks to

represent and has retained counsel that is capable and qualified to vigorously

represent the interests of the class . . . ."[22]

   The second step provides class members an opportunity to challenge

the presumptively most adequate plaintiff chosen in the first step.  Once the

---

[19] *Id.* § 78u-4(a)(3)(B)(iii)(I)(cc).

[20] *In re Bank of America Corp. Sec. Deriv. & ERISA Litig.*, 258 F.R.D. 260, 268 (S.D.N.Y. 2009) (quoting *Kaplan v. Gelfond*, 240 F.R.D. 88, 94 (S.D.N.Y. 2007)).

[21] *Central States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 504 F.3d 229, 245 (2d Cir. 2007) (quoting *Robinson v. Metro-N. Commuter R.R. Co.*, 267 F.3d 147, 155 (2d Cir. 2001)).

[22] *Glauser v. EVCI Ctr. Colls. Holding Corp.*, 236 F.R.D. 184, 189 (S.D.N.Y. 2006) (citing *Dietrich v. Bauer*, 192 F.R.D. 119, 124 (S.D.N.Y. 2000)).

presumption attaches, a class member seeking to rebut the designation of the presumptively most adequate plaintiff must come forward with "proof"[23] that either the presumptively most adequate plaintiff "will not fairly and adequately protect the interests of the class" or "is subject to unique defenses that render such plaintiff incapable of adequately representing the class."[24]  If the presumptively most adequate plaintiff is disqualified on these grounds, the candidate's position is forfeited and the court returns to the first phase to determine a new presumptively most adequate plaintiff.  The process repeats itself until a candidate succeeds in both the first and second phases of inquiry.  However, the lead plaintiff determination does not depend on the court's judgment of which party would be the best lead plaintiff for the class, but rather which candidate fulfills the requirements of the PSLRA.[25]

## B.   Consolidation

The PSLRA provides that "[i]f more than one action on behalf of a class asserting substantially the same claim or claims arising under this title have

---

[23]     *See* 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II)

[24]     *Id.* § 78u-4(a)(3)(B)(iii)(II)(aa), (bb).

[25]     *See In re Cavanaugh*, 306 F.3d 726, 729 (9th Cir. 2002) ("While the words 'most capable' seem to suggest that the district court will engage in a wide-ranging comparison to determine which plaintiff is best suited to represent the class, the statute defines the term much more narrowly.").

12

been filed," courts shall not appoint a lead plaintiff until "after the motion to consolidate is rendered."[26]  Under Federal Rule of Civil Procedure 42, consolidation is appropriate where the actions involve common questions of law and/or fact.[27]  District courts have "broad discretion" in determining whether to consolidate cases.[28]  The party moving for consolidation bears the burden of showing the commonality of factual and legal issues.[29]  "Differences in causes of action, defendants, or the class period do not render consolidation inappropriate if the cases present sufficiently common questions of fact and law, and the differences do not outweigh the interests of judicial economy served by consolidation."[30]  Although consolidation may enhance judicial economy, "[c]onsiderations of convenience and economy must yield to a paramount concern

---

[26]   15 U.S.C. § 87u-4(a)(3)(B)(ii).

[27]   *See In re Tronox, Inc. Sec. Litig.*, 262 F.R.D. 338, 344 (S.D.N.Y. 2009) (citing Fed. R. Civ. P. 42(a)).

[28]   *Johnson v. Celotex Corp.*, 899 F.2d 1281, 1284 (2d Cir. 1990); *Seidel v. Noah Educ. Holdings Ltd.*, Nos. 08 Civ. 9203, 08 Civ. 9427, 08 Civ. 9509, 08 Civ. 9427, 2009 WL 700782, at *1 (S.D.N.Y. Mar. 9, 2009).

[29]   *In re Repetitive Stress Injury Litig.*, 11 F.3d 368, 373 (2d Cir. 1993) ("A party moving for consolidation must bear the burden of showing the commonality of factual and legal issues in different actions[.]").

[30]   *Kaplan*, 240 F.R.D. at 91.

for a fair and impartial trial."[31]

## IV.   DISCUSSION

Because four movants have withdrawn their motions to be appointed lead plaintiff, this Court is confronted with two lead plaintiff motions filed by Danske-Local One and the Kowalczyk Group.  The losses for these movants, and their constituent members, are summarized in the chart below.

| MOVANT | APPROXIMATE LOSSES | |
|---|---|---|
| 1.  Danske-Local One Group | 1. | $3,513,477.89 |
| 1a.  Danske Invest Management | 1a. | $2,783,389.46 |
| 1b.  Pension Fund of Local No. One | 1b. | $730,088.43 |
| 2.  The Kowalczyk Group | 2. | $1,741,976.52 |
| 2a.  Joseph Kowalczyk | 2a. | $1,042,489.50 |
| 2b.  The Platinum Funds | 2b. | $485,598.00 |
| 2c.  James Casolo | 2c. | $213,889.02 |

As shown above, Danske-Local One has the largest financial interest. If Danske is excluded, however, the remaining loss of Local One is smaller than both the collective losses of the Kowalczyk Group and the losses of Joseph Kowalczyk individually.  Both Danske-Local One and the Kowalczyk Group accuse each other of being subject to unique defenses, thereby making each group

---

[31]     *Johnson*, 899 F.2d at 1285.

allegedly incapable of adequately representing the class.  For the following

reasons, I find that the Kowalczyk Group is subject to unique defenses while

Danske-Local One is not.

### A.     Danske-Local One

#### 1.      Danske Has a Valid Assignment

The Kowalczyk Group argues that Danske is an investment manager

and, as such, lacks Article III standing unless there is a valid and enforceable

assignment from the investment funds that actually purchased Longtop securities.[32]

Dankse did not submit an assignment from its funds (or "associations") when

Danske-Local One originally moved for appointment as lead counsel.  The

Kowalczyk Group characterizes Danske's decision not to present such assignment

with its moving submission as "inexplicable" and rejects Danske's "proffered

interpretation of a legal agreement that readily could have been, but has not been,

submitted."  However, in its reply submission, Danske-Local One did provide the

Assignment of Claims and Power of Attorney received by Danske from its Funds,

Investeringsforeningen Danske Invest and Den Professsionelle Forening Danske

---

[32]     *See* Memorandum of Law of the Kowalczyk Group in Opposition to
Competing Lead Plaintiff Motions at 5-9 ("Kowalczyk Opp. Mem.").

Invest Institutional.[33]

   The Assignment transfers to Danske "for purposes of prosecution and collection, all rights, title and interest of the Funds in the Funds' claims, demands or causes of action against any defendant relating to any security issued by Longtop Financial Technologies Limited."[34]  The Assignment is virtually identical to the assignment found to be valid by the Supreme Court in *Sprint Communications Co., L.P. v. APCC Services, Inc.*[35]  The Assignment conclusively establishes Danske's standing.

### 2.  The Assignment Is Valid Under Danish Law

   The Kowalczyk Group argues that even if the Assignment is sufficient to satisfy Article III standing concerns, "there is a substantial question whether Danske Invest has legal authority to receive such an assignment of claims from the Danish investment associations that actually purchased Longtop securities."[36]

---

[33]  *See* Assignment of Claims and Power of Attorney, Ex. A to the 8/15/11 Declaration of Deborah A. Elman, Liaison Counsel to Danske-Local One, in Support of Danske Invest Management A/S and Pension Fund of Local No. One, I.A.T.S.E.'s Reply in Further Support of Its Motion for Appointment as Lead Plaintiff (the "Assignment").

[34]  *Id.* at 1.

[35]  554 U.S. 269 (2008).

[36]  Kowalczyk Opp. Mem. at 9.

Danske obtained the Assignment out of an abundance of caution, to moot

arguments challenging its standing, given that Danish law already gives managers

like Danske the right to initiate legal proceedings on behalf of associations like the

Funds identified in the Assignment.  Under Danish law, a manager's authority to

prosecute legal claims on behalf of associations is an inherent power and one of the

manager's core functions.  Thus, a manager like Danske has the inherent power to

prosecute an association's claims as a matter of right, without an assignment of

claims.  Because the Assignment merely memorializes Danske's inherent power

under Danish law, the Assignment is fully compliant and valid under Danish law.

The Kowalczyk Group's arguments to the contrary are not well

founded.  The Kowalczyk Group assumes that Danish law (Section 10(2) of the

Financial Business Act) limiting a manager's ability to act as a custodian also

limits, by extension, a manager's ability to receive an assignment to pursue

claims.[37]  However, Section 10(2) of the Financial Business Act says nothing about

the acquisition of rights to pursue claims.[38]  Actual ownership of an underlying

---

[37]     *See* Report of Jørgen Reimer Jensen, Esq., Ex. 4 to the 8/8/11
Declaration of Phillip Kim in Opposition to Competing Lead Plaintiff Motions at
2-3.

[38]     *See* Declaration of Jens Rostock-Jensen, Esq., Ex. B to the 8/15/11
Declaration of Deborah A. Elman, liaison counsel to Danske-Local One, in
Support of Danske Invest Management A/S and Pension Fund of Local No. One,
I.A.T.S.E.'s Reply in Further Support of Its Motion for Appointment as Lead

investment is wholly unrelated to a manager's ability to secure the right to

prosecute claims relating to the investment.[39]   Moreover, legal ownership of an

investment is not necessary to pursue claims related to an investment.[40]   As

explained by Michael Steen Jensen, Danske-Local One's expert on Danish law:

> the Assignment here does not relate to traditional custody services and does therefore not in any event fall within Section 10, subsection 2, of the Financial Business Act. The Assignment is instead related to legal proceedings arising from investments made by the two associations and thus forms part of the management, which Danske is undertaking on behalf of the associations as their appointed manager.   The Assignment is therefore part of the core activities, which Danske is undertaking on behalf of the two associations and not related to traditional custody services, and is thus an activity, which Danske may undertake in accordance with Section 10, subsection 1, of the Financial Business Act.   The Assignment is not required as a matter of Danish law and is . . . entered into in order to satisfy certain procedural requirements under US law.[41]

Accordingly, as part of its core management duties, Danske has the

right to litigate the claims of its associations under Danish law.[42]   Moreover, the

---

Plaintiff ("Elman Reply Decl.") ¶ 22.

[39]   *See id.*

[40]   *See id.*

[41]   Report of Michael Steen Jensen, Esq., Ex. C to the Elman Reply Decl., at 5.

[42]   *See id.* ("The Assignment is in our opinion valid as a matter of Danish law and neither the Investment Associations Act nor the Financial Business Act

Kowalczyk Group ignores the fact that three United States district courts have

permitted Danske to pursue claims upon receipt of an assignment and two of those

courts appointed Danske lead plaintiff.[43]   In sum, the Assignment is valid and there

is no question as to Danske's legal authority to receive an assignment of claims

from the investment association-assignors.

### 3.    The Champerty Arguments Are Baseless

Finally, the Kowalczyk Group asserts that even if the Assignment is

sufficient for purposes of Article III standing and within the scope of Danske's

authority under Danish law, there is still a question as to whether the Assignment is

valid and enforceable under state law.   Assuming that New York law applies to the

Assignment, the Kowalczyk Group argues that Danske's individual claims will be

---

imposes any restrictions on the activities of Danske, which would impact on the
ability of Danske to receive the assignment from Investeringsforeningen Danske
Invest and Den Professsionelle Forening Danske Invest Institutional and to act in
accordance with the Assignment.").

[43]     *See In re SunPower Sec. Litig.*, No. 09-cv–5473-CRB (N.D. Cal. Mar.
5, 2010) (Docket Entry # 70 appointed Danske as lead plaintiff); *In re Vivendi, S.A.
Sec. Litig.*, 605 F. Supp. 2d 570, 586 (S.D.N.Y. 2009) (allowing Danske to replead
claims upon receiving an assignment of claims from the funds on whose behalf suit
was brought); *Minneapolis Firefighters' Relief Ass'n v. Medtronic, Inc.*, No. 08-
6324, 2009 WL 1458234, at *2 (D. Minn. May 26, 2009) ("Finally, the Court finds
that the City of Los Angeles has not effectively rebutted the presumption favoring
the Medtronic Group with regard to a contention that the Union and Danske
plaintiffs are subject to unique defenses regarding their Article III standing in this
matter because those funds lack an ownership interest in the claims of their
clients.").

subject to the defense of champerty.  New York's champerty statute provides, in relevant part, as follows:

> [N]o corporation or association . . . shall . . . take an assignment of . . . a . . . thing in action, or any claim or demand, with the intent and for the purpose of bringing an action or proceeding thereon . . . . Any corporation or association violating the provisions of this section shall be liable to a fine of not more than five thousand dollars; any person or co-partnership, violating the provisions of this section, and any officer, trustee, director, agent or employee of any . . . co-partnership, corporation or association violating this section who, directly or indirectly, engages or assists in such violation, is guilty of a misdemeanor.[44]

Historically, courts have interpreted the proscription of the champerty statute narrowly.[45]  For example, the New York Court of Appeals analyzed the champerty statute and held that "'[t]he doctrine of champerty developed to prevent or curtail the commercialization of or trading in litigation.'"[46]   The Court of Appeals further stated that "the prohibition of champerty has always been 'limited in scope and largely directed toward preventing attorneys from filing suit merely as

---

[44]    N.Y. Judiciary Law § 489(1).

[45]    *See Richbell Info. Servs., Inc. v. Jupiter Partners*, 723 N.Y.S.2d 134, 139 (1st Dep't 2001).

[46]    *Trust for the Certification of Merrill Lynch Mortg. Investors, Inc. v. Love Funding Corp.*, 13 N.Y.3d 190, 198 (2009) (quoting *Bluebird Partners v. First Fid. Bank*, 94 N.Y.2d 726, 729 (2000)).

a vehicle for obtaining costs.'"[47]  As recently explained by this Court,

> the Court of Appeals in *Love Funding Corp.* held that the statute "does not apply when the purpose of an assignment is the collection of a legitimate claim." *Id.*, 13 N.Y.3d at 201.  Rather, "if a party acquires a debt instrument for the purpose of enforcing it – that is not champerty simply because the party intends to do so by litigation." *Id.*, 13 N.Y.3d at 200.  The Court of Appeals further emphasized the distinction between acquiring a right in order to make money from litigating it and acquiring a right in order to enforce it, with the former acquisition being the kind that implicates the anti-champerty statute. *See id.*, 13 N.Y.3d at 200.  The court explained that "[t]he champerty statutes are directed at preventing the 'strife, discord and harassment' that would be likely to ensue 'from permitting attorneys and corporations to purchase claims for the purpose of bringing actions thereon.'" *Id.*, 13 N.Y.3d at 199 (quoting *Fairchild Hiller Corp. v. McDonnell Douglas Corp.*, 28 N.Y.2d 325, 329 (N.Y. 1971)).  "In short, the champerty statute does not apply when the purpose of an assignment is the collection of a legitimate claim.  What the statute prohibits, as the Appellate Division stated over a century ago, 'is the purchase of claims with the intent and for the purposes of bringing an action that . . . may involve parties in costs and annoyance, where such claims would not be prosecuted if not stirred up . . . in [an] effort to secure costs.'" *Id.*, 13 N.Y.3d at 201 (quoting *Wightman v. Catlin*, 98 N.Y.S. 1071 (N.Y. App. Div. 2d Dep't 1906)).[48]

---

[47]     *Id.* at 199 (quoting *Bluebird Partners*, 94 N.Y.2d at 734).

[48]     *In re Imax Sec. Litig.*, No. 06 Civ. 6128, 2011 WL 1487090, at *5 (S.D.N.Y. Apr. 15, 2011) (alteration and second ellipsis in original, parallel citations omitted).

Here, Danske is not a stranger to this suit but rather is seeking to enforce the claims of the associations resulting from investments in Longtop securities, investments for which Danske is ultimately responsible as the investment manager.   Thus, the Kowalczyk Group's argument that the Assignment constitutes a prohibited "commercialization of litigation"[49] is without merit. Accordingly, the Assignment is not prohibited by the New York champerty statute.

In sum, Danske and Local One are sophisticated institutional investors collectively responsible for overseeing billions of dollars in investments.  These highly sophisticated institutional investors represent the largest financial interest of any movant and can adequately represent the class, as determined above. Moreover, Danske-Local One has demonstrated its commitment to protecting the members of this putative class action.[50]  Accordingly, the presumption in favor of Danske-Local One has attached and the challenges thereto are dismissed.

---

[49]      *Id.* at *6.

[50]      *See* The Longtop Investor Group's Joint Declaration in Support of Their Motion to Consolidate Related Actions, for Appointment as Lead Plaintiff and Approval of Lead Counsel, Ex. F to the 7/22/11 Declaration of Deborah A. Elman in Support of Danske Investment Management A/S and Pension Fund of Local No. One, I.A.T.S.E.'s Motion for Consolidation, Appointment as Lead Plaintiff and Approval of Selection of Lead Counsel and Liaison Counsel ("Elman Decl.").

### B.     Kowalczyk Group

Given that the above arguments challenging Danske's ability to adequately represent the class have been found to be without merit, the Kowalczyk Group has failed to rebut the presumption that Danske-Local One is the most adequate plaintiff.  Accordingly, the two-step process is complete and the inquiry can stop here, now that the Court has determined that Danske-Local One has the largest financial interest and is otherwise typical and adequate.  However, in an abundance of caution, the following issues, which weigh against the Kowalczyk Group as the presumptively most adequate plaintiff, will be addressed briefly.

### 1.     Unusual Trading

Three members of the Kowalczyk Group – Kowalczyk, Platinum Arbitrage and Platinum Opportunity – collectively account for approximately $1.52 million of the Kowalczyk Group's approximate $1.74 million losses, which is roughly eighty-seven percent.  These three members, however, purchased all of their shares in Longtop after April 26, 2011:  Kowalczyk, who asserts $1,042,489.50 in losses, purchased all of his Class period shares of Longtop on May 11, 2011; the Platinum Funds, which assert $485,598.00 in losses, purchased all of their shares on May 6 and 9, 2011.  These post-disclosure purchases suggest that these three members invested in Longtop securities notwithstanding notice of

defendants' misstatements and omissions.  These unusual trading patterns may well undermine the ability of these three members to assert the fraud-on-the-market presumption of reliance, thereby rendering them inadequate class representatives.[51]  The Kowalczyk Group argues that this purported defense is not "unique" in that it is applicable to all class members who purchased shares between April 26, 2011 and May 17, 2011.  But this Court sees no reason to subject the class to this potential defense where there is another movant, Danske-Local One, that purchased the vast majority of its Longtop shares before the first corrective disclosure was made on April 26, 2011.[52]

### 2.    Involvement in a Ponzi Scheme

A second problem detracting from the Kowalczyk Group as lead plaintiff is the fact that Platinum Arbitrage is currently involved in a lawsuit for its role in a $1.4 billion Ponzi scheme orchestrated by Scott Rothstein, a disbarred

---

[51]    *See, e.g., Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 903 F.2d 176, 179 (2d Cir. 1990) (holding that it was not an abuse of discretion for the district court to find the proposed class representative inappropriate because its claim would be subject to the unique defenses of having purchased the securities despite having notice of, and having investigated, the alleged fraud); *In re Cardinal Health, Inc. Sec. Litig.*, 226 F.R.D. 298, 310 (S.D. Ohio 2005) (finding movant subject to a unique defense because it purchased its shares after the company's public disclosures of investigations by the Securities and Exchange Commission and the United States Attorney's Office for the Southern District of New York into the company's accounting methods).

[52]    *See* Exs. B and C to the Elman Decl.

Florida attorney.[53]  The Chapter 11 Trustee appointed by the court in the *Rothstein* action alleges that Platinum Arbitrage knowingly received $261 million from the fraudulent scheme.  Whether or not the Trustees' claims are eventually proven to be true is irrelevant.  The Trustee's allegations that Platinum Arbitrage knowingly profited from victims of a Ponzi scheme certainly subjects it to a unique defense atypical of the conduct expected of a lead plaintiff.[54]  Moreover, the willingness of the other members of the Kowalczyk Group to seek lead plaintiff appointment with Platinum Arbitrage raises questions about the adequacy of the entire group.

## C.    Lead and Liaison Counsel

The PSLRA provides that "[t]he most adequate plaintiff shall, subject to the approval of the court, select and retain counsel to represent the class."[55] Danske-Local One, has selected the law firm of Kessler Topaz Meltzer & Check LLP as lead counsel and the law firm of Grant & Eisenhofer P.A. as liaison counsel.  As ascertained from each firm's resume, both firms are qualified to

---

[53]    *See In re Rothstein Rosenfeldt Adler, P.A.*, Case No. 10-03802-RBR (S.D. Fla. Bankr. Dec. 20, 2010).

[54]    *In re Marsh & McLennan Cos., Inc. Sec. Litig.*, No. 04 Civ. 8144, 2008 WL 2941215, at *6 (S.D.N.Y. July 30, 2008) (stating that many courts "review information regarding investigations, charges, and determinations of wrongdoing in deciding whether a proposed class representative will adequately represent a putative class").

[55]    15 U.S.C. § 77z-1(a)(3)(B)(v).

litigate this action.  Therefore, Danske-Local One's selection of Kessler Topaz Meltzer & Check LLP as lead counsel is approved as is its selection of Grant & Eisenhofer P.A. as liaison counsel.

### D.   Consolidation

The above-captioned actions are hereby consolidated for all purposes and will henceforth be referred to as: In re Longtop Financial Technologies Limited Securities Litigation, Docket No. 11 Civ. 3658 (SAS).  A separate Order consolidating the related actions will be entered, setting forth the terms of consolidation and the procedures to be followed in connection therewith.

## V.   CONCLUSION

Danske-Local One is appointed lead plaintiff in this action;  Kessler Topaz Meltzer & Check LLP is  appointed lead counsel; and Grant & Eisenhofer P.A. is appointed liaison counsel.  The Clerk of the Court is directed to close the outstanding lead plaintiff  motions (Docket Entry Nos. 4, 8, 11, 14, 17 and 19 in Case No. 11 Civ. 3658 and Docket Entry Nos. 7, 10 and 13 in Case No. 11 Civ. 3661).  The Clerk of the Court is further directed to close Case No. 11 Civ. 3661.  A conference is scheduled for October 18, 2011, at 4:30 p.m., in Courtroom 15C.

SO ORDERED:

_____
Shira A. Scheindlin
U.S.D.J.

Dated:      New York, New York
            October 4, 2011

27

**-Appearances-**

**For Plaintiff Joseph F. Faris:**

Curtis V. Trinko, Esq.
Jennifer E. Traystman, Esq.
Law Offices of Curtis V. Trinko, LLP
16 West 46th Street, Seventh Floor
New York, NY 10036
(212) 490-9550

Joseph E. White, Esq.
Christopher S. Jones, Esq.
Lester R. Hooker, Esq.
Saxena White P.A.
2424 North Federal Highway
Boca Raton, FL 33431
(561) 394-3399

**For Plaintiff Bradley D. Kair:**

Jeffrey P. Campisi, Esq.
Donald R. Hall, Jr., Esq.
Frederic S. Fox, Sr., Esq.
Joel B. Strauss, Esq.
Pamela A. Mayer, Esq.
Kaplan Fox & Kilsheimer LLP
850 Third Avenue, 14th Floor
New York, New York 10022
(212) 687-1980

**For Movant Danske-Local One:**

Jay W. Eisenhofer, Esq.
Grant & Eisenhofer P.A.
485 Lexington Avenue, 29th Floor
New York, NY 10118
(212) 686-1060

**For Movant Kowalczyk Group:**

Phillip C. Kim, Esq.
The Rosen Law Firm P.A.
350 5th Avenue, Suite 5508
New York, NY 10017
(646) 722-8512

**For Movant Norfolk:**

Jeffrey C. Block, Esq.
Berman DeValerio
One Liberty Square, 8th Floor
Boston, MA 02109
(617) 542-8300

**For Movant Retirement Systems:**

David A. Rosenfeld, Esq.
Robbins Geller Rudman & Dowd
58 South Service Road, Suite 200
Melville, NY 11747
(631) 367-7100