GREENBERG TRAURIG, LLP
Paul R. Bessette
Metlife Building
200 Park Avenue
New York, NY  10166
Telephone:  (212) 801-2130
Facsimile:  (212) 801-6400
Email: bessettep@gtlaw.com

Michael J. Biles (admitted *pro hac vice*)
Royale Price (admitted *pro hac vice*)
300 West 6th Street, Ste. 2050
Austin, TX 78701
Telephone:  (512) 320-7200
Facsimile:  (512) 320-7210
Email:  bilesm@gtlaw.com
Email:  pricer@gtlaw.com

*Attorneys for Defendant Derek Palaschuk*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE LONGTOP FINANCIAL TECHNOLOGIES LIMITED SECURITIES LITIGATION | Civil Action No. 11-cv-03658-SAS |

**DEFENDANT DEREK PALASCHUK'S CORRECTED MEMORANDUM OF LAW
IN SUPPORT OF THE MOTION TO DISMISS  PLAINTIFFS'
<u>CONSOLIDATED CLASS ACTION COMPLAINT</u>**

## <u>TABLE OF CONTENTS</u>

**Page**

I.  INTRODUCTION ........................................................................................................ 1

II. STATEMENT OF FACTS ........................................................................................ 1

     A.  Longtop's Background and Growth............................................................ 1

     B.  Longtop's Initial and Secondary Public Offering ..................................... 2

     C.  Longtop's Use and Disclosure of XLHRS and Other Staffing Companies........... 3

     D.  Short Sellers Issue Reports on Longtop.................................................... 3

     E.  Palaschuk, DTT, and the Audit Committee Resign ................................. 4

III. PLAINTIFFS' ALLEGATIONS ............................................................................... 4

     A.  Plaintiffs Allege that Longtop Used XLHRS to Understate Expenses and Overstate Gross Margins and Net Income. ............................................ 5

          1.  Plaintiffs claim that XLHRS was either "wholly-owned" or a "related entity." ................................................................................ 5

          2.  Plaintiffs claim that Longtop used fraudulent off-balance-sheet transfers to avoid reflecting employee-related expenses in its financial statements........................................................................ 6

          3.  Plaintiffs allege that XLHRS underpaid state social welfare benefits.................................................................................... 6

     B.  Plaintiffs Claim that Longtop Falsified Reported Cash and Loan Balances. ................................................................................................. 7

     C.  Plaintiffs Allege that Longtop Fraudulently Reported Revenue and Net Income.................................................................................................... 7

IV. LEGAL STANDARDS ............................................................................................. 7

     A.  Section 10(b) ............................................................................................ 7

          1.  The PSLRA and Rule 9(b)............................................................. 8

          2.  Scienter ........................................................................................... 8

          3.  Material misrepresentation............................................................. 9

     B.  Section 20(a) ............................................................................................ 9

V.  ARGUMENT AND AUTHORITIES....................................................................... 10

     A.  Plaintiffs Fail to Establish a "Strong Inference" of Palaschuk's Scienter. .......... 10

          1.  The Short Reports do not establish scienter................................ 10

          2.  Palaschuk's and DTT's resignations do not establish scienter. ............... 11

          3.  Palaschuk's position as CFO does not establish his scienter.................. 13

*536,202,831 7AUS*

4.  Palaschuk's alleged stock sales fail to establish motive and opportunity to commit fraud. ...................................................................... 13

5.  Palaschuk's signing of Longtop's SEC filings and Sarbanes-Oxley certifications do not establish scienter. .......................................... 15

6.  Plaintiffs cannot plead Palaschuk's scienter through group pleading. ............................................................................................... 15

B.  Plaintiffs Fail to Establish that Longtop's Public Statements were False. .......... 16

1.  XLHRS was neither "wholly owned" by Longtop, nor a "related entity." ............................................................................................... 17

2.  Longtop was not required to consolidate XLHRS with its financial statements, and it did not engage in improper "off-balance-sheet transfers." ..................................................................... 18

a.  Plaintiffs do not explain with the requisite specificity why Longtop was required to consolidate XLHRS. ........................... 18

b.  Plaintiffs fail to explain how XLHRS allowed Longtop to improperly understate expenses and inflate margins. .................. 20

3.  The facts Plaintiffs plead about Longtop's social welfare payments do not establish that its financial statements were false. .......... 21

4.  DTT's resignation does not establish falsity of Longtop's financial statements prior to the full year ended March 31,  2011. .......... 22

5.  Plaintiffs fail to establish that Longtop fabricated its revenue and net income. ................................................................................... 23

6.  Plaintiffs fail to identify materially false and misleading statements in Longtop's SPO Prospectus and Prospectus Supplement. ..................................................................................... 23

C.  Many of Longtop's and Palaschuk's Statements are Protected by the PSLRA Safe Harbor. .................................................................................... 23

D.  Palaschuk Cannot be Liable for the Statements of Others as a Matter of Law. .............................................................................................................. 24

E.  Plaintiffs Fail to Establish Control-Person Claims. ............................................. 25

VI.  CONCLUSION ................................................................................................................ 25

536,202,831 7AUS

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>

*Beck v. Mfrs. Hanover Trust Co.*,
   820 F.2d 46 (2d Cir. 1987)..................................................................... 9

*Boguslavsky v. Kaplan*,
   159 F.3d 715 (2d Cir. 1998)............................................................ 10, 25

*Decker v. Massey-Ferguson, Ltd.*,
   534 F. Supp. 873 (S.D.N.Y. 1981) ...................................................... 19

*Dura Pharms, Inc. v. Broudo*,
   544 U.S. 336 (2005)............................................................................. 8

*Ernst & Ernst v. Hochfelder*,
   425 U.S. 185 (1976)............................................................................. 8

*Ganino v. Citizens Utils. Co.*,
   228 F.3d 154 (2d Cir. 2000)........................................................ 8, 9, 13

*Goplen v. 51job, Inc.*,
   453 F. Supp. 2d 759 (S.D.N.Y. 2006).................................................. 15

*Harrison v. Rubenstein*,
   No. 02 Civ. 9356 (DAB), 2007 WL 582955 (S.D.N.Y. Feb. 26, 2007)................. 25

*In re Adelphia Commc'n. Corp.*,
   No. 03 MD 1529 (LMM), 2006 WL 2463355 (S.D.N.Y. Aug. 23 2006) ............... 20

*In re Alcatel Sec. Litig.*,
   382 F. Supp. 2d 513 (S.D.N.Y. 2005).................................................. 20

*In re Am. Apparel, Inc. S'holder Litig.*,
   No. CV 10-06352, 2012 WL 1131684 (C.D. Cal. Jan. 13, 2012) ..................... 12

*In re AstraZenaca Sec. Litig.*,
   559 F. Supp. 2d 453 (S.D.N.Y. 2008)............................................ 15, 16

*In re Bayer AG Sec. Litig.*,
   No. 03 Civ. 1546, 2004 U.S. Dist. LEXIS 19593 (S.D.N.Y. Sept. 30, 2004) .......... 9

*In re BISYS Sec. Litig.*,
   397 F. Supp. 2d 430 (S.D.N.Y. 2005)........................................ 9, 11, 14

*In re Optionable Sec. Litig.*,
   577 F. Supp. 2d 681 (S.D.N.Y. 2008).................................................. 9

*In re PXRE Group, Ltd., Sec. Litig.*,
   600 F. Supp. 2d 510 (S.D.N.Y. 2009).................................................. 11

*In re Sec. Capital Assurance, Ltd. Sec. Litig.*,
   729 F. Supp. 2d 569 (S.D.N.Y. 2010).................................................. 13

*536,202,831 7AUS*

*In re Spiegel, Inc. Sec. Litig.*,
   382 F. Supp. 2d 989 (N.D. Ill. 2004) ........................................................ 10

*In re Top Tankers, Inc. Sec. Litig.*,
   528 F. Supp. 2d 408 (S.D.N.Y. 2007)........................................................ 15

*Janus Capital Group Inc. v. First Derivative Traders*,
   131 S. Ct.  2296 (2011)............................................................................. 25

*Lindner Dividend Fund, Inc. v. Ernst & Young*,
   880 F. Supp. 49 (D. Mass. 1995) .............................................................. 19

*Magellan Int'l Corp. v. Salzgitter Handel GmbH*,
   76 F. Supp. 2d 919 (N.D. Ill. 1999) .......................................................... 17

*Novak v. Kasaks*,
   216 F.3d 300 (2d Cir. 2000).......................................................... 8, 13, 18

*Rombach v. Chang*,
   355 F.3d 164 (2d Cir. 2004)........................................................................ 9

*San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos., Inc.*,
   75 F.3d 801 (2d Cir. 1996)........................................................................ 14

*Shields v. Citytrust Bancorp, Inc.*,
   25 F.3d 1124 (2d Cir. 1994)...................................................................... 14

*Slayton v. Am. Express Co.*,
   604 F.3d 758 (2d Cir. 2010).......................................................... 9, 23, 24

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007)............................................................................ 8, 12

*Zucco Partners, LLC v. Digimarc Corp.*,
   552 F.3d 981 (9th Cir. 2009) ................................................................ 11, 12

*Zucker v. Sasaki*,
   963 F. Supp. 301 (S.D.N.Y. 1997) ........................................................... 19

## Statutes

15 U.S.C. § 75u-5(h)................................................................................... 23

15 U.S.C. § 78u-4(b)............................................................................. 8, 9, 23

15 U.S.C. § 78u-5(c)............................................................................. 23, 24

15 U.S.C. § 78u-5(h)................................................................................... 24

## I.      INTRODUCTION

A fundamental principle of the Private Securities Litigation Reform Act ("PSLRA") is that plaintiffs must plead particularized facts that raise a strong inference of scienter against *each* defendant individually.  The facts here—lifted from three "short reports" and an auditor resignation letter—do not provide any basis to suggest that Defendant Derek Palaschuk knew or was severely reckless in not knowing that Longtop Financial Technologies, Limited's ("Longtop" or the "Company") financial statements were false or misleading when made.  The "short reports" are not "facts" at all—they are unsupported allegations of entities with a financial motive to drive down Longtop's stock price—and cannot be used to establish Palaschuk's scienter.  Moreover, Plaintiffs do not explain how the allegations in the short reports establish a violation of Generally Accepted Accounting Principles ("GAAP"), much less show how they render Longtop's financial statements false or misleading.

Deloitte's resignation letter makes no mention of Palaschuk and thus raises no inference that he was involved in the issues causing the auditor's resignation.  In sum, the Consolidated Amended Complaint's ("CAC") (D.I. # 45) failure to plead a single, specific fact establishing that Palaschuk knew of the issues alleged requires dismissal.

## II.     STATEMENT OF FACTS

### A.      Longtop's Background and Growth

Mr. Hiu Kung Ka,[1] who served as Chairman of the Board of Directors during the purported class period, and Mr. Wai Chau Lin,[2] who served as Chief Executive Officer ("CEO") during the class period, founded Longtop in 1996 in Xiamen, China.  (Declaration of Royale Price in Support of Derek Palaschuk's Motion to Dismiss ("Price Decl.") Ex. 1 at 73.)  Longtop

---

[1] Mr. Ka is also referred to as Xiaogong Jia in Longtop's public filings.
[2] Mr. Lin is also referred to as Weizhou Lian in Longtop's public filings.

1

provided a comprehensive range of software solutions targeting the financial services industry in China, including the largest banks, national commercial banks, city and regional banks, and insurance companies.  (Price Decl. Ex. 1 at 42, 46.)  Longtop's employees grew from 372 on December 31, 2004 (Price Decl. Ex. 2 at 107) to 4,258 on March 31, 2010.  (Price Decl. Ex. 1 at 79.)

Longtop was the highest ranked Chinese financial technology provider on the Global FinTech 100 survey of top technology partners to the financial services industry.  (Price Decl. Ex. 4.)  Independent research firm IDC named Longtop the No. 1 market-share leader in China's Banking IT solution market and the No. 2 market-share leader in China's Insurance IT solution market in 2009.  (Price Decl. Ex. 3.)

Derek Palaschuk, who is a Canadian Chartered Accountant, joined Longtop as its Chief Financial Officer ("CFO") in September 2006.  He previously served as CFO of two NASDAQ-listed Chinese companies, eLong Inc., from April 2004 until July 2006, and Sohu.com, from July 2000 to March 2004, where he served in various financial positions before becoming CFO.  Palaschuk has also served as an audit manager with PricewaterhouseCoopers in Hong Kong and Beijing. (Price Decl. Ex. 1 at 73, 74.)

### B.      Longtop's Initial and Secondary Public Offering

Prior to its initial public offering ("IPO") on the New York Stock Exchange, Longtop's success attracted high-profile, sophisticated U.S. investors including 24% owner Tiger Global Investment Partners III and IV, L.P. and 18.5% owner Cathay ITfinancial, each of which appointed an individual to serve on Longtop's board of directors.  (Price Decl. Ex. 2 at 123-125.)

Longtop *did not* become public through a reverse merger.  Rather, Longtop conducted its IPO through the filing of a prospectus and registration statement with the Securities and Exchange Commission ("SEC").  The IPO closed on October 29, 2007, in which Longtop sold

2

8,999,675 American Depository Shares ("ADS") at $17.50 per share.  Goldman Sachs, Deutsche

Bank Securities, and Jefferies & Company underwrote the offering.  (Price Decl. Ex. 2, cover

sheet; Price Decl. Ex. 1 at 95.)

On November 23, 2009, Longtop conducted a Secondary Public Offering ("SPO") of

4,255,000 ADSs at $31.25 per share.  Deutsche Bank Securities, Inc. and Morgan Stanley & Co.

International plc co-underwrote the SPO. (Price Decl. Ex. 1 at 95.)

>### C.       Longtop's Use and Disclosure of XLHRS and Other Staffing Companies

Like many companies, Longtop outsourced some of its operational functions.  Longtop

disclosed that it contracted a portion of its workforce from unrelated third-party staffing

companies, including Xiamen Longtop Human Resources ("XLHRS").  (Price Decl. Ex. 1 at 79-

80.)  Longtop disclosed various facts about XLHRS and about Longtop's workforce-related

expenses, including the total number of employees it contracted from XLHRS, the average salary

of these employees, and the total social welfare contributions Longtop paid on behalf of its

employees. (*See* Section V(B)(2)(b).)

>### D.       Short Sellers Issue Reports on Longtop

Longtop's success made it the target of short sellers.  Short sellers profit from issuing

negative reports on companies while holding a short position in the company's stock, profiting

on the downward influence their reports have on the stock price. (*See* Price Decl. Ex. 5.)

Three different short sellers issued articles and reports on Longtop (the "Short Reports").

On April 26, 2011, Citron Research issued a report speculating that Longtop's high margins were

"too good to be true," and questioning its use of XLHRS.  (CAC ¶ 45.)  The next day, Bronte

Capital published an article questioning why Longtop needed to raise $127 million from its SPO.

(CAC ¶ 48.)  Then, on May 9, 2011, OLP Global issued a report noting that Longtop employees

3

signed off on XLHRS's public filings, and questioned whether Longtop used XLHRS to underpay the social welfare benefits of its employees.  (CAC ¶ 54.)

>          E.       **Palaschuk, DTT, and the Audit Committee Resign**

On May 23, 2011, Longtop announced that Palaschuk tendered his resignation by letter dated May 19, 2011, after Palaschuk resigned at a May 19, 2011 board meeting.  (Price Decl. Ex. 6.)

Also on May 23, 2011, Longtop disclosed that the Company's registered independent accounting firm, Deloitte Touche Tohmatsu CPA Ltd. ("DTT") resigned as auditor of the Company by letter dated May 22, 2011.  (Price Decl. Ex. 6.)  The letter, which Plaintiffs[3] reproduce in the CAC, detailed DTT's reasons for its resignation. (CAC ¶ 58.)  The issues DTT identified in its resignation letter were all unrelated to the allegations in the Short Reports, and while DTT identified certain members of Longtop management, it made no mention of Palaschuk.

On July 5, 2011, Longtop disclosed that all of the independent director members of its Audit Committee also resigned even after Longtop attempted to retain them. (Price Decl. Ex 7.) As of April 23, 2012, Longtop has not disclosed that the remaining board members, CEO, Wai Chau Lin, and Chairman, Hiu Kung Ka, and Ms. Yinhua Chen, have resigned or been replaced. (*See* Price Decl. Ex. 1 at 72.)

## III.    PLAINTIFFS' ALLEGATIONS

Plaintiffs allege that Longtop "falsified its financial results" in two main ways, by 1) "transferring its employee expenses to an off-balance sheet related entity, thereby enabling Longtop to materially understate expenses and materially overstate reported gross margins and

---

[3] "Plaintiffs" are Danske Investment Management A/S and Pension Fund of Local No. One, I.A.T.S.E.

net income," and 2) "exaggerating its cash and cash equivalents and revenue while underreporting its bank loan balances."  (CAC ¶ 9.)

> **A.      Plaintiffs Allege that Longtop Used XLHRS to Understate Expenses and Overstate Gross Margins and Net Income.**

In support of their argument that Longtop used XLHRS to understate expenses and overstate gross margins and net income, Plaintiffs allege that 1) XLHRS was either "wholly-owned" by Longtop or a "related entity," 2) Longtop fraudulently transferred its employee-related expenses to XLHRS, and 3) Longtop used XLHRS to underpay its state social welfare benefits.

> **1.      Plaintiffs claim that XLHRS was either "wholly-owned" or a "related entity."**

Plaintiffs allege both that Longtop "wholly owned" XLHRS and that XLHRS was a "related entity," and therefore that Longtop's public statements that it was an "unrelated party" were false (the "wholly-owned/related" allegation).  (CAC ¶¶ 9, 45, 46, 54, 60, 69, 92, 116, 130, 134-37.)  In support, Plaintiffs identify ten "facts" from the Short Reports (the "Ten Short Report Facts").  Nine are contained in the Citron report:  1) XLHRS shares a name with Longtop; 2) Longtop is XLHRS's only customer; 3) "XLHRS was formed in May of 2007, just months before [Longtop's] IPO;" 4) Longtop did not identify XLHRS in its SEC filings until the annual report filed July 2008, even though XLHRS is Longtop's "largest line item expenditure by far;" 5) "XLHRS has no website and does not seem to be soliciting any customers;" 6) Longtop "did not have any long term contract and did not have to pay any penalties or minimums in [its] relationship with XLHRS;" 7) "XLHRS used the same email server as [Longtop];" 8) "XLHRS has for months been located in the same building as Longtop;" 9) "When the outsourcing agency relationship was challenged, [Longtop's] response was to terminate it." (CAC ¶ 45.)  The tenth purported fact is from the OLP Global report: 10) "Two [Longtop] employees have been

administering XLHRS company filings." (CAC ¶ 54.)  Notably, Plaintiffs do not explain how these Ten Short Report Facts or any other alleged facts, even if true, establish that XLHRS was a "related entity" and/or "wholly owned" and how Longtop violated GAAP.

### 2. Plaintiffs claim that Longtop used fraudulent off-balance-sheet transfers to avoid reflecting employee-related expenses in its financial statements.

Plaintiffs further allege that Longtop fraudulently transferred its employee-related expenses off balance sheet to XLHRS (the "off-balance-sheet" allegation). (CAC ¶ 9, 45, 46, 60, 134, 157.)  Plaintiffs allege that this allowed Longtop to "improperly understate[] [its] expenses, including those associated with its workforce, thereby artificially inflating gross margins," relying on ten Short Report Facts. (CAC ¶¶ 9, 45, 69, 73, 76, 83, 92, 98, 102, 106.)  Again, Plaintiffs do not explain how the Ten Short Report Facts or any other alleged facts establish that Longtop used XLHRS to avoid expenses on its balance sheet, either because it should be consolidated under the relevant accounting principles or otherwise.

### 3. Plaintiffs allege that XLHRS underpaid state social welfare benefits.

In addition to the off-balance-sheet allegation, Plaintiffs allege that Longtop used XLHRS to "consistently under-contribute[] to state social welfare benefit funds" (the "social welfare benefits" allegation).  (CAC ¶ 54.)  In support, Plaintiffs rely exclusively on the OLP Global Report, which concludes that "XLHRS paid…in social welfare benefits on behalf of [Longtop], an amount that appear[s] too low for a headcount of 3,235 [Longtop] employees that were contracted through XLHRS as of March 31, 2010." (CAC ¶ 54.)  Plaintiffs allege that this had the effect of further "inflating Longtop's margins by several million dollars." (CAC ¶ 54.) Neither Plaintiffs nor OLP Global analyze the social welfare benefits that Longtop disclosed it paid to support this allegation, and focus solely on OLP Global's interpretation of XLHRS's

People's Republic of China ("PRC") GAAP audited financial statements which are not relevant to Longtop's US GAAP financial statements.

### B.      Plaintiffs Claim that Longtop Falsified Reported Cash and Loan Balances.

Plaintiffs allege that during the class period Longtop's financial statements failed to disclose that "Longtop had falsified its cash positions and bank loan balances by manipulating and lying about bank records and confirmations and later, by interfering with DTT's contacts with those banks" (the "cash and loan balances" allegation). (CAC ¶ 59.)  Plaintiffs rely exclusively on the May 23, 2011 DTT resignation letter in support, even though DTT's resignation letter does not indicate that there were falsified cash positions and bank loan balances in financial statements published during the class period.  (CAC ¶ 58.)

### C.      Plaintiffs Allege that Longtop Fraudulently Reported Revenue and Net Income.

Plaintiffs further allege that Longtop's financial statements were materially false and misleading because they failed to disclose that Longtop "fabricated its revenue and net income" (the  "revenue and net income" allegation).  (CAC ¶ 69, 73, 76, 83, 92, 98, 102, 106.)  This allegation is based on the statement in the DTT resignation letter that Mr. Ka stated that "there were fake revenue in the past so there were fake cash recorded on the books."  Although included in its reasons for its resignation, DTT mentions sales revenue merely as an aside: "(and also now seemingly in the sales revenue)."  (CAC ¶ 58.)  Neither DTT nor Plaintiffs explain how Longtop "fabricated its revenue and net income."

## IV.    LEGAL STANDARDS

### A.      Section 10(b)

To state a claim under Section 10(b), plaintiffs must allege: (1) a material misrepresentation; (2) scienter; (3) a connection with the purchase or sale of a security; (4)

7

reliance; (5) economic loss; and (6) loss causation.  *Dura Pharms, Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005).[4]

### 1.      The PSLRA and Rule 9(b)

Plaintiffs' Section 10(b) claim is subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) and the PSLRA.  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007).  Under the PSLRA, Plaintiffs must plead particularized facts "(1) specify[ing] the statements that [plaintiffs] contend[] were fraudulent, (2) identify[ing] the speaker, (3) stat[ing] where and when the statements were made, and (4) explain[ing] why the statements were fraudulent."  *Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir. 2000).  The PSLRA mandates dismissal of a complaint that fails to meet these heightened pleading requirements. 15 U.S.C. § 78u-4(b)(3)(A).

### 2.      Scienter

The Amended Complaint must, "*with respect to each act or omission … state with particularity facts* giving rise to a *strong* inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(emphasis added).  The required state of mind is "an intent to deceive, manipulate, or defraud."  *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 168 (2d Cir. 2000) (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976)).  The scienter inference "must be more than merely 'reasonable' or 'permissible'—it must be cogent and compelling, thus strong in light of other explanations" and "at least as compelling as any opposing inference one could draw from the facts alleged."  *Tellabs*, 551 U.S. at 324.  Thus, "a court must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff."  *Id.*

---

[4] As this motion challenges only the CAC's allegations of scienter and material misrepresentations, only these elements will be discussed herein.

8

To satisfy the scienter requirement, plaintiffs must demonstrate either (1) "that [each] defendant[] had both motive and opportunity to commit fraud," or (2) allege "facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Ganino*, 228 F.3d at 168-69. Where a complaint fails to adequately allege motive, "the strength of circumstantial allegations of conscious misbehavior or recklessness 'must be correspondingly greater.'" *In re Bayer AG Sec. Litig.*, No. 03 Civ. 1546, 2004 U.S. Dist. LEXIS 19593, at *43 (S.D.N.Y. Sept. 30, 2004) (quoting *Beck v. Mfrs. Hanover Trust Co.*, 820 F.2d 46, 50 (2d Cir. 1987)).

The PSLRA and Rule 9(b) require plaintiffs to allege with particularity that ***each individual*** defendant acted with the requisite scienter. *In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 440-41 (S.D.N.Y. 2005). The group pleading doctrine cannot be used to create a presumption of scienter as to individual defendants. *Id.*

### 3. Material misrepresentation

The PSLRA's heightened pleading standards require that falsity be pled with particularity—plaintiffs must specifically identify each allegedly false or misleading statement and the reason why the statement was false or misleading. 15 U.S.C. § 78u-4(b)(1). Plaintiffs must do more than allege a statement was materially misleading—"they must demonstrate with specificity why and how that is so." *In re Optionable Sec. Litig.*, 577 F. Supp. 2d 681, 689 (S.D.N.Y. 2008) (quoting *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004)). Further, Plaintiffs may not plead fraud by hindsight, but instead must allege particularized facts demonstrating that a statement or omission was false when made. *Slayton v. Am. Express Co.*, 604 F.3d 758, 776 (2d Cir. 2010).

### B. Section 20(a)

To prevail on a Section 20(a) claim, Plaintiffs must establish (1) a primary violation by a controlled person; (2) control of the primary violator by the defendant; and (3) that the

9

controlling person was in some meaningful sense a culpable participant in the primary violation.
*Boguslavsky v. Kaplan*, 159 F.3d 715, 720 (2d Cir. 1998).

## V.  ARGUMENT AND AUTHORITIES

### A.  Plaintiffs Fail to Establish a "Strong Inference" of Palaschuk's Scienter.

Plaintiffs fail to identify a single fact indicating that Palaschuk was aware that any of the
statements attributed to him were untrue when made.  The CAC does not identify a single
internal document or communication received by Palaschuk contradicting his public statements.
*See In re Spiegel, Inc. Sec. Litig.*, 382 F. Supp. 2d 989, 1027 (N.D. Ill. 2004) (that defendants
reviewed reports or drafted memoranda discussing the alleged issues, but not status as officers of
the company, was sufficient to establish scienter).  Nor do Plaintiffs rely on any confidential
witnesses to place Palaschuk at meetings or receiving communications discussing any of the
alleged fraudulent practices.  *See Id*. at 1030 (plaintiffs did not allege that the CFO "attended any
previous [Audit] committee meetings, or that he reviewed any documents revealing the fraud"
and failed to establish scienter).  Failure to plead such facts not only falls far short of the strong
inference of scienter the PSLRA requires, but creates the inference that scienter did not exist.

Instead of pleading specific facts, Plaintiffs plead circumstantial facts:  Palaschuk's and
DTT's resignations, the existence of the Short Reports, Palaschuk's position as CFO, allegations
that Palaschuk had a motive and opportunity to commit fraud through relatively small stock sales,
his signing of Longtop's SEC filings and Sarbanes-Oxley certifications, and through group
pleading.  These facts—whether considered in isolation or together—fail to raise a strong
inference of scienter against Palaschuk.

### 1.  The Short Reports do not establish scienter.

Most of Plaintiffs' factual allegations rest on the Short Reports.  But as discussed in detail
below  in Section V(B), the allegations in the Short Reports do not even demonstrate a violation

10

of GAAP, much less raise a strong inference that Palaschuk had any information that Longtop's financials were false or misleading.  Indeed, the Short Reports do not mention Palaschuk, and they were all published after Longtop's last reported financial statement[5]—they are not "red flags" that Palaschuk ignored prior to certifying Longtop's financials.

### 2.    Palaschuk's and DTT's resignations do not establish scienter.

An executive's resignation is probative of scienter only when a plaintiff's factual allegations establish a sufficient link between the resignation and the alleged fraud.  *In re PXRE Group, Ltd., Sec. Litig.*, 600 F. Supp. 2d 510, 545 (S.D.N.Y. 2009); *see also In re BISYS*, 397 F. Supp. 2d at 446–447 ( "Plaintiffs, however, have alleged no facts linking the resignation of [two of the individual defendants] to the accounting improprieties at BISYS.").  This is because "there are any number of reasons that an executive might resign, most of which are not related to fraud...." *Id.*  In other words, the circumstances of the resignation must raise an inference that the executive engaged in wrongdoing.  Such circumstances are not present here.

Plaintiffs allege that Palaschuk resigned on May 19, 2011, but the only support for their conclusion that the "sudden resignation" was "in the midst of skepticism over the Company's financial condition and business operation" is its timing.  But even when a resignation and an alleged corrective disclosure are near in time,  it does not permit a "cogent and compelling" inference that "the defendant corporation forced certain employees to resign because of its knowledge of the employee's role in the fraudulent representations." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1002 (9th Cir. 2009).

In fact, the timing of Palaschuk's resignation raises competing plausible, nonculpable explanations, which the Court must weigh against any culpable explanations.  *Tellabs*, 551 U.S.

---

[5] Longtop's last reported financial statement was for its quarter ended December 31, 2010, issued January 31, 2011.

at 324.  Notably, Palaschuk resigned before DTT's resignation, inferring that he first learned of

the DTT issues as they were being discovered by DTT.  The most plausible inference is that he

resigned because certain members of Longtop management interfered with DTT's audit process

and Longtop's unlawful detention of DTT audit files, and/or his desire to cease being associated

with these members of Longtop management.  This inference is further supported by the entire

Audit Committee's resignation on July 1, 2011, leaving the two founders (the Chairman, who

admitted to DTT that there was "fake revenue in the past so there were fake cash recorded on the

books," and the CEO) and a third director as the only members of Longtop's board. (CAC ¶ 58;

Price Decl. Ex. 7.)

　　　　　Nor does DTT's resignation contribute to Palaschuk's scienter.  As one district court

recently held:

> [T]he fact that an auditor resigns because it feels it cannot rely on management's
> representations, by itself, does not demonstrate that management was
> intentionally, recklessly, or deliberately withholding information….Without
> allegations detailing the inaccuracies in the financial statements, the types of
> information that defendants purportedly withheld, **_and the knowledge or_**
> **_participation of the individual defendants in the withholding_**, plaintiffs fail to
> plead scienter.

*In re Am. Apparel, Inc. S'holder Litig.*, No. CV 10-06352, 2012 WL 1131684, at *27 (C.D. Cal.

Jan. 13, 2012) (emphasis added).[6]  Importantly, although the DTT letter specifically identifies

Longtop's Chief Operating Officer, it did not mention Palaschuk.  (CAC ¶ 58.)  Palaschuk's and

DTT's resignations, therefore, not only do not raise a strong inference of Palaschuk's scienter,

but actually raise a competing inference of no scienter.

---

[6] *See also Zucco Partners*, 552 F.3d at 1002 ("[T]he resignation of KPMG as Digimarc's
independent accounting firm a month after the restatement was issued is not surprising—it had
just been partially responsible for the corporation's failure to adequately control its accounting
procedures. This is not enough to support a strong inference of scienter.")

*536,202,831 7AUS*

### 3.      Palaschuk's position as CFO does not establish his scienter.

Allegations that defendants must have had access to contradictory information solely by reason of their management roles and/or involvement in the business do not support an inference of scienter.  *In re Sec. Capital Assurance, Ltd. Sec. Litig.*, 729 F. Supp. 2d 569, 595 (S.D.N.Y. 2010).  A CFO is not omnipotent—he or she must rely upon the information supplied by company employees.  To raise an inference of scienter, Plaintiffs must "specifically identify the reports or [internal] statements" that contradicted the public statements.  *Novak*, 216 F.3d at 309.

Plaintiffs allege that "Defendant Palaschuk, the Company's CFO, was intimately involved with Longtop's financial reporting," and "Palaschuk demonstrated an in-depth involvement in the presentation of the fraudulent financial results."  (CAC ¶¶ 118, 120.)  But even assuming that the financial statements in question were false (which, as discussed in Section V(B) below, Plaintiffs fail to establish), without specifically identifying facts showing how or why Palaschuk knew the financial results were false, Plaintiffs' allegations do not establish his scienter.  *Novak*, 216 F.3d at 309.  Indeed, Plaintiffs do not establish the existence of a single fact known to Palaschuk, such as receipt of an internal document, communication, or report, that would indicate the falsity of the financial statements or any other public statement attributed to him.  Their reliance on his position as CFO, therefore, creates no inference of scienter.  *Sec. Capital*, 729 F. Supp. 2d at 595.

### 4.      Palaschuk's alleged stock sales fail to establish motive and opportunity to commit fraud.

In the absence of circumstantial evidence establishing scienter, a strong inference of scienter can arise from particularized allegations "that [each] defendant[] had both motive and opportunity to commit fraud."  *Ganino*, 228 F.3d at 168.  Plaintiffs must particularly allege "concrete benefits that could be realized by one or more of the false statements and wrongful

nondisclosures alleged," and "the means and likely prospect of achieving concrete benefits by the means alleged." *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1130 (2d Cir. 1994).

The CAC's only "motive and opportunity" allegations are that Palaschuk sold 150,000 shares of Longtop stock during the class period, but Plaintiffs do not specify the source of this information.  (CAC ¶ 122.)  Although Palaschuk filed a Form 144 on August 29, 2009 for 150,000 Longtop shares, a Form 144 is a "Notice of Proposed Sale of Securities" and therefore reflects only an ***intent*** to sell Longtop shares, and does not establish that Palaschuk ***actually*** sold 150,000 shares or the date(s) of any sale(s). (Price Decl. Ex. 8.)  Nor does Form 144 or the CAC reflect any of Palaschuk's purchases of Longtop shares during the class period or the number of shares that Palaschuk held during the class period.

Even if Palaschuk did sell 150,000 shares, insider trading raises a scienter inference only when the sales are suspicious in timing or amount. *San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos., Inc.*, 75 F.3d 801, 814 (2d Cir. 1996).  Because Plaintiffs do not give the date of Palaschuk's sale, discuss any of his purchase or sale history to show that the sale were larger than previous sales, or indicate his total position in Longtop's shares, they fail to establish that the sale was suspicious in timing or amount.  *Id*.  Accordingly, the facts Plaintiffs plead about Palaschuk's stock sales fail to create the inference that they were motivated by fraud.

In fact, the timing indicated in Palaschuk's Form 144 negates an inference of scienter as the intention was to sell between August 26 and September 10, 2009, years before the alleged "truth beg[an] to emerge" on April 26, 2011.  (Price Decl. Ex. 8; CAC ¶ 44)  His sales, therefore, were not motivated by a desire to "cash in" on the alleged fraud before the market learned of it, which negates an inference of scienter.  *See BISYS*, 397 F. Supp. 2d at 444-45 (insider sales not

14

unusual when not clustered at the end of class period, "when insiders theoretically would have rushed to cash out before the fraud was revealed and stock prices plummeted").

     **5.**     **Palaschuk's signing of Longtop's SEC filings and Sarbanes-Oxley certifications do not establish scienter.**

That an executive signed SEC filings, without more, such as particularized allegations of red flags, is insufficient to establish scienter. *Goplen v. 51job, Inc.*, 453 F. Supp. 2d 759, 774-75 (S.D.N.Y. 2006). Nor does the signing of Sarbanes-Oxley certifications raise a strong inference of scienter. *In re Top Tankers, Inc. Sec. Litig.*, 528 F. Supp. 2d 408, 415 (S.D.N.Y. 2007).

As previously discussed, Plaintiffs do not suggest that Palaschuk was aware of any facts that would constitute a "red flag." While the Short Reports publicly questioned Longtop's relationship with XLHRS, the final Longtop SEC filing that Palaschuk signed was on January 31, 2011, nearly three months before publication of the first Short Report on April 26, 2011. (CAC ¶ 103.) The Short Reports, therefore, cannot be considered a "red flag" present at the time Palaschuk signed the allegedly false SEC filings and Sarbanes-Oxley certifications.

     **6.**     **Plaintiffs cannot plead Palaschuk's scienter through group pleading.**

The group pleading doctrine, if applicable at all, specifically does not apply to scienter allegations, and each defendant's state of mind must be pled with particularity. *In re AstraZenaca Sec. Litig.*, 559 F. Supp. 2d 453, 472 (S.D.N.Y. 2008) ("The group pleading doctrine cannot apply to create a presumption of scienter as to individual defendants."). Accordingly, although Plaintiffs allege that "it is appropriate to treat the Individual Defendants as a group for pleading purposes," Plaintiffs cannot use the alleged knowledge of any other defendant to establish Palaschuk's scienter.

In particular, the allegation that Defendant Ka told DTT that "senior management" was involved in the "fake revenue in the past so there were fake cash recorded on the books," cannot

establish Palaschuk's scienter because Defendant Ka's knowledge cannot be attributed to Palaschuk. *AstraZenaca*, 559 F. Supp. 2d at 472.  Nor can Palaschuk be presumed to be included in the "senior management" referred to by Defendant Ka without particular allegations specific to him. *Id*.  Indeed, the DTT resignation letter makes no mention of Palaschuk.  Plaintiffs' group pleading cannot substitute for a lack of such scienter allegations specific to Palaschuk.

**B.      Plaintiffs Fail to Establish that Longtop's Public Statements were False.**

Plaintiffs allege that Longtop's public statements during the class period were false or misleading for failure to disclose five distinct facts set forth in Section III, subsections A(1), A(2), A(3), B, and C.  These allegations, however, do not support that each of Longtop's public statements was false.

Most of these allegations are based on the Short Reports. As an initial matter, "facts" contained in the reports of entities that short the stock of the companies they report on are obviously suspect.  For example, Citron disclosed that "[a]t any times the principals of Citron might hold a position in any of the securities profiled on the site."[7]  And the Chief Investment Officer at Bronte Capital wrote in his blog that he held short positions in Longtop's shares. (Price Decl. Ex. 5.)  Because these firms have a financial motivation to issue negative reports, that they questioned Longtop's use of XLHRS should not be a basis for concluding that Plaintiffs' allegations regarding XLHRS are true.  Holding that allegations in short reports are sufficient to state a securities fraud claim without a proper application of the alleged facts and relevant accounting principles would eviscerate the PSLRA and open the floodgates of litigation.

---

[7] This language can be found in a legal disclaimer posted on Citron Research's website at http://www.citronresearch.com/index.php/disclaimer as of April 18, 2012.

1.      **XLHRS was neither "wholly owned" by Longtop, nor a "related entity."**

Plaintiffs allege that Longtop's statements that XLHRS is "an unrelated party" are false because XLHRS was either "wholly owned" by Longtop and/or was a "related entity" to which Longtop transferred off-balance-sheet employee expenses. (CAC ¶¶ 9, 45-47, 52, 54, 60, 67, 69, 88, 92, 116, 134, 136-37.)  But these allegations are entirely conclusory and cannot establish that Longtop violated GAAP, much less issued materially false statements. (*See* CAC ¶¶ 47,60.)

Plaintiffs allege no facts to establish that Longtop "wholly owned" XLHRS.  The Citron report they rely upon does not make this conclusion. (*See* CAC ¶ 45.)  In fact, Longtop's and XLHRS's public statements show that Longtop does not "wholly own" XLHRS.  In a March 31, 2010 conference call, Ms. Hong Liang, the CEO of XLHRS, disclosed that:

> Investors can see from the public report that the shareholders of [XLHRS] are Xiamen individuals, whose names are Xi Wei, who has 90% of the shares, and Hong Shuichan, who has 10% of the shares….Longtop does not have any ownership directly or indirectly in [XLHRS], nor does Longtop provide financing to [XLHRS]. Xi Wei and Hong Shuichan and I are not related to any of the Longtop management team, including Mr. Lian, the CEO, or Mr. Jia, the Chairman. [XLHRS] is not a related party to Longtop…

(Price Decl. Ex. 9 at 6.)  The relevant portion of the public report referred to in the March 31, 2010 conference call is attached as Exhibit 10, and reflects XLHRS's ownership.[8]  Neither of the shareholders of XLHRS, Xi Wei nor Hong Shuichan, are officers or directors of Longtop, and Plaintiffs do not attempt to explain how either are affiliated with Longtop in any way. (*See, e.g.*,  Price Decl. Ex. 1 at 72-74.)  XLHRS, therefore, was not "wholly owned" by Longtop.

---

[8] Plaintiffs introduce XLHRS's SAIC report in ¶ 116, and Defendant introduces the remainder of the report under Federal Rule of Evidence 106.  *See Magellan Int'l Corp. v. Salzgitter Handel GmbH*, 76 F. Supp. 2d 919, 922 (N.D. Ill. 1999) (entirety of documents referred to in the complaint may be properly considered as part of the pleadings).

17

Nor do Plaintiffs explain why XLHRS qualifies as a "related entity."  (*See* CAC ¶ 9.) Although Plaintiffs note that Statement of Financial Accounting Standards ("SFAS") No. 57 mandates disclosure of material related-party transactions in certain circumstances, they make no attempt to demonstrate why XLHRS qualifies as a "related party" under SFAS No. 57.  While Plaintiffs allege the Ten Short Report Facts about XLHRS (*see* Section III(A)(1)), they make no attempt to either identify the relevant accounting principles governing whether an entity is a "related party" or to demonstrate that ***any*** of the Ten Short Report Facts or other alleged facts are relevant under those principles. (CAC ¶¶ 45, 54.)  For instance, Plaintiffs do not explain why the alleged fact that XLHRS was formed a few months before Longtop's IPO qualifies XLHRS as a "related party."  These wholly-owned/related allegations therefore fail to provide the particularized facts the PSLRA requires and must be dismissed.  *Novak*, 216 F.3d at 306.

### 2. Longtop was not required to consolidate XLHRS with its financial statements, and it did not engage in improper "off-balance-sheet transfers."

Plaintiffs allege that Longtop used XLHRS to improperly understate its workforce expenses and thereby increase its operating margins in "fraudulent off-balance sheet transfers." (CAC ¶¶ 46, 69.)  But Plaintiffs do not explain their theory of how Longtop allegedly accomplished this.  This alone is grounds for dismissal.

Assuming that Plaintiffs are alleging that XLHRS should have been consolidated with Longtop, Plaintiffs fail to explain why consolidation was required or how Longtop used XLHRS to understate its workforce-related expenses.

### a. Plaintiffs do not explain with the requisite specificity why Longtop was required to consolidate XLHRS.

To sufficiently plead that a company's financial statements were materially false and misleading because of an accounting error, a plaintiff must identify with particularity the

18

governing accounting principle and the facts that demonstrate a violation of the accounting

principle.  *See Zucker v. Sasaki*, 963 F. Supp. 301, 309 (S.D.N.Y. 1997) (to plead accounting

fraud, "a plaintiff must specify the improper transactions, explain why such procedures used

were improper, and estimate the approximate amount by which the company's finances were

misstated.").[9]  Plaintiffs allege that the statements in Longtop's 2009 and 2010 year-end results

reported on Form 20-F were false because during the class period Longtop used XLHRS to

improperly understate its workforce-related expenses.  (CAC ¶ 69, 92.)  Although Plaintiffs

allege the Ten Short Report Facts and conclude that XLHRS was "wholly owned" and/or related

to Longtop and should have been consolidated with Longtop, they make no attempt to

demonstrate why ***any*** of these facts are relevant factors under GAAP or any other accounting

principle governing consolidation of "wholly owned" or "related entities." (CAC ¶¶ 45, 54.)  For

instance, assuming the allegation that XLHRS did not have a website is true, Plaintiffs do not

explain why lack of a website would require XLHRS to be consolidated with Longtop under U.S.

GAAP.  Longtop's public statements and XLHRS's SAIC reports establish that neither Longtop

nor its officers or directors directly or indirectly owned ***any*** XLHRS shares, but Plaintiffs do not

explain why the SAIC report is false or what US GAAP accounting principles they are relying on

to support their allegations.

Plaintiffs' unremarkable proposition that GAAP requires useful, reliable, and complete

disclosures of a company's economic resources and financial information and general allegation

that "Longtop's Class Period financial statements violated GAAP" does not fulfill Plaintiffs'

---

[9] *See also Lindner Dividend Fund, Inc. v. Ernst & Young*, 880 F. Supp. 49, 58 (D. Mass. 1995)
(finding that plaintiff's failure to identify the applicable auditing principle or the manner in
which the principles were allegedly disregarded was insufficient to state a claim);  *Decker v.
Massey-Ferguson, Ltd.*, 534 F. Supp. 873, 883 (S.D.N.Y. 1981) (to plead accounting fraud with
particularity under Rule 9(b) a complaint specify the relevant auditing standard, accounting
principle, or standard of fair reporting purportedly violated).

burden. (CAC ¶ 108, 110.)  When a plaintiff fails to link alleged GAAP violations to specific alleged misstatements in such a way to show that the statements were in fact fraudulent, as Plaintiffs fail to do here, the allegations fail to establish falsity. *In re Alcatel Sec. Litig.*, 382 F. Supp. 2d 513, 533 (S.D.N.Y. 2005).  Plaintiffs' failure to explain why Longtop was required to consolidate XLHRS requires dismissal of its off-balance-sheet allegation.

> ### b.     Plaintiffs fail to explain how XLHRS allowed Longtop to improperly understate expenses and inflate margins.

Other than suggesting that Longtop used XLHRS to under-contribute its employee welfare benefits, which is incorrect as discussed below, Plaintiffs fail to explain with the requisite particularity how XLHRS allowed Longtop to "improperly understate expenses." (CAC ¶ 69.)  Although Citron notes that off-balance-sheet transfers can create "opportunities for massive accounting fraud," neither Citron nor Plaintiffs explain how the relationship was "fraudulent" in any way. (*See* CAC ¶ 45, 46.)  This is not a situation where a company admits that it improperly recorded liabilities in off-balance-sheet transfers.  *See, e.g., In re Adelphia Commc'n. Corp.*, No. 03 MD 1529 (LMM), 2006 WL 2463355, at *2 (S.D.N.Y. Aug. 23 2006) (plaintiffs filed a securities class action following Adelphia's revelation that billions of dollars in off-balance-sheet debt had not been disclosed in prior filings).  Rather, it is common for companies to outsource corporate functions (such as IT, administrative, or employment).  There is nothing unusual or suspect, much less fraudulent, about outsourcing such functions.

In fact, Longtop disclosed its workforce-related expenses, including social welfare benefits payments.  Plaintiffs do not explain why these expenses were fraudulently lower than they would have been had Longtop employed the staff directly rather than through XLHRS or otherwise violated any relevant accounting principle.  Nor do they compare the expenses to the those of alleged "peer" companies with allegedly lower margins.  (*See* CAC ¶ 45.)  For example,

Longtop disclosed that (1) it paid an average salary of $700 per month as of March 31, 2010 for each employee contracted through third-party staffing companies, including XLHRS, (2) it paid social welfare benefits on behalf of all of its employees, including those contracted through staffing companies, of $4.2 million for the year ended March 31, 2009, $7.7 million for the year ended March 31, 2010, and $14.8 million for the year ended March 31, 2011, and (3) its average social welfare contribution per employee was $2,300 in fiscal 2010 and $2,900 in fiscal 2011, based on the average quarter-end employee headcount.  (Price Decl. Ex. 9 at 3; Price Decl. Ex. 4; Price Decl. Ex. 1 at F-31.)  Plaintiffs, therefore, fail to show that Longtop used off-balance-sheet transfers to understate its expenses.

### 3. The facts Plaintiffs plead about Longtop's social welfare payments do not establish that its financial statements were false.

Plaintiffs quote the OLP Global report suggesting that XLHRS "consistently under-contribute[] to state social welfare benefit funds, thus inflating Longtop's margins by several million dollars." (CAC ¶ 54.)  OLP Global based this conclusion on "information from XLHRS 2009 [PRC GAAP] audited financial statements."  (CAC ¶ 54.)  But when the alleged "facts" from the OLP Global report are viewed in the context of Longtop's own financial statements, they fail to support Plaintiffs allegations.

First, XLHRS is a Chinese company and its 2009 audited financial statements referred to in the OLP Global Report are not required to be in accordance with U.S. GAAP, but are prepared in accordance with PRC GAAP.  Whether the information OLP Global relied upon actually supports its conclusion, therefore, is questionable.

Second, as referred to in Section V(B)(2)(b) above, *Longtop reflected on its own financial statements the expense of the social welfare contributions* on behalf of the employees it sourced through XLHRS.  (Price Decl. Ex. 1 at F-31; Price Decl. Ex. 3.)  OLP Global's failure

to analyze the facts Longtop disclosed in its own financial statements makes its report, which appears to analyze only XLHRS's contributions on behalf of its own employees, inapplicable to the social welfare benefits allegation.

OLP Global's report, therefore, does not establish that Longtop actually "under-contributed social welfare benefits, creat[ed] inflated margins, and possibly violat[ed] China's labor law," when viewed in the context of Longtop's own disclosures.  (CAC ¶ 54.)  And Plaintiffs' failure to conduct any further analysis, such as applying Longtop's disclosures to the China labor law requirements or comparing them to those of "peer" companies, requires dismissal of the social welfare benefits allegation.

### 4. DTT's resignation does not establish falsity of Longtop's financial statements prior to the full year ended March 31, 2011.

DTT stated that it resigned in connection with irregularities it encountered in its audit of the year ended March 31, 2011.[10]  (CAC ¶ 58.)  Notably, DTT did *not* resign because of anything related to XLHRS.  DTT's resignation, therefore, does not support the wholly-owned/related, off-balance-sheet, and social welfare benefits allegations.

While DTT's resignation letter relates to issues with cash and loan balances as of March 31, 2011, it does not support the cash and loan balances allegation for the periods previously reported during the class period.  DTT refers only to its audit for the year ended March 31, 2011, and financial statements for that period were not published publicly during the class period.  In its resignation letter, DTT did not state, for example, that the cash and loan balances were false on December 31, 2010, the last quarterly financial statement issued by Longtop during the class period.

---

[10] Longtop had not publicly released its financial statements for the three months ended March 31, 2011 or its annual report for the year ended March 31, 2011.

5.    **Plaintiffs fail to establish that Longtop fabricated its revenue and net income.**

Plaintiffs seize on the language in the DTT resignation letter, including Mr. Ka's statement that "there were fake revenue in the past so there were fake cash recorded on the books," and that based on this statement, DTT identified falsity "seemingly in the sales revenue." (CAC ¶¶ 57-58.)  Plaintiffs, however, allege no further facts to support the allegation that Longtop fabricated its revenue and net income.  They do not even attempt to identify which revenue stream was falsely reported and in what periods, how Longtop's revenue and income accounting violated GAAP, or quantify the amount of revenue that they allege Longtop fabricated.  This failure to satisfy the strict PSLRA pleading requirements requires dismissal of Plaintiffs' claims based on the revenue and net income allegation.

6.    **Plaintiffs fail to identify materially false and misleading statements in Longtop's SPO Prospectus and Prospectus Supplement.**

Plaintiffs do not attempt to identify with particularity any of the statements in Longtop's 51-page Prospectus and Prospectus Supplement issued in connection with the SPO it alleges are materially false and misleading.  Plaintiffs' failure to "specify each statement alleged to have been misleading" as required under the PSLRA requires dismissal of the claims based on the statements in the Prospectus and Prospectus Supplement.  15 U.S.C. § 78u-4(b)(1).

C.    **Many of Longtop's and Palaschuk's Statements are Protected by the PSLRA Safe Harbor.**

The PSLRA Safe Harbor protects statements that are forward-looking and accompanied by meaningful cautionary language.  15 U.S.C. § 78u-5(c)(1).  Forward-looking statements are projections of revenue, income, earnings, capital expenditures, capital structure or other financial items;[11] plans and objectives of management for future operations;[12] and statements about future

---

[11] *Slayton*, 604 F.3d at 766-67 (quoting 15 U.S.C. § 75u-5(h)(i)(1)(A)).

economic performance, including financial condition or results of operations.[13]  The PSLRA

established a statutory safe harbor for these forward-looking statements that protects them in two

ways.  *Slayton*, 604 F.3d at 765.  First, forward-looking statements are protected even in the

absence of meaningful cautionary language where a plaintiff fails to establish that the statement

was made with actual knowledge that it was false or misleading.  *Id*. at 773 (citing 15 U.S.C. §

78u-5(c)).  Second, even if plaintiffs establish that defendants knew that they were false when

made, forward-looking statements are still protected if accompanied by meaningful cautionary

statements identifying important factors that could cause actual results to differ materially from

those in the forward-looking statement.  *Id*.

Many of the statements Plaintiffs allege are materially false or misleading are protected

by the PSLRA safe harbor.  Exhibit 11 is a chart of the forward-looking statements Plaintiffs

allege are materially false or misleading and the accompanying cautionary language.   Because

these statements are accompanied by meaningful cautionary language and Plaintiffs fail to

establish that Palaschuk had knowledge of their alleged falsity, the statements are protected by

the Safe Harbor and are immaterial as a matter of law.

### D.      Palaschuk Cannot be Liable for the Statements of Others as a Matter of Law.

Under the U.S. Supreme Court's recent holding in *Janus Capital*, a defendant cannot be

liable under Section 10(b) for a statement unless he is the maker of the statement, or "the person

or entity with ultimate authority over the statement, including its content and whether and how to

communicate it."  *Janus Capital Group Inc. v. First Derivative Traders*, 131 S. Ct.  2296, 2298

---

[12] 15 U.S.C. § 78u-5(h)(i)(1)(B).

[13] *Slayton*, 604 F.3d at 766-67 (citing 15 U.S.C. § 78u-5(h)(i)(1)(C)).  The Second Circuit explained that "[t]he use of linguistic cues like 'we expect' or 'we believe,' when combined with an explanatory description of the company's intention to thereby designate a statement as forward-looking, generally should be sufficient to put the reader on notice that the company is making a forward-looking statement."  *Id*. at 769.

24

(2011).  When evaluating whether the CAC states a claim against Palaschuk, therefore, the Court may not consider the statements made by other executives, specifically those attributed to Defendant Ka. (*See* CAC ¶¶ 58, 117.)

      **E.**    **Plaintiffs Fail to Establish Control-Person Claims.**

      To prevail on their Section 20(a) claim, Plaintiffs must establish (1) a primary violation by a controlled person; (2) control of the primary violator by the defendant; and (3) that the controlling person was in some meaningful sense a culpable participant in the primary violation. *Boguslavsky*, 159 F.3d at 720.  Because Plaintiffs fail to establish that Longtop's financial statements were materially misleading, they fail to establish a primary violation underlying their Section 20(a) claim.

      Plaintiffs also fail to establish control and culpable participation. That a defendant was a director or officer of the corporate entity does not suffice as a control allegation.  *See Harrison v. Rubenstein*, No. 02 Civ. 9356 (DAB), 2007 WL 582955, at * 19 (S.D.N.Y. Feb. 26, 2007) (dismissing control person claim because "pleading officer and director status alone is not enough").  Plaintiffs' allegations based on Palaschuk's position as CFO, therefore, fail to establish that he had sufficient control of the primary violator. (*See* CAC ¶¶ 118-120, 151-152.) Finally, as discussed in Section V(A) above, Plaintiffs do not show that Palaschuk knew that any of Longtop's public statements were false, and therefore cannot show that he was in some meaningful sense a culpable participant in the primary violation. *Boguslavsky*, 159 F.3d at 720. Their Section 20(a) claims against Palaschuk must be dismissed.

**VI.**    **CONCLUSION**

      For the reasons stated herein, Defendant Palaschuk respectfully requests that the Court dismiss the CAC's claims against him.

DATED:  April 26, 2012                     Respectfully submitted,

GREENBERG TRAURIG, LLP

By     /s/ Paul R. Bessette
      Paul R. Bessette
      Metlife Building
      200 Park Avenue
      New York, NY  10166
      Telephone:  (212) 801-2130
      Facsimile:  (212) 801-6400
      Email: bessettep@gtlaw.com

      Michael J. Biles (admitted *pro hac vice*)
      Royale Price (admitted *pro hac vice*)
      300 West 6th Street, Ste. 2050
      Austin, TX 78701
      Telephone:  (512) 320-7200
      Facsimile:  (512) 320-7210
      Email: bilesm@gtlaw.com
      Email: pricer@gtlaw.com

      *Attorneys for Defendant Derek Palaschuk*

26

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on April 26, 2012, I electronically filed the foregoing Defendant Derek Palaschuk's Corrected Memorandum of Law in Support of the Motion to Dismiss Plaintiffs' Consolidated Class Action Complaint with the Clerk of Court using the CM/ECF system which will send a notice of electronic filing to all counsel of record who have consented to electronic notification.  I further certify that I mailed the foregoing document and the notice of electronic filing by first-class mail to all non-CM/ECF participants.

*/s/Royale Price*
Royale Price

*536,202,831 7AUS*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE LONGTOP FINANCIAL TECHNOLOGIES LIMITED SECURITIES LITIGATION | Civil Action No.<br><br>11-cv-03658-SAS |

## [PROPOSED] ORDER ON DEFENDANT DEREK PALASCHUK'S MOTION TO DISMISS PLAINTIFFS' CONSOLIDATED CLASS ACTION COMPLAINT

The Court hereby GRANTS Defendant Derek Palaschuk's Motion to Dismiss Plaintiffs'

Consolidated Class Action Complaint.

Dated: _____, 2012
        New York, New York

        _____
        Honorable Shira A. Scheindlin
        United States District Judge

*536,202,831 7AUS*