UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------ X

IN RE LONGTOP FINANCIAL
TECHNOLOGIES LIMITED
SECURITIES LITIGATION

------------------------------------------------ X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 6/29/12

<u>OPINION AND ORDER</u>

11 Civ. 3658

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.    INTRODUCTION

This putative class action arises out of federal securities law claims. Danske Invest Management A/S ("Danske") and Pension Funds of Local No. One, I.A.T.S.E. ("Local One") bring this action against Longtop Financial Technologies, Ltd. ("Longtop") and several of its officers (Derek Palaschuk, Wai Chau Lin, and Hui Kung Ka). Plaintiffs' Consolidated Class Action Complaint alleges violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder (Count I) and violations of Section 20(a) of the Securities Exchange Act of 1934 (Count II). Palaschuk now moves to dismiss the complaint. For the reasons stated below, Palaschuk's motion is denied.

1

## II.     BACKGROUND

### A.     Plaintiffs

Danske is an investment manager for Investeringsforeningen Danske Invest and Den Professionelle Forening Danske Invest Institutional, both of whom acquired Longtop securities and assigned their claims to Danske.[1]

Local One provides welfare, pension and annuity benefits to Local One union membership consisting of members who operate, maintain, and construct stage and sound equipment for various New York City shows and concerts.  Local One acquired Longtop securities.[2]

Both Danske and Local One ("Lead plaintiffs") claim damages as a result of acquiring Longtop American Depositary Shares ("ADSs") during the period from June 29, 2009 through and including May 17, 2011 (the "Class Period"),[3] and were appointed co-Lead plaintiffs in this action by order of the Court on September 21, 2011.[4]

### B.     Defendants

---

[1]     *See* Complaint ¶ 17.

[2]     *See id.* ¶ 18.

[3]     *See id.* at 1.

[4]     *See id.* ¶¶ 17–18.

### 1.   Palaschuk

Derek Palaschuk served as Longtop's Chief Financial Officer from September 2006 until his resignation on May 19, 2011.[5]  Palaschuk is a resident of China.[6]

### 2.   Longtop

Longtop is another defendant in this class action, but has not yet filed an appearance or a responsive pleading.[7]  Longtop is incorporated under the laws of the Cayman Islands with principal executive offices located in North Point, Hong Kong.[8]  During the Class Period, Longtop "held itself out as a leading provider of software and information technology, or IT, services targeting the financial services industry in China."[9]  Longtop successfully marketed its ADSs in the U.S., as Longtop was considered the "perfect company" to serve China's IT banking sector, "a niche market poised for rapid growth."[10]  As a result, Longtop

---

[5]      *See id.* ¶ 23.

[6]      *See id.*

[7]      *See* Plaintiffs' Memorandum of Law in Opposition to Defendant's Motion to Dismiss ("Pl. Mem.") at 1 n.2.

[8]      *See* Complaint ¶ 20.

[9]      *See id.* ¶ 34 (quotation marks omitted).

[10]      *See id.*

experienced "immense growth" during the Class Period, reporting total revenues of $106.2 million and a net income of $43.5 million in the fiscal year ending March 31, 2009 (compared with revenues of $66.7 million and a net income of $2.9 million in the previous year).[11]  In the fiscal year ending March 31, 2010, revenues skyrocketed to $169.1 million and net income reached $59.1 million.[12]

Analysts credited Longtop's unique success to operating margins that "dwarfed those of its peers" — gross and operating margins of 62.5% and 35.8%, respectively, compared with peer rates of 15-50% and 10-25%, respectively.[13] Longtop's reported financial performance allowed the company to access greater U.S. capital through a Second Public Offering ("SPO"), through which Longtop raised more than $132 million, contributing to what Palaschuk termed a "robust" cash flow.[14]

Lead plaintiffs allege that Longtop and its officers perpetrated a "massive fraud,"[15] which is the cause of the subsequent drop in price of Longtop's

---

[11]     *See id.* ¶ 37.

[12]     *See id.*

[13]     *See id.* ¶ 38.

[14]     *See id.* ¶¶ 40, 42.

[15]     *See id.* ¶ 12.

ADSs from $42.73 to $0.[16]  Longtop is now delisted from the New York Stock
Exchange ("NYSE") and is the subject of an SEC investigation.[17]  Lead plaintiffs
allege that the materially false and misleading statements of officers — delivered
even as negative reports concerning Longtop emerged — artificially inflated the
price of Longtop ADSs throughout the Class Period.[18]  They further allege that the
ultimate decline in the ADS price caused substantial damage to all plaintiffs.[19]

### 3.   Additional Defendants

Wai Chau Lin a/k/a Weizhou Lian has served as director and Chief
Executive Officer of Longtop since Longtop's inception in June 1996.[20]  He is a
resident of China.[21]  Hui Kung Ka a/k/a Xiaogong Ka ("Ka") is one of Longtop's
founders and has served as Longtop's Chairman since the Company' inception.[22]
Ka is resident of China.[23]  Lead plaintiffs are in the process of serving these two

---

[16]     *See id.* ¶ 11.

[17]     *See id.*

[18]     *See id.* ¶¶ 147–148.

[19]     *See id.* ¶ 149.

[20]     *See id.* ¶ 22.

[21]     *See id.*

[22]     *See id.* ¶ 24.

[23]     *See id.*

defendants.[24]

### D.     Lead Plaintiffs' Allegations Against Palaschuk

#### 1.     Palaschuk's statements to the public

Lead plaintiffs allege that Palaschuk made false and misleading statements to the public throughout the Class Period.

##### a.     Form 20-F

On the first day of the Class Period, June 29, 2009, Longtop filed its 2009 Form 20-F (Lontop's fiscal year ends March 31)[25] with the SEC.[26]  This form was signed by Palaschuk.[27]  The Form 20-F reported total revenues of $106.2 million, operating expenses of $25.5 million, net income of $43.5 million, and a gross profit margin of 65.7% for the period.[28]  It reported that the financial statements were prepared in conformity with U.S. Generally Accepted Accounting Principles ("U.S. GAAP").[29]  The Form 20-F also discussed staffing and indicated that Longtop employed 2,039 contracted employees for a monthly service fee

---

[24]     *See* Pl. Mem. at 1 n.2.

[25]     *See* Complaint ¶ 4.

[26]     *See id.* ¶ 65.

[27]     *See id.*

[28]     *See id.*

[29]     *See id.* ¶ 69.

through Xiamen Longtop Human Resource Services Co, Ltd. ("XLHRS"), an "unrelated party."[30]  In connection with the filing of the 2009 Form 20-F, Palaschuk signed certifications pursuant to the Sarbanes-Oxley Act of 2002 "that affirmed the accuracy of Longtop's reported financial results and the effectiveness of its internal controls over reporting."[31]

On July 16, 2010, Palaschuk signed the 2010 Form 20-F, which reported total revenues of $169.1 million, operating expenses of $45.2 million, a net income of $59.1 million, a gross margin of 62.5%, and cash and cash equivalents of $331.9 million.[32]  The 2010 Form 20-F reiterated that XLHRS was an unrelated party,[33] and attributed gross margin and revenue growth to an improving line of products.[34]  The 2010 Form 20-F also included Palaschuk's Sarbanes-Oxley certifications,[35] and stated that it was produced in accordance with the standards of the U.S. Public Company Accounting Oversight Board.[36]

---

[30]     *See id.*

[31]     *See id.* ¶ 68.

[32]     *See id.* ¶ 87.

[33]     *See id.* ¶ 88.

[34]     *See id.* ¶ 90.

[35]     *See id.* ¶ 91.

[36]     *See id.* ¶ 89.

Lead plaintiffs allege that these certifications and statements were fraudulent in particular because they certified that Longtop's financial results were prepared in accordance with U.S. GAAP and that XLHRS was an unrelated entity.[37]  U.S. GAAP mandates the disclosure of material related-party transactions as set forth in the Financial Accounting Standards ("FAS") No. 57.[38]  Lead plaintiffs allege that XLHRS is a related entity[39] and Palaschuk made a material misstatement in signing Form 20-F that certified that XLHRS was an unrelated company.[40]

### b.    Press Releases

Longtop issued quarterly press releases, which were submitted to the SEC and signed by Palaschuk.  The first of these within the Class Period was issued on August 19, 2009, furnished to the SEC on Form 6-K, and signed by Palaschuk.[41]  The press release reported revenues of $28.5 million, operating expenses of $6.3 million, net income of $10.5 million, a gross margin of 62.6% for

---

[37]    *See id.* ¶ 107.

[38]    *See id.* ¶ 109; FAS no. 57 ¶ 1.

[39]    *See* Complaint ¶¶ 69, 92.

[40]    *See id.*

[41]    *See id.* ¶ 71.

the period, and cash and cash equivalents of $215.1 million.[42]

In the second quarter of 2010, Palaschuk signed another of these press releases which was again furnished to the SEC on Form 6-K.  This press release reported revenues of $42.8 million, operating expenses of $10 million, net income of $21.4 million, a gross margin of 65.9% for the period, and cash and cash equivalents of $226.4 million.[43]

In the third quarter of 2010, Palaschuk again signed a press release furnished to the SEC on Form 6-K.[44]  In the press release, Palaschuk stated that

> third quarter revenue and adjusted net income once more substantially exceeded guidance.  A robust third quarter cash flow from operations of US$39.2 million and US$50.1 million for the first nine months together with the proceeds from the November 2009 secondary offering will . . . help extend our leading position in China's financial technology industry.[45]

The press release also reported revenues of $54.7 million, operating expenses of $9.7 million, net income of $29.3 million, a gross margin of 71.4% for the period, cash and cash equivalents of $389.7 million, and $27.1 million in short term

---

[42]     *See id.*

[43]     *See id.* ¶ 74.

[44]     *See id.* ¶ 80.

[45]     *See id.* ¶ 82.

borrowings.[46]

Palaschuk signed the fourth quarter press release on May 24, 2010.[47]

It reported revenues of $43 million, operating expenses of $9 million, net income

of $16.3 million, and a gross margin of 61.5% for the quarter.[48]  Palaschuk also

participated in an investor conference call on May 24, 2010, and stated that he

expected "adjusted gross margins of 66% as compared to 67% in 2009 . . .[the]

margin decline is due to the acquisition of Giantstone and other investments we're

making, including annual salary increase of around 10%."[49]

Palaschuk continued to sign the quarterly press releases in 2011,

which were furnished to the SEC on Form 6-K.[50]  The first quarter's press release

reported revenues of $48.9 million, operating expenses of $9.4 million, net income

of $17.9 million, a gross margin of 58.4% for the period, and cash and cash

equivalents of $342.4 million.[51]  Palaschuk added a statement:

We have delivered sound top and bottom line financial results

---

[46]     *Id.* ¶ 80.

[47]     *See id.* ¶ 84.

[48]     *See id.*

[49]     *Id.* ¶ 86.

[50]     *See id.* ¶ 94.

[51]     *See id.*

10

during the first fiscal quarter, which is traditionally our lowest revenue and net income quarter in the fiscal year. The strong outlook, evidenced by a healthy backlog and pipeline in our core software development business, has allowed us to increase guidance, and for the first time in our history we expect to achieve US$100 million in Adjusted Net Income. As in previous years, in Q2 and Q3 2011 we expect significant improvements from this quarter in our margins as well as from cash flow from operations.[52]

In the second quarter of 2011, Palaschuk signed another press release.[53] It reported revenues of $55.5 million, operating expenses of $10.1 million, a net income of $25.7 million, a gross margin of 64.3% for the period, cash and cash equivalents of $379 million, and $27.1 million in short term borrowings.[54] Palaschuk added that "our order intake, margins and cash flow from operations which was US$31.6 million significantly improved in the second quarter . . . on the back of strong demand and execution, we are now raising our fiscal 2011 revenue guidance."[55]

On January 31, 2011, Palaschuk signed the final press release within the Class Period, noting, "Longtop's growth prospects remain bright for fiscal 2012 . . . Longtop's growth competitive position is stronger than ever . . . ."[56] This

---

[52] *Id.* ¶ 97.

[53] *See id.* ¶ 99.

[54] *See id.*

[55] *Id.* ¶ 101.

[56] *Id.* ¶¶ 103–104.

press release also reported revenues of $72.5 million, operating expenses of $12.8 million, net income of $35.6 million, a gross margin of 68.8% for the period, cash and cash equivalents of $423.2 million, and $10.6 million in short term borrowings.[57]

### 2. What Palaschuk Knew

Lead plaintiffs allege that Palaschuk's public statements were false and misleading because they failed to disclose that Longtop had (1) falsified records in relation to its cash position, (2) improperly stated expenses and artificially inflated gross margins, particularly with respect to its workforce and XLHRS, and (3) fabricated its revenue and net income.[58]  Generally, they allege that Palaschuk had no reasonable basis for speaking positively about Longtop's financial outlook during the Class Period.[59]   Lead plaintiffs allege that directors or senior officers were in "a position to control all of the company's false and misleading statements and omissions including the contents of the Forms Form 20-F, the Forms 6-K and press releases."[60]  They further allege that senior officers

---

[57]     *See id.* ¶ 103.

[58]     *See id.* ¶¶ 69, 73, 76, 83, 92, 98, 102, 106.

[59]     *See id.*

[60]     *Id.* ¶ 111.

knew and/or recklessly disregarded adverse facts[61] — namely, facts indicated in analyst reports and the resignation letter discussed below.[62]

Lead plaintiffs allege that "key officers" can rightfully bear liability for falsely portrayed cash levels, as such figures were significant to the company.[63] Lead plaintiffs also allege that directors and senior officers had full knowledge of Longtop's "close relationship" with XLHRS, heavy reliance on XLHRS, and shared headquarters.[64] Lead plaintiffs state that Palaschuk "was intimately involved with Longtop's financial reporting, touting his training as a professional accountant,"[65] and that he demonstrated an "in-depth involvement in the presentation of the fraudulent financial results" — signing press releases and issuing commentary therein.[66] Lead plaintiffs also plead that Palaschuk benefitted personally from the alleged fraud by selling 150,000 shares for four million dollars during the Class Period.[67]

---

[61]    *See id.* ¶ 114.

[62]    *See infra* Parts II.D.2.a–b.

[63]    *See* Complaint ¶ 115.

[64]    *See id.* ¶ 116.

[65]    *Id.* ¶ 118.

[66]    *Id.* ¶ 120.

[67]    *See id.* ¶ 122.

13

### a.   Analyst Reports

Lead plaintiffs cite to three analyst reports in the Complaint that were published during the Class Period and state adverse facts about Longtop.[68]  The first of these was published by Citron Research ("Citron") on April 26, 2011.[69]  This report stated that Longtop's high margins (which greatly exceeded its peers') were partly due to its staffing model, which outsourced 80% of its workforce — 95% of that 80% came from XLHRS.[70]  Citron reported that this model allowed Longtop to "transfer the majority of its cost structure off-balance sheet which creates opportunities for massive accounting fraud."[71]  Citron then produced eight facts indicating the XLHRS was a related entity (requiring disclosure under U.S. GAAP):  (1) XLHRS shares a name (Longtop) with Longtop; (2) XLHRS was formed in May 2007, just months before Longtop's IPO; (3) XLHRS is Longtop's largest line item by far, but it was not mentioned in filings until 2008; (4) XLHRS has no website and was not soliciting clients, even though it just lost its only customer; (5) Longtop did not have a long term contract with XLHRS and did not

---

[68]      *See id.* ¶¶ 44, 48, 54.

[69]      *See id.* ¶ 44.

[70]      *See id.* ¶ 45.

[71]      *Id.*

have to pay any penalties or minimums; (6) XLHRS used the same email server as Longtop; (7) Citron had reason to believe Longtop and XLHRS were located in the same building; and (8) when the agency relationship was challenged the company terminated it and brought all the XLHRS employees in-house.[72]  Upon the publishing of the Citron report, Longtop's ADSs declined in price from $25.54 to $22.24 — a decline of approximately eight percent.[73]

On April 27, 2011, Bronte Capital ("Bronte") issued an article that challenged the accuracy of Longtop's financial statements and questioned the need for Longtop's SPO, in light of the cash Longtop purportedly already possessed.[74] Upon this news, the ADSs declined an additional twenty percent to close at $17.73 on April 27, 2011.[75]  Following this decline, Palaschuk participated in a conference call with investors to address Citron's and Bronte's allegations: "it is appropriate to have this call to rebut the absolutely false allegations of fraud and other alleged wrongdoings in an April 26 report [posted in] Citron reports . . . There is absolutely no basis to support his allegation. . . ."[76]  Palaschuk specifically

---

[72]     *See id.*

[73]     *See id.* ¶ 47.

[74]     *See id.* ¶ 48.

[75]     *See id.* ¶ 49.

[76]     *Id.* ¶ 50.

addressed the XLHRS issue, stating:  "there has been no off-balance sheet accounting . . . [XLHRS] is definitely an unrelated party."[77]  In response to these assurances, the company's stock rose eleven percent to close at $19.66 on April 28, 2011.[78]

Over the following weeks, Citron, Bronte, and other analysts issued followup reports raising new questions about the validity of Longtop's representations.[79]  OLP Global issued a report on May 9, 2011, in which it was disclosed that two employees of Longtop had been administering XLHRS's state filings and that Longtop, using XLHRS, was under-contributing to state social welfare benefit funds, thus inflating its margins by several million dollars.[80]  In response, Longtop's ADSs declined further, settling at $18.93 per share when the NYSE halted trading in Longtop's ADSs on May 17, 2011.[81]  On May 19, 2011, Palaschuk resigned.[82]

### b.    Resignation Letter

---

[77]    *Id.* ¶ 52.

[78]    *See id.* ¶ 53.

[79]    *See id.* ¶ 54.

[80]    *See id.*

[81]    *See id.* ¶ 55.

[82]    *See id.* ¶ 56.

16

On May 23, 2011, Deloitte Touche Tohmatsu CPA Ltd. ("DTT"), Longtop's accounting firm, released their resignation letter.[83]  This letter indicated that (1) Longtop employees had interfered with DTT's auditing process by threatening DTT staff and indicating to bank staff that DTT was not Longtop's auditor, and (2) there were serious defects in documents on file.[84]  DTT reported that its reasons for resignation included (1) the falsity of the Group's financial records in relation to cash at bank and loan balances, (2) deliberate interference by the management in the audit process, and (3) the unlawful detention of audit files.[85]  DTT declined to be associated with any prior period financial reports including the financial communications produced during 2010 and 2011.[86]  DTT also stated that Ka, the Chairman of Longtop, informed DTT's Eastern Region Managing Partner that "there were fake revenue in the past so there were fake cash recorded on the books."[87]  Ka reported that "senior management" was involved in the discrepancies.[88]

---

[83]     *See id.* ¶ 58.

[84]     *See id.*

[85]     *See id.*

[86]     *See id.*

[87]     *Id.* (quotation marks omitted).

[88]     *See id.* (quotation marks omitted).

## III.   LEGAL STANDARD — MOTION TO DISMISS

In deciding a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the court "accept[s] all factual allegations in the complaint as true, and draw[s] all reasonable inferences in the plaintiff's favor."[89]  The court evaluates the sufficiency of the complaint under the "two-pronged approach" advocated by the Supreme Court in *Ashcroft v. Iqbal.*[90]  *First*, "[a] court 'can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth.'"[91]  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to withstand a motion to dismiss.[92]  *Second*, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief."[93]  To

---

[89]    *Wilson v. Merrill Lynch & Co.*, 671 F.3d 120, 128 (2d Cir. 2011) (quotation marks omitted).

[90]    556 U.S. 662, 679 (2009).

[91]    *Hayden v. Paterson*, 594 F.3d 150, 161 (2d Cir. 2010) (quoting *Iqbal*, 556 U.S. at 664).  *Accord Ruston v. Town Bd. for Town of Skaneateles*, 610 F.3d 55, 59 (2d Cir. 2010).

[92]    *Iqbal*, 556 U.S. at 663 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

[93]    *Id.* at 670.  *Accord Kiobel v. Royal Dutch Petroleum Co.*, 621 F.3d 111, 124 (2d Cir. 2010).

survive a Rule 12(b)(6) motion to dismiss, the allegations in the complaint must meet a standard of "plausibility."[94]   A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[95]   Plausibility "is not akin to a probability requirement;" rather, plausibility requires "more than a sheer possibility that a defendant has acted unlawfully."[96]

        "In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint."[97] The court may consider matters that are subject to judicial notice.[98]   The court may also consider a document that is not incorporated by reference, "where the complaint 'relies heavily upon its terms and

---

[94]     *Twombly*, 550 U.S. at 564.

[95]     *Iqbal*, 556 U.S. at 678 (quotation marks omitted).

[96]     *Id.* (quotation marks omitted).

[97]     *DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010) (citing *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002)).

[98]     *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

effect,' thereby rendering the document 'integral' to the complaint."[99]  The court

may also consider "legally required public disclosure documents filed with the

SEC."[100]

## IV.   APPLICABLE LAW

### A.      Section 10(b) and Rule 10b-5 of the Securities Exchange Act

Section 10(b) of the Securities Exchange Act of 1934 makes it illegal

to "use or employ, in connection with the purchase or sale of any security . . . any

manipulative or deceptive device or contrivance in contravention of such rules and

regulations as the Commission may prescribe . . . ."[101]  Under Rule 10b-5 one may

not "make any untrue statement of a material fact or [] omit to state a material fact

necessary in order to make the statements made, in the light of the circumstances

under which they were made, not misleading . . . in connection with the purchase

or sale of any security."[102]  "To sustain a private claim for securities fraud under

Section 10(b), 'a plaintiff must prove (1) a material misrepresentation or omission

---

[99]     *Id*. (quoting *Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006)).  *Accord Global Network Commc'ns, Inc. v. City of N.Y.*, 458 F.3d 150, 156 (2d Cir. 2006).

[100]     *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

[101]     15 U.S.C. § 78j(b).

[102]     17 C.F.R. § 240.10b-5.

by the defendant; (2) scienter; (3) a connection between the misrepresentation or

omission and the purchase or sale of a security; (4) reliance upon the

misrepresentation or omission; (5) economic loss; and (6) loss causation.'"[103]

### 1.    Misstatements or Omissions of Material Fact

In order to satisfactorily allege misstatements or omissions of material

fact, a complaint must "state with particularity the specific facts in support of

[plaintiffs'] belief that [defendants'] statements were false when made."[104]  "For

the purposes of Rule 10b-5, the maker of a statement is the person or entity with

ultimate authority over the statement, including its content and whether and how to

communicate it."[105]

"'[A] fact is to be considered material if there is a substantial

likelihood that a reasonable person would consider it important in deciding

whether to buy or sell shares [of stock].'"[106]  In situations "'[w]here plaintiffs

---

[103]     *Ashland Inc. v. Morgan Stanley & Co., Inc.*, 652 F.3d 333, 337 (2d
Cir. 2011) (quoting *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552
U.S. 148, 157 (2008)).  *Accord Erica P. John Fund, Inc. v. Halliburton Co.*, —
U.S. — , 131 S.Ct. 2179, 2184 (2011).

[104]     *Rombach v. Chang*, 355 F.3d 164, 172 (2d Cir. 2004) (quotation
marks omitted).

[105]     *Janus Capital Grp., Inc. v. First Derivative Traders*, 131 S.Ct. 2296,
2302 (2011).

[106]     *Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt.
LLC*, 595 F.3d 86, 92–93 (2d Cir. 2010) (quoting *Azrielli v. Cohen Law Offices*, 21

contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information.'"[107]  Mere "allegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did[,] do not suffice to make out a claim of securities fraud."[108]  "[A]n omission is actionable when the failure to disclose renders a statement misleading."[109]

## 2.    Scienter

A plaintiff may plead scienter by "alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness."[110]  "'Sufficient motive allegations entail concrete benefits that could be realized by

---

F.3d 512, 518 (2d Cir. 1994)).

[107]    *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 197 (2d Cir. 2008) (quoting *Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000)).

[108]    *Id.  Accord Rothman v. Gregor*, 220 F.3d 81, 90 (2d Cir. 2000).

[109]    *In re Alstom SA*, 406 F. Supp. 2d 433, 453 (S.D.N.Y. 2005) (citing *In re Time Warner Inc. Secs. Litig.*, 9 F.3d 259, 268 (2d Cir. 1993)).

[110]    *ATSI*, 493 F.3d at 99 (citing *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 168–69 (2d Cir. 2000)).  *Accord Dandong v. Pinnacle Performance Ltd.*, No. 10 Civ. 8086, 2011 WL 5170293, at *11 (S.D.N.Y. Oct. 31, 2011) (quoting *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290-91 (2d Cir. 2006)).

one or more of the false statements and wrongful nondisclosures alleged.'"[111] "Motives that are generally possessed by most corporate directors and officers do not suffice; instead, plaintiffs must assert a concrete and personal benefit to the individual defendants resulting from the fraud."[112]

"'Where motive is not apparent, it is still possible to plead scienter by identifying circumstances indicating conscious behavior by the defendant, though the strength of the circumstantial allegations must be correspondingly greater.'"[113] Under this theory of scienter, a plaintiff must show that the defendant's conduct is "at the least . . . highly unreasonable and [] represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it."[114]  "To state a claim based on recklessness, plaintiffs may either specifically allege

---

[111]    *Campo v. Sears Holdings Corp.*, 371 Fed. App'x 212, 215 (2d Cir. 2010) (quoting *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001)).

[112]    *Kalnit,* 264 F.3d at 139.  *Accord ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009).

[113]    *Kalnit*, 264 F.3d at 142 (quoting *Beck v. Manufacturers Hanover Trust Co.*, 820 F.2d 46, 50 (2d Cir. 1987)).  *Accord South Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 109 (2d Cir. 2009); *In re Novagold Res. Inc. Secs. Litig.*, 629 F. Supp. 2d 272, 297 (S.D.N.Y. 2009) (quoting *ECA*, 553 F.3d at 198–99).

[114]    *South Cherry St.*, 573 F.3d at 109 (quotation marks and emphasis omitted).  *Accord ECA*, 553 F.3d at 203.

defendants' knowledge of facts or access to information contradicting defendants' public statements, or allege that defendants failed to check information they had a duty to monitor."[115]

### 3.   Causation

A securities fraud plaintiff is required to "prove both transaction causation (also known as reliance) and loss causation."[116]  Loss causation is "the proximate causal link between the alleged misconduct and the plaintiff's economic harm."[117]  "A misrepresentation is 'the proximate cause of an investment loss if the risk that caused the loss was within the zone of risk *concealed* by the misrepresentations . . . .'"[118]  Therefore, "to plead loss causation, the complaint[] must allege facts that support an inference that [defendant's] misstatements and omissions concealed the circumstances that bear upon the loss suffered such that plaintiffs would have been spared all or an ascertainable portion of that loss absent

---

[115]    *In re Gildan Activewear, Inc. Secs. Litig.*, 636 F. Supp. 2d 261, 272 (S.D.N.Y. 2009) (quotation marks and citation omitted).

[116]    *ATSI*, 493 F.3d at 106.

[117]    *Id.* at 106-07 (citing *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 346 (2005); *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 172 (2d Cir. 2005)). *Accord Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 157 (2d Cir. 2007); *Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 343 F.3d 189, 197 (2d Cir. 2003).

[118]    *In re Omnicom Grp., Inc. Secs. Litig.*, 597 F.3d 501, 513 (2d Cir. 2010) (quoting *Lentell*, 396 F.3d at 173) (emphasis in original).

the fraud."[119]

### a.      Fraud-on-the-Market Presumption

In *Basic v. Levinson*, the Supreme Court determined that an investor may invoke a rebuttable presumption of reliance in certain cases of misrepresentations.[120]  The Court held that an investor who bought stock at market price[121] may avail herself of the presumption that she "relied on the integrity of the price set by the market" if the market is efficient.[122]   "Because most publicly available information is reflected in [the] market price, an investor's reliance on any public material misrepresentations, therefore, may be presumed for purposes of a Rule 10b-5 action."[123]  As long as the "plaintiffs can show that the alleged misrepresentation was *material* and publicly transmitted into a well-developed market, then reliance will be presumed . . . ."[124]

Defendants can rebut the fraud-on-the-market presumption by

---

[119]      *Lentell*, 396 F.3d at 175.

[120]      485 U.S. 224, 247 (1988).

[121]      *Id.*

[122]      *Id.* at 227.

[123]      *Id.* at 247.  *Accord Hevesi v. Citigroup Inc.*, 366 F.3d 70, 77 (2d Cir. 2004).

[124]      *In re Salomon Analyst Metromedia Litig.*, 544 F.3d 474, 483 (2d Cir. 2008) (emphasis added).

demonstrating that "no price impact" resulted from the misrepresentations.[125]

"Any showing that severs the link between the alleged misrepresentation and either

the price received (or paid) by the plaintiff, or his decision to trade at a fair market

price, will be sufficient to rebut the presumption of reliance."[126]  One way to "sever

the link" is to demonstrate that the alleged misrepresentations were immaterial

because they did not lead to a distortion in price.[127]

### b.    *Affiliated Ute* Presumption

The Supreme Court has also held that a presumption of reliance may

apply in certain cases in which plaintiffs have alleged that defendants failed to

disclose information.  In *Affiliated Ute Citizens of the State of Utah v. United*

*States*, the Court held that where a plaintiff's fraud claims are based on omissions,

transaction causation may be satisfied as long as the plaintiff shows that defendants

had an obligation to disclose the information and the information withheld is

material.[128]  This presumption is not conclusive.[129]  "Once the plaintiff establishes

the materiality of the omission . . . the burden shifts to the defendant to establish . .

---

[125]     *Basic*, 485 U.S. at 248–49.

[126]     *Id.*

[127]     *See id.* at 248.

[128]     *See* 406 U.S. 128, 154 (1972).

[129]     *See DuPont v. Brady*, 828 F.2d 75, 78 (2d Cir. 1987).

. that the plaintiff did not rely on the omission in making the investment decision."[130]  To satisfy this burden, a defendant must prove "that 'even if the material facts had been disclosed, plaintiff's decision as to the transaction would not have been different from what it was.'"[131]

### B.    Control Person Liability Under Section 20(a) of the Exchange Act

"To establish a prima facie case of control person liability, a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud."[132] "Allegations of control are not averments of fraud and therefore need not be pleaded with particularity."[133]  "Thus, '[a]t the pleading stage, the extent to which the control must be alleged will be governed by Rule 8's pleading standard . . .

---

[130]    *Id.* at 76.

[131]    *Id.* at 78 (quoting *Rochez Bros. v. Rhoades*, 491 F.2d 402, 410 (3d Cir. 1974)). *But see Ganino*, 228 F.3d at 162 ("[I]t is not necessary to assert that the investor would have acted differently if an accurate disclosure was made.").

[132]    *ATSI*, 493 F.3d at 108 (citing *S.E.C. v. First Jersey Secs., Inc.*, 101 F.3d 1450, 1472 (2d Cir. 1996)).

[133]    *In re Parmalat Secs. Litig.*, 414 F. Supp. 2d 428, 440 (S.D.N.Y. 2006).

.'"[134]  "While a party cannot be held liable for both a primary violation and as a control person, alternative theories of liability are permissible at the pleading stage."[135]

## IV.   DISCUSSION

### A.   Lead Plaintiffs Have Sufficiently Pled Specific Facts Regarding Palaschuk

Lead plaintiffs pled considerable facts regarding the senior officers of Longtop under the group pleading doctrine, including the facts concerning the Form 20-F.[136]  However, Lead plaintiffs also pled sufficient facts that concern Palaschuk alone.  As such, it is not necessary to reach the question of whether the group pleading doctrine survives *Janus Capital Group v. First Derivative Traders* in federal securities actions.[137]  Regardless of the answer to this question, there are

---

[134]     *In re Scottish Re Grp. Secs. Litig.*, 524 F. Supp. 2d 370, 386 (S.D.N.Y. 2007) (quoting *In re Converium Holding AG Secs. Litig.*, No. 04 Civ. 7897, 2006 WL 3804619, at *14 (S.D.N.Y. Dec. 28, 2006)).

[135]     *In re American Int'l Grp., Inc. 2008 Secs. Litig.*, 741 F. Supp. 2d 511, 534–35 (S.D.N.Y. 2010) (citing *Police & Fire Ret. Sys. of City of Detroit v. SafeNet, Inc.*, 645 F. Supp. 2d 210, 241 (S.D.N.Y. 2009)).

[136]     *See* Complaint ¶¶ 151–152.

[137]     *See* 131 S.Ct. 2296.  *See also In re Optimal U.S. Litig.*, — F. Supp. 2d — , No. 10 Civ. 4095, 2011 WL 6424988, at *11 (S.D.N.Y. Dec. 21, 2011) (noting several rationales indicating *Janus* bars the group pleading doctrine in federal securities actions and applies exclusively to those actions, as well as preserving the group pleading doctrine in common law fraud actions); *Rolin v. Spartan Mullen Et Cie, S.A.*, No. 10 Civ. 1586, 2011 WL 5920931, at *5 (S.D.N.Y. Nov. 23, 2011)

sufficient well-pleaded facts specifically targeting Palaschuk to state a claim under

Sections 10(b) and 20(a), without employing the group pleading doctrine or

examining collectively pleaded facts.[138]

### B.    The 10(b) Claim — Count I

#### 1.    Plaintiffs Have Sufficiently Pled Facts Demonstrating that Palaschuk Made Material False and Misleading Statements

Lead plaintiffs have satisfactorily alleged that Palaschuk made

material misstatements and omissions.  The Complaint states with particularity two

categories of statements that were false when made by Palaschuk — the signed

press release commentary[139] and the conference call statements.[140]  The Complaint

also states with particularity facts in support of the falsity of those statements.[141]

---

(finding that the question of whether *Janus* abrogated the group pleading doctrine
remains an open question).

[138]    *See* Complaint ¶¶ 23, 50–52, 65, 68, 71, 74, 80, 82, 84, 86, 87, 94, 97,
99, 101, 103, 107, 118–121, 127.

[139]    *See id.* ¶¶ 65, 68, 71, 74, 80, 82, 84, 87, 94, 97, 99, 101, 103.

[140]    *See id.* ¶¶ 50–52, 86.

[141]    *See id.* ¶¶ 44–56.  Palaschuk argues that these statements are protected
by the Private Securities Litigation Reform Act Safe Harbor because the statements
are forward-looking. However, these statements are only partially forward-looking
and not protected.   *See Sgalambo v. McKenzie*, 739 F. Supp. 2d 453, 478
(S.D.N.Y. 2010) (citation omitted) ("Many of the alleged misstatements are not
forward-looking because they either state a present or historical fact alone or
incorporate forward-looking aspects into statements of present or historical fact.").

### a.    "Maker" of the Statements

The signed press release commentary and the conference call statements can rightly be attributed to Palaschuk because he had the ultimate authority over those statements.[142]  Palaschuk's brief does not address who "made" the statements issued, spoken, or signed by Palaschuk; it only argues that, under *Janus*, Palaschuk cannot be held liable for the statements of other directors.[143] However, Palaschuk, the CFO, had authority over the content and delivery of his own oral and written statements.[144]

---

[142]    *See Janus*, 131 S.Ct. at 2302 ("For the purposes of Rule 10b-5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it.").  *See also In re Merck & Co., Inc. Secs., Derivative, & "ERISA" Litig.*, Nos. 05–1151, 05–2367, 2011 WL 3444199, at *25 (D.N.J. Aug. 8, 2011) (distinguishing the facts of *Janus* from a case where a defendant was an officer of a single entity during the period when the alleged misrepresentations were made, and finding that the officer was acting "pursuant to his responsibility and authority to act as an agent of [the entity]"); *In re Pfizer Inc. Secs. Litig.*, Nos. 04 Civ. 9866, 05 MD 1688, 2012 WL 983548, at *4 (S.D.N.Y.  Mar. 22, 2012) (finding individual officers liable for misrepresentations they made in corporate press releases they drafted, reviewed, approved, or ratified).

[143]    *See* Defendant's Corrected Memorandum of Law in Support of Motion to Dismiss ("Def. Mem.") at 24–25.

[144]    *See S.E.C. v. Greenstone Holdings, Inc.*, No. 10 Civ. 1302, 2012 WL 1038570, at *7–8 (S.D.N.Y. Mar. 28, 2012) (holding that the "maker" of the statements within press releases was the drafter of the press releases, where the drafter was the CEO or COO of the company, even though the releases were unsigned).

### b.   Signed Press Release Commentary

Lead plaintiffs sufficiently allege that the signed press release commentary was false when made.  Palaschuk affirmed in the February 10, 2010 press release that "cash flow from operations" supported Longtop's rapid growth.[145]  Palaschuk next indicated in the May 24, 2010 release that "organic business expansion" and acquisitions were behind the growth.[146]  In August 18, 2010, Palaschuk credited the "healthy backlog and pipeline" in Longtop's core software development business.[147]  In November 15, 2010, Palaschuk commented again, stating: "our order intake, margins and cash flow form operations . . . significantly improved . . . [o]n the back of strong demand and execution . . . ."[148]  Last, Palaschuk touted Longtop's "industry leading margins" in January 31, 2011.[149]

Palaschuk's argument that the analysts cited by Lead plaintiffs have a financial stake in negatively affecting Longtop's stock (and short-selling it) is

---

[145]   *See* Complaint ¶ 82.

[146]   *Id.* ¶ 85.

[147]   *Id.* ¶ 97.

[148]   *Id.* ¶ 101.

[149]   *Id.* ¶ 105.

compelling.[150]  However, Palaschuk made financial statements in the press

releases.  Contrary to Palaschuk's argument that DTT's resignation letter does not

concern cash levels during the Class period,[151] the DTT letter plainly indicates that

DTT rejected  Longtop's documentation in 2010 and 2011and felt that Longtop's

financial statements were overstated *throughout* the Class Period.[152]  DTT also

indicated that Longtop should investigate its legal liability under the Exchange

Act.[153]  As such, Lead plaintiffs have pled that Palaschuk made material

misstatements when he delivered financial information to the public and the SEC.

　　　　Lead plaintiffs have also adequately pled facts with particularity

indicating that Palaschuk's explanations for Longtop's growth were false and

misleading, and, in fact, Longtop's growth was due to an illicit accounting scheme

— the shifting of workforce costs off the books to XLHRS.  The analyst report

facts — though not as persuasive as the DTT letter — are nonetheless

considered.[154]  Lead plaintiffs allege that Longtop's high margins (which greatly

---

[150]　*See* Def. Mem. at 16.

[151]　*See id.* at 22.

[152]　*See* Complaint ¶ 58.

[153]　*See id.*

[154]　*See Tellabs*, 551 U.S. at 323–324 (citation omitted) ("[C]ourts must
consider the complaint in its entirety, as well as other sources courts ordinarily
examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents

exceeded its peers') were partly due to its staffing model, which outsourced 80% of its workforce — 95% of that 80% came from XLHRS.[155]  They also allege that this model allowed Longtop to "transfer the majority of its cost structure off-balance sheet which creates opportunities for massive accounting fraud."[156]  Lead plaintiffs further allege the eight Citron facts indicating that XLHRS is a related entity (requiring disclosure under U.S. GAAP), all of which are set forth above.[157] These facts include the allegation that Longtop and XLHRS share headquarters.[158]  The Lead plaintiffs also allege that two employees of Longtop had been administering XLHRS's state filings and that Longtop, using XLHRS, was under-contributing to state social welfare benefit funds, thus inflating its margins by several million dollars.[159]

These facts are stated with particularity and support the allegation that Palaschuk's press release commentary regarding the cause of Longtop's margins

---

incorporated into the complaint by reference, and matters of which a court may take judicial notice.").

[155]     *See* Complaint ¶ 45.

[156]     *Id.*

[157]     *See supra* Part II.D.2.a.

[158]     *See id.*

[159]     *See* Complaint ¶ 45.

and resulting success were false when made during the Class period.  Given the

specific allegations supporting the strong inference that a GAAP violation may

have been the source of Longtop's success, Palaschuk's statements to the contrary

are actionable.[160]

Palaschuk argues that the analyst report facts do not suggest that the

financial statements themselves were false.[161]  However, the Lead plaintiffs'

allegations raise a strong inference that the rationales given to the public and the

SEC to *explain* Longtop's growth were false.[162]  Palaschuk further argues that Lead

plaintiffs must plead the specific accounting principles violated in order to plead

accounting fraud.[163]  However, Lead plaintiffs have alleged that Palaschuk violated

U.S. GAAP — specifically, FAS No. 57 — in failing to disclose related-party

---

[160]     *See id.* ¶¶ 45, 54.  *See also In re Alstom*, 406 F. Supp. 2d at 453 (citing *In re Time Warner*, 9 F.3d at 268) (an omission is actionable when it renders a statement misleading).

[161]     *See* Def. Mem. at 20–21.

[162]     *See Lapin v. Goldman Sachs Group, Inc.*, 506 F. Supp. 2d 221, 240 (S.D.N.Y. 2006) (citation omitted) (quoting *In re Providian Fin. Corp. Secs. Litig.*, 152 F. Supp. 2d 814, 824–25 (E.D. Pa. 2001)) ([I]f [a defendant] puts the topic of the cause of its financial success at issue, then it is 'obligated to disclose information concerning the source of its success, since reasonable investors would find that such information would significantly alter the mix of available information.").

[163]     *See id.* at 18–19.

transactions.[164]  Lead plaintiffs must demonstrate a material misstatement or

omission.[165]  In this case, they have done so by alleging a failure to comply with

the GAAP rule requiring disclosure of related-party transactions with sufficient

particularity as required by Section 10(b) pleading standards.[166]

### c.   Conference Call Statements

Lead plaintiffs have also properly pled that Palaschuk's conference

call statements were false when made.  On April 28, 2011, Palaschuk told investors

that there was "no basis" to support the Citron report, and reiterated that XLHRS

was unrelated.[167]  On May 24, 2010, Palaschuk attributed slight downward trends

in the gross margin to acquisitions and investments.[168]  Lead plaintiffs have

sufficiently alleged that these statements were false and misleading — in that they

---

[164]     *See* Complaint ¶ 108; FAS No. 57 ¶ 1.

[165]     *Ashland Inc.*, 652 F.3d at 337 (quoting *Stoneridge Inv. Partners, LLC*, 552 U.S. at 157).

[166]     *See In re Bear Stearns Cos., Inc. Secs., Derivative, and ERISA Litig.*, 763 F. Supp. 2d 423, 472 (S.D.N.Y. 2011) ("Related party transactions include transactions between affiliates, which are defined as 'a party that, directly or *indirectly* through one or more intermediaries, controls, is controlled by, or is under common control with an enterprise.'") (quoting FAS no. 57 ¶ 1) (emphasis added).

[167]     *See id.* ¶¶ 51–52.

[168]     *See id.* ¶ 86.

allege a violation of GAAP.[169]

### d.    Materiality

Lead plaintiffs have properly pled that the facts concerning the potential GAAP violation (XLHRS) and the artificial inflation of the gross margin were material.  A reasonable person would consider an artificially inflated gross margin or accounting violations when purchasing stock.[170]  Further, investors clearly did weigh these issues because the stock declined eight percent in response to the Citron report.[171]

## 2.    Plaintiffs Have Sufficiently Pled Facts Indicating Scienter

Lead plaintiffs have properly pleaded strong circumstantial evidence of Palaschuk's recklessness.

### a.    Motive and Opportunity Are Apparent

Lead plaintiffs have pled that Palaschuk made material

---

[169]    *See supra* IV.A.1.b.

[170]    *In re Bear Stearns Cos.*, 763 F. Supp. 2d at 497 ("'[A] complaint may not properly be dismissed . . . on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance.'") (quoting *ECA and Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009)).

[171]    *See* Complaint ¶ 47.

misstatements[172] — which artificially inflated the value of the company — and made a large stock sale during the Class Period.[173]  Palaschuk argues that the documentation provided to demonstrate this sale only indicates the proposed sale of stock.[174]  This argument raises a factual dispute which cannot be resolved on a motion to dismiss.  Lead plaintiffs sufficiently allege that Palaschuk sold 150,000 shares for four million dollars during the Class Period.

### b.    Allegations Indicate a Duty to Monitor

There are allegations also indicating that Palaschuk was reckless in failing to check information that he had a duty to monitor.  As CFO, Palaschuk made alleged misstatements concerning XLHRS and Longtop's workforce that concerned the core operations of Longtop.[175]  It is therefore appropriate to impute knowledge of available contrary facts to Palaschuk.[176]  The allegations indicate that

---

[172]    *See supra* Part IV.B.1.

[173]    *See* Complaint ¶ 122.  *See also Novak*, 216 F.3d at 309 (citation omitted) ("[Concrete and personal benefits arise] when corporate insiders were alleged to have misrepresented to the public material facts about the corporation's performance or prospects in order to keep the stock price artificially high while they sold their own shares at a profit.").

[174]    *See* Def. Mem. at 14.

[175]    *See supra* Part IV.B.1.

[176]    *See In re Atlas Air Worldwide Holdings, Inc. Secs*, 324 F. Supp. 2d 474, 489 (S.D.N.Y. 2004) (citing *Cosmas v. Hassett*, 886 F.2d 8, 13 (2d Cir. 1989)) ("[I]f a plaintiff can plead that a defendant made false or misleading

information was available to Palaschuk that would have made him aware of the

falsity of the financial statements (which he signed) and his own oral and written

statements.

Lead plaintiffs plead the facts gleaned from the analyst reports,

including the fact that Longtop employees were compiling state filings for

XLHRS.[177]  These facts were readily available to Palaschuk and Lead plaintiffs

sufficiently allege that if investigated they would have revealed a GAAP violation

that artificially inflated Longtop's gross margins.[178]  Palaschuk relies on the fact

that Lead plaintiffs have not provided any internal corporate documents.[179]

However, they have cited to specific reports to which Palaschuk had access.[180]

_____

statements when contradictory facts of critical importance to the company either
were apparent, or should have been apparent, an inference arises that high-level
officers and directors had knowledge of those facts by virtue of their positions with
the company.").  *See also In re Lehman Bros. Secs. and Erisa Litig.* 799 F. Supp.
2d 258, 294 (S.D.N.Y. 2011) ("A complaint may allege facts sufficient to give rise
to an inference of scienter with respect to a misleading financial statement where it
alleges that a corporate officer knew of or recklessly failed to learn of "red flags"
indicating that the officer's public statements were false or misleading.").

[177]     *See* Complaint ¶¶ 44–57.

[178]     *See id.* ¶ 50.  *See also Novak*, 216 F.3d at 309 ("Where plaintiffs
contend defendants had access to contrary facts, they must specifically identify the
reports or statements containing this information.").

[179]     *See* Defendant's Reply Memorandum of Law in Support of Motion to
Dismiss at 2.

[180]     *See* Complaint ¶¶ 44–57.

There is no requirement in the case law that the contradictory reports be internal to a corporation.[181]  As a result, Lead plaintiffs have properly pled scienter by alleging facts both to demonstrate motive and opportunity and recklessness.[182]

### 3.      Plaintiffs Have Properly Pled, Unchallenged, a Presumption of Reliance

Plaintiffs have properly pled *Affiliated Ute* and fraud-on-the-market presumptions based on material omissions and misstatements, respectively.[183] Palaschuk has not challenged these presumptions, and, for the purposes of this motion, I accept the allegation that the market "promptly digested current information regarding Longtop," and that all purchasers have suffered "similar injury."[184]

### 4.      The Remaining Elements of a 10(b) Claim Are Pled

---

[181]    *See Novak*, 216 F.3d at 308 (finding that recklessness claims can typically rest on access to contradictory *information*).  *See also Cosmas*, 886 F.2d at 12 (finding that knowledge of a foreign import restriction was contradictory information).

[182]    *See Tellabs*, 551 U.S. at 324 (citation omitted) ("A complaint will survive, we hold, only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.").  Palaschuk has not offered an opposing nonculpable inference to draw from the analyst report facts regarding XLHRS, and chooses instead to challenge the argument of Lead plaintiffs that Longtop's and Palaschuk's public statements were false when made.  *See* Def. Mem. at 10.

[183]    *See* Complaint ¶ 44.

[184]    *Id.*

Palaschuk has not challenged the remaining elements of the 10(b)

claim.  Lead plaintiffs have properly alleged a causal connection between the

misrepresentations and the purchase of the ADSs[185] and the purchase of the ADSs,

and an economic loss due to the drop in the stock price.[186]  They have also

adequately alleged that the misrepresentations caused the loss — they allege that as

the truth of Longtop's financial circumstances became public, the price of the stock

deflated, causing substantial damage to plaintiffs.[187]  Loss causation is buttressed

by the well-pled facts demonstrating price drops in response to the analyst

reports,[188] and price increases in response to Palaschuk's conference call

statements.[189]  As a result, Lead plaintiffs have stated a Section 10(b) claim.

## C.      The Section 20(a) Claim — Count II

### 1.      Plaintiffs Have Properly Pled a Primary Violation

Lead plaintiffs have properly pled a primary violation by Longtop, the

controlled entity.  Longtop's financial filings contained financial representations.[190]

---

[185]      *See id.* ¶ 144.

[186]      *See id.* ¶ 149.

[187]      *See id.* ¶¶ 147–150.

[188]      *See id.* ¶¶ 47, 49.

[189]      *See id.* ¶ 53.

[190]      *See supra* Part II.D.1.a.

Longtop made the financial statements contained in Longtop's Forms 20-F and 6-K filings.[191]  DTTs resignation letter indicates that Longtop's cash position and revenues were falsely inflated during the Class Period.[192]  Lead plaintiffs allege that Longtop realized concrete benefits from the fraud — the artificial inflation of the gross margins.  Lead plaintiffs further allege sufficient motive — Longtop's reported performance allowed it to access additional U.S. capital through the SPO[193] and additional operations.[194]

Palaschuk does not rebut the presumption of reliance, and Lead plaintiffs have sufficiently alleged a connection between the misrepresentation and the purchase of the ADSs,[195] an economic loss,[196] and loss causation.  Lead plaintiffs allege that as concealed risks became known by the public, the price of Longtop ADSs declined substantially,[197] culminating in the removal of the ADSs

---

[191]    *See Janus*, 131 S.Ct. at 2302 (holding that a corporation with the obligation to file documents with the SEC was the maker of statements contained within those SEC filings).

[192]    *See* Complaint ¶ 58.

[193]    *See id.* ¶ 40.

[194]    *See id.* ¶ 82.

[195]    *See id.* ¶ 150.

[196]    *See id.* ¶ 147.

[197]    *See id.* ¶ 149.

from the NYSE,[198] and damaging plaintiffs.

### 2.   Plaintiffs Have Properly Pled Control

Control need only be alleged according to the Rule 8 standard.[199]

Here, Lead plaintiffs have sufficiently alleged Palaschuk had control over the

financial statements of the company and direct involvement in Longtop's financial

reporting.[200]  They include Palaschuk's own statement that he had "very close

discussions with [the] auditors since the day [he] joined the company."[201]

Palaschuk signed the SEC filings and issued commentary on the press releases that

accompanied those filings.[202]

### 3.   Plaintiffs Have Properly Pled Culpability

---

[198]   *See id.* ¶ 11.

[199]   *See In re Am. Int'l Grp., Inc. 2008 Secs.*, No. 08 Civ. 4772, 2012 WL 1134142, at * 2. (S.D.N.Y. Mar. 6, 2012); *In re Fannie Mae 2008 Secs. Litig.*, 742 F. Supp. 2d 382, 415 (S.D.N.Y. 2010); *Cornwell v. Credit Suisse Grp.*, 689 F. Supp. 2d 629, 639 (S.D.N.Y. 2010).

[200]   *See* Complaint ¶ 118.

[201]   *Id.*

[202]   *See id.* ¶ 120.  *See also In re Bristol Myers Squibb Co. Secs. Litig.*, 586 F. Supp. 2d 148, 171 (S.D.N.Y. 2008) (finding adequate allegations of control where an officer was the "signor and speaker of many of the public statements" and CEO, and therefore, "clearly in a position to exercise control over the Company"); *In re Alstom SA*, 406 F. Supp. 2d at 494 (citation omitted) (finding that although an officer's status is generally not enough to constitute control, it is reasonable to assume that an officer who signs a report has a measure of control over that report).

Lead plaintiffs have properly pled the liability of Palaschuk with regard to the 10(b) claim.[203]  As a result, Lead plaintiffs have stated a 20(a) claim.[204]

## V.    CONCLUSION

For the foregoing reasons, Palaschuk's motion to dismiss is denied. The Clerk of the Court is directed to close this motion (Docket No. 68). A conference is scheduled for July 16, 2012, at 4:00 p.m. in Courtroom 15C.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      New York, New York
            June 28, 2012

---

[203]    *See supra* Part IV.B.

[204]    *In re American,* 741 F. Supp. 2d at 535 (A plaintiff must demonstrate "'that the controlling person was in some meaningful sense a culpable participant in the primary violation.'") (quoting *Boguslavsky v. Kaplan,* 159 F.3d 715, 720 (2d Cir. 1998)) (quotation marks and citation omitted).

43

**-Appearances-**

**For Plaintiffs:**

Daniel Lawrence Berger, Esq.
Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas, 38th Floor
New York, New York 10019
(212) 554-1406

Deborah A. Elman, Esq.
Jay W. Eisenhofer, Esq.
Grant & Eisenhofer P.A. (NY)
485 Lexington Avenue, 29th Floor
New York, New York 10017
(646) 722-8500

John Anthony Kehoe, Esq.
John J. Gross, Esq.
Kimberly A. Justice, Esq.
Margaret Onasch, Esq.
Kessler Topaz Meltzer & Check, LLP (PA)
280 King of Prussia Road
Radnor, Pennsylvania 19087
(610) 667-7706

**For Defendant:**

Michael J. Biles, Esq.
Royale P. Price, Esq.
King & Spalding, L.L.P. (Austin)
401 Congress Avenue, Suite 3200
Austin, Texas 78701
(512) 457-2000

Paul Richard Bessette, Esq.
King & Spalding LLP (NYC)
1185 Avenue of the Americas
New York, New York 10036
(212) 556-2100