UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X

|  |  |
|---|---|
| | ) |
| | ) Civil Action No. 11-cv-3658-SAS |
| IN RE LONGTOP FINANCIAL TECHNOLOGIES | ) |
| LIMITED SECURITIES LITIGATION | ) ECF CASE |
| | ) Electronically Filed |
| | ) |
| | ) |
| | ) |

-------------------------------------------------------------------X

**DEFENDANT DELOITTE TOUCHE TOHMATSU CPA LTD.'s
MEMORANDUM IN SUPPORT OF ITS MOTION TO DISMISS
<u>THE AMENDED CONSOLIDATED CLASS ACTION COMPLAINT</u>**

<u>**ORAL ARGUMENT REQUESTED**</u>

## TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................. ii

PRELIMINARY STATEMENT ....................................................................................... 1

ARGUMENT .................................................................................................................... 4

    I.      THE AMENDED COMPLAINT DOES NOT ALLEGE FACTS THAT GIVE RISE TO A STRONG INFERENCE THAT DTTC ACTED WITH SCIENTER. ............................................................................................................. 4

            1.      Allegations regarding internal control deficiencies and risk factors....................................................................................... 5

            2.      Allegations regarding confirmation of revenue contract terms .....14

            3.      Allegations regarding information from third parties....................17

            4.      Allegations regarding XLHRS and Longtop's social welfare payments ........................................................................................ 20

    II.     THE AMENDED COMPLAINT DOES NOT PLEAD WITH PARTICULARITY THAT DTTC MADE A MATERIAL MISREPRESENTATION. ....................... 23

    III.    ANY CLAIM BASED ON MISSTATEMENTS PRIOR TO DECEMBER 14, 2007 IS BARRED BY THE STATUTE OF REPOSE.......................................... 24

CONCLUSION................................................................................................................ 25

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Boudinot v. Shrader*,
   2012 WL 489215 (S.D.N.Y. Feb. 15, 2012)..........................................................................24

*Citadel Equity Fund Ltd. v. Aquila*,
   168 Fed. Appx. 474 (2d Cir. 2006)..................................................................................8

*In re Exxon Mobil Corp. Sec. Litig.*,
   500 F.3d 189 (3d Cir. 2007)............................................................................................24

*In re IndyMac Mortgage-Backed Sec. Litig.*,
   793 F. Supp. 2d 637 (S.D.N.Y. 2011).............................................................................24

*In re Lehman Bros. Sec. & ERISA Litig.*,
   799 F. Supp. 2d 258 (S.D.N.Y. 2011).............................................................................23

*Iowa Public Employee's Retire. Sys. v. Deloitte & Touche LLP*,
   No. 12-cv-02136-JPO (S.D.N.Y. Jan. 23, 2013) ..........................................................4

*McCann v. Hy-Vee, Inc.*,
   663 F.3d 926 (7th Cir. 2011) .........................................................................................24

*Stephenson v. PricewaterhouseCoopers, LLP*,
   2012 WL 1764191 (2d Cir. May 18, 2012) ...................................................................19

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007) .........................................................................................................3

STATUTES

15 U.S.C. § 7213(a)(2)(A)(iii)(III) ............................................................................................9

28 U.S.C. § 1658(b) ..................................................................................................................24

OTHER AUTHORITIES

17 C.F.R. § 229.308 ....................................................................................................................9

Interim PCAOB Standard AU 316 ...............................................................................11, 13, 16

72 Fed. Reg. 32340 ....................................................................................................................11

Interim PCAOB Standard AU 326 ............................................................................................15

Interim PCAOB Standard AU 330 ............................................................................................15

Defendant Deloitte Touche Tohmatsu CPA Ltd. ("DTTC"), by its attorneys, respectfully submits this memorandum in support of its motion to dismiss Plaintiffs' Amended Consolidated Class Action Complaint (the "Amended Complaint" or "AC") as to DTTC.[1]

## PRELIMINARY STATEMENT

The Court should dismiss the Amended Complaint for the same reason it dismissed the prior one:  the immutable facts demonstrate that "the strongest inference is that DTTC was duped by Longtop, not that it recklessly enabled them."  11/14/12 Opinion and Order ("Order"), Dkt. 115, at 33.  Plaintiffs have had three months to review more than four million pages of discovery from Defendant Derek Palaschuk and a month to analyze this Court's Order and repackage their allegations.  Yet the inescapable conclusion remains "that DTTC had performed its prior audits with diligence."  *Id.* at 29.  The Amended Complaint, just like the prior one, is flatly inconsistent with any inference that DTTC acted with scienter "approximat[ing] an actual intent to aid in the fraud being perpetrated by the audited company."  *Id.* at 21.

The central facts underlying this case, as the Amended Complaint continues to allege, show that "Longtop went to great lengths to conceal its fraud from DTTC," and that DTTC promptly and noisily resigned when it uncovered that fraud.  Order at 24; AC ¶¶ 56-57.  Longtop Financial Technologies Limited's ("Longtop" or the "Company") management falsified bank confirmations provided to DTTC and "deliberate[ly] interfere[d]" with DTTC's audit process. *See* AC ¶ 57.  DTTC tried to "follow[] up" on discrepancies identified during its audit work, only to be "halted by Longtop's obstructionist behavior," Order at 7, which included seizing DTTC's workpapers and detaining DTTC audit personnel.  *See* AC ¶ 57.  As before, the "most compelling inference to be drawn from the Resignation Letter … is that Longtop had been hiding

---

[1] The parties have complied with this Court's Individual Rules of Practice and have exchanged letters prior to the filing of this motion.  Declaration of Elizabeth L. Howe ("Howe Decl.") at ¶ 2.

its fraud from DTTC, but was forced to reveal it under enhanced scrutiny." Order at 31-32. None of that has changed in the Amended Complaint, nor could it.

As it turns out, even with the benefit of four million pages of discovery, Plaintiffs have added only four sets of new *factual* allegations about DTTC, asserting that: (1) Longtop's internal control deficiencies and risk factors should have put DTTC on notice that the Company was engaged in fraud, (2) DTTC acceded to Longtop's request to drop a purportedly mandatory confirmation procedure, (3) DTTC ignored allegations raised by third parties (most of which were raised after DTTC issued its final audit opinion), and (4) in addition to the "red flags" alleged in the prior complaint (which this Court rejected), there were other "red flags" that should have put DTTC on notice that Longtop was using XLHRS, a staffing company, to underpay its social welfare payments. But far from undermining the narrative told by Plaintiffs' prior complaint, these new allegations only confirm the inference that DTTC conducted its audits diligently and, most critically here, do not allege facts that support a compelling inference that DTTC acted recklessly.[2]

As just one example, Plaintiffs' new allegations concerning internal controls defy common sense. Plaintiffs allege that DTTC properly identified certain control deficiencies at Longtop in 2006 and 2007 that were disclosed to the SEC and the investing public (when DTTC

---

[2] For the Court's convenience, DTTC has attached as Exhibit A a chart categorizing the allegations in the Amended Complaint that were not included in the prior complaint. As the chart demonstrates, the vast majority of Plaintiffs' new allegations are not factual allegations concerning DTTC's conduct or state of mind. Rather, many of those "new" allegations add nothing of substance and are instead simply long quotations from and summaries of auditing standards and conclusory allegations of violations of those standards. Still other allegations have nothing to do with DTTC at all: summaries of public statements made by Longtop, recitations of publicly available information, and allegations otherwise entirely unconnected to DTTC. Because as the Court previously ruled, "general recitations of accounting standards, post-hoc reasoning, and conclusory allegations" do not satisfy the heightened pleading standards of Rule 9(b) and the Private Securities Litigation Reform Act ("PSLRA"), Order at 37, DTTC focuses here on the allegations based on new "facts."

was *not* required to issue an opinion on internal controls), but that once DTTC was required to issue an opinion on Longtop's internal controls to be included in its public SEC filings in 2009 and 2010, DTTC changed its tune entirely, decided to ignore any deficiencies, and started to perform its control work recklessly. This inference is nonsensical and far from the "compelling inference" required by the PSLRA and *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007). As further demonstrated below, the most compelling inference to be drawn from the conduct alleged in the Amended Complaint is that DTTC did its job, not that it acted recklessly.

At bottom, Plaintiffs' new allegations are nothing more than an attempt to rehash their prior discredited theory: "[h]ad DTT conducted its audits in accordance with GAAS, it would have reacted to the numerous, obvious 'red flags' set forth above and, in so doing, *would have discovered* the truth about Longtop's operations." AC ¶ 271 (emphasis added). This is exactly the theory this Court already has rejected—"that, had DTTC performed a better audit, it would have uncovered Longtop's fraud." Order at 23.

Separately, Plaintiffs have all but ignored the second, equally critical holding of this Court's Order dismissing the prior complaint. This Court held that an auditor's opinion is, in fact, an *opinion*, and therefore a complaint must allege both that it is "grounded on a specific factual premise that is false, and that the speaker did not 'genuinely or reasonably believe' it." Order at 35. The prior complaint asserted that DTTC's audit opinions on Longtop's financial statements for the fiscal years ending March 31, 2009 and 2010 were misstated. The Amended Complaint appears to add allegations concerning additional opinions: DTTC's opinions on Longtop's financial statements for the fiscal years ending December 31, 2005 and 2006, the three months ending March 31, 2007 (all included in its IPO filings), and the fiscal year ending March 31, 2008, and its opinions, pursuant to Section 404(b) of the Sarbanes-Oxley Act, on the

3

effectiveness of Longtop's internal controls over financial reporting as of March 31, 2009 and

2010.  *See, e.g.,* AC ¶ 33.  But as with the prior complaint, there are no allegations that DTTC

believed *any* of these opinions to be untrue.  This pleading failure independently dooms all of

Plaintiffs' claims.

  Plaintiffs twice have taken their best shot at stating a claim against DTTC—first with the

Consolidated Class Action Complaint (filed five months after the original complaint) and again

with the Amended Complaint (filed a year later with the benefit of more than four million pages

of discovery and the Court's dismissal Order).  Twice Plaintiffs have failed.  The Amended

Complaint should be dismissed with prejudice.  *See* Transcript of 1/8/2013 Hearing at 32-33,

attached as Ex. A to the Declaration of Gazeena K. Soni ("Soni Decl.").

## ARGUMENT

**I. THE AMENDED COMPLAINT DOES NOT ALLEGE FACTS THAT GIVE RISE TO A STRONG INFERENCE THAT DTTC ACTED WITH SCIENTER.**

  The Amended Complaint should be dismissed as to DTTC for failure to allege scienter.

Like the prior complaint, and critically different from Plaintiffs' allegations concerning other

defendants, the Amended Complaint does not even try to assert that DTTC acted with a motive

to commit fraud.  This is consistent with this Court's observation that "[a]n outside auditor will

typically not have an apparent motive to commit fraud."  Order at 21.  Accordingly, to state a

claim against DTTC, the Amended Complaint, taken as a whole, must allege recklessness, *i.e.*,

"an extreme departure from the standards of ordinary care"  "approximating an actual intent to

aid Longtop's deception."  *Id.* at 21, 23 (citing cases); *see also* Memorandum and Order in *Iowa

Public Employee's Retire. Sys. v. Deloitte & Touche LLP*, No. 12-cv-02136-JPO, at *11, 14-15

(S.D.N.Y. Jan. 23, 2013) (attached as Ex. B).  As discussed at length in the Court's prior

dismissal Order, the facts alleged in the prior complaint, when "viewed holistically," were not

sufficient to raise a compelling inference that DTTC was "on notice that Longtop was engaged in

fraud."  Order at 23.  Indeed, the facts alleged suggested the exact opposite inference:  that

DTTC performed its audits with diligence, only to be duped by Longtop.  As explained below,

Plaintiffs' new allegations confirm the narrative told by the prior complaint and reinforce that

Plaintiffs' claim against DTTC again should be dismissed.[3]

### 1.    Allegations regarding internal control deficiencies and risk factors

As the Court explained in its dismissal Order, the facts alleged in the prior complaint set

forth a narrative involving an auditor that performed its audits "with diligence" and that took

---

[3] The Amended Complaint alleges (at ¶¶ 18-20, 161) that DTTC is now a party to *two* SEC
proceedings related to the production of audit workpapers (but not the quality of its audit work).
As the Court previously explained with respect to the first of those proceedings, "Lead Plaintiffs'
argument that DTTC's failure to comply with the SEC's subpoena provides proof of scienter is
also baseless."  Order at 33 n.128.  The fact that the SEC has filed a second proceeding against
DTTC and four other accounting firms (including each of the China Big Four)—confirms that
restrictions on the production of audit workpapers is a profession-wide issue "caused by
conflicting demands from Chinese regulators" and the SEC, and not any reason to think that
DTTC itself has acted with scienter.  *Id.*

In a section concerning "Longtop and the Individual Defendants," and *not DTTC*, AC § V.A.,
Plaintiffs also point to the Longtop's CEO admission in May 2011 that Longtop's bank accounts
were substantially overstated.  *See, e.g.,* AC ¶¶ 69-70; Notes on Telephone Discussion with Lian
Weizhou (May 19-20, 2011) (cited in AC ¶¶ 69-70) at PALASCHUK_SEC0323334-35
(referring to understated "bank loans" and overstated "cash balances"), attached as Ex. A to
Howe Decl.  But these allegations are nothing new.  DTTC's own resignation letter, discussed at
length in this Court's Order, not only quotes the admission of Longtop's CEO that there was
"fake cash recorded on the books," but specifically states that one reason for DTTC's resignation
is "the recently identified falsity of [Longtop's] financial records in relation to *cash at bank and
loan balances* (and also now seemingly in the sales revenue)."  AC ¶ 57 (emphasis added).
These are the *exact* same issues discussed in the notes underlying paragraphs 69 and 70 of the
Amended Complaint, and the Court already has held them to be insufficient.  Likewise, as the
Court has already noted, and as also noted in DTTC's resignation letter, DTTC itself was a target
of Longtop's cash fraud.  *See* Order at 24 (Plaintiffs have "amply allege[d] that Longtop went to
great lengths to conceal its fraud from DTTC, e.g., by falsifying bank confirmations").  Given
this fraud upon DTTC, any back-of-the-envelope calculation of the quantity of that fraud is
insufficient to show scienter, as "a fraud's large size, standing alone, is insufficient to show
recklessness."  *Id*. at 31.

action when it learned of potential issues, "despite the obvious temptation to discount them."
Order at 29.  In the Amended Complaint, Plaintiffs again attempt to wish away this narrative,
disregarding the undisputed facts and common sense in the process.  This time, Plaintiffs claim
that DTTC was aware of, but acted recklessly in response to, known "internal control
deficiencies" and "fraud risk factors" at Longtop.  *See* AC ¶¶ 91-106, 109-12.  But, as in the
prior complaint, the *facts* tell the opposite story:  that DTTC was alert to potential internal
control issues and risk factors and took those issues into account in planning and performing its
audits.

**Internal Controls.**  First, Plaintiffs ask this Court to put aside the facts—and common
sense—in alleging that DTTC failed to respond appropriately to internal control deficiencies at
Longtop.  To draw the inferences that Plaintiffs proffer, this Court would have to conclude that
DTTC reported internal control deficiencies at Longtop when it was under no obligation to do so,
but wholly abdicated its responsibilities once it was actually engaged to issue an opinion on
those controls.  Not surprisingly, the facts alleged tell a very different story—and the only
inference to be drawn from those facts is that DTTC did its job.

When Longtop decided to go public in the United States, the Company (which was based
in China and kept its books in Chinese GAAP) needed to prepare U.S. GAAP financial
statements to file with the SEC registration statement for its IPO.  Although DTTC had not been
engaged to audit Longtop's internal controls, DTTC identified one "material weakness" and one
"significant deficiency" in Longtop's internal controls during its audit of the December 31, 2006
financial statements.[4]  Neither the material weakness nor the significant deficiency suggested

---

[4] Although the Amended Complaint uses the term "material internal control deficiencies," there
is no such phrase in accounting and auditing literature, and it wrongly suggests that all internal
control deficiencies are somehow "material."  Instead, accounting and auditing standards

that Longtop was engaged in fraud:  The material weakness resulted from the Company's need to

make "material adjustments" to its financial statements in order for those financial statements "to

comply with US GAAP and SEC reporting requirements"—an issue that is hardly surprising for

a company transitioning from Chinese GAAP to U.S. GAAP.  2006 Management Letter at

PALASCHUK_SEC0031205.  A "significant deficiency" was also identified because, as of

December 31, 2006, the then-private Company "[did] not have detailed accounting policies and

procedures."  *Id.* at 31206-07.[5]

DTTC communicated these deficiencies to Longtop's Board of Directors, *see id.* at

31205-07, and the Company took steps to implement DTTC's recommendation that the

---

distinguish among: (1) "*control deficiency*," (2) "*significant deficiency*," which is "a control
deficiency, or combination of control deficiencies" that present "more than a remote likelihood
that a misstatement of the company's … financial statements that is more than inconsequential
will not be prevented or detected," and (3) "*material weakness*," which is "a significant
deficiency, or combination of significant deficiencies, that results in more than a remote
likelihood that a material misstatement of the [company's] financial statements will not be
prevented or detected."  6/19/2007 Ltr. from DTTC to Longtop Board of Directors ("2006
Management Letter") at PALASCHUK_SEC0031233 (cited in AC ¶ 100), attached as Ex. B to
Howe Decl.

Each of the documents from Mr. Palaschuk's production cited in this memorandum were
obtained from Plaintiffs, as they are quoted or specifically referenced in the Amended Complaint
and therefore are integral to that document.  Accordingly, the Court may consider the documents
cited in this memorandum in connection with DTTC's motion to dismiss the Amended
Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) and without converting DTTC's
motion to dismiss into a motion for summary judgment.  Order at 12-13.

[5] The Plaintiffs allege (AC ¶ 110) that DTTC's 2006 and 2007 Management Letters show that
DTTC "learned that Longtop did not conduct bank reconciliations as part of its ordinary month-
and quarter-end closing process."  But the Management Letters make clear that the Company did
"obtain[] all bank payment and receipt confirmation documents before month end close.  Bank
reconciliation procedures and review, however, were not *documented* as part of the accounts
closing process."  2006 Management Letter at PALASCHUK_SEC0031222 (emphasis added);
*accord* 8/2/2007 Ltr. from DTTC to Longtop Board of Directors ("2007 Management Letter") at
PALASCHUK_SEC0292670 (cited at AC ¶ 100), attached as Ex. C to Howe Decl; *see* AC
¶ 111.  This is consistent with the Management Letters' categorization of the bank reconciliation
issue as a "control deficiency," *not* a "material weakness" or "significant deficiency."

Company "strengthen its own internal expertise in US GAAP and SEC reporting," and that it

develop "[a] comprehensive accounting policies and procedures manual."[6]  *Id.* at 31205-06; *see,*

*e.g.*, 10/24/2007 Longtop Form 424(b)(4) ("Prospectus") at 22, attached as Ex. B to Soni Decl.[7]

Longtop also undertook other related efforts, including establishing a U.S. GAAP-based

accounting system, Prospectus at 22,  implementing procedures to more quickly convert its

accounts from Chinese GAAP to U.S. GAAP, *id.*, and converting its general ledger from Chinese

GAAP to U.S. GAAP, May 2007 Minutes at PALASCHUK_SEC0088632.[8]  And, contrary to

Plaintiffs' conclusory allegation, Longtop disclosed to the SEC and the investing public the

material weakness and significant deficiency that DTTC had identified, as well as its ongoing

remediation efforts.  *See* 10/2/2007 Longtop Form F-1 ("Registration Statement") at 21, attached

as Ex. C to Soni Decl.; Prospectus at 22; *compare* AC ¶ 102 (alleging that "nothing was done to

alert the investing public of these deficiencies").

    After its IPO, the Company continued its efforts to implement SOX 404's internal control

---

[6] Documents referenced in the Amended Complaint show that Longtop undertook a staffing "initiative" that resulted in the hiring of several new staff focused on U.S. GAAP and financial reporting matters including:  a Finance Director, ███████████████ a Supervisor – Internal Audit and SOX 404, and a consultant.  *See* 5/29/2007 Audit Committee Meeting Draft Minutes at PALASCHUK_SEC0088632 ("May 2007 Minutes") (cited at AC ¶ 99), attached as Ex. D to Howe Decl.; 2/20/2008 Audit Committee Meeting Draft Minutes ("Feb. 2008 Draft Minutes") at PALASCHUK_SEC0051872 (cited at AC ¶ 101), attached as Ex. E to Howe Decl.; 2/15/2008 Email from D. Palaschuk to X. Zuyun at PALASCHUK_SEC0051886-91 (attached to the Feb. 2008 Draft Minutes), attached as Ex. F to Howe Decl.

[7] The Court may consider SEC filings in determining this motion to dismiss.  *See Citadel Equity Fund Ltd. v. Aquila*, 168 Fed. Appx. 474, 476 (2d Cir. 2006).

[8] Because (not surprisingly) Longtop's efforts to improve its accounting and financial reporting capabilities were ongoing as of March 31, 2007, DTTC also communicated these internal control deficiencies to the Board of Directors in connection with its audit of the March 31, 2007 quarterly financial statements (downgrading the material weakness to a significant deficiency, consistent with Longtop's hiring of additional experienced accounting personnel in early 2007). 2007 Management Letter at PALASCHUK_SEC0292653-55.

requirements by the SEC's deadline of March 31, 2009, even hiring another Big Four accounting

firm (PricewaterhouseCoopers ("PwC")) to assist the Company in those efforts.  *See* Feb. 2008

Draft Minutes at PALASCHUK_SEC0051872.  After almost two years of work developing its

SOX 404 internal controls framework (including with the assistance of PwC), Longtop issued its

first management report on internal controls on June 29, 2009, and DTTC issued its first opinion

on Longtop's internal controls.[9]  No material weaknesses were identified.[10]  *See* 6/29/2009

Longtop Form 20-F ("2009 Form 20-F") at 98-99, attached as Ex. D to Soni Decl.; *see also*

5/26/2009 SOX 404 Attestation Status Update ("May 2009 Presentation") (cited at AC ¶ 103) at

PALASCHUK_SEC0063307 ("So far we have not identified matters involving the company's

internal control over financial reporting that we consider to be a potential significant deficiency

or material weakness…."), attached as Ex. G to Howe Decl.

　　　　Put into context, Plaintiffs' internal control allegations do not create a compelling

inference of scienter on behalf of DTTC.  The Amended Complaint does not allege any *facts*

showing that DTTC ignored and did not disclose any material weaknesses in Longtop's internal

controls.  Indeed, Plaintiffs' allegation that DTTC turned a blind eye to internal control

---

[9] Because implementing SOX 404's internal control requirements requires "substantial time and resources" and would "impose[] an additional burden on newly public companies," newly public companies have a transition period of approximately one year after becoming public to establish a SOX 404 framework and to conduct their first internal controls assessment.  SEC Release Nos. 33-8760, 34-54942, *Internal Control Over Financial Reporting in Exchange Act Periodic Reports of Non-Accelerated Filers and Newly Public Companies*, at 6, 23-28; *see* Instructions to Item 308, SEC Regulation S-K, 17 C.F.R. § 229.308.

[10] Consistent with the Sarbanes-Oxley Act, DTTC's audit opinion did *not* provide any assurance that there were *no* internal control deficiencies at Longtop.  Rather, DTTC's audit opinion properly focused on whether there were any *material weaknesses* in Longtop's internal controls.  *See* 15 U.S.C. § 7213(a)(2)(A)(iii)(III) (audit report to include "a description, at a minimum, of material weaknesses in such internal controls"); *see also* Item 308, SEC Regulation S-K, 17 C.F.R. § 229.308 (management report "must include disclosure of any material weakness in the registrant's internal control over financial reporting identified by management").

deficiencies at Longtop is belied by the fact that DTTC reported the existence of internal control

deficiencies in 2006 and 2007, even though it had not been engaged to audit those internal

controls.[11]  Plaintiffs have no compelling explanation—much less any factual support—to

explain why DTTC acted diligently in 2006 and 2007 in bringing attention to Longtop's internal

control deficiencies, and yet conducted "no audit at all" in 2009 and 2010 – the only two years it

actually rendered an opinion on Longtop's internal controls.

Finally, to the extent Plaintiffs contend that the internal control deficiencies DTTC

identified were "red flags" that Longtop was engaged in fraud, this assertion is simply wrong.

The fact that Longtop (a newly public company based in China) needed to strengthen its U.S.

GAAP and SEC reporting expertise and develop an accounting manual is not the sort of

information that "would place a reasonable auditor on notice that the audited company was

engaged in wrongdoing to the detriment of its investors."  Order at 27 (defining "red flag")

(citation omitted).  Rather, Plaintiffs' allegation is simply fraud by hindsight—"a claim that is

accorded the same respect in this Circuit today as it was when Judge Friendly gave it a name."

*Id.* at 32.  Moreover, Plaintiffs' claim that the internal control deficiencies identified by DTTC

were "red flags" of fraud is refuted by the fact that these internal control deficiencies *were*

*disclosed* in the Company's SEC filings, and "neither the SEC nor the investing public

recognized Longtop's alleged fraud."  *Id*. at 28.  As explained above, the more compelling

inference is that it was reasonable for DTTC—like the SEC and the investing public—to believe

---

[11] Plaintiffs are incorrect in their repeated assertion that DTTC was aware of multiple "material internal control deficiencies" at Longtop.  *E.g.*, AC ¶ 98.  The *facts* show that DTTC identified a single material weakness in 2006 and that the Company (per DTTC's recommendation) addressed that material weakness by hiring additional experienced staff.  Plaintiffs simply have no *factual* allegation that DTTC was aware of other material weaknesses during the Class Period that went undisclosed to investors.

that Longtop's internal control deficiencies were reflective of a newly public company implementing U.S. GAAP for the first time—and nothing more.

**Risk Factors.**  Plaintiffs also allege that DTTC's identification of risk factors as part of its audit planning process shows that DTTC was on notice of *actual fraud* at Longtop and that DTTC must have acted recklessly in the face of such fraud.  AC ¶¶ 95-96, 103.  Again, Plaintiffs ask this Court to suspend common sense and confuse diligence with recklessness.

*First*, an auditor's identification of risk factors is the antithesis of recklessness under applicable standards.  Indeed, doing so is a *required* element of a *well-planned* audit.  PCAOB auditing standards require auditors to identify "the potential for material misstatement due to fraud" and to plan an audit.  AU 316, *Consideration of Fraud in a Financial Statement Audit* ("AU 316"), at § 316.14, attached as Ex. E to Soni Decl.[12]  When promulgating Auditing Standard No. 5 (on internal controls), the PCAOB made this crystal clear:  "Incorporating the auditor's fraud risk assessment—required in the financial statement audit—into the auditor's planning process for the audit of internal control should *promote audit quality* as well as better integration."  *Notice of Filing of Proposed Rule on Auditing Standard No. 5*, 72 Fed. Reg. 32340, 32361 (June 12, 2007) (emphasis added).

*Second*, the documents on which Plaintiffs rely suggest *diligence*, not recklessness.  As alleged in the Amended Complaint, DTTC appropriately identified risk factors each year.  As it was supposed to do, DTTC identified risk factors in May 2008, 5/26/2008 Longtop Financial Technologies Limited Presentation (cited in AC ¶ 103) at PALASCHUK_SEC0042682-84, attached as Ex. H to Howe Decl., and in May 2009, May 2009 Presentation at

---

[12] DTTC quotes here the text of interim PCAOB auditing standard AU 316 as it existed at the time of DTTC's audits.  In August 2010, the PCAOB adopted eight new PCAOB Auditing Standards (A.S.), including A.S. No. 8, *Audit Risk*, which supersede portions of AU 316 for audits after December 15, 2010.

PALASCHUK_SEC0063294-300.  Plaintiffs note three of them in their Amended Complaint:

(1) that Longtop was "under significant pressure of profitability," AC ¶ 95; (2) that Longtop had

a "potential risk of management override of control," *id.* ¶ 96, and (3) that Longtop's "current

internal control may not meet the evolving demands in business," *id.*  But Plaintiffs fail to note

that DTTC *appropriately addressed* each of these issues.

With respect to the risk from profitability pressure, DTTC identified seven specific

planned audit responses:

- Increase the professional skepticism of all personnel involved in the audit engagement.

- Effectively communicate with the Company to identify any issues.

- Search more information for the industry as compared to the Company.

- Ensure appropriate audit work has been done for each specific risk and significant matters.

- Review the forecast and interview with the management for the business plan and identify if the assumption used is reasonable.

- Perform design and implementation test of internal controls to identify control deficiencies and related compensational controls.

- When encounter errors, fraud, possible fraud, an illegal act, a possible illegal act, or improper influence on the conduct of an audit, consider whether our findings may indicate a violation of the Foreign Corrupt Practices Act and involve an internal fraud specialist if deemed necessary.

May 2009 Presentation at PALASCHUK_SEC0063294.  Similarly, with respect to the risk of

management override of controls, DTTC identified three specific planned audit responses:

- Evaluate the internal control effectiveness, especially entity level control and internal controls on significant management judgment and accounting estimates.

- Increase professional skepticism.

- Understand and evaluate the contract control and review process.

12

*Id.* at 63296.  Finally, with respect to the observation that internal controls might not meet

*evolving* demands (*i.e.*, in the future), DTTC understood that Longtop (assisted by PwC) was

engaging in a lengthy SOX 404 implementation, *see supra* at 8-9, and concluded in 2009 that

"[a]ll the issues identified have been either remediated or compensated" and that such "controls

were tested effectively by Deloitte."  *Id.* at 63307.  Plaintiffs have it backwards:  DTTC's

identification of risk factors as part of its audits shows that DTTC did *not* recklessly turn a blind

eye to the risk of fraud at Longtop, but rather that it performed its audits with those very risks in

mind.  Whatever one thinks of the ultimate success of those audits, it would be absurd to refer to

DTTC's approach here as "no audit at all."  Order at 21-22.

   *Third*, this Court should reject Plaintiffs' attempt to conflate the identification of *fraud*

*risks* with notice of *actual fraud*.  In fact, PCAOB auditing standards themselves expressly refute

the conclusion that Plaintiffs suggest here, *i.e.*, that because DTTC considered potential risks of

fraud as part of its audits, DTTC must have been aware that Longtop was, in fact engaged in

fraud.  *See* AU 316.31 ("Fraud risk factors do not necessarily indicate the existence of fraud

….").  Many of these fraud risks are commonplace, and indeed, "[t]he risk of management

override of controls exists in *all* organizations."  1/23/2009 PCAOB Preliminary Staff Views, *An*

*Audit of Internal Control Over Financial Reporting That Is Integrated with An Audit of*

*Financial Statements:  Guidance for Auditors of Smaller Public Companies,* at 18 (emphasis

added), attached as Ex. F to Soni Decl.; *see, e.g.*, 6/26/2012 Form 10-K of Oracle Corporation, at

79 (identifying risk of "management override of the controls"), attached as Ex. G to Soni Decl.;

3/15/12 Form 10-K of Build-A-Bear Workshop, Inc. at 40 (same), attached as Ex. H to Soni

Decl.  The notion that management *might* override controls to inflate company performance or

that profitability pressure *might* lead to incentives to do so does not mean that management *in*

*fact* is doing so.  After all, returning a profit for one's investors is (or should be) a goal of every public company.  And, if a company's actual "superior performance" is not a "self-sufficient cause to suspect fraud," Order at 32, aspiring to such "superior performance" surely cannot be either.

*Finally*, DTTC specifically disclosed the risk of management override of controls in its 2009 and 2010 audit opinions on the effectiveness of Longtop's internal controls:  "Because of the inherent limitations of internal control over financial reporting*, including the possibility of collusion or improper management override of controls*, material misstatements due to error or fraud may not be prevented or detected on a timely basis."  2009 Form 20-F at 99 (emphasis added); 7/16/2010 Longtop Form 20-F ("2010 Form 20-F"), at 97 (same), attached as Ex. I to Soni Decl.  The SEC's and the investing public's (appropriate) failure to construe the identification of this risk as an indicator of actual fraud at Longtop again shows that Plaintiffs' allegations are "red herrings," not "red flags."  Order at 28.

<div align="center">

**2.    Allegations regarding confirmation of revenue contract terms**

</div>

Plaintiffs' allegations concerning DTTC's alleged failure to obtain confirmations are also misguided, and not for the first time.  *See* Order at 37 n.138 (rejecting Plaintiffs' allegation that DTTC had failed to obtain confirmation of bank balances).  In the Amended Complaint, Plaintiffs now allege, based on an April 2009 email exchange between Mr. Palaschuk and DTTC, that DTTC failed to conduct a supposedly mandatory confirmation of company contracts in order to "appease[]" Longtop.  AC ¶¶ 112-20.  But Plaintiffs confuse two very different issues, *i.e.*, confirming accounts receivable (which is a presumptively required audit procedure under PCAOB auditing standards) and confirming the terms of customer contracts (for which there is no presumption that confirmation procedures will be performed).

Audit evidence can be obtained in any number of ways, such as obtaining written confirmations from third parties, inspecting company documents, observing company processes, and obtaining representations from management.  *See* AU 326, *Evidential Matter* ("AU 326") at § 326.17, attached as Ex. J to Soni Decl.  As a general matter, the decision as to what procedures should be used on an audit engagement is a matter of judgment for the auditor based on the specific circumstances of that engagement.  *See* AU 326.13 ("The nature, timing, and extent of the procedures to be applied on a particular engagement are a matter of professional judgment to be determined by the auditor, based on the specific circumstances.").

In some limited circumstances, PCAOB auditing standards provide that certain audit procedures are presumptively required.  For example, PCAOB auditing standards provide that confirmation of a company's accounts receivable is a presumptively-required audit procedure.  *See* AU 330, *The Confirmation Process* ("AU 330") at § 330.34, attached as Ex. K to Soni Decl.  But the Amended Complaint does not allege any facts suggesting that DTTC failed to perform accounts receivable confirmations; indeed, the documents incorporated into the Amended Complaint show that those procedures were performed.  *See* May 2007 Minutes at PALASCHUK_SEC0088628 (reflecting discussion of "[a]n accounts receivable confirmation" received from a Longtop customer).

Instead, Plaintiffs' allegations rest entirely on an April 2009 email exchange regarding whether DTTC should use confirmations to test the *terms and conditions* of three contracts with Longtop's customers.  But Plaintiffs' allegations fall well short of showing that DTTC failed to conduct appropriate audit procedures, much less that it acted with scienter.  *First*, Plaintiffs' allegations do not make out a violation of PCAOB auditing standards.  Unlike the confirmation of accounts receivable, there is no PCAOB auditing standard that *required* DTTC to test the

terms of Longtop's revenue contracts using confirmations (as opposed to some other type of

audit procedure).  Instead, PCAOB auditing standards make clear that "[c]onfirming with

customers certain relevant contracts terms and the absence of side agreements" is *not* required,

but rather is something that an auditor "*may* want to consider."  AU 316.54 (emphasis added).[13]

    *Second,* there is nothing in the April 2009 email exchange cited in the Amended

Complaint to suggest that DTTC should have been aware that Longtop was engaged in fraud.

Rather, the email exchange reflects a discussion between Longtop's CFO (a former PwC auditor)

and DTTC as to whether confirmation of contracts was required under international auditing

standards, U.S. auditing standards, or both.  *See* 4/2009 Email Chain at PALASCHUK_-

SEC1114203-08 (cited at AC ¶ 115), attached as Ex. I to Howe Decl.  Ultimately, the documents

confirm that DTTC (appropriately) determined that: (1) confirmations were not required under

U.S. auditing standards, (2) there were no individually significant (*e.g.*, material) contracts for

the 2009 fiscal year, and (3) DTTC could obtain audit evidence through other forms of testing.

*Id*.  And the April 2009 email exchange also makes clear that DTTC already had confirmed,

without incident, the terms of Longtop's revenue contracts as part of its March 31, 2008 fiscal

year audit.  *Id*. at 1114207.

---

[13] The Amended Complaint also notes that DTTC referred Mr. Palaschuk to a PCAOB Concept
Release, issued just weeks prior to the April 2009 email exchange, regarding proposed changes
to the PCAOB's auditing standard regarding confirmations.  In that Concept Release, the
PCAOB proposed amendments to AU 330 that would, for the first time, require confirmation of
"significant terms of material, complex revenue transactions and unusual agreements."
4/14/2009 Release, *Concept Release on Possible Revisions to the PCAOB's Standard on Audit
Confirmations*, at 4-5, attached as Ex. L to Soni Decl.  Notably, after receiving public comments
on its proposed rule, the PCAOB did *not* adopt those amendments.  *See* PCAOB Dkt. 028,
*Proposed Auditing Standard Related to Confirmation and Related Amendments to PCAOB
Standards*, available at http://pcaobus.org/Rules/Rulemaking/Pages/Docket028.aspx (last
accessed January 25, 2013).

At bottom, Plaintiffs' allegations are the very sort of fraud-by-hindsight allegations that this Court already has held do not establish auditor scienter.  *See* Order at 32-33.  Plaintiffs' fundamental assertion is that "[h]ad DTT gone forward with obtaining confirmations relating to Longtop's three largest revenue contracts in 2009, it would have learned, for example, that Longtop's internal controls related to revenue were grossly inadequate, out of step with industry practice, and presented the opportunity for fraud."  AC ¶ 123.  Plaintiffs' claim is wholly conclusory—Plaintiffs allege no facts about what information would have been contained in those three confirmations that would have revealed Longtop's fraud.  And, "merely alleging that the auditor had access to the information by which it could have discovered the fraud is not sufficient."  Order at 22; *see id.* at 32-33 ("it is not reckless to lack clairvoyance").  Far from correcting the deficiencies in the prior complaint, the Amended Complaint simply repeats them.

### 3.   Allegations regarding information from third parties

The Amended Complaint alleges that DTTC disregarded information from third parties who expressed concerns regarding Longtop's financial performance.  These allegations are based on (1) a series of three reports by Wedge Partners, (2) an October 2010 meeting between DTTC audit partners and the Chief Financial Officer of YTEC, one of Longtop's chief competitors, and (3) "market rumors" in November 2010 that Longtop's revenues were overstated.  AC ¶¶ 125-30.  Far from suggesting scienter, however, the more compelling inference from these allegations again is that DTTC was diligent.

Plaintiffs first allege that a series of reports in February and March 2010 by "Wedge Partners, a U.S. equity analyst firm," raised questions regarding Longtop's use of Xiamen Longtop Human Resource Services Co., Ltd. ("XLHRS"), a third-party human resources company through which Longtop contracted much of its workforce.  *Id*. ¶¶ 125-27; *see also* Order at 27-28.  This Court defined "red flags" as "sign[s] consciously disregarded by the auditor

that would place a reasonable auditor on notice that the audited company was engaged in wrongdoing to the detriment of its investors." Order at 27 (quotation marks and citation omitted). The Wedge reports do not come close to meeting this standard.

As an initial matter, the Wedge reports would not "place a reasonable auditor on notice that the audited company was engaged in *wrongdoing*." To the contrary, the Wedge reports, taken as a whole, tell a *positive* story about Longtop. Although Plaintiffs focus on potential concerns Wedge Partners raised about Longtop, they neglect to inform the Court that, in the *very same series of documents*, and after carefully considering Longtop's position over the course of weeks, Wedge Partners ultimately concluded that they have a "generally positive view of this company[']s business prospects." 2/4/2010, 2/11/2010, 3/8/2010 3/23/2010 Wedge Partner reports (cited in AC ¶¶ 125-27) at PALASCHUK_SEC0039818, attached as Ex. J to Howe Decl.[14] A reader of these reports reasonably would conclude that Longtop was a good, if developing, company. This is not a "red flag."

Even more significantly, there is no allegation that DTTC "consciously disregarded" the Wedge reports, either. Indeed, on March 24, 2010, the day *after* the last Wedge report, Longtop obtained a legal opinion from its outside counsel that reconfirmed the legality of Longtop's relationship with XLHRS under Chinese law and further confirmed that XLHRS was not a related entity to Longtop, effectively answering any lingering questions about XLHRS.

---

[14] Critically, in February 2010, Wedge Partners initially expressed skepticism about Longtop in significant part because it believed that "[a] large number of staff in [Longtop's] accounting department have abruptly left (we believe over questions about their extremely high [gross margin] and other accounting)." Wedge reports at PALASCHUK_SEC0039814; *id.* at 39815 (referring to "exodus of staff in accounting and finance following the acquisition"). But this critical assumption turned out to be untrue. As Wedge Partners conceded in March 2010, "[a]fter checking back with our channels, we determined that only two financial managers have left Longtop, for personal reasons, one in May and one in December last year, rather than the larger exodus we reported." *Id.* at 39817.

3/24/2010 Legal Opinion (cited in AC ¶¶ 147-48) at PALASCHUK_SEC0067963-65, attached as Ex. K to Howe Decl.  This legal opinion was shared with DTTC.  *See* 12/19/2010 Email from D. Palaschuk to T. Wang (cited in AC ¶ 147) at PALASCHUK_SEC0067960 ("Here is the legal opinion previously sent to" DTTC), attached as Ex. L to Howe Decl.  Then, on March 31, 2010 (less than a week later), "Longtop convened a conference call for analysts and investors to address 'various questions' that Longtop received regarding its relationship with XLHRS, including some of the [alleged 'red flags']."  AC ¶ 73.  During the conference call, members of Longtop management, as well as the CEO of XLHRS, *id.*, exhaustively answered questions posed by analysts from (among others) Goldman Sachs, Deutsche Bank, and Oppenheimer.  Thus, the story of the Wedge reports is the same one this Court already has rejected as indicating scienter; Plaintiffs have pointed to no reason why DTTC should have been aware, let alone consciously disregarded, that XLHRS was anything more than "what Longtop presented it as:  a fully-disclosed independent staffing agency."  Order at 28.  Notably, Plaintiffs do not allege that Wedge Partners issued any reports questioning anything, including XLHRS, after the March 31 conference call.

The other two allegations regarding third party information suffer from a different, yet no less fatal, flaw:  they post-date DTTC's final audit opinion, dated July 16, 2010.  AC ¶¶ 128-30.  Because DTTC cannot have been aware of these facts before issuing its opinions, they therefore cannot be red flags.  Order at 26; *see also Stephenson v. PricewaterhouseCoopers, LLP*, 2012 WL 1764191, at *3 (2d Cir. May 18, 2012) ("[P]leading the existence of red flags does not establish that a defendant was aware of those warning signals.").

Moreover, these allegations are consistent with an inference that DTTC was diligently doing its job.  In late October 2010, the CFO of one of Longtop's competitors met with DTTC

partners to alert DTTC "to potential improprieties at Longtop." AC ¶ 128. Shortly thereafter, in early November 2010, DTTC met with Longtop's management to question them on the subject of "market rumors." *Id.* ¶¶ 129-30. DTTC suggested that Longtop consider hiring a third party to conduct an independent investigation, and Longtop followed up on that suggestion by obtaining the advice of the Company's external legal counsel on the issue. 11/2/2010 Meeting Notes (cited in AC ¶ 129-30) at PALASCHUK_SEC0107688-93, attached as Ex. M to Howe Decl. Following the meeting, DTTC reiterated that, although such accusations were "hearsay" (and therefore of questionable reliability), DTTC was taking the matter seriously and would, as a result, "do some additional procedures (for instance interview Lian Zong and other audit procedures)" in response. 11/8/2010 Email from ███ to D. Palaschuk (cited in AC ¶ 128) at PALASCHUK_SEC4000858, attached as Ex. N to Howe Decl. As a result of DTTC's "enhanced scrutiny," Longtop ultimately was "forced to reveal" the fraud it "had been hiding … from DTTC." Order at 32.

### 4. Allegations regarding XLHRS and Longtop's social welfare payments

Plaintiffs further strain to rehabilitate their XLHRS allegations, but it is a story this Court has heard before and rejected. Relying on the same conclusory allegations this Court previously rejected, Plaintiffs assert that DTTC should have been aware that XLHRS was a related-entity to Longtop. *See, e.g.,* AC ¶ 137. But Plaintiffs cannot change that "Longtop disclosed in its 2008 Form 20-F that it entered into a staffing contract with XLHRS in May 2007," including disclosing "an account of the relationship that Longtop had with XLHRS, the number of employees provided by XLHRS, and a copy of XLHR[S]'s contract with Longtop." Order at 27-28. As this Court concluded, "neither the SEC nor the investing public recognized Longtop's alleged fraud," raising "the inference that these purported red flags are in fact red herrings." *Id*. at 28.

In addition to repeating the prior complaint's XLHRS allegations that this Court already has rejected, the Amended Complaint also alleges that Longtop was using XLHRS in some nebulous "scheme" to underpay its "government-mandated social welfare."  *See, e.g.,* AC ¶¶ 140, 160.  The facts are simply inconsistent with any such "scheme," much less one of which DTTC was aware.

As an initial matter, there is no allegation that the accounting for Longtop's welfare payments was incorrect.  Plaintiffs point to a memo prepared by a Longtop employee in 2008 in which the employee allegedly "admitted that in fiscal years 2004 through 2006" – *i.e.*, prior to the Class Period (and when Longtop was a privately-held company) – "the amount of welfare paid by Longtop was 'less than the amount calculated by government regulation.'"  AC ¶ 141.  But in the very next sentence, Plaintiffs acknowledge that Longtop actually accounted in its financial statements for the possibility that the China government might require Longtop to make additional social welfare payments by setting up a reserve account that "accrued the additional potential welfare expenses."  *Id.*; *see also id.* ¶ 140.  There may have been some ambiguity about the amount Longtop was required to pay, but the Amended Complaint is clear that Longtop properly accounted for the maximum payment it believed it could be required to pay.  There is no financial statement issue here.

Plaintiffs also rely on an April 2010 email exchange in which Palaschuk requested advice as to whether a *potential* change in the way the welfare payments were calculated "would be an acceptable accounting treatment under US GAAP."  AC ¶ 142.  There is nothing unusual about the CFO of a company seeking advice from its outside auditor.  Moreover, DTTC did not "rubber stamp" Longtop's proposal, but rather provided their interpretation of the social welfare regulations and information regarding industry practices.  *Id.*  Plaintiffs allege no explanation for

why, if DTTC was conducting "no audit at all," Palaschuk would be requesting its advice on

whether a decision complied with GAAP.

The remaining allegations concerning XLHRS and Longtop's social welfare payments all

occurred after the DTTC's final audit opinion and thus cannot serve as red flags.[15]  *See* AC

¶¶ 144-59; *see also* Order at 26.  And again, these allegations are consistent with a diligent audit.

The documents suggest that DTTC exercised professional skepticism and asked probing

questions regarding the relationship between Longtop and XLHRS and Longtop's social welfare

payments.  AC ¶¶ 146, 148-49, 151-52.  And instead of blindly accepting Longtop's answers to

these questions, Plaintiffs allege that DTTC required a confirmation from the Chinese

government regarding Longtop's welfare payments, insisted that it be able to discuss the legal

opinion with the outside law firm, and pressed for further analysis on certain issues.  *Id.* ¶¶ 157-

59.  Such allegations do not give rise to a compelling inference that DTTC acted recklessly.

---

[15] One such document is a May 12, 2011 memo Mr. Palaschuk prepared to Longtop's file discussing a gift of shares made by Longtop's Chairman to his brother in July 2010.  According to the Amended Complaint, the memo concludes that the gift of shares should be recorded by Longtop as a compensation expense because the shares could be considered to benefit the CEO. AC ¶ 155.  The Amended Complaint attempts to suggest—without any factual support—that the Chairman's gift of shares to his brother (who worked as a clerk at the tax bureau) was somehow related to Longtop's obtaining a confirmation from the welfare bureau that Longtop's social welfare payments were correct.  This allegation cannot carry the weight Plaintiffs place on it. *First*, as the Amended Complaint notes, the gift of shares occurred in July 2010 – *i.e.*, after March 31, 2010, the final period for which DTTC issued an audit opinion.  *Second*, Plaintiffs fail to allege that DTTC was aware of the Chairman's gift when it issued its 2010 audit opinion. *Third*, the Amended Complaint fails to note that the May 12, 2011 memo expressly states that the Chairman's brother "does not work on or have any involvement in the review of any of Longtop's tax filings."  5/12/2011 Memo from D. Palaschuk to File (cited in AC ¶ 155) at PALASCHUK_SEC0140781, attached as Ex. O to Howe Decl.  *Fourth*, the Amended Complaint alleges no facts indicating that the *tax* bureau at which the Chairman's brother worked was the same government entity as the *welfare* bureau that handled Longtop's social welfare payments. *Finally*, DTTC's comment that the issue was "murky" pertained not to the propriety or purpose of the gift, but rather the technical question of whether a gift of shares to the Chairman's relative should be classified as part of the Chairman's compensation expense.  *See* 5/13/2011 Email from D. Palaschuk to T. Bancroft (cited in AC ¶ 155) at PALASCHUK_SEC0149405, attached as Ex. M to Soni Decl.

## II.    THE AMENDED COMPLAINT DOES NOT PLEAD WITH PARTICULARITY THAT DTTC MADE A MATERIAL MISREPRESENTATION.

Plaintiffs base their claim against DTTC on its audit opinions that were publicly filed in Longtop's SEC filings.  AC ¶¶ 163, 173, 190-91, 215-16.  Audit opinions are properly analyzed as opinions for purposes of determining whether they are misstatements under the federal securities laws.  Order at 34-35; *see also In re Lehman Bros. Sec. & ERISA Litig.*, 799 F. Supp. 2d 258, 299-304 (S.D.N.Y. 2011).  "[T]o allege that an auditor opinion is a misrepresentation, a complaint must show that the statement in question is grounded on a specific factual premise that is false, and that the speaker did not 'genuinely or reasonably believe' it."  Order at 34-35 (quoting *In re IBM Corp. Sec. Litig.*, 163 F.3d 102, 107 (2d Cir. 1998)).  Where "the underlying alleged auditing standard violations [are] inherently subjective," "strong circumstantial evidence of subjective falsehood" will be required to survive a motion to dismiss.  Order at 35.

Like the prior complaint, the Amended Complaint does not even attempt to suggest that DTTC had any subjective belief that the statements made in any of its opinions were untrue.  *See* Order at 34-36.  Nor have Plaintiffs alleged facts showing that DTTC "was aware, or should have been aware, of wrongdoing on Longtop's part at the time DTTC issued the audit reports."  This alone is fatal to Plaintiffs' claim, yet they made no effort to correct it.  At bottom, the Amended Complaint does not – and cannot – allege that DTTC did not actually believe the opinions expressed in its audit opinions.  *Id*. at 36.

Moreover, Plaintiffs have alleged no facts demonstrating that DTTC's 2009 and 2010 audit opinions on the effectiveness of Longtop's internal controls were objectively false.  Although Plaintiffs generally assert that internal control deficiencies existed throughout the Class Period, Plaintiffs do not allege facts supporting that claim or even identifying what those internal control deficiencies were.  Nor do Plaintiffs allege facts sufficient to show that any such internal

control deficiencies were of such magnitude and severity that DTTC was required to issue an

adverse opinion on the effectiveness of Longtop's internal controls.

Thus, the Amended Complaint must be dismissed for the separate reason that it fails to

allege any material misstatement by DTTC.

### III.   ANY CLAIM BASED ON MISSTATEMENTS PRIOR TO DECEMBER 14, 2007 IS BARRED BY THE STATUTE OF REPOSE.

The Amended Complaint's claims based on DTTC's October 24, 2007 audit opinion are

time barred.  The statue of repose for federal securities fraud claims is five years.  28 U.S.C.

§ 1658(b).[16]  Until Plaintiffs' Amended Complaint, filed on December 14, 2012, Plaintiffs did

not make any allegations concerning DTTC's statements included in Longtop's October 24,

2007 Prospectus.  Because the Amended Complaint was filed more than five years after DTTC's

audit opinion was issued, any claim based on that audit report must be dismissed.[17]

* * *

Finally, although (as explained above) the documents produced by Defendant Palaschuk

only reinforce that Plaintiffs' claim against DTTC should be dismissed, DTTC notes its

continuing objection to Plaintiffs' use of discovery materials in amending their complaint against

DTTC.  As DTTC explained in a series of letter briefs to the Court, DTTC believes that the

---

[16] In addition to the five-year statute of repose, Section 804(a) of the Sarbanes-Oxley Act enacted a two-year statute of limitations for securities fraud claims.  Unlike statutes of limitations, which, for example, may not be triggered until inquiry notice, statutes of repose are absolute. Accordingly, neither judicial tolling doctrines nor relation back under Fed. R. Civ. P. 15 may be invoked to avoid the certainty imposed by its limits.  *See In re IndyMac Mortgage-Backed Sec. Litig.*, 793 F. Supp. 2d 637, 642-43 (S.D.N.Y. 2011).

[17] Courts in this district have "consistently stated that the five-year period begins to run from the time that the allegedly fraudulent representations were made," *Boudinot v. Shrader*, 2012 WL 489215, at *4 (S.D.N.Y. Feb. 15, 2012), and the two circuit courts to authoritatively address this issue agree, s*ee McCann v. Hy-Vee, Inc.*, 663 F.3d 926, 932 (7th Cir. 2011); *In re Exxon Mobil Corp. Sec. Litig.*, 500 F.3d 189, 199-202 (3d Cir. 2007).

PSLRA's automatic stay of discovery barred Plaintiffs from conducting discovery after serving the Summons and Consolidated Class Action Complaint on DTTC in August 2012; that the production of the Palaschuk discovery materials in September 2012 after DTTC filed its motion to dismiss the Consolidated Class Action Complaint violated the PSLRA's automatic discovery stay; and that Plaintiffs are prohibited from using the Palaschuk discovery materials to amend their complaint against DTTC, particularly following the Court's dismissal of that complaint for failing to satisfy (among other things) the PSLRA's heightened pleading standards.

DTTC notes that the Court has considered DTTC's letter briefs on this issue, heard oral argument on this issue at the January 8, 2013 hearing, and held that Plaintiffs properly obtained the Palaschuk discovery materials and were permitted to use those materials in amending their claim against DTTC.  DTTC understands that the Court has ruled on this issue and accordingly does not seek to relitigate it here.  DTTC instead raises the issue to provide a written record, in this motion, of the issue having been previously raised and decided, and to preserve the issue for appeal (if any).  For that reason, it also incorporates the arguments it previously made by reference here.

## CONCLUSION

For the foregoing reasons, DTTC's motion to dismiss the Amended Complaint with prejudice should be granted.

Dated:  January 25, 2013                    Respectfully submitted,

                                             /s/ Gazeena K. Soni_____
                                            Gary F. Bendinger
                                            Gazeena K. Soni
                                            SIDLEY AUSTIN LLP
                                            787 Seventh Avenue
                                            New York, NY 10019
                                            Telephone:  (212) 839-5300
                                            gbendinger@sidley.com
                                            gsoni@sidley.com

                                            Michael D. Warden (admitted *pro hac vice*)
                                            Elizabeth L. Howe (admitted *pro hac vice*)
                                            SIDLEY AUSTIN LLP
                                            1501 K Street, N.W.
                                            Washington, DC 20005
                                            Telephone:  (202) 736-8000
                                            mwarden@sidley.com
                                            ehowe@sidley.com

                                            David A. Gordon (admitted *pro hac vice*)
                                            SIDLEY AUSTIN LLP
                                            One South Dearborn Street
                                            Chicago, IL 60603
                                            Telephone:  (312) 853-7000
                                            dgordon@sidley.com

                                            *Attorneys for Defendant Deloitte Touche*
                                            *Tohmatsu CPA Ltd.*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on March 25, 2013, I electronically filed the foregoing

Defendant Deloitte Touche Tohmatsu CPA Ltd.'s Memorandum in Support of its Motion to

Dismiss the Amended Consolidated Class Action Complaint with the Clerk of Court using the

CM/ECF system. I also certify that the foregoing document is being served on all counsel of

record or pro se parties, either via transmission of Notice of Electronic Filing generated by

CM/ECF or in some other authorized manner for those counsel or parties who are not authorized

to receive electronically Notices of Electronic Filing.

<div style="margin-left:50%">

 /s/ Gazeena K. Soni
Gary F. Bendinger
Gazeena K. Soni
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, NY 10019
Telephone:  (212) 839-5300
Facsimile:  (212) 839-5599
gbendinger@sidley.com
gsoni@sidley.com

</div>