UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE LONGTOP FINANCIAL TECHNOLOGIES LIMITED SECURITIES LITIGATION | Civil Action No. 11-cv-3658-SAS |
| | **JURY TRIAL DEMANDED** |
| | **ECF CASE** |

## AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

## TABLE OF CONTENTS

**Page**

I.    INTRODUCTION .............................................................................................. 1

II.   JURISDICTION AND VENUE ........................................................................ 6

III.  PARTIES .......................................................................................................... 6

IV.  SUBSTANTIVE ALLEGATIONS ................................................................... 8

      A.    Longtop's Supposed Business ............................................................... 8

      B.    Longtop's Access to the U.S. Capital Markets .................................... 10

      C.    The Truth Begins to Emerge ................................................................ 10

V.   ADDITIONAL SCIENTER ALLEGATIONS ................................................. 18

      A.    Longtop and the Individual Defendants ............................................... 18

      B.    DTT ....................................................................................................... 23

            1.    Overview of applicable generally accepted auditing standards ..................................................................................... 23

            2.    DTT was aware of Longtop's many red flags and internal control deficiencies .............................................................. 27

            3.    DTT also disregarded known red flags concerning Longtop's bank balances and revenues ...................................... 32

            4.    DTT disregarded information from third parties who expressed concerns to DTT over the impropriety of Longtop's supposed financial performance ............................... 38

            5.    DTT ignored red flags regarding XLHRS and Longtop's underfunding to China's mandatory social welfare payments ................................................................................... 41

VI.  FALSE AND MISLEADING STATEMENTS ................................................ 52

VII. GAAP VIOLATIONS .................................................................................... 71

VIII. LOSS CAUSATION ....................................................................................... 73

IX.  GROUP PLEADING ...................................................................................... 74

i

X.      INAPPLICABILITY OF STATUTORY SAFE HARBOR ............................................ 75

XI.     PRESUMPTION OF RELIANCE ................................................................................ 75

XII.    CLASS ACTION ALLEGATIONS APPLICABLE TO ALL CLAIMS ........................ 76

XIII.   CAUSES OF ACTION ................................................................................................ 78

COUNT I Violation of Section 10(b) of the Exchange Act and Rule 10b-5
Promulgated Thereunder Against Longtop and the Individual Defendants ................................ 78

COUNT II Violation of Section 20(a) of the Exchange Act  Against the Individual
Defendants ................................................................................................................................ 81

COUNT III Violation of Section 10(b) of the Exchange Act and Rule 10b-5
Promulgated Thereunder Against DTT ...................................................................................... 82

Lead Plaintiffs Danske Invest Management A/S and Pension Funds of Local No. One, I.A.T.S.E. ("Lead Plaintiffs"), and additional plaintiff Pompano Beach General Retirement System (collectively, "Plaintiffs") bring this action (the "Action") on their own behalf and as a class action on behalf of all other persons and entities who purchased Longtop Financial Technologies, Ltd. ("Longtop" or the "Company") American Depositary Shares ("ADSs") on the New York Stock Exchange ("NYSE") during the period October 24, 2007 through May 17, 2011, inclusive (the "Class Period"), and who were damaged thereby (the "Class").

I.    **INTRODUCTION**

1.    This securities class action is brought pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

2.    Longtop is a Cayman Islands corporation with principal offices in Hong Kong and Xiamen, China.

3.    During the Class Period, Longtop held itself out as a "leading provider of software and information technology, or IT, services targeting the financial services industry in China." In 2009 and 2010, American Banker listed Longtop as the highest ranked Chinese company in the "Global FinTech 100," an annual listing of the top global technology providers.

4.    Longtop reported enormous financial growth throughout the Class Period. For example, for fiscal year ended March 31, 2008 (Longtop's fiscal year ends March 31), Longtop reported total revenues of $66.7 million and net income of $2.9 million. For fiscal year ended March 31, 2010, Longtop's revenues and net income reportedly skyrocketed to $169.1 million and $59.1 million, respectively.

5.    Longtop attributed much of its reported financial growth to the Company's supposedly strong gross margins, which Longtop touted as being substantially higher than any of

1

its peers.  For example, for fiscal year ended March 31, 2010, Longtop reported gross margins of 69% and non-GAAP operating margins of 49%, compared to Longtop's peer companies that reported gross margins between just 15-50% and operating margins between 10-25%.

6.      Based on Longtop's supposed financial performance, the Company obtained approximately $143 million from U.S. capital markets through an initial public offering of ADSs on October 24, 2007 at $17.50 per share (the "IPO").  Longtop raised another $127 million through a secondary offering on November 23, 2009 at $31.25 per share (the "Secondary Offering").

7.      By November 10, 2010, Longtop's ADSs reached a Class Period high of $42.86 per share.

8.      Unbeknownst to investors, the revenues, gross margins and net income that Longtop reported throughout the Class Period were nothing more than fiction.  In truth, the Individual Defendants, defined below, materially inflated the Company's reported amounts of cash and cash equivalents, accounts receivable, revenues, gross profit, and net income, and they materially understated or omitted disclosure of the amounts of outstanding bank loan obligations, cost of revenues, employee related expenses and related party transactions, thereby creating the false appearance of growth and prosperity.  Meanwhile, the Individual Defendants reaped tens of millions of dollars through insider sales of Longtop ADSs.

9.      On or around May 19-20, 2011, Defendant Lian Weizhou a/k/a Wai Chau Lin ("Lian"), Longtop's Chief Executive Officer ("CEO"), admitted that Longtop's financial results were materially untrue.  During a telephone call he had with Defendant Derek Palaschuk ("Palaschuk"), then Longtop's Chief Financial Officer ("CFO"), Lian acknowledged that Longtop's publicly reported financial results, including revenue, income, cash, and outstanding

2

debt, were falsified *throughout the Class Period*. As Lian acknowledged during this call, Longtop had never generated a profit throughout the entire time the Company's ADSs were publicly traded. Just days later Lian confessed to the fraudulent misconduct during a Longtop Board meeting.

10.   Longtop's ability to raise capital from U.S. markets and have its ADSs traded on the NYSE was made possible by the imprimatur of Deloitte Touche Tohmatsu CPA Ltd. ("DTT"). DTT was Longtop's outside auditor throughout the Class Period, issuing unqualified audit opinions on each of Longtop's Class Period annual financial statements, and consenting to the use of its audit reports in Longtop's registration statements filed with the U.S. Securities and Exchange Commission (the "SEC") in conjunction with Longtop's IPO and Secondary Offering.

11.   Despite DTT's representations to the contrary, DTT's audits of Longtop's Class Period financial statements were not conducted in accordance with, and materially departed from, generally accepted auditing standards ("GAAS"). The primary deficiencies in the conduct of DTT's audits, and the related violations of GAAS, include its failures to:

    (a)   adequately plan its audits to identify and adequately respond to the risk of material misstatement that was indicated by Longtop's industry leading gross margins;

    (b)   exercise both due professional care and professional skepticism in all phases of its audits;

    (c)   appropriately respond to, and thereby essentially ignoring, the presence of risk factors or "red flags" and the related risk of material misstatement of Longtop's financial statements due to fraud;

    (d)   express an appropriate opinion on the effectiveness of Longtop's internal control over financial reporting in light of the numerous material weaknesses and internal control deficiencies known by DTT to have existed and remained unresolved throughout the Class Period;

(e)     obtain sufficient and appropriate audit evidence in support of its audit opinions, particularly with respect to Longtop's cash and cash equivalents, accounts receivable balances, loan obligations, revenues, cost of revenues and employee related expenses;

(f)     corroborate, in a manner consistent with GAAS, representations made by Longtop's management; and

(g)     ensure that Longtop's related party relationship and transactions with Xiamen Longtop Human Services Co. ("XLHRS") were adequately disclosed.

12.     No prudent auditor who was aware of all of the relevant information set forth herein could have concluded that Longtop's Class Period financial statements were fairly presented, in all material respects, in accordance with generally accepted accounting principles ("GAAP"). DTT's audits were so deficient and represented such a significant departure from GAAS that they effectively equated to no audit at all with respect to the relevant financial statement areas.

13.     Thus, DTT's audit opinions were materially false and misleading because (a) Longtop's Class Period financial statements were not fairly presented, in all material respects, in accordance with GAAP; (b) DTT's audits were not conducted in accordance with GAAS; and (c) DTT had identified material deficiencies in Longtop's internal controls over financial reporting during the Class Period.

14.     It was not until May 2011, after multiple third parties claimed Longtop's financial statements did not fairly present the Company's operations and financial results, that DTT resigned and acknowledged publicly that Longtop's financial statements, including its reported cash and outstanding debt, were materially false.

15.     As a result of Longtop's and the Individual Defendants' material misstatements, and DTT's failure to conduct its audits in accordance with GAAS, the price of Longtop's ADSs

dropped from a Class Period high of $42.86 to $0 as the true facts materialized in a series of stunning accusations by third parties, denials by Longtop, and finally by the sudden resignations of Palaschuk and DTT.

16.     Longtop's ADSs are now delisted from the NYSE and the Company is the subject of an investigation by the SEC in a matter styled *In the Matter of Longtop Financial Technologies Limited*, SEC File No. HO-11698.

17.     Notwithstanding that DTT was Longtop's outside auditor throughout the Class Period, for months it has refused to produce documents in response to a subpoena served upon DTT in connection with the SEC's investigation into the fraud at Longtop.

18.     As a result, on December 3, 2012, in an action pending in the United States District Court for the District of Columbia and captioned *U.S. Securities and Exchange Commission v. Deloitte Touche Tohmatsu CPA Ltd.* (11 Misc. 512 GK/DAR), the SEC re-filed an application for an order to show cause that would require DTT to comply with the SEC subpoena seeking documents related to DTT's audits of Longtop.

19.     On December 3, 2012, the SEC announced that it had begun administrative proceedings, pursuant to Rule 102(e)(1)(iii) of the SEC Rules of Practice, against, among others, DTT and three other China affiliates of the Big Four accounting firms resulting from their refusal to produce audit work papers and other documents related to China-based companies under investigation by the SEC for potential accounting fraud against U.S. investors.

20.     SEC Rule of Practice 102(e)(1)(iii) provides, in pertinent part, that:

> The Commission may . . . deny, temporarily or permanently, the privilege of appearing or practicing before it . . . to any person who is found . . . to have willfully violated, or willfully aided and abetted the violation of any provision of the Federal securities laws or the rules and regulations thereunder.

21.     As a result of the fraudulent misconduct alleged herein, Plaintiffs and the Class have suffered hundreds of millions of dollars in damages, which they now seek to recover.

**II.     JURISDICTION AND VENUE**

22.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. §78aa and 28 U.S.C. §1331.

23.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §1391.  At all relevant times, Longtop's stock traded as ADSs on the NYSE in this District.

24.     In connection with the wrongful acts and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail and the facilities of a national securities market.

**III.    PARTIES**

***Plaintiffs***

25.     Danske Invest Management A/S ("Danske") is an investment manager for funds including Investeringsforeningen Danske Invest ("IDI") and Den Professsionelle Forening Danske Invest Institutional ("DPFDII"), both of which purchased or otherwise acquired Longtop ADSs during the Class Period in the amounts set forth in the certification Danske filed with the Court on July 22, 2011, and were damaged thereby.  IDI and DPFDII have properly assigned their claims against Defendants to Danske.  On September 21, 2011, Danske was appointed by Order of the Court to serve as Co-Lead Plaintiff in this Action.

26.     Pension Funds of Local No. One, I.A.T.S.E. ("Local One") provides welfare, pension and annuity benefits to Local One union membership consisting of members who construct, install, maintain, and operate the lighting, scenery, sound equipment, and special effects for Broadway shows, concerts at Radio City Music Hall, Madison Square Garden and

Carnegie Hall, and productions at The Metropolitan Opera and throughout Lincoln Center. Local One purchased or otherwise acquired Longtop ADSs during the Class Period, in the amounts set forth in the certification Local One filed with the Court on July 22, 2011, and was damaged thereby. On September 21, 2011, Local One was appointed by Order of the Court to serve as Co-Lead Plaintiff in this Action.

27.     Pompano Beach General Employees Retirement System ("Pompano Beach") was created by the Pompano Beach City Commission to provide retirement benefits to eligible general employees of the city of Pompano Beach. Its mission is to ensure the proper management and investment of its assets in order to protect the benefits of its members and beneficiaries. Pompano Beach purchased or otherwise acquired Longtop ADSs during the Class Period and was damaged thereby. Pompano Beach is named herein as an additional plaintiff.

### Company Defendant

28.     Longtop is a corporation incorporated under the laws of the Cayman Islands with principal executive offices located at Flat A, 10/F, Block 8, City Garden, 233 Electric Road, North Point, Hong Kong.

29.     During the Class Period, Longtop's ADSs were traded on the NYSE under the ticker symbol "LFT" and the Company filed annual reports on Form 20-F ("Forms 20-F") and quarterly reports on Form 6-K ("Forms 6-K") with the SEC. According to Longtop's Form 20-F for its fiscal year ending March 31, 2010, there were over 41 million shares of Longtop ADSs issued and outstanding.

### Individual Defendants

30.     Weizhou Lian a/k/a Wai Chau Lin ("Lian") served as a director and CEO of Longtop throughout the Class Period. Lian is a resident of the People's Republic of China ("PRC" or "China").

7

31.     Derek Palaschuk ("Palaschuk") served as Longtop's CFO from September 2006 until his resignation on or about May 19, 2011.

32.     Lian and Palaschuk together are referred to hereinafter as the "Individual Defendants."

### *Auditor Defendant*

33.     Deloitte Touche Tohmatsu CPA Ltd., or DTT, was Longtop's auditor throughout the Class Period.  DTT is located at 30/F Bund Center, No. 222, Yan An Road East, Shanghai, PRC.  DTT issued unqualified audit opinions for each of Longtop's annual financial statements for calendar years 2005 and 2006 and fiscal years 2007 through 2010 (prior to Longtop's IPO, the Company's fiscal year ended December 31).  Subsequent to the IPO, Longtop changed its fiscal year to end March 31).  DTT specifically consented to the incorporation of its audit reports for the calendar years ended December 31, 2005 and 2006 and the three months ended March 31, 2007 in connection with Longtop's IPO.  It also consented to the incorporation of its audit report for Longtop's fiscal year ended March 31, 2009 in connection with Longtop's Secondary Offering.  DTT also issued unqualified opinions on the effectiveness of Longtop's internal control over financial reporting as of March 31, 2009 and 2010.

## IV.     SUBSTANTIVE ALLEGATIONS

### A.     Longtop's Supposed Business

34.     Throughout the Class Period, Longtop held itself out as a "leading provider of software and information technology, or IT, services targeting the financial services industry in China."  In 2007, when Longtop first availed itself of the U.S. capital markets, China's IT banking sector was a niche market poised for rapid growth, and Longtop seemed the perfect company to fill the market void and profit greatly in the process, according to analysts.

8

35.    For example, in November 2007, analysts at Avondale Partners, LLC reported seeing "strong secular growth trends in the China IT banking sector" noting that "due to competitive pressures and looming regulatory requirements, financial institutions in China are investing in IT at an urgent pace. . . ." Global market intelligence firm International Data Corporation projected the market for IT services and software for Chinese banks to grow by 22.3% and 21.7% per year, respectively, between 2006 and 2011, compared to 6.4% globally.

36.    Analysts found Longtop to be perfectly suited to address the urgent need for technology solutions for Chinese banks, citing the Company's industry leading margins, strong customer list, which included eight of China's top thirteen banks and China's top two insurance companies, as well as room for rapid growth.

37.    Longtop reported immense growth during the Class Period.  For example, on October 24, 2007, the first day of the Class Period, Longtop filed a prospectus with the SEC on Form 424B4 (the "Prospectus") in conjunction with its IPO, and reported total revenues of $43.2 million and net income of $8.3 million for fiscal year ended December 31, 2006, the fiscal year immediately preceding Longtop's IPO.  In fiscal year ended March 31, 2010, Longtop's reported revenues and net income had supposedly ballooned to $169.1 million and $59.1 million, respectively.

38.    In crediting the Company's outstanding financial performance, Wall Street analysts focused particularly on Longtop's purported gross margins and operating margins that supposedly dwarfed Longtop's peers.  For example, for fiscal year ended March 31, 2010, Longtop reported gross margins and operating margins of 62.5% and 35.8%, respectively, compared to its peer companies that reported gross margins between just 15-50% and operating margins between 10-25%.

9

**B.     Longtop's Access to the U.S. Capital Markets**

39.     Longtop and the Individual Defendants capitalized on the reported growth and profit story through an IPO on October 24, 2007.  Longtop raised approximately $143 million through the sale of approximately 10 million ADSs (including the overallotment exercised by the IPO underwriters) priced at $17.50.   The Individual Defendants benefited directly from Longtop's presence as a listed company on the NYSE.  During the Class Period, the Individual Defendants collectively sold over $69 million worth of Longtop ADSs.

40.     In connection with Longtop's IPO, DTT agreed to include its unqualified audit opinion of Longtop's financial statements for the Company's calendar years ended December 31, 2005 and 2006 and for the three months ended March 31, 2007.

41.     Longtop's inflated financial performance allowed the Company to access additional U.S. capital through the November 17, 2009 Secondary Offering in which Longtop issued 4.25 million ADSs at a per share price of $31.25, raising net proceeds of approximately $127 million.

42.     In conjunction with the Secondary Offering, DTT consented to the inclusion of its prior unqualified audit reports relating to Longtop's fiscal 2009 financial statements and the effectiveness of the Company's internal control over financial reporting as of March 31, 2009.

**C.     The Truth Begins to Emerge**

43.     On April 26, 2011, the truth about Longtop's financial condition and growth prospects began to materialize when Citron Research ("Citron") issued a report calling into question the legitimacy of Longtop's financial statements dating back to its IPO.

44.     Specifically, Citron reported:

10

*Margins Far in Excess of Competitors*

LFT reports spectacularly high margins — much greater than any peer company. In the fiscal year March 2010 LFT reported gross margins of 69% and non-GAAP operating margins of 49%. Peers report gross margins between 15-50% and operating margins of 10-25% or even lower. Management's explanation for the high margins is that they have more standardized software sales than peers and standardized software has very high gross margins of around 90%. The company claims that these solutions and modules can be deployed to new customers with fewer man-hours and expenses. Furthermore, even if you believe the standardized software gross margin is 90%, then this implies that LFT is generating 60-65% gross margins on customized software development which is still much higher than peers. If the China space has taught us anything, it is that when something seems too good to be true, it probably is. So what is the real reason for these supersized margins?

*Unconventional Staffing Model*

Until recently, the vast majority of LFT's employees were not directly employed by the company. As of March 31, 2010 LFT had 4,258 employees of which 3,413 (80%) were employed by third-party HR staffing companies. Of the employees at staffing companies, 95% (3,235) were from a single firm called Xiamen Longtop Human Resources Services Co (XLHRS), but this entity has no verifiable business presence except for LFT . . . LFT has consistently claimed that (XLHRS) is an unrelated party. The existence of Longtop Staffing has allowed LFT to transfer the majority of its cost structure off-balance sheet which creates opportunities for massive accounting fraud.

Does any of this sound unrelated to you?

- Xiamen Longtop Human Resources (XLHRS) shares a name with its only customer: Longtop Financial. XLHRS was formed in May of 2007, just months before LFT's IPO;
- Even though it is its largest line item expenditure by far, XLHRS is never mentioned in filings until the annual report filed July 2008;
- XLHRS has no website and does not seem to be soliciting any customers, even though they just lost their only customer;
- LFT did not have any long term contract and did not have to pay any penalties or minimums in their relationship with XLHRS;
- XLHRS used the same email server as their only client — as evidenced by these help wanted ads placed by them that ask perspective employees to contact them at "longtop.com." For example, this is a 2009 job listing for XLHRS using a Longtop.com email address. . .

- As of the writing of this report, Citron has reason to believe that XLHRS has for months been located in the same building as Longtop Financial.
- When the outsourcing agency relationship was challenged, the company's response was to terminate it, and take all the employees in-house.

45.     In other words, Citron conveyed that Longtop's reported margins—which were much greater than its competitors—were the result of Longtop's questionable dealings with XLHRS, an entity that, unbeknownst to investors, Longtop wholly-owned and controlled, and that allowed Longtop to under-contribute to employee related expenses.

46.     On April 26, 2011, following the publication of the Citron report, Longtop's ADSs fell by approximately 13% to $22.24 per share.

47.     On April 27, 2011, Bronte Capital ("Bronte") published an article that also challenged the accuracy of Longtop's financial statements and questioned the need for Longtop's Secondary Offering in light of the Company's purported strong cash position at the time of the Offering.  Specifically, Bronte explained:

> But for the life of me I can't see any reason why [Longtop] needed to raise $127 million in cash in December 2009 quarter?  It's sort of like a mini-version of Microsoft going to the market to raise money.  They are - according to their accounts - swimming in money.  Indeed their current cash holdings represent something like 200 quarters of capital expenditure.  Come to think of it - the company has enough cash for 26 quarters - more than 6 years - of all pre-tax operating expenditures.  Let's put this in context.  Microsoft has about 36 billion in cash and short term investments and $38 billion in annual operating expenditure.  Relative to expenses (and hence needs) Longtop has over 6 times as much cash as Microsoft.  They are swimming in it.  But they still went to market and raised more.

48.     On this news, Longtop's ADSs declined an additional 20% to close at $17.73 per share on April 27, 2011.

49.     The following day, on April 28, 2011, Longtop held a conference call with investors to address the concerns raised by Citron and Bronte.  During this call, the Company

denied any wrongdoing and repeatedly assured investors of the accuracy of its financial

statements. In doing so, Longtop emphasized the "very close dialogue" the Company has with

DTT. According to Defendant Palaschuk:

> Although it is Longtop's practice not to respond to market rumors, especially when the Company is in a quiet period ahead of earnings, management believes that in this case it is appropriate to have this call to rebut the absolutely false allegations of fraud and other alleged wrongdoings in an April 26 report [posted in a] Citron report.

> The report starts with the allegation that every financial statement from IPO to date is fraudulent. There is absolutely no basis to support this allegation, and we are deeply outraged that anyone purporting to conduct reputable market research would make such a statement without basis.

> 50.    Further:

> I've been having very close discussions with our auditors since the date I joined the company. For me, I'm a professionally trained accountant; the most important relations I have other than with my family, my CEO, and then the next on the list is Deloitte, [as] our auditors, because their trust and their support is extremely important. And it's not just because this has happened, it's been important for the last five years.

51.    Defendant Palaschuk also specifically addressed the allegations concerning

Longtop's use of XLHRS to hide employee-related costs, stating "I want to reiterate that all costs

were recorded in Longtop, there has been no off-balance sheet accounting." Defendant

Palaschuk further stated that XLHRS "is definitely an unrelated party."

52.    In response to the Company's assurances, on April 28, 2011, Longtop's ADSs

rose nearly 11% to close at $19.66 per share.

53.    Over the following weeks, Citron, Bronte, and other analysts issued follow-up

reports raising additional questions about the validity of Longtop's representations and financial

statements. For example, OLP Global issued a report on May 9, 2011 in which it countered the

Company's denials by disclosing that two employees of Longtop's legal department had been

administering XLHRS's state filings. OLP Global also reported that Longtop, using XLHRS,

consistently under-contributed to state social welfare benefit funds, thus inflating Longtop's

margins by several million dollars. Specifically, OLP Global reported, in part:

> This report discusses . . . 1) our research shows that two LFT employees have
> been administering XLHRS company filings. This is a clear indication that
> XLHRS has been operated by LFT. Since a significant portion of LFT's cost of
> revenue and other employee-related expenses were paid through XLHRS, LFT's
> involvement in XLHRS operations creates room for expense manipulation; 2)
> based on payments LFT made through XLHRS, we believe LFT is likely under-
> contributing social welfare benefits for employees, possibly a violation of China's
> labor law . . . .
>
> **Issue #1:  Two LFT employees have been administering XLHRS company
> filings, a clear indication of LFT's involvement in XLHRS operations.** After
> reviewing XLHRS documents (Appendix 1), we found that LFT employees have
> been actively involved in the operations of XLHRS, a key fact that LFT
> management has adamantly denied. We fully expect LFT management to come
> up with an explanation (whether credible or not), but we encourage investors to
> ask the question – **If LFT were a bona fide client of yours, would you ask the
> employees of your ONLY client to administer your internal controls and
> serve as corporate contacts?  We think not.** Not to mention that these internal
> matters involve administrative minutia such as filing address change and routine
> tasks such as filing of an annual inspection report. Our discovery of LFT and
> XLHRS as related parties, coupled with management's repeated denial of any
> operating links between the two, leads us to believe that **the integrity of the cost
> of revenue line item has been severely compromised.** In order to remedy this
> situation, we believe LFT's financial statements need to be re-audited to include
> XLHRS, which may lead to material restatements.
>
> **Issue #2:  Our research indicates that LFT has under-contributed social
> welfare benefits, creating inflated margins and possibly violating China's
> labor law.** We extrapolated LFT's compensation-related information from
> XLHRS 2009 audited financial statements (Appendix II). XLHRS paid RMB
> 5.7 million in social welfare benefits on behalf of LFT, an amount that appear too
> low for a headcount of 3,235 LFT employees that were contracted through
> XLHRS as of March 31, 2010. **We estimate that total social welfare benefits
> contribution should be in the range of RMB 22-29 million, or 4x – 5x the
> amount LFT paid through XLHRS in 2009.** We believe there are two possible
> scenarios: 1) LFT simply did not make any contribution for certain employees,
> possibly a violation of China's labor law; 2) LFT made contribution for all
> contracted employees as non-residents of Xiamen, using the minimum monthly
> base of RMB 900 and Xiamen's low contribution rate. Should this be the case,
> LFT management has misled investors by making false statements (as recent as
> LFT's conference call on March 18, 2011) regarding how LFT contributed social
> welfare benefits for its employees. Given recent change in LFT's human
> resources practice, **we believe LFT will be obligated to contribute the**

14

**appropriate amount for employees in their respective cities of residence,
which will negatively impact margins.** (Emphasis in original).

54.     In response, Longtop's ADSs declined further, ultimately settling at $18.93 per share when the NYSE halted trading in Longtop's ADSs on May 17, 2011 because the NYSE was "[unable] to assess the Company's continued listing status in light of undisclosed material corporate developments regarding the Company."

55.     On May 19, 2011, in the midst of skepticism over the Company's financial condition and business operations, Defendant Palaschuk suddenly resigned.

56.     On May 23, 2011, Longtop announced that DTT had resigned and that the SEC had initiated an inquiry into the Company.  Specifically, the Company issued the following press release:

**Longtop Financial Technologies Limited Announces Resignation of Independent Auditor and Chief Financial Officer, Initiation of Independent Investigation, SEC Inquiry and COO Appointment**

Hong Kong, China, May 23, 2011 - Longtop Financial Technologies Limited ("Longtop" or the "Company") (NYSE: LFT) announced today that the Company's registered independent accounting firm, Deloitte Touche Tohmatsu CPA Ltd. ("DTT"), has resigned as auditor of the Company by letter dated May 22, 2011. . . . In its letter, DTT stated that it was resigning as the result of, among other things (1) the recently identified falsity of the Company's financial records in relation to cash at bank and loan balances (and possibly in sales revenue); (2) the deliberate interference by certain members of Longtop management in DTT's audit process; and (3) the unlawful detention of DTT's audit files. DTT further stated that DTT was no longer able to rely on management's representations in relation to prior period financial reports, that continued reliance should no longer be placed on DTT's audit reports on the previous financial statements, and DTT declined to be associated with any of the Company's financial communications in 2010 and 2011.

Longtop's Audit Committee has retained US legal counsel and authorized the retention of forensic accountants to conduct an independent investigation into the matters raised by DTT's resignation letter.  The Audit Committee has also initiated a search for a new auditor.  Further, Longtop was advised by the United States Securities and Exchange Commission ("SEC") that the SEC was conducting an inquiry regarding related matters.

*     *     *

Longtop cannot predict when it will announce its financial results for Q4 201[1], or when it will file its Form 20F for the fiscal year ended March 31, 2011.

57.      DTT's resignation letter, also released on May 23, 2011, further described Longtop's "illegal acts" and stated that "continuing reliance should no longer be placed on our audit reports on the previous financial statements. . . ." Specifically, DTT's letter stated, in relevant part:

> As part of the process for auditing the Company's financial statements for the year ended 31 March 2011, we determined that, in regard to bank confirmations, it was appropriate to perform follow up visits to certain banks. These audit steps were recently performed and identified a number of very serious defects including: statements by bank staff that their bank had no record of certain transactions; confirmation replies previously received were said to be false; significant differences in deposit balances reported by the bank staff compared with the amounts identified in previously received confirmations (and in the books and records of the Group); and significant bank borrowings reported by bank staff not identified in previously received confirmations (and not recorded in the books and records of the Group).
>
> In the light of this, a formal second round of bank confirmation was initiated on 17 May. Within hours however, as a result of intervention by the Company's officials including the Chief Operating Officer, the confirmation process was stopped amid serious and troubling new developments including: calls to banks by the Company asserting that Deloitte was not their auditor; seizure by the Company's staff of second round bank confirmation documentation on bank premises; threats to stop our staff leaving the Company premises unless they allowed the Company to retain our audit files then on the premises; and then seizure by the Company of certain of our working papers.
>
> In that connection, we must insist that you promptly return our documents. Then on 20 May the Chairman of the Company, Mr. Ka Xiao Gong called our Eastern Region Managing Partner, Mr. Paul Sin, and informed him in the course of their conversation that "there were fake revenue in the past so there were fake cash recorded on the books." Mr. Ka did not answer when questioned as to the extent and duration of the discrepancies. When asked who was involved, Mr. Ka answered: "senior management . . ."
>
> **Reasons for our resignation**
> The reasons for our resignation include: 1) the recently identified falsity of the Group's financial records in relation to cash at bank and loan balances (and also now seemingly in the sales revenue); 2) the deliberate interference by the

16

management in our audit process; and 3) the unlawful detention of our audit files. These recent developments undermine our ability to rely on the representations of the management which is an essential element of the audit process; hence our resignation.

**Prior periods' financial reports and our reports thereon**
We have reached the conclusion that we are no longer able to place reliance on management representations in relation to prior period financial reports. Accordingly, we request that the Company take immediate steps to make the necessary 8-K filing to state that continuing reliance should no longer be placed on our audit reports on the previous financial statements and moreover that we decline to be associated with any of the Company's financial communications during 2010 and 2011 . . .

In our view, without providing any legal conclusion, the circumstances mentioned above could constitute illegal acts for purposes of Section l0A of the Securities Exchange Act of 1934.  Accordingly, we remind the Board of its obligations under Section 10A of the Securities Exchange Act, including the notice requirements to the U.S. Securities and Exchange Commission.

DTT's admissions make it clear that Longtop's reported financial results, including cash, outstanding debt and revenue, were materially false.

58.     Further, an analysis published by OLP Global on May 9, 2011 again confirmed, as Citron first reported on April 26, 2011, that Longtop's reported gross margins—which were much greater than its competitors—were the result of a scheme between Longtop and XLHRS, an entity that Longtop claimed was "unrelated" but that, in reality, Longtop wholly-owned and controlled.

59.     Through its scheme with XLHRS, Longtop deliberately under contributed to "social-welfare payments" owed to Chinese governmental authorities in connection with Longtop's employee-related expenses, in order to inflate Longtop's gross margins and income.

60.     On May 17, 2011, the NYSE halted trading in Longtop's ADSs, citing its inability to assess Longtop's status in light of "undisclosed material corporate developments."  Shortly thereafter, on July 22, 2011, the NYSE began delisting proceedings against Longtop.

61.     The NYSE delisted Longtop on August 29, 2011 after finding its shares no longer suitable for listing and trading.

62.     On November 10, 2011, the SEC charged Longtop with failing to comply with its reporting requirements by having not filed an annual report for the fiscal year ended March 31, 2011, and because DTT acknowledged in May 2011 that each of its prior audit reports on Longtop's financial statements should no longer be relied upon.  In announcing this action, the SEC stated "[w]e are taking this action to protect investors because it appears there is no current and reliable information available to the investing public about Longtop."

63.     As set forth above in ¶¶ 17-20, DTT is refusing to cooperate with the SEC's investigation into Longtop's fraudulent activities and has declined to produce documents in response to a subpoena, despite DTT's acknowledgement that it possesses "vast amounts of responsive documents."

## V.     ADDITIONAL SCIENTER ALLEGATIONS

### A.     Longtop and the Individual Defendants

64.     The Individual Defendants, as directors and/or the most senior officers of Longtop during the Class Period, are liable as direct participants in all of the wrongs complained of herein.  Through their positions of control and authority, as well as their stock ownership, the Individual Defendants were in a position to control all of the Company's false and misleading statements and omissions, including the content of the Forms 20-F, the Forms 6-K and press releases, as set forth below.

65.     Because of their positions within Longtop, the Individual Defendants possessed the power and authority to control the contents of Longtop's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.   The Individual Defendants were provided with copies of the

18

Company's reports and press releases alleged herein to be materially false and misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.

66.    Because of their positions and access to material non-public information, the Individual Defendants knew and/or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.

67.    Moreover, the Company's gross margin, cash and cash equivalents, accounts receivable, revenues, income, bank loan balances and employee-related costs—each of which was falsely portrayed throughout the Class Period—were so important to Longtop's survival that knowledge regarding the same may rightfully be attributed to the Company and its key officers, including the Individual Defendants.

68.    Longtop's chairman, Jia Xiao Gong, admitted to DTT that *"there were fake revenue in the past so there were fake cash recorded in the books,"* and also admitted that the Company's "senior management" was involved in the misconduct.

69.    Defendant Lian also has admitted that Longtop's financial results were fraudulent. On or around May 19 or 20, 2011, Defendants Lian and Palaschuk participated in a telephone call during which Lian stated, in words or substance, that "the Company has been a fraud since 2004." Lian added, in sum or substance, that "while the company has reported significant profits, in fact the company had never really made a profit," and "bank loans not shown in the financial statements were Rmb570 million [$85.5 million], compared to $0 of bank debt actually shown on the March 31, 2011 financial statements."

70.    As Lian further acknowledged during this call, Longtop's cash balance was actually just $131 million compared to $421 million recorded on Longtop's balance sheet as of March 31, 2011.   In other words, $290 million in cash was fabricated.   Including the $85.5 million in undisclosed borrowings, the Company's net assets were $375.5 million less than what appeared on Longtop's balance sheet as of March 31, 2011, a discrepancy that is more than twice the *net income* that Longtop claimed to have earned throughout the entire Class Period.

71.    On or about May 20, 2011, Longtop's Board of Directors convened a meeting during which Lian again acknowledged that Longtop's reported financial results were materially false throughout the Class Period.

72.    Longtop's close relationship with and heavy reliance on XLHRS, which was on-site and at the Company's headquarters, further evidences that the Individual Defendants had full knowledge of the true structure and purpose of the purportedly unrelated company. Additionally, (1) XLHRS shares a name with Longtop, its only customer; (2) XLHRS was formed in May of 2007, just months before Longtop's IPO; (3) XLHRS used the same email server as Longtop, as evidenced by help wanted ads placed by XLHRS that ask perspective employees to contact them at "longtop.com" and email addresses ending "@longtop.com"; (4) XLHRS "operated" out of the same building as Longtop; (5) filings with China's State Administration for Industry & Commerce from 2007, 2008 and 2009 indicate that employees of Longtop's legal department handled and signed off on all XLHRS's filings for that time; and (6) when the outsourcing agency relationship was challenged, Longtop was able to immediately terminate its relationship with XLHRS and take all the employees in-house without any contractual violations, legal action or apparent fees paid to XLHRS.

73.     On March 31, 2010, Longtop convened a conference call for analysts and investors to address "various questions" that Longtop received regarding its relationship with XLHRS, including some of the issues set forth in ¶ 72 above.  During the March 31, 2010 call, the Company represented, among other things that (1) XLHRS used the "Longtop" name to provide employees with a "closer affiliation with Longtop"; (2) Longtop's relationship with XLHRS was "fully in accordance with PRC law and has been fully disclosed to our auditors," and (3) Longtop believed it was complying "with the policies and practices in China" concerning its social welfare requirements.  Liang Hong, the CEO of XLHRS, also represented during the March 31, 2010 conference call that Longtop has no "ownership directly or indirectly in the staffing company, nor does Longtop provide financing to us," and stated that XLHRS "is not a related party to Longtop."

74.     On May 19, 2011, in the wake of public skepticism over the truthfulness of Longtop's financial results and its true relationship with XLHRS, and in the midst of Longtop's unraveling, Defendant Palaschuk suddenly resigned.

75.     Both Defendants Lian and Palaschuk demonstrated an in-depth involvement in the presentation of the fraudulent financial results.  For example, as set forth herein, either Defendant Lian or Palaschuk (and sometimes both) issued his own commentary in conjunction with every Class Period release concerning the Company's finances and prospects for growth.  And, as set forth more fully in ¶¶ 49-51, 72, 208-09, when the fraud began to come to light, Defendant Palaschuk continued this practice in communications with the market in an attempt to explain away the accusations.

76.     Defendants Lian and Palaschuk signed Sarbanes-Oxley certifications annually during the Class Period attesting to their responsibility for and knowledge of the accuracy of

Longtop's financial statements, disclosure controls and procedures, as defined in Exchange Act Rules 13a-15(e) and 15d-15(e), as well as Longtop's internal control over financial reporting.

77.     Defendant Palaschuk, the Company's former CFO, was intimately involved with Longtop's financial reporting, touting his training as a professional accountant and his regular contact with both Defendants Lian and DTT.  For example, Defendant Palaschuk publically stated during the Class Period: "I've been having very close discussions with our auditors since the date I joined the company.  For me, I'm a professionally trained accountant; the most important relationships that I have other than with my family, my CEO, and then the next on the list is Deloitte [as] our auditors, because their trust and their support is extremely important.  And it's not just because this has happened, it's been important for the last five years."

78.     Palaschuk also knew that people working in Longtop's finance department were untrustworthy and incompetent.  For example, on February 9, 2010, Palaschuk informed Lian that:

> I know there are many things that certain people are doing behind my back and I am not going to tolerate it *anymore*.  If you want to put people in finance that only both of you 'like' rather than based on them being *trustworthy and competent*, then you should start your new CFO search as soon as possible." (Emphasis added).

79.     Both of the Individual Defendants benefited directly from Longtop's fraud. During the Class Period, the Individual Defendants collectively sold over $69.5 million of Longtop ADSs. Defendant Palaschuk sold 350,000 shares – approximately 77% of his direct and indirect holdings according to Longtop's Form 20-F for the year ended March 31, 2009 – for a total of approximately $9.6 million.  Defendant Lian sold approximately 2 million shares – approximately 25% of his direct and indirect holdings according to the same Form 20-F – for a total of approximately $60 million.

**B.   DTT**

**1.   Overview of applicable generally accepted auditing standards**

80.   DTT issued unqualified audit opinions on Longtop's Class Period financial statements, which communicated DTT's conclusions that (a) Longtop's financial statements were fairly presented, in all material respects, in conformity with GAAP, and (b) its audits had been conducted in accordance with the standards of the Public Company Accounting Oversight Board ("PCAOB").

81.   The PCAOB was established by the Sarbanes-Oxley Act of 2002, and is responsible for the establishment of auditing and related professional practice standards that must be followed by registered public accounting firms and by auditors when performing audits of the financial statements of public and registered filers.   On April 16, 2003, the PCAOB adopted, as its interim standards, the ten general, fieldwork, and reporting standards and related interpretations in existence on that date that had been previously approved by the membership of the Auditing Standards Board ("ASB") of the American Institute of Certified Public Accountants.   Since that time, the PCAOB has implemented several authoritative standards meant to bolster, edit, amend, and/or replace existing guidance.   All references to "GAAS" herein refer to the ten general, fieldwork, and reporting standards that were in existence prior to the establishment of the PCAOB (referred to by the prefix "AU"), and are also meant to encompass the standards issued by the PCAOB (referred to by the prefix "AS").

82.   GAAS, therefore, represent the rules and guidelines by which an audit must be planned, performed, and reported on, and are, therefore, a measure of audit quality and the objectives to be achieved in an audit.   GAAS requires external auditors to (a) plan and perform its audit to obtain reasonable assurance about whether an entity's financial statements are free of material misstatement, whether caused by error or fraud, i.e., unintentionally or intentionally, and

(b) express an opinion on "the fairness with which [such financial statements] present, in all material respects, financial position, results of operations, and its cash flows in conformity with [GAAP]." (AU § 110, Responsibilities and Functions of the Independent Auditor, ¶¶ 1-3; AU § 316.05).

83.     Overarching obligations that an auditor must adhere to in all phases of an audit (including the planning and performance of an audit, as well as the preparation of the audit report) are the exercise of due professional care and professional skepticism. (AU § 230, Due Professional Care in the Performance of Work, ¶¶ 1-2, 8).

84.     AU § 230 defines due professional care as "'the degree of skill commonly possessed' by other auditors" which requires an auditor to exercise "reasonable care and diligence" and "professional skepticism." (AU § 230.05, .07). Professional skepticism is defined as "an attitude that includes a questioning mind and a critical assessment of audit evidence." (AU § 230.07). In exercising professional skepticism, "[t]he auditor uses the knowledge, skill, and ability called for by the profession of public accounting to diligently perform, in good faith and with integrity, the gathering and objective evaluation of evidence." (AU § 230.07). In doing so, the auditor should "consider the competency and sufficiency of the evidence," and "neither assume[] that management is dishonest nor assume[] unquestioned honesty. In exercising professional skepticism, the auditor should not be satisfied with less than persuasive evidence because of a belief that management is honest." (AU § 230.08-09).

85.     The exercise of due professional care and professional skepticism underlies all phases of an auditor's process for carrying out his/her responsibilities of planning and performing an audit to obtain reasonable assurance about whether such financial statements are free of material misstatement, whether caused by error or fraud. Due professional care and

24

professional skepticism are particularly critical, because judgment is typically required in an auditor's efforts to (a) determine areas to be tested, as well as the nature, timing, and extent of such tests to be performed, (b) interpret the results of such audit testing, and (b) evaluate such audit evidence. (AU § 230.10-11).

86.     An auditor is required to "assess audit risk and materiality . . . in determining the nature, timing and extent of audit procedures and in evaluating the results of those procedures." AU § 312.01.  In considering audit risk, "*the auditor should specifically assess the risk of material misstatement of the financial statements due to fraud*."  (AU § 312.16) (emphasis added).  If the auditor concludes that there is a heightened risk of material misstatement due to fraud or otherwise, he must take whatever steps are necessary to assure himself that the financial statements are not materially misleading. *See generally* AU § 312 (requiring an auditor to limit audit risk to a low level, that is, a level appropriate for expressing an opinion on the financial statements).  This is true in terms of the number and types of audit procedures he must perform, the time that he must spend on the audit, the number and experience of personnel that must be involved, and the level of supervision that should be employed. (AU § 312.17).

87.     DTT acknowledged the applicability of the foregoing audit stands to its audits of Longtop.  In annual engagement letters entered into between DTT and Longtop throughout the Class Period, DTT undertook to audit Longtop's annual financial statements in accordance with PCAOB standards, and to review prior quarterly reports to determine whether any material modifications were needed to conform Longtop's quarterly financial statements to GAAP.  As part of annual audits, DTT stated in the engagement letters that it would, among other things, examine "evidence supporting the amounts and disclosures in [Longtop's] financial statements," and design and implement "programs and controls to prevent and detect fraud."

25

88.     The overarching and consistent deficiency in DTT's audits of Longtop's Class Period financial statements was its failure to exercise both due professional care and professional skepticism in all phases of its audits, in violation of GAAS (AU § 230), particularly with respect to its failures to:

- appropriately respond to, and thereby essentially ignoring, the presence of known fraud risk factors or red flags and the related risk of material misstatement of Longtop's financial statements due to fraud;

- express an appropriate opinion on the effectiveness of Longtop's internal control over financial reporting, and appropriately modify its financial statement audit approach to perform more extensive substantive audit procedures (particularly in the audit areas relating to cash and cash equivalents, accounts receivable, revenues, cost of revenues and employee-related expenses) in light of the numerous material weaknesses and internal control deficiencies known by DTT to have existed and remained unresolved throughout the Class Period;

- adequately plan its audits to identify and adequately respond to the risk of material misstatement that was indicated by Longtop's industry leading gross profits;

- obtain sufficient and appropriate audit evidence in support of its audit opinions, particularly with respect to Longtop's cash and cash equivalents, accounts receivable balances, loan obligations, revenues, cost of revenues and employee related expenses;

- corroborate, in a manner consistent with GAAS, representations made by Longtop's management; and

- ensure that Longtop's related party relationship and transactions with XLHRS were adequately disclosed.

89.     No prudent auditor who was aware of all of the relevant information set forth herein could have concluded that Longtop's Class Period financial statements were fairly presented, in all material respects, in accordance with GAAP.  DTT's audits were so deficient and represented such a significant departure from GAAS that they effectively equated to no audit at all with respect to the relevant financial statement areas.

90.     Thus, DTT's audit opinions were materially false and misleading because (a) Longtop's Class Period financial statements were not fairly presented, in all material respects, in accordance with GAAP, and (b) DTT's audits were not conducted in accordance with GAAS.

**2.     DTT was aware of Longtop's many red flags and internal control deficiencies**

91.     Auditors are obligated under GAAS (AU § 110 and AU § 316) to consider, and appropriately respond to, the risk of material misstatement of an entity's financial statements due to fraud.  AU § 316 requires an auditor to use professional judgment in considering whether information obtained during the course of its audit indicates the presence of certain conditions, known as "fraud risk factors" or red flags, which may suggest to the auditor the possibility that fraud may exist.  Fraud risk factors are events or conditions that indicate the existence of, among other things, incentives or pressures to perpetrate a fraud and opportunities to carry out a fraud.

92.     AU § 316.85 provides examples of risk factors relating to misstatements arising from fraudulent financial reporting, including the following, of which DTT was aware during the Class Period:  (1) financial stability or profitability is threatened by economic, industry or entity operating conditions, as indicated by "[r]apid growth or unusual profitability, especially compared to that of other companies in the industry"; and (2) excessive pressure on management to meet financial targets.

93.     Additionally, AU § 316 provides that the risk of fraudulent financial reporting is heightened when a company fails to maintain an adequate system of internal controls.  The absence of internal controls, ineffective internal controls, or the ability of management to override internal controls, all provide an opportunity for fraud to be perpetrated, and therefore represent fraud risk factors.  (AU § 316.07, .42, .85).

94.     The existence of fraud risk factors triggers heightened scrutiny on the part of the auditor.  Under AU § 316, an auditor should respond to the presence of fraud risk factors by, among other things, altering its audit procedures to address the risk of material misstatement due to fraud, or withdrawing from the engagement with communication to the appropriate parties if the auditor concludes that the risk of material misstatement due to fraud is so significant that it would not be practicable to design auditing procedures to sufficiently address such risks.  (AU § 316.48-.50, .76, .78).

95.     Here, by no later than May 2008, DTT knew of the many material internal control deficiencies and red flags at Longtop that gave rise to a significant risk of management fraud. For example, a May 26, 2008 presentation that DTT made to Longtop prior to the issuance of the Company's 2008, 2009 and 2010 Forms 20-F, stated that Longtop was "under *significant pressure of profitability* or trend level expectations of investment analysts, investors, significant creditors or other external parties (*particularly expectations that are unduly aggressive or unrealistic*), *including expectations created by management*." (Emphasis added).

96.     DTT further noted in this May 2008 presentation that, *"the Company's current internal control may not meet the evolving demands in business,"* which, according to DTT, "causes additional management and control risk for the Company, *especially when the [Sarbanes-Oxley] related controls were not implemented yet."* DTT also specifically identified the *"potential risk of management override of control."* (Emphasis added).

97.     In light of DTT's awareness of these fraud risk factors, DTT failed to express an appropriate opinion on the effectiveness of Longtop's internal control over financial reporting, and failed to appropriately modify its financial statement audit approach to respond to the increased fraud risk.  Instead, while AS No. 5, *An Audit of Internal Control Over Financial*

*Reporting that is Integrated with an Audit of Financial Statements*, states that "[i]f one or more material weaknesses [in internal controls] exist, the company's internal control over financial reporting cannot be considered effective," DTT represented in the clean audit opinions it issued in connection with Longtop's 2009 and 2010 Forms 20-F that "[i]n our opinion, the Company maintained, in all material respects, effective internal control over financial reporting" as of March 31, 2009 and 2010, respectively.

98.    DTT's awareness of material internal control deficiencies at Longtop dates back to at least 2007.

99.    An agenda for a May 29, 2007 meeting with Longtop's audit committee at DTT's offices also states that "[m]aterial weaknesses/significant deficiencies may exist" within Longtop's internal controls, and that "Deloitte will provide their management letter" explaining the deficiencies. The agenda goes on to note that "[n]umerous adjustments are currently required after the first closing" and that there are "lots of improvements and work to do." Despite noting the deficiencies months earlier, draft meeting minutes for a November 15, 2007 Longtop audit committee meeting at DTT's offices likewise state that "[m]aterial [internal control] weaknesses/significant deficiencies may exist and a lot of work is required."

100.    Management letters dated June 19 and August 2, 2007, which were prepared by DTT to be sent to the members of Longtop's Board of Directors, state that DTT had "considered [Longtop's] internal control over financial reporting as a basis for designating audit procedures that are appropriate in the circumstances." During this review, DTT identified "certain matters involving the Company's internal control over financial reporting that [it] consider[ed] to be material weaknesses or significant deficiencies under standards established by the PCAOB." Attached to the Management letters were specific lists of the internal control deficiencies that

DTT identified. For example, DTT "identified several complex issues which required in-depth accounting analysis under U.S. GAAP and which resulted in material adjustments to the consolidated financial statements." DTT determined that Longtop's deficiency in this regard was "a material weakness in the design and operation of internal control over financial reporting." The letters further state that "in preparing the Company's consolidated financial statements for the years ended December 31, 2006, 2005 and 2004, which were used as the basis for preparing the consolidated financial statements for the three month period ended March 2007, we also noted that there were a substantial number of modifications that were required to be made for the company-prepared consolidated financial statements and notes thereto to comply with US GAAP and SEC reporting requirements."

101.    The statement "[m]aterial [internal control] weaknesses/deficiencies may exist and a lot of work is required" is repeated in the draft minutes of a February 20, 2008 meeting between Longtop's Audit Committee and DTT. The minutes also note that "[s]ignificant work [is] required in [Longtop's] corporate reporting department."

102.    Thus, on multiple occasions DTT represented that significant work was required in Longtop's reporting department and/or that management had the ability to override internal controls, yet nothing was done to alert the investing public of these deficiencies. In fact, the opposite was occurring with respect to DTT's clean audit opinions.

103.    Additionally, while DTT identified the above internal control deficiencies and risks in 2007 and 2008, it knew that many of these risks and deficiencies had gone unremedied throughout the Class Period. Specifically, the internal control deficiencies and fraud risk factors set forth above, which appear in DTT's May 2008 presentation, including the "risk of

management override of internal control," also appear in a follow-up presentation by DTT dated May 26, 2009 (titled "Longtop Technologies Limited SOX 404 Attestation Status Update").

104.    In this May 2009 presentation, DTT notes that its planned audit response to certain of these risks would be to "[i]ncrease professional skepticism of all personnel involved in the audit engagement." Nevertheless, the very same internal control deficiencies and fraud risk factors, including the risk of management override of internal controls, appear again in an August 12, 2010 DTT presentation titled "FY2011 Client Service Plan." In the August 12, 2010 presentation, DTT notes that for each identified risk, DTT would "perform a test of internal controls or substantive procedures to address that risk."

105.    Notwithstanding these known and repeated internal control deficiencies and fraud risk factors, in conjunction with Longtop's Form 20-F for the period ended March 31, 2009, DTT told Longtop's investors that "[i]n our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of March 31, 2009, based on the criteria established in Internal Control — Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission." In conjunction with Longtop's Form 20-F for the period ended March 31, 2010, DTT issued an identical opinion on the supposed effectiveness of Longtop's internal controls.

106.    Given DTT's awareness of these fraud risk factors and material deficiencies in Longtop's internal controls, DTT should have issued an adverse opinion on Longtop's internal control over financial reporting as of March 31, 2009 and 2010, communicated that material weaknesses existed in Longtop's internal controls, and informed investors that the Company's internal control over financial reporting was not effective.

107.    DTT also failed to adequately plan its audit of Longtop in accordance with GAAS, and it failed to use appropriate analytical procedures to detect the risk of fraud, including that Longtop's gross margins and income were false by having recorded fake revenues and cash, and by underreporting bank loan balances and employee related expenses. Instead, DTT turned a blind eye to Longtop's many internal control deficiencies. Not until after Citron, Bronte and other analysts questioned the legitimacy of Longtop's financial results did DTT begin to adequately assess the risk that Longtop's financial statements were materially false and misleading.

108.    Had DTT exercised even the most cursory of audit procedures, it would have discovered serious defects in Longtop's financial records, including statements by Longtop's banks that they had no records of certain transactions; confirmation replies previously received that were said to be false; significant differences in deposit balances reported by the banks as compared with the amounts identified in previously received confirmations and in the books and records of Longtop; and significant bank borrowings reported by the banks that were not identified in Longtop's books and records.

### 3.    DTT also disregarded known red flags concerning Longtop's bank balances and revenues

109.    DTT was aware of internal control deficiencies that may have impacted Longtop's reported cash and cash equivalent balances and outstanding loan obligations, and was also aware of significant fraud risk factors indicating the existence of an increased risk of misstatement of Longtop's reported accounts receivable and revenues. However, DTT failed to appropriately modify its audit approach in response to these deficiencies.

110.   Around the same time that DTT discovered that Longtop had numerous material deficiencies in its internal controls over financial reporting, DTT also learned that Longtop did not conduct bank reconciliations as part of its ordinary month- and quarter-end closing process.

111.   With respect to Longtop's "Monthly Bank Reconciliation Procedures," DTT's June 19 and August 2, 2007 deficiency letters specifically noted that "[b]ank reconciliation procedures and review . . . were not documented as part of the accounts closing process." As a result, DTT recommended that "[b]ank reconciliation statements should be prepared and reviewed by an independent supervisor on a timely basis to ensure that cash items are properly recorded." In light of DTT's awareness of this red flag concerning Longtop's month end bank reconciliation process in 2007, DTT was required by GAAS to appropriately modify its audit approach to perform more extensive substantive audit procedures relating to the Company's reported cash and cash equivalent balances during the Class Period.

112.   Moreover, in addition to being aware of multiple material weaknesses and internal control deficiencies during the Class Period and Longtop's failure to conduct month-end bank reconciliations, which may have affected one of the largest assets reported on the Company's financial statements, DTT also allowed Longtop executives, including Defendant Palaschuk, to talk it out of obtaining audit evidence related to additional material line items reported on Longtop's financial statements – specifically, confirmations for certain of Longtop's major revenue contracts—confirmations which could have revealed the fraud at Longtop.

113.   AU § 330 states that confirmation of accounts receivable is a generally accepted auditing procedure. Further, since "it is generally presumed that evidence obtained from third parties will provide the auditor with higher-quality audit evidence than is typically available

33

from within the entity," AU § 330 states that "there is a presumption that the auditor will request the confirmation of accounts receivable during an audit unless one of the following is true":

- Accounts receivable are immaterial to the financial statements.

- The use of confirmations would be ineffective.

- The auditor's combined assessed level of inherent and control risk is low, and the assessed level, in conjunction with the evidence expected to be provided by analytical procedures or other substantive tests of details, is sufficient to reduce audit risk to an acceptably low level for the applicable financial statement assertions.  In many situations, both confirmation of accounts receivable and other substantive tests of details are necessary to reduce audit risk to an acceptably low level for the applicable financial statement assertions.  (AU §330.34).

114.    Additionally, AU § 330 states that "[a]n auditor who has not requested confirmations in the examination of accounts receivable should document how he or she overcame this presumption." (AU §330.35).

115.    Here, in April 2009, ███████ of Longtop informed Tony Wen-ping Wang of DTT that he was concerned that obtaining confirmations for Longtop's major revenue contracts would delay the filing of Longtop's Form 20-F for the fiscal year ended March 31, 2009. ███ suggested that because Longtop already had internal control procedures in place to cover these risks, DTT could address this issue via "alternative testing . . . rather than send confirmation[s]." After Wang noted that "confirmation is a required procedure" that is "difficult to get around," he received further pushback from Defendant Palaschuk, who stated that he was "absolutely certain that it is not a US auditing standard to confirm terms of revenue contracts."  Palaschuk requested that Wang send him any auditing standards or SEC regulations that were on point.

116.    Thereafter, Wang sent ███ and Defendant Palaschuk the relevant International Standard on Auditing and PCAOB provisions governing confirmations, including International Standard on Auditing ("ISA") 505, titled "External Confirmations."  ISA 505 specifically states

"[e]xternal confirmations are frequently used in relation to account balances and their components, but need not be restricted to these items. For example, the auditor may request external confirmations of the terms of agreements or transactions an entity has with third parties." Other examples of confirmations contemplated by ISA 505 include "[b]ank balances and other information from bankers," and "[a]ccounts receivable balances."

117. Wang also provided Longtop with a copy of Deloitte US Auditing Standard Manual AAMPS AUD 15/G625.11, which states that as part of its audits, DTT "may need to obtain assurance about both understatement and overstatement of sales. We address a specific identified risk related to validity by testing sales for overstatement. To obtain such assurance, we may design external confirmations that confirm the details of sales agreements (*e.g.*, transaction dates, rights of return, shipping terms) as well as outstanding receivable amounts. Additionally, we may select invoices recorded in sales ledger and vouch the details of such transactions to directly test for overstatement of sales."

118. Defendant Palaschuk continued to resist DTT's attempts to obtain such confirmations, informing Wang that international auditing standards were not applicable, and that the confirmations are "not a requirement" under U.S. auditing standards. In response, Wang forwarded a copy of AU § 330, which, as set forth above, provides auditors with a framework for confirming key contracts and agreements. Wang also stated that the PCAOB issued a concept release on April 14, 2009, which listed possible revisions to the PCAOB's standard on audit confirmations. Wang stated that "the trend is that PCAOB would be in line with International auditing standards" on the issue of confirmations, and further noted that DTT merely wanted to confirm the terms of Longtop's three biggest contracts. Wang further noted that DTT had

developed a plan for reviewing Longtop's contracts that "would not delay the reporting process," thus eviscerating Longtop's original concern about DTT obtaining confirmations from its clients.

119.    Despite DTT's position that it was necessary to confirm Longtop's three largest revenue contracts, Defendant Palaschuk responded by stating: "My point stands that it is not an auditing standard requirement to confirm revenue contracts under US accounting standards." Even though DTT had previously stated that such confirmations were required, and despite the red flags that existed by virtue of Longtop's unwillingness to allow the confirmation process to occur, Wang and DTT ignored these red flags and relented to Longtop's wishes, agreeing to "perform alternative testing on revenue instead of confirmation."

120.    DTT's appeasement of Longtop and its decision not to perform confirmation procedures for the Company's reported accounts receivables and revenues was not appropriate under GAAS. The rationale underlying DTT's decision did not meet any of the three exceptions set forth in AU § 330.34 to overcome the presumption that an auditor will perform confirmation procedures because (1) Longtop's reported accounts receivable and revenues were material to the Company's financial statements; (2) the use of confirmations would have been an effective audit procedure to obtain appropriate audit evidence regarding the existence of accounts receivables and revenues; and (3) the combined assessed level of inherent and control risk was not low in light of the material weaknesses and deficiencies existing in the Company's internal controls. Moreover, AU § 326.12 states that "the matter of difficulty or expense involved is not in itself a valid basis for omitting an audit procedure for which there is no appropriate alternative."

121.    Longtop's vehement refusal to allow DTT to confirm its three main revenue contracts was a significant red flag that would have put a reasonable auditor on notice of improprieties at the Company. AU § 316 specifically provides that "[d]omineering management

36

behavior in dealing with the auditor, especially involving attempts to influence the scope of the auditor's work," represents a red flag or risk factor giving rise to the risk of a material misstatement due to fraud.  When faced with such a risk of material misstatement due to fraud, AU § 316 further states that the auditor should consider "[c]onfirming with customers certain relevant contract terms and the absence of side agreements because the appropriate accounting often is influenced by such terms or agreements."  Thus, in conjunction with the other red flags identified herein, these red flags should have caused DTT to heighten the level of professional skepticism that it supposedly employed in connection with its audit of Longtop.  Additionally, AU § 508 states that when "restrictions that significantly limit the scope of the audit are imposed by the client, ordinarily the auditor should disclaim an opinion on the financial statements."  Accordingly, Longtop's pushback also should have caused DTT to evaluate whether it could issue an unqualified opinion on the Company's financial statements.

122.   DTT's appeasement of Longtop, and its failure to undertake any meaningful investigation to confirm Longtop's revenue contracts throughout the Class Period was, at the very least, reckless in light of Longtop's failure to include bank reconciliations as part of its closing process, and the significant pushback that DTT received from Longtop concerning the revenue confirmation process.

123.   Had DTT gone forward with obtaining confirmations relating to Longtop's three largest revenue contracts in 2009, it would have learned, for example, that Longtop's internal controls related to revenue were grossly inadequate, out of step with industry practice and presented the opportunity for fraud.  Significantly, in a series of e-mails in November 2008, Defendant Palaschuk informed Defendant Lian that "Longtop has a culture where they book accounting entries without contracts, which 1 have never seen [] in a company."  Defendant

Palaschuk went on to state that Longtop's accountants "rely upon fapiaos [invoices] and hand written descriptions" in booking revenues instead of the actual contracts.  Palaschuk noted that rather than looking at invoices, the "accountant must look at the contract because documents easily could be forged."

> **4.    DTT disregarded information from third parties who expressed concerns to DTT over the impropriety of Longtop's supposed financial performance**

124.    In addition to uncovering internal control deficiencies and red flags during the course of its Class Period audits, DTT also was made aware of numerous additional red flags concerning Longtop from a variety of third party sources, including analysts, market participants and Longtop's own competitors.

125.    On February 4, 2010, Wedge Partners, a U.S. equity analyst firm, issued a report titled "Wedge MKI Asia Notes."  The report sets forth numerous red flags related to Longtop, including, among other things, that "a very large [percentage] of their employees (80-90%) are actually not even employees of LFT – rather a separate private company – and we have concerns that the costs and margins LFT is reporting is not fully counting the true costs of the business and employees given this other company and its relationship with LFT."  The document further notes that Wedge Partners has "lost trust and thus enthusiasm for LFT and its exciting secular story," noting that "especially in China, we have found it to be best to trust our instincts and choose not to ignore the red flags."

126.    On February 11, 2010, Wedge Partners issued another report on Longtop based upon conversations with Longtop's investor relations director and Defendant Palaschuk.  The February 11, 2010 Wedge Partners report noted, with respect to XLHRS, that "one reason for hiring staff through Longtop HR may be to reduce social insurance obligations by reducing the

base salary used for calculating benefits. Since all of China now uses the actual salary as a standard, we are not sure what mechanism might be used."

127. On March 23, Wedge Partners issued a follow-up note titled "Lingering Concerns Over Longtop's Margins," stating that it remained concerned because "Longtop uses an independent, private company, also based in Xiamen and also called Longtop, to manage employment." The March 23 note goes on to state that "Longtop management first told us that they pay market rates for the seconded staff" but later stated that "Longtop is able to save on government-mandated social insurance fees by using Longtop HR" because, according to Longtop, "Longtop HR is able legally to use a lower wage standard for calculating the percentage of wages due as social insurance." With respect to Longtop's relationship with XLHRS, the March 23 Wedge Partners report also states:

> We took a closer look at Longtop HR. The company was established in Xiamen in 2007, a few months before Longtop listed, and originally had very modest revenues . . . . The company appeared to run high receivables and those other receivables, at least in 2008, were more than three times annual revenues. It would appear that, if Longtop was the principal or only customer of the company, Longtop may have been delaying payments. We asked management about this issue, but they deferred to the meeting next week at which they hope to answer comprehensively.

> It is common in China to contract with a third-party company to manage social insurance payments and maintain employment contracts[ -] the companies act sort of like super ADPs. ***But it is not common to have employees directly employed by the third party company.*** Also, there are well-established agencies capable of operating in most localities that process such payments, including Fesco, a company with which Longtop contracts. ***There does not seem to be a good business reason to set up a separate, private company to handle this type of benefits management.*** (Emphasis added).

128. Additionally, during the fall of 2010, DTT was alerted to additional red flags concerning Longtop's financial condition when DTT representatives met personally with the Chief Financial Officer of YTEC, one of Longtop's chief competitors and a company that had long accused Longtop of over reporting its revenues. Specifically, in or around October of 2010,

YTEC's CFO met with partners from Deloitte's Beijing office and alerted them to potential improprieties at Longtop. The Beijing partners then informed the partners at DTT in Shanghai that were responsible for auditing Longtop. Charlotte Lu, an audit partner at DTT, subsequently told Defendant Palaschuk that "because this was discussed with partners in Beijing it is very high profile" and that as a result, DTT "must do some additional [audit] procedures."

129.    DTT's awareness of significant red flags concerning Longtop's financial condition during the Class Period was further evidenced by a November 2, 2010 meeting between representatives from Longtop and Patrick Tsang, Charlotte Lu, and Tony Wen-ping Wang of DTT at Longtop's Xiamen office. According to the meeting minutes, the purpose of the meeting was to discuss multiple "market rumors" that had been brought to DTT's attention concerning, among other things, "whether Longtop's software development revenue from China Construction Bank was inflated," "questions in the market over Longtop's use of third party outsourcing companies," and "[w]hy Longtop's margins were so much higher" than its competitors.

130.    Concerning Longtop's inflated revenues from China Construction Bank, the November 2, 2010 meeting minutes state that at least one person at China Construction Bank questioned Longtop's representation that it had earned revenues in excess of $30 million during 2010, stating that Longtop's revenues were "closer to 'Rmb30 million.'" Rumors also had been circulating that Longtop had no standardized contracts with China Construction Bank and was not an "approved vendor" of the company. During the meeting, DTT suggested that Longtop hire an independent consultant to conduct an investigation into this matter, but Longtop rejected that course of action, stating that because "there are no indications of fraud or internal control problems, an independent investigation is unnecessary."

40

131.    Despite being aware of these red flags long before the market began to question the truth of Longtop's reported financial results, DTT did nothing to independently confirm the accuracy of Longtop's financial statements.  Instead, DTT continually issued unqualified audit opinions, and did not undertake to "perform specific audit procedures to address" these red flags until after it became plainly evident that Longtop's financial misconduct would likely become unveiled.  Only after the Citron report was published did DTT inform Defendant Palaschuk that it was "required to formulate and perform specific audit procedures to address the alleged improprieties."

132.    Additionally, even though DTT's meeting with YTEC and certain of the additional red flags set forth above occurred after DTT issued its audit opinion in connection with Longtop's 2010 Form 20-F, it was nonetheless required under AU § 561, *Subsequent Discovery of Facts Existing at the Date of the Auditor's Report*, to "determine whether the [post-audit] information is reliable and whether the facts existed at the date of his report."  If DTT determined that the information was reliable, available at the date of DTT's 2010 audit report, and would have affected its audit report, DTT was required to take action to prevent future reliance on its audit report.  Rather than make these independent determinations in response to the market rumors concerning Longtop and after YTEC met with DTT directly and "accuse[d] [Longtop] of improprieties," DTT recklessly relied on management representations in determining that no further investigation was warranted into, among other things, whether Longtop's revenues from China Construction Bank were inflated.

### 5.    DTT ignored red flags regarding XLHRS and Longtop's underfunding to China's mandatory social welfare payments

133.    DTT failed to ensure that Longtop's related party relationship and transactions with XLHRS had been adequately disclosed in the Company's Class Period financial statements

in accordance with FAS ASC 850-10-50. Certain of Longtop's Class Period financial statements omitted disclosure that XLHRS was a related party, while the Company's fiscal 2008, 2009 and 2010 Forms 20-F expressly and falsely disclosed that XLHRS was not a related party.

134.    DTT was obligated by GAAS in AU § 334, *Related Parties*, to assess whether Longtop's Class Period financial statements were fairly stated, in all material respects, in conformity with FASB ASC 850-10-50, and whether material related party relationships and/or transactions had been identified and adequately disclosed.

135.    AU § 334 sets forth numerous examples of procedures that an auditor should perform to identify the existence of related parties and related party transactions, including reviewing "the extent and nature of business transacted with major customers, suppliers, borrowers, and lenders for indications of previously undisclosed relationships" and "accounting records for large, unusual, or nonrecurring transactions or balances, paying particular attention to transactions recognized at or near the end of the reporting period." (AU § 334.08). AU § 334 also sets forth numerous examples of procedures that an auditor should perform to examine related parties that have been identified in order to "obtain satisfaction concerning the purpose, nature, and extent of these transactions and their effect on the financial statements." (AU § 334.09). Such procedures "should be directed toward obtaining and evaluating sufficient competent evidential matter and ***should extend beyond the inquiry of management***." (AU § 334.09) (emphasis added).

136.    Accordingly, GAAS requires auditors to have a heightened focus on related party relationships and transactions because of the increased risk presented by the possibility that transactions with related parties may not have been conducted on an arm's length basis, or may have been motivated solely, or in large measure, by conditions such as (a) lack of sufficient

working capital or credit to continue the business; (b) an urgent desire for a continued favorable earnings record in the hope of supporting the price of the company's stock; (c) an overly optimistic earnings forecast; [and] (d) dependence on a single or relatively few products, customers, or transactions for the continuing success of the venture. . . ." (AU § 334.06, AU § 334.18).

137.   Throughout the Class Period, DTT was aware that the majority of Longtop's employees had been contracted from XLHRS, and that the transactions and related expenses between the Company and XLHRS were material and relevant to the users of the Company's financial statements.  As a result, DTT was obligated to undertake these critical audit procedures to ensure there were no undisclosed related-party transactions.  Even the most cursory of audit procedures would have alerted DTT to the fact that Longtop had transferred the majority of its cost structure off-balance sheet to XLHRS, thereby creating the opportunity for a massive fraud, and DTT was obligated to test the veracity of Longtop's repeated statements that XLHRS was "unrelated to us."

138.   DTT failed to apply the heightened focus required by AU § 334, and an appropriate level of professional skepticism as required by AU § 230, when evaluating whether XLHRS was a related party and whether the relationship, transactions, and expenses with XLHRS were properly accounted for and disclosed, in view of the risk that existed that such relationship and transactions with XLHRS may have been motivated in large part by Longtop's desire to continue reporting industry-leading gross profits.  DTT also failed to adequately evaluate the substance of Longtop's relationship with XLHRS, and to consider the risk that such relationship may have been a vehicle that provided Longtop an opportunity to understate its cost of revenues and employee-related expenses (since such costs were no longer transparent in

Longtop's financial statements), and thereby contribute to the Company's reported industry-leading gross profits.

139.   Had DTT properly exercised the duties incumbent upon an auditor to identify and conduct procedures aimed at uncovering related-party transactions, the relationship between Longtop and XLHRS would have raised significant doubts as to the true nature of such dealings, the reliability of Longtop's representations, the fairness of Longtop's financial statements and whether those statements were prepared in conformity with GAAP.   Indeed, four separate financial research firms – Citron Research, OLP Global, Wedge Partners and Bronte Capital – each raised questions concerning Longtop's dealing with XLHRS during the Class Period.

140.   By no later than 2007, when Longtop first shifted to a third party outsourcing model, DTT knew that Longtop had been underpaying its government-mandated social welfare obligations, and was seeking to use XLHRS to further this scheme.   An agenda prepared for a May 29, 2007 meeting between Longtop and DTT in connection with DTT's 2006 audit stated that in 2004, 2005 and 2006 the Company based its level of welfare payments on "*Longtop's interpretation of the welfare law*," and admitted to underpaying welfare during those years.   For example, the agenda notes that Longtop had a total "accrued liability" of $1,834,000 as of December 31, 2006.   Of that figure, Longtop made welfare payments totaling only $475,000 to the government based on Longtop's interpretation of the welfare law, and accrued $1,258,000 for what it deemed to be Longtop's "maximum potential welfare payments" for 2006.   The agenda further noted that in 2007, Longtop "transferred approximately 800 employment contracts . . . to a company which manages their file and welfare contributions," and paid the outsourcing company Rmb1,100 per employee but "did not accrue for interest or penalties on the basis the likelihood is remote and the amounts are unknown."

141.   In a July 28, 2008 memo to file, ████████████ of Longtop admitted that in fiscal years 2004 through 2006, the amount of welfare paid by Longtop was "less than the amount calculated by government regulation." Longtop accrued the additional potential welfare expenses in case the government investigated the adequacy of its welfare payments with the understanding that "[i]f there is no adjustment requirement[] from the government, Longtop will write off the provision by quarter after 5 years."

142.   In an April 8, 2010 e-mail, Defendant Palaschuk advised Paul Siu and Tony Wang of DTT of Longtop's efforts to evade its welfare obligations. Specifically, Palaschuk stated that he knew that "in practice" most Chinese companies "use the city average [salary] rather than the [employee's] actual salary even if the actual salary exceeds the city average," for purposes of calculating social welfare payments. Palaschuk stated that in planning its 2011 budget, Longtop wanted to do the same thing, and sought advice from DTT as to whether "this would be an acceptable accounting treatment under US GAAP." Palaschuk acknowledged in his e-mail that "the strictest reading of the law would probably suggest using the actual salary instead of the city average salary." Wang responded that Xiamen's social welfare regulations state that actual salary must be used unless the employee's average monthly salary "is lower than 60% of [the] city average salary" or "over 300% of [the] city average salary." Wang further noted that DTT had surveyed several companies in Shanghai and Beijing and "all strictly follow" the regulation.

143.   While these facts—standing alone—should have raised a red flag and caused DTT to further scrutinize Longtop's social welfare payments and its use of XLHRS, they did not. Instead, DTT again failed to take necessary and appropriate steps to ensure the accuracy of

Longtop's reported financial position, and only began to question meaningfully the use of XLHRS after third parties raised concerns about Longtop's outsourcing model.

144.    In a December 8, 2010 e-mail to Tsang and Lu at DTT titled "Welfare Analysis – 'Smell Test' – Patrick and Charlotte please see attached," Palaschuk stated that he had "***heard from your [DTT] team that there are some concerns about using the outsourcing model*** for employing our lower level engineers. I also know some of our competitors in investor relations circles say this is the reason our margins are higher than their margins which is also false." Palaschuk goes on to explain to DTT that Longtop's welfare payments purportedly pass the "smell test" because they are similar to those of DTT's other clients.

145.    During a subsequent meeting between DTT and Longtop on December 13, 2010, Longtop's outsourcing model again was discussed.  A redlined draft of minutes taken during this meeting show that the following entry originally was included in, but subsequently deleted from, the meeting minutes:  "DTT INTERNALLY TO REVIEW 'SMELL TEST MEMO' AND DISCUSS WITH VARIOUS ENGAGEMENT PARTNERS AND CONFIRM WHETHER LONGTOP QUOTED CORRECT NOTES AND ASSUMPTIONS IN THE MEMO."  Another deleted entry in the redlined minutes states:  "LONGTOP TO CHECK WHETHER FEASIBLE TO HAVE A CLEAN CERTIFICATE FROM THE SOCIAL WELFARE BUREAU WITH REGARD TO HISTORICAL WELFARE PAYMENT."  Notwithstanding Longtop's admission that it underpaid social welfare, the meeting minutes also reflect that Longtop and DTT discussed ways to reduce Longtop's average welfare rate and ways to paper such a reduction.

146.    E-mail exchanges between Longtop and DTT employees around the time of this December 13, 2010 meeting further reflect that DTT remained concerned about the overall appropriateness of Longtop's outsourcing model.  For example, in a December 13 e-mail, Tony

Wen-ping Wang inquired as to why, as of October 31, 2010, XLHRS owed Longtop $143,514. Specifically, Wang questioned why, or how, Longtop's human resources outsourcing vendor could owe the Company money, and further questioned how that amount could exceed the $120,980 that Longtop owed XLHRS. The same e-mail chain shows that DTT's questions lingered even after the December 13 meeting with Longtop, with Wang sending along a list of additional concerns about the outsourcing model that had been expressed by DTT partner John Wilde.

147.    During December of 2010, Longtop also sought DTT's assistance in its continued efforts to circumvent its welfare obligations and applicable U.S. accounting regulations. Specifically, on December 19, 2010, Defendant Palaschuk asked Tony Wen-ping Wang whether Longtop could, in contravention of Chinese law, "use less than [employees'] actual salary" in order to calculate properly under GAAP its required welfare payments. Palaschuk proposed to Wang that Longtop obtain a legal opinion stating that its methodology for calculating welfare payments was acceptable under Chinese law and therefore, GAAP compliant. Palaschuk further noted that, according to a legal opinion the Company had previously obtained, Longtop would not be liable for any underpayment by XLHRS of its welfare obligations. In a further attempt to persuade DTT to approve Longtop's continued attempt to violate its legal obligations, Palaschuk accused DTT of permitting its other clients to circumvent their welfare obligations, stating: "[s]ome of your clients are materially underreporting their welfare unless they are getting some very very very special treatment in Beijing which we will research . . . I believe Deloitte should do an internal investigation but this is obviously an internal matter for yourself."

148.    After reviewing the legal opinion that Longtop had secured, Wang informed Palaschuk that, in fact, the opinion did not reference XLHRS's welfare payment obligation.

Wang noted that as a result, it "is ambiguous on what is Longtop's liability for the welfare – if the welfare expense calculated by [XLHRS] is inaccurate or understated, can they adjust the amount and require Longtop to pay the additional amount?"

149.    Obviously concerned that Longtop was seeking to use XLHRS as a vehicle for underpaying its welfare obligations, Wang responded to Defendant Palaschuk's December 19, 2010 e-mail by asking for a "separate analysis **only on those employees contracted from HR company**." (Emphasis in original).  In response, Defendant Palaschuk noted that the average welfare per person per month was just ¥ 1,181, a figure that, as set forth below, Palaschuk later admitted was not in accordance with Longtop's strict legal obligations.

150.    Throughout the Class Period, Longtop was knowingly understating its employees' salaries for the purpose of minimizing its welfare obligations.  Indeed, on December 23, 2010, ▮▮▮▮▮▮▮ informed Defendant Palaschuk that Longtop employees "sign a labor contract with a very low salary amount," and that the contract contains "a separate appendix to show the actual salary."  For example, ▮▮▮ noted that "[m]aybe 500 employee[s]" have labor contracts listing their base salary as RMB3,000.  Each then has a "different appendix show[ing] their unique salary."

151.    DTT again discussed the issue of Longtop's welfare payments during a January 28, 2011 meeting with Longtop's Audit Committee.  A draft agenda prepared for the January 28 meeting noted that Longtop obtained a legal opinion "provid[ing] this arrangement is in accordance with PRC law and Longtop has no joint liability to the government or HR staffing company for any underpaid social welfare or housing funds or potential penalties to the government or the HR staffing firm."  The notes further state that there had been "no change from previous years in the law or the arrangement."

152.    Redline edits to the January 28, 2011 agenda by DTT suggest that DTT believed Longtop could be legally responsible for any social welfare underpayments.  The edits state: "Even if staff are employed through an HR staffing company, Longtop could have joint liability directly to employees for any underpaid social welfare or housing funds if these were not settled by the HR staffing company."  The agenda further states that Longtop reviewed the SEC filings of DTT's other clients and proposed that Longtop pay welfare at a rate similar to those other entities, but "this was rejected by Deloitte unless it could be supported by legal opinions. Management also engaged a number of law firms including some of these companies' law firms but the law firms cannot provide to Longtop such opinions . . ."

153.    In a February 18, 2011 e-mail to DTT, Palaschuk again questioned whether Longtop could reduce its required welfare payments by fraudulently basing its payments "on an amount less than the actual salary."  Palaschuk stated that "as a practical matter we know using less than the actual salary for social welfare is a prevalent and common practice in China," but acknowledged to DTT that "the proper application of US GAAP is we cannot rely on a 'practice' if [it is] inconsistent with the law."  Nevertheless, Palaschuk again urged DTT to consider whether Longtop could obtain and use a "confirmation" from the local Chinese social welfare bureau "stating that Longtop is in compliance with their policies" to circumvent its legally-mandated welfare obligations.  Palaschuk proposed using this "confirmation" to support Longtop's accounting treatment of the Company's social welfare obligations, i.e., Longtop "would not accrue in its quarterly or annual reporting additional welfare" even though the method used to calculate its welfare payments was "not in accordance with the strict interpretation of the law."

154.     While Charlotte Lu informed Palaschuk that, in DTT's opinion, Longtop was required to record "the legal obligation" and not the amount of welfare payments that it was paying consistent with Chinese practice, Palaschuk later provided DTT with a "draft opinion" from Global Law Office, and stated that Longtop's "position is that we believe with the confirmation . . . and the legal opinion there is no liability under US GAAP for our social welfare."   Defendant Palaschuk's attempt to include DTT in a scheme to fraudulently avoid Longtop's legal obligations in violation of GAAP, should have, at the very least, raised a severe red flag to DTT concerning management's integrity and the veracity of Longtop's financial statements.

155.     Tellingly, in July of 2010, just prior to Longtop seeking to obtain a "confirmation" regarding the adequacy of its social welfare contributions, Longtop's Chairman gifted 20,000 Longtop shares valued at approximately $654,000 to Defendant Lian's brother, who "works for the tax bureau as a clerk."   Rather than disclosing the full nature of this transaction to shareholders, the Company determined, as set forth in a May 12, 2011 memo to the file from Defendant Palaschuk, that it would "record the compensation expense as if it had been made to the CEO as it could be considered to the benefit of the CEO."   DTT was aware that Longtop was seeking to avoid specifically disclosing that the gift was to Lian's brother, and "agreed [that] this is a little murky."

156.     On February 18, 2011, Wang and Defendant Palaschuk again discussed Longtop's welfare payments, with Palaschuk admitting to Wang that certain divisions of Longtop were using a base salary of Rmb1,100 to calculate its welfare payments, even though "this is also not in accordance with the strict [legal] requirements."   Palaschuk again noted that Longtop wanted to "get a 'confirmation' from the welfare bureau to say there is no [further welfare] liability even

though your own HR department may say that using Rmb1,100 is not in accordance with the strict [legal] requirements."

157.   On March 8, 2011, DTT and Palaschuk convened a conference call to discuss Longtop's welfare obligations.  In an e-mail to Longtop executives following the call, Palaschuk noted that DTT had consented to their use of a "confirmation" from the welfare bureau. Palaschuk noted that "Deloitte said they may want to meet with the welfare bureau but I think we can refuse this request."  He further noted that after speaking with DTT, and based upon the "confirmation" and a legal opinion "which would say the company's welfare policy is in accordance with Chinese law," Longtop "should have no liability for social welfare payments." Palaschuk concluded by stating that he was "not 100% sure Deloitte will accept our treatment but we will try our best."

158.   The documents further reveal that, rather than rejecting Longtop's scheme to evade its welfare obligations, on March 14, 2011 Tony Wen-ping Wang actually edited the draft legal opinion that Longtop had obtained from Global Law Office.

159.   Ultimately, notwithstanding their firsthand knowledge that Longtop had been fraudulently evading its welfare obligations for years, DTT signed off on Longtop's approach on the basis of the "confirmation" and legal opinion.  Specifically, Defendant Palaschuk informed ██████████ Yingling Li and other Longtop employees on March 14, 2011 that "Deloitte can accept the confirmations as our audit evidence if we get the changes made that they suggested and they talk to Global [Law Office]."

160.   Given DTT's awareness of significant red flags suggesting that Longtop was seeking to use XLHRS to manipulate and, ultimately, evade its government-mandated welfare obligations, DTT's failure to undertake any meaningful investigation with respect to these

interrelated party transactions with XLHRS, and the impact of these transactions on Longtop's financial results—particularly on reported and gross margins and net income—was, at the very least, reckless.

161.     DTT's culpable conduct continues to date with its refusal to produce documents or otherwise cooperate with the SEC in its investigation into Longtop's downfall, even in the face of a widely-publicized SEC enforcement action, as set forth above at ¶¶ 17-20.

## VI.     FALSE AND MISLEADING STATEMENTS

### *IPO Prospectus*

162.     On October 24, 2007, Longtop filed an SEC Rule 424(b)(4) prospectus in connection with its initial public offering pursuant to a registration statement filed with the SEC on October 2, 2007 on Form F-1 which was signed by Defendants Lian and Palaschuk.  The prospectus purportedly accurately set forth Longtop's financial data for the years 2004-2006 and for the three months ended March 31, 2007 and June 30, 2007.  According to the prospectus, in 2004, Longtop's total revenues were $15.2 million, operating expenses were $4.2 million, net income was $6.6 million, gross profit margin was 82.4%, and cash and cash equivalents were $9.4 million.  In 2005, Longtop's total revenues were $25.3 million, operating expenses were $6.5 million, net income was $12.5 million, gross profit margin was 86.1%, and cash and cash equivalents were $24.9 million.  In 2006, Longtop's total revenues were $43.2 million, operating expenses were $22.9 million, net income was $8.3 million, gross profit margin was 82.3%, and cash and cash equivalents were $81.3 million.  For the three months ended March 31, 2007, Longtop's total revenues were $8.8 million, operating expenses were $3.9 million, net income was $768,000, gross profit margin was 60.5%, and cash and cash equivalents were $69.9 million.  For the three months ended June 30, 2007, Longtop's total revenues were $16.1 million, operating expenses were $3.9 million, net income was $4.9 million, gross profit margin was

55.9%, and cash and cash equivalents of $79.4 million.  The prospectus also stated that, at

June 30, 2007, the Company had short term debt obligations of $12.9 million.

163.  DTT audited Longtop's consolidated financial results for 2004-2006 and for the

three months ended March 31, 2007, and made certain representations in its audit report for those

periods, which was reproduced in the prospectus.  According to DTT:

> We conducted our audits in accordance with the standards of the Public Company
> Accounting Oversight Board (United States).  Those standards require that we
> plan and perform the audit to obtain reasonable assurance about whether the
> financial statements are free of material misstatement.  The Company is not
> required to have, nor were we engaged to perform, an audit of its internal control
> over financial reporting . . . An audit also includes examining, on a test basis,
> evidence supporting the amounts and disclosures in the financial statements,
> assessing the accounting principles used and significant estimates made by
> management, as well as evaluating the overall financial statement presentation.
> We believe that our audits provide a reasonable basis for our opinion.
>
> In our opinion, such consolidated financial statements present fairly, in all
> material respects, the financial position of Longtop Financial Technologies
> Limited and subsidiaries as of December 31, 2005 and 2006 and March 31, 2007,
> and the results of their operations and their cash flows for each of the three years
> in the period ended December 31, 2006 and for the three month period ended
> March 31, 2007, in conformity with accounting principles generally accepted in
> the United States of America.  Also in our opinion, such financial statement
> schedule, when considered in relation to the basic consolidated financial
> statements taken as a whole, presents fairly in all material respects the
> information set forth therein.

164.  The statements referenced in ¶¶ 162-63 were materially false and misleading

because they misrepresented and failed to disclose that Longtop had materially inflated its (a)

cash and cash equivalents, (b) accounts receivable, (c) revenue, (d) gross profit, and (e) net

income, and materially understated or omitted disclosure of its (a) loan obligations, (b) cost of

revenues and employee-related expenses, and (c) related party transactions.

165.  The statement at ¶ 163 was additionally false as to DTT because (a) Longtop's

financial statements were not presented fairly, in all material respects, in accordance with GAAP,

and (b) DTT's audits were not conducted in accordance with GAAS.

*2008 Second Quarter Results*

166.    On November 19, 2007, Longtop issued a press release reporting its financial results for the quarter ended September 30, 2007, a copy of which was filed with the SEC on Form 6-K and signed by Defendant Palaschuk.   The press release reported revenues of $20.2 million, operating expenses of $3.3 million, net income of $9.9 million and a gross margin of 82.7% for the period.   The press release further reported cash, bank deposits and cash equivalents of $87.3 million and short term borrowings of $21.1 million.

167.    The statements referenced in ¶ 166 were materially false and misleading because they misrepresented and failed to disclose that Longtop had materially inflated its (a) cash and cash equivalents, (b) accounts receivable, (c) revenue, (d) gross profit, and (e) net income, and materially understated or omitted disclosure of its (a) loan obligations, (b) cost of revenues and employee-related expenses, and (c) related party transactions.

*2008 Third Quarter Results*

168.    On February 21, 2008, Longtop issued a press release reporting its financial results for the quarter ended December 30, 2007, a copy of which was filed with the SEC on Form 6-K and signed by Defendant Palaschuk.   The press release reported revenues of $18.6 million, operating expenses of $3.8 million, net income of $10.5 million after adjustment for a one time compensation-related expense (reported at adjusted net income) and a gross margin of 71.5% for the period.   The press release further reported cash, bank deposits and cash equivalents of $209.6 million and short term borrowings of $12.3 million.

169.    The statements referenced in ¶ 168 were materially false and misleading because they misrepresented and failed to disclose that Longtop had materially inflated its (a) cash and cash equivalents, (b) accounts receivable, (c) revenue, (d) gross profit, and (e) net income, and

materially understated or omitted disclosure of its (a) loan obligations, (b) cost of revenues and employee-related expenses, and (c) related party transactions.

### 2008 Fourth Quarter Results

170.    On May 18, 2008, Longtop issued a press release reporting its financial results for the quarter ended March 31, 2008, a copy of which was filed with the SEC on Form 6-K and signed by Defendant Palaschuk.  The press release reported revenues of $16.3 million, operating expenses of $4.8 million, net income of $4.6 million and a gross margin of 69.9% for the period. The press release further reported cash, bank deposits and cash equivalents of $204.5 million and short term borrowings of $512,000.

171.    The statements referenced in ¶ 170 were materially false and misleading because they misrepresented and failed to disclose that Longtop had materially inflated its (a) cash and cash equivalents, (b) accounts receivable, (c) revenue, (d) gross profit, and (e) net income, and materially understated or omitted disclosure of its (a) loan obligations, (b) cost of revenues and employee-related expenses, and (c) related party transactions.

### 2008 Year End Results

172.    On July 1, 2008, the Company filed its Annual Report for the fiscal year ended March 31, 2008, with the SEC on Form 20-F ("2008 20-F"), signed by Lian and Palaschuk, which reported total revenues of $66.7 million, operating expenses of $33.8 million, net income of $2.9 million and a gross profit margin of 60.4% for the period.  The 2008 Form 20-F further reported cash and cash equivalents of $204.5 million and $512,000 in short term borrowings. The Company again stated that its financial statements were prepared in conformity with U.S. GAAP.

173.    DTT permitted Longtop to reproduce its audit report in the 2008 Form 20-F which stated, in relevant part:

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement . . . . An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, such consolidated financial statements present fairly, in all material respects, the financial position of Longtop Financial Technologies Limited and subsidiaries as of March 31, 2007 and 2008, and the results of their operations and their cash flows for the years ended December 31, 2005 and 2006, three months ended March 31, 2007 and year ended March 31, 2008, in conformity with accounting principles generally accepted in the United States of America. Also in our opinion, such financial statement schedule, when considered in relation to the basic consolidated financial statements taken as a whole, presents fairly in all material respects the information set forth therein.

174.    The 2008 Form 20-F also discussed Longtop's staffing levels and employee costs, reporting "1,496 contracted employees provided by Xiamen Longtop Human Resource Services Co., Ltd, an unrelated party, pursuant to a human resource service agreement with us. Under this agreement, we have agreed to pay a monthly service fee to Xiamen Longtop Human Resource Services Co., Ltd to cover the cost of those contracted employees as well as operational expenses. We consider these 1,496 persons to be employees."

175.    The statements referenced in ¶¶ 172-74 were materially false and misleading because they misrepresented and failed to disclose that Longtop had materially inflated its (a) cash and cash equivalents, (b) accounts receivable, (c) revenue, (d) gross profit, and (e) net income, and materially understated or omitted disclosure of its (a) loan obligations, (b) cost of revenues and employee-related expenses, and (c) related party transactions.

176.    The statement at ¶ 173 was additionally false as to DTT because (a) Longtop's financial statements were not presented fairly, in all material respects, in accordance with GAAP, and (b) DTT's audits were not conducted in accordance with GAAS.

### 2009 First Quarter Results

177.   On August 12, 2008, Longtop issued a press release reporting its financial results for the quarter ended June 30, 2008, a copy of which was filed with the SEC on Form 6-K and signed by Defendant Palaschuk.  The press release reported revenues of $19.3 million, operating expenses of $4.9 million, net income of $6.1 million and a gross margin of 63.7% for the period. The press release further reported cash and cash equivalents of $201.5 million and short term borrowings of $633,000.

178.   Defendant Lian attributed Longtop's results to "higher demand for our solutions than we had anticipated . . ." in the press release and stated "[b]ased on this demand and business momentum, we are raising our guidance for 2009."

179.   The statements referenced in ¶¶ 177-78 were materially false and misleading because they misrepresented and failed to disclose that Longtop had materially inflated its (a) cash and cash equivalents, (b) accounts receivable, (c) revenue, (d) gross profit, and (e) net income, and materially understated or omitted disclosure of its (a) loan obligations, (b) cost of revenues and employee-related expenses, and (c) related party transactions.  The statements were also materially false and misleading because Defendant Lian had no reasonable basis for making positive statements about Longtop's business and financial results or its outlook.

### 2009 Second Quarter Results

180.   On November 16, 2008, Longtop issued a press release reporting its financial results for the quarter ended September 30, 2008, a copy of which was filed with the SEC on Form 6-K and signed by Defendant Palaschuk.   The press release reported revenues of $28.2 million, operating expenses of $6.2 million, net income of $14.2 million and a gross margin of 69.8% for the period.  The press release further reported cash and cash equivalents of $208.9 million and short term borrowings of $619,000.

181.    Defendant Palaschuk commented on the results, stating "[t]he second quarter's record revenues were supported by robust cash flow from operations . . ."

182.    The statements referenced in ¶¶ 180-81 were materially false and misleading because they misrepresented and failed to disclose that Longtop had materially inflated its (a) cash and cash equivalents, (b) accounts receivable, (c) revenue, (d) gross profit, and (e) net income, and materially understated or omitted disclosure of its (a) loan obligations, (b) cost of revenues and employee-related expenses, and (c) related party transactions. The statements were also materially false and misleading because Defendant Palaschuk had no reasonable basis for making positive statements about Longtop's business and financial results or its outlook.

### *2009 Third Quarter Results*

183.    On February 18, 2009, Longtop issued a press release reporting its financial results for the quarter ended December 31, 2008, a copy of which was filed with the SEC on Form 6-K and signed by Defendant Palaschuk. The press release reported revenues of $32.9 million, operating expenses of $6.1 million, net income of $14.4 million and a gross margin of 71.2% for the period. The press release further reported cash and cash equivalents of $236.4 million and short term borrowings of $567,000.

184.    Defendant Palaschuk commented on the results, stating "[t]his strong growth is supported by robust cash flow from operations, which was US$18.8 million during the quarter, leaving us with a December 31, 2008, cash balance of US$236.4 million or US$4.67 per ordinary share."

185.    The statements referenced in ¶¶ 183-84 were materially false and misleading because they misrepresented and failed to disclose that Longtop had materially inflated its (a) cash and cash equivalents, (b) accounts receivable, (c) revenue, (d) gross profit, and (e) net income, and materially understated or omitted disclosure of its (a) loan obligations, (b) cost of

revenues and employee-related expenses, and (c) related party transactions. The statements were also materially false and misleading because Defendant Palaschuk had no reasonable basis for making positive statements about Longtop's business and financial results or its outlook.

### May 2009 Interim Report

186.   On May 15, 2009, Longtop filed a report on Form 6-K with the SEC signed by Defendant Palaschuk that purported to update certain information contained in the Company's 2008 Form 20-F, but that failed to update or correct any of the materially false and misleading information contained in the 2008 Form 20-F or any statement Defendants issued.

### 2009 Fourth Quarter Results

187.   On May 27, 2009, Longtop issued a press release reporting its financial results for the quarter ended March 31, 2009, a copy of which was filed with the SEC on Form 6-K and signed by Defendant Palaschuk. The press release reported revenues of $25.9 million, operating expenses of $5.9 million, net income of $8.8 million and a gross margin of 63.6% for the period. The press release further reported cash and cash equivalents of $238.3 million and short term borrowings of $486,000.

188.   The statements referenced in ¶¶ 186-87 were materially false and misleading because they misrepresented and failed to disclose that Longtop had materially inflated its (a) cash and cash equivalents, (b) accounts receivable, (c) revenue, (d) gross profit, and (e) net income, and materially understated or omitted disclosure of its (a) loan obligations, (b) cost of revenues and employee-related expenses, and (c) related party transactions.

### 2009 Year-End Results

189.   On June 29, 2009, the Company filed its Annual Report for the fiscal year ended March 31, 2009 with the SEC on Form 20-F ("2009 Form 20-F"), signed by Lian and Palaschuk, which reported total revenues of $106.2 million, operating expenses of $25.5 million, net income

of $43.5 million and a gross profit margin of 65.7% for the period. The 2009 Form 20-F further reported cash and cash equivalents of $238.3 million and $486,000 in short term borrowings. The Company again stated that its financial statements were prepared in conformity with U.S. GAAP.

190.   DTT permitted Longtop to reproduce its audit report in the 2009 Form 20-F which stated, in relevant part:

> We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, testing and evaluating the design and operating effectiveness of internal control based on the assessed risk, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.
>
> *     *     *
>
> In our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of March 31, 2009 , based on the criteria established in Internal Control — Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission.
>
> We have also audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the consolidated financial statements and financial statement schedule as of and for the year ended March 31, 2009 of the Company and our report dated June 29, 2009 expressed an unqualified opinion on those financial statements and financial statement schedule and included an explanatory paragraph relating to the adoption of FASB Interpretation No. 48 "Accounting for Uncertainty in Income Taxes — an interpretation of FASB Statement No. 109," effective April 1, 2007.

191.   In connection with the 2009 Form 20-F, DTT further stated:

> In our opinion, such consolidated financial statements present fairly, in all material respects, the financial position of Longtop Financial Technologies Limited and subsidiaries as of March 31, 2008 and 2009, and the results of their operations and their cash flows for the year ended December 31, 2006, three months ended March 31, 2007 and years ended March 31, 2008 and 2009, in conformity with accounting principles generally accepted in the United States of

America. Also in our opinion, such financial statement schedule, when considered in relation to the basic consolidated financial statements taken as a whole, presents fairly in all material respects the information set forth therein.

192.     The 2009 Form 20-F also discussed Longtop's staffing levels and employee costs. Longtop reported 2,602 employees, "includ[ing] 2,039 . . . contracted employees . . . provided by *Xiamen Longtop Human Resource Services Co., Ltd, . . . an unrelated party* pursuant to a human resource service agreement with us.  Under [the] agreement, we have agreed to pay a monthly service fee to Xiamen Longtop Human Resource Services Co. . . . to cover the cost of those contracted employees as well as operational expenses.  We consider these 2,131 persons to be employees."

193.     Discussing workforce-related costs, Longtop stated that "headcount related expenses [included in General and Administrative expenses of $2.7 million] include payroll, bonuses, employee benefits, share-based compensation, travel and entertainment and overhead costs that are allocated based on headcount."

194.     Also in connection with the 2009 Form 20-F, Defendants Lian and Palaschuk signed certifications pursuant to the Sarbanes-Oxley Act of 2002 that affirmed the accuracy of Longtop's reported financial results and the effectiveness of its internal controls over reporting.

195.     The statements referenced in ¶¶ 189-94 were materially false and misleading because they misrepresented and failed to disclose that Longtop had materially inflated its (a) cash and cash equivalents, (b) accounts receivable, (c) revenue, (d) gross profit, and (e) net income, and materially understated or omitted disclosure of its (a) loan obligations, (b) cost of revenues and employee-related expenses, and (c) related party transactions. The statements were also materially false and misleading because they falsely stated that wholly-owned and controlled XLHRS was an "unrelated party, and because they falsely gave the impression that

61

"headcount related expenses" included all costs associated with Longtop's workforce." The Sarbanes-Oxley certifications signed by Defendants Lian and Palaschuk were also materially false and misleading in light of the material internal control deficiencies identified by DTT.

196.   The statements in ¶¶ 190-91 were additionally false as to DTT because (a) Longtop's financial statements were not presented fairly, in all material respects, in accordance with GAAP, (b) DTT's audits were not conducted in accordance with GAAS, and (c) DTT had identified numerous material internal control deficiencies by 2007, and also identified specific fraud risk factors such as unrealistic management expectations and potential management override of internal controls by no later than 2008.

### 2010 First Quarter Results

197.   On August 18, 2009, Longtop issued a press release reporting its financial results for the quarter ended June 30, 2009, a copy of which was filed with the SEC on Form 6-K and signed by Defendant Palaschuk.  The press release reported revenues of $28.5 million, operating expenses of $6.3 million, net income of $10.7 million and a gross margin of 62.6% for the period.  The press release further reported cash and cash equivalents of $215.1 million.

198.   Defendant Lian attributed the financial results to "healthy demand from Longtop's customers, which has allowed us to increase our full year guidance" and "strong demand across all customer and product segments."  Lian further noted that "we see this trend continuing . . ."

199.   The statements referenced in ¶¶ 197-98 were materially false and misleading because they misrepresented and failed to disclose that Longtop had materially inflated its (a) cash and cash equivalents, (b) accounts receivable, (c) revenue, (d) gross profit, and (e) net income, and materially understated or omitted disclosure of its (a) loan obligations, (b) cost of revenues and employee-related expenses, and (c) related party transactions.  Defendant Lian's

62

statements were also materially false and misleading because he had no reasonable basis for his positive statements about Longtop's business and financial results, nor the Company's outlook.

### 2010 Second Quarter Results

200.    On November 16, 2009, Longtop issued a press release reporting its financial results for the quarter ended September 30, 2009 in an SEC filing on Form 6-K signed by Defendant Palaschuk.  The press release reported revenues of $42.8 million, operating expenses of $10 million, net income of $21.4 million and a gross margin of 65.9% for the period.  The press release further reported cash and cash equivalents of $226.4 million.

201.    The statements referenced in ¶ 200 were materially false and misleading because they misrepresented and failed to disclose that Longtop had materially inflated its (a) cash and cash equivalents, (b) accounts receivable, (c) revenue, (d) gross profit, and (e) net income, and materially understated or omitted disclosure of its (a) loan obligations, (b) cost of revenues and employee-related expenses, and (c) related party transactions.

### Secondary Offering

202.    On November 17, 2009, Longtop conducted a public offering of 4.25 million ADSs at $31.25 per share.  In connection with the Secondary Offering, the Company filed a registration statement on Form F-3 that incorporated – with DTT's consent – DTT's 2009 audit report in which DTT expressed an unqualified opinion as to the Company's consolidated financial statements, financial statement schedule and the effectiveness of Longtop's internal control over financial reporting.  A copy of DTT's 2009 audit opinion was reproduced in the Company's 2009 Form 20-F and is set forth at ¶¶ 190-91.

203.    Longtop also filed a prospectus with the SEC on Form 424B5 in conjunction with the Secondary Offering that incorporated by reference the 2009 Form 20-F and the November 16, 2009 Form 6-K.

204.    The statements contained in the registration statement and prospectus filed in connection with the Secondary Offering were materially false and misleading for the reasons set forth in ¶¶ 195-96.

### *2010 Third Quarter Results*

205.    On February 10, 2010, Longtop issued a press release reporting its financial results for the quarter ended December 31, 2009, a copy of which was filed with the SEC on Form 6-K and signed by Defendant Palaschuk.    The press release reported revenues of $54.7 million, operating expenses of $9.7 million, net income of $29.3 million and a gross margin of 71.4% for the period.    The press release further reported cash and cash equivalents of $389.7 million and $27.1 million in short term borrowings.

206.    In the press release, Defendant Palaschuk boasted:

> *third quarter revenue and adjusted net income once more substantially exceeded guidance.    A robust third quarter cash flow from operations of US$39.2 million and US$50.1 million for the first nine months* together with the proceeds from the November 2009 secondary offering will allow us to continue to invest intelligently in our existing operations and grasp further consolidation opportunities through acquisitions that will *help extend our leading position in China's financial technology industry.*

207.    The statements referenced in ¶¶ 205-06 were materially false and misleading because they misrepresented and failed to disclose that Longtop had materially inflated its (a) cash and cash equivalents, (b) accounts receivable, (c) revenue, (d) gross profit, and (e) net income, and materially understated or omitted disclosure of its (a) loan obligations, (b) cost of revenues and employee-related expenses, and (c) related party transactions.    The statements were also materially false and misleading because Defendant Palaschuk had no reasonable basis for making positive statements about Longtop's business and financial results or its outlook.

### *March 31, 2010 Conference Call*

208.    On March 31, 2010, Longtop convened a conference call for shareholders and investors to address "various questions that [Longtop] received" regarding its relationship with XLHRS. Defendant Palaschuk and ▮▮▮ participated in the call, during which ▮ informed investors that Longtop seeks "to comply with the social welfare requirements and practices" in China, and that Longtop believes that it does "comply with the policies and practices in China." ▮ also specifically stated that there were "no off balance sheet financing or unrecorded costs" resulting from Longtop's relationship with XLHRS, and that Longtop's "use of these staffing companies is fully in accordance with PRC law."

209.    The statements set forth in ¶ 208 were materially false and misleading because, as detailed above, Defendant Palaschuk acknowledged that the method Longtop used to calculate its social welfare contributions was "not in accordance with the strict interpretation of the [Chinese] law."

### *2010 Fourth Quarter and Year-End Results*

210.    On May 23, 2010, Longtop issued a press release disclosing its financial results for the quarter and fiscal year ended March 31, 2010, a copy of which was filed with the SEC on Form 6-K and signed by Defendant Palaschuk. The press release reported revenues of $43.1 million, operating expenses of $9 million, net income of $16.3 million and a gross margin of 61.5% for the quarter, and revenues of $169.1 million, operating expenses of $33.6 million, net income of $3.8 million and a gross margin of 66.7% for the fiscal year ended March 31, 2010. The press release further reported cash and cash equivalents of $331.2 million at March 31.

211.    Defendant Lian summarized the quarter and year-end results as follows in the May 23, 2010 Press Release:

we have concluded fiscal 2010 with another quarter of solid results. We look back at a year in which our *business flourished due to significant organic business expansion in the financial IT industry, and the synergies of the Sysnet acquisition that further boost our presence in the insurance IT solution market.* This quarter's results once more indicate that Longtop's business is based on the *indispensable and recurring* nature of our software and solutions ... *Our outlook for 2011 is strong* based on our sound business fundamentals and feedback from our customers . . .

212.    On May 24, 2010, Longtop hosted an investor conference call to discuss its fourth quarter and year-end results. Defendants Lian and Palaschuk participated in the call, during which Palaschuk commented on the Company's gross margin. He stated:

The 100 basis point year-on-year decline in adjusted operating margin shows that the gross margin level where *we expect adjusted gross margins of 66% as compared to 67% in 2009. The adjusted gross margin decline is due to the acquisition of Giantstone and other investments we're making, including annual salary increase of around 10%.*

\*          \*          \*

Our adjusted quarterly margin is expected to be 62%, 66%, 71% and 63%.

213.    On July 16, 2010, the Company filed its annual report for the fiscal year ended March 31, 2010 with the SEC on Form 20-F (the "2010 Form 20-F"), signed by Defendants Lian and Palaschuk, which reported total revenues of $169.1 million, operating expenses of $45.2 million, net income of $59.1 million and a gross margin of 62.5%. The 2010 Form 20-F also reported cash and cash equivalents of $331.9 million.

214.    The 2010 Form 20-F also discussed Longtop's staffing and employee costs, stating that the Company carries 4,258 employees, "*3,235 of whom are contract employees . . . provided by Xiamen Longtop Human Resource Services Co., Ltd.,*" which Longtop again described as "*an unrelated party.*"

215.    DTT permitted Longtop to reproduce its audit report in the 2010 Form 20-F which stated, in relevant part:

66

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, testing and evaluating the design and operating effectiveness of internal control based on the assessed risk, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

*     *     *

In our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of March 31, 2010, based on the criteria established in *Internal Control-Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission.

We have also audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the consolidated financial statements and financial statement schedule as of and for the year ended March 31, 2010 of the Company and our report dated July 16, 2010 expressed an unqualified opinion on those financial statements and financial statement schedule and included an explanatory paragraph relating to the adoption of a new accounting standard.

216.    In connection with the 2010 Form 20-F, DTT further stated:

In our opinion, such consolidated financial statements present fairly, in all material respects, the financial position of Longtop Financial Technologies Limited and subsidiaries as of March 31, 2009 and 2010, and the results of their operations and their cash flows for each of the three years in the period ended March 31, 2010, in conformity with accounting principles generally accepted in the United States of America. Also in our opinion, such financial statement schedule, when considered in relation to the basic consolidated financial statements taken as a whole, presents fairly, in all material respects, the information set forth therein.

217.    The 2010 Form 20-F also attributed Longtop's gross margin and revenue growth

to its improving line of products. Specifically:

We introduced our first suite of standardized software solutions in 2003 and need to be constantly updating our standardized software solutions. ***These standardized solutions contributed substantially to our revenue growth and operating margins. In the near term, we expect our revenue growth to be***

*driven by our customized software solutions in response to changes in client demands and to a lesser extent by growth in our standardized solutions.*

218.    The 2010 Form 20-F also included Defendants Lian and Palaschuk's Sarbanes-Oxley certifications, which mirrored those contained in the 2009 Form 20-F. *See* ¶ 194.

219.    The statements referenced in ¶¶ 210-18 were materially false and misleading because they misrepresented and failed to disclose that Longtop had materially inflated its (a) cash and cash equivalents, (b) accounts receivable, (c) revenue, (d) gross profit, and (e) net income, and materially understated or omitted disclosure of its (a) loan obligations, (b) cost of revenues and employee-related expenses, and (c) related party transactions.  The statements were also materially false and misleading because they falsely stated that wholly-owned and controlled XLHRS was an "unrelated party," and because neither Defendant Lian nor Palaschuk had a reasonable basis for making positive statements about Longtop's business and financial results or its outlook.   The Sarbanes-Oxley certifications signed by Defendants Lian and Palaschuk were also materially false and misleading in light of the material internal control deficiencies identified by DTT.

220.    The statements in ¶¶ 215-16 were additionally false as to DTT because (a) Longtop's financial statements were not presented fairly, in all material respects, in accordance with GAAP, (b) DTT's audits were not conducted in accordance with GAAS, and (c) DTT had identified numerous material internal control deficiencies by 2007, and also identified specific fraud risk factors such as unrealistic management expectations and potential management override of internal controls by no later than 2008.

*2011 First Quarter Results*

221.    On August 18, 2010, Longtop issued a press release reporting its financial results for the quarter ended June 30, 2010, a copy of which was filed with the SEC on Form 6-K and

68

signed by Defendant Palaschuk. The press release reported revenues of $48.9 million, operating expenses of $9.4 million, net income of $17.9 million and a gross margin of 58.4% for the period. The press release further reported cash and cash equivalents of $342.4 million.

222. Defendant Lian described the first quarter 2011 results as "strong" and noted "the continuing strong demand for Longtop's solutions due to long-term and structural technology growth trends in the financial services industry, which tend to be independent of the macroeconomic environment." Lian continued "[i]n consideration of our growth momentum, we increase revenue and net income guidance for fiscal 2011."

223. Defendant Palaschuk also commented on the results, stating:

> We have delivered **sound top and bottom line financial results** during the first fiscal quarter, which is traditionally our lowest revenue and net income quarter in the fiscal year. The **strong outlook, evidenced by a healthy backlog and pipeline in our core software development business**, has allowed us to increase guidance, and for the first time in our history we **expect to achieve US$100 million in Adjusted Net Income**. As in previous years, in Q2 and Q3 2011 we expect s**ignificant improvements from this quarter in our margins as well as from cash flow from operations**.

224. The statements referenced in ¶¶ 221-23 were materially false and misleading because they misrepresented and failed to disclose that Longtop had materially inflated its (a) cash and cash equivalents, (b) accounts receivable, (c) revenue, (d) gross profit, and (e) net income, and materially understated or omitted disclosure of its (a) loan obligations, (b) cost of revenues and employee-related expenses, and (c) related party transactions. The statements were also materially false and misleading because neither Defendant Lian nor Palaschuk had a reasonable basis for making positive statements about Longtop's business and financial results or its outlook.

***2011 Second Quarter Results***

225.   On November 14, 2010, Longtop issued a press release reporting its financial results for the quarter ended September 30, 2010, a copy of which was filed with the SEC on Form 6-K and signed by Defendant Palaschuk.   The press release reported revenues of $55.5 million, operating expenses of $10.1 million, net income of $25.7 million and a gross margin of 64.3% for the period.   The press release further reported cash and cash equivalents of $379 million and $27.1 million in short term borrowings.

226.   Defendant Palaschuk commented on the results, stating:

Our Company performance has once more exceeded guidance for both top and bottom line results. ***Our order intake, margins and cash flow from operations which was US$31.6 million significantly improved in the second quarter as we had anticipated.***   On the back of ***strong demand and execution***, we are ***now raising our fiscal 2011 revenue guidance*** to US$242.5 million up from 225.0 million at the beginning of our fiscal year and Adjusted Earnings Per Share of US$1.76 up from US$1.64.

227.   The statements referenced in ¶¶ 225-26 were materially false and misleading because they misrepresented and failed to disclose that Longtop had materially inflated its (a) cash and cash equivalents, (b) accounts receivable, (c) revenue, (d) gross profit, and (e) net income, and materially understated or omitted disclosure of its (a) loan obligations, (b) cost of revenues and employee-related expenses, and (c) related party transactions. The statements were also materially false and misleading because Defendant Palaschuk had no reasonable basis for making positive statements about Longtop's business and financial results or its outlook.

***2011 Third Quarter Results***

228.   On January 31, 2011, Longtop issued a press release disclosing its financial results for the quarter ended December 31, 2010, a copy of which was filed with the SEC on Form 6-K and signed by Defendant Palaschuk.   The press release reported revenues of $72.5 million, operating expenses of $12.8 million, net income of $35.6 million and a gross

margin of 68.8% for the period. The press release further reported cash and cash equivalents of

$423.2 million and $10.6 million in short term borrowings.

229. Defendant Lian commented on the third quarter results, stating:

We have delivered the strongest cash flow from operations to date since our IPO in 2007 *on the back of outstanding execution from our management and employees*. The *momentum has accelerated* during fiscal 2011 with our *organic growth* rate for software development revenue of approximately 40% in the first nine months significantly higher than the 30% guidance we gave at the outset of the year while maintaining a relatively stable organic operating margin. With this momentum, we are *once again raising guidance for the fiscal fourth quarter of 2011* . . . For fiscal 2012 *we continue to see strong demand from our customers* that execute on their long-term IT development plans irrespective of short-term changes in macroeconomic factors. *Based on our sales pipeline and ongoing discussions with customers about their IT spending plans, Longtop's growth prospects remain bright for fiscal 2012*. I believe *Longtop's competitive position is stronger than ever and we continue to take market share from our competitors.*

230. The statements referenced in ¶¶ 228-29 were materially false and misleading

because they misrepresented and failed to disclose that Longtop had materially inflated its (a)

cash and cash equivalents, (b) accounts receivable, (c) revenue, (d) gross profit, and (e) net

income, and materially understated or omitted disclosure of its (a) loan obligations, (b) cost of

revenues and employee-related expenses, and (c) related party transactions. The statements were

also materially false and misleading because Defendant Lian had no reasonable basis for making

positive statements about Longtop's business and financial results or its outlook.

## VII.    GAAP VIOLATIONS

231. The representations and certifications by Defendants Lian, Palaschuk and DTT

that Longtop's financial results were prepared and reported accurately and in accordance with

U.S. GAAP were materially false and misleading.

232. Clear and longstanding GAAP provisions require: (i) that financial reporting

should provide information that is useful to present and potential investors and creditors and

other users in making rational investment, credit, and similar decisions, set forth in FASB Statement of Concepts No. 1, ¶ 34; (ii) that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events, and circumstances that change resources and claims to those resources, set forth in FASB Statement of Concepts No. 1, ¶ 40; (iii) that financial reporting should provide information about an enterprise's financial performance during a period set forth in FASB Statement of Concepts No. 1, ¶ 42; (iv) that financial reporting should be reliable in that it represents what it purports to represent, set forth in FASB Statement of Concepts No. 2, ¶¶ 58-59; and (v) completeness, meaning that nothing material is left out of the information that may be necessary to ensure that it validly represents underlying events and conditions, set forth in FASB Statement of Concepts No. 2, ¶ 79.

233.    Furthermore, Statement of Financial Accounting Standards No. 57 ("Related Party Disclosures") mandates disclosure of material related-party transactions.  Specifically, financial statements shall include disclosures of material related-party transactions, other than compensation arrangements, expense allowances, and other similar items in the ordinary course of business. The disclosures shall include:

a.    The nature of the relationship(s) involved;

b.    A description of the transactions, including transactions to which no amounts or nominal amounts were ascribed, for each of the periods for which income statements are presented, and such other information deemed necessary to an understanding of the effects of the transactions on the financial statements;

c.    The dollar amounts of transactions for each of the periods for which income statements are presented and the effects of any change in the method of establishing the terms from that used in the preceding period; and

        d.     Amounts due from or to related parties as of the date of each balance sheet presented and, if not otherwise apparent, the terms and manner of settlement.

234.    Because Longtop's Class Period financial statements violated GAAP, they are presumptively misleading and inaccurate under SEC Regulation S-X, 17 C.F.R. § 210.4-01(a)(1).

## VIII.  LOSS CAUSATION

235.    Defendants' unlawful conduct alleged herein directly caused the losses incurred by Plaintiffs and the Class.  Throughout the Class Period, the price of Longtop's ADSs was artificially inflated as a direct result of Defendants' materially false and misleading statements and omissions.

236.    The true facts became known by investors and the market through a series of partial corrective disclosures, some by third parties and ultimately, some by Defendants.  By making contemporaneous additional misstatements in the form of denials in response to partial disclosures by third parties, or by failing to reveal the falsity of all statements at one time, artificial inflation remained in the price of Longtop ADSs throughout the entirety of the Class Period.

237.    As the true facts became known and/or the materialization of the risks that had been concealed by Defendants occurred, the price of Longtop ADSs declined as the artificial inflation was removed from the market price of the ADSs, causing substantial damage to Plaintiffs and the members of the Class.

238.    The declines in the price of Longtop's ADSs and the resulting losses are directly attributable to the disclosure of information and materialization of risks that were previously misrepresented or concealed by the Defendants.  Had Plaintiffs and other members of the Class known of the material adverse information not disclosed by Defendants or been aware of the

truth behind their material misstatements, they would not have purchased Longtop ADSs at artificially inflated prices.

## IX.    GROUP PLEADING

239.    It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein are the collective actions of the narrowly-defined group of the Individual Defendants.  Each of the Individual Defendants, by virtue of their high-level positions with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, growth, financial statements, and financial condition, as alleged herein.  The Individual Defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein; were aware, or recklessly disregarded, that the materially false and misleading statements were being issued regarding the Company; and approved or ratified these statements, in violation of the federal securities laws.

240.    The Individual Defendants acted with scienter in that each knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Longtop, their control over, and/or receipt and/or modification of Longtop's allegedly materially misleading misstatements and/or

their associations with the Company which made them privy to confidential proprietary information concerning Longtop, participated in the fraudulent scheme alleged herein.

## X.      INAPPLICABILITY OF STATUTORY SAFE HARBOR

241.    The federal statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The specific statements pleaded herein were not "forward looking statements" when made. To the extent there were any forward-looking statements, there was no meaningful cautionary statement identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Longtop and the Individual Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Longtop who knew that those statements were false when made. Moreover, to the extent that Longtop and the Individual Defendants issued any disclosures designed to "warn" or "caution" investors of certain "risks," those disclosures were also false and misleading because they did not disclose that Longtop and the Individual Defendants were actually engaging in the very actions about which they purportedly warned and/or had actual knowledge of undisclosed material adverse facts that rendered such "cautionary" disclosures false and misleading.

## XI.     PRESUMPTION OF RELIANCE

242.    At all relevant times, the market for Longtop's publicly traded securities was an efficient market for the following reasons, among others:

a.      Longtop ADSs met the requirements for listing, and were listed and actively traded on the NYSE, a highly efficient and automated market;

b.      As a regulated issuer, Longtop filed periodic public reports with the SEC;

c.      Longtop regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

d.      Longtop was followed by numerous securities analysts employed by major brokerage firms throughout the Class Period who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

243.    As a result, the market for Longtop's publicly-traded ADSs promptly digested current information regarding Longtop from all publicly-available sources and reflected such information in Longtop's ADS prices.  Under these circumstances, all purchasers of Longtop's ADSs during the Class Period suffered similar injury through their purchase of Longtop's ADSs at artificially inflated prices, and a presumption of reliance applies.

## XII.    CLASS ACTION ALLEGATIONS APPLICABLE TO ALL CLAIMS

244.    Plaintiffs bring this Action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all persons and entities who purchased or otherwise acquired Longtop ADSs on the NYSE between October 24, 2007 and May 17, 2011, inclusive, and who were damaged thereby.  Excluded from the Class are Defendants, the officers and directors of the Company, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

245.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Longtop's ADSs were actively traded on the

NYSE.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class.  Millions of Longtop ADSs were traded publicly during the Class Period on the NYSE and as of May 17, 2011, there were over 41 million shares of Longtop ADSs issued and outstanding.  Record owners and other members of the Class may be identified from records maintained by Longtop and/or its transfer agent and may be notified of the pendency of this Action by mail, using the form of notice similar to that customarily used in securities class actions.

246.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of the federal laws that is complained of herein.

247.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

248.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

      (i)    Whether the federal securities laws were violated by Defendants' acts as alleged herein;

      (ii)    Whether statements made by Longtop and the Individual Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Longtop; and

      (iii)    To what extent the members of the Class have sustained damages and the proper measure of damages.

249.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as

the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this Action as a class action.

250.    The prosecution of separate actions by individual Class members would create the risk inconsistent or varying adjudications with respect to the individual Class members, which would establish incompatible standards of conduct for Defendants, or adjudications with respect to individual Class members that would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair their ability to protect their interests.

251.    Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## XIII.   CAUSES OF ACTION

### COUNT I

**Violation of Section 10(b) of the Exchange Act and Rule 10b-5
Promulgated Thereunder Against Longtop and the Individual Defendants**

252.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein. This Count is being brought pursuant to Section 10(b) of the Exchange Act, 15 U.S.C. §78(j)(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. 240.10b-5, on behalf of Plaintiffs and all members of the Class against Longtop and the Individual Defendants.

253.    Throughout the Class Period, Longtop and the Individual Defendants carried out a plan, scheme and course of conduct that:  (i) deceived the investing public, including Plaintiffs and other Class members, as alleged herein; and (ii) caused Plaintiffs and other members of the

78

Class to purchase Longtop's ADSs at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Longtop and each of the Individual Defendants took the actions set forth herein.

254.    Longtop and the Individual Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's ADSs in an effort to maintain artificially high market prices for Longtop's ADSs in violation of Section 10(b) of the Exchange Act and Rule 10b-5.

255.    Longtop and the Individual Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the United States mail, engaged and participated in a continuous course of conduct to conceal adverse material information about Longtop's financial well-being and prospects, as specified herein.

256.    Longtop and the Individual Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Longtop's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Longtop and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

257. Each of the Individual Defendant's primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these Defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these Defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

258. The Individual Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were issued knowingly or recklessly and for the purpose and effect of concealing Longtop's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities.

259. As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Longtop's ADSs was artificially inflated throughout the Class Period. In ignorance of the fact that market prices of the Company's ADSs were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Longtop and the Individual

Defendants, or upon the integrity of the market in which the securities traded, and/or in the absence of material adverse information that was known to or recklessly disregarded by Longtop and the Individual Defendants, Plaintiffs and the other members of the Class acquired Longtop's ADSs during the Class Period at artificially inflated prices and were damaged thereby.

260.   At the time of the misrepresentations and/or omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiffs and the other members of the Class known the truth regarding Longtop's true financial condition and business practices, Plaintiffs and other members of the Class would not have purchased or otherwise acquired Longtop ADSs, or, if they had acquired such ADSs during the Class Period, they would not have done so at the artificially inflated prices that they paid.

261.   By virtue of the foregoing, Longtop and the Individual Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder and are liable to Plaintiffs and the members of the Class, each of whom has been damaged as a result of such violations.

## COUNT II

### Violation of Section 20(a) of the Exchange Act
### Against the Individual Defendants

262.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein. This Count is brought pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. §78t(a), on behalf of Plaintiffs and all members of the Class against the Individual Defendants.

263.   By reason of their positions of control and authority as officers of Longtop, the Individual Defendants had the power and authority to cause Longtop to engage in the wrongful conduct complained of herein.  The Individual Defendants were able to and did control, directly and indirectly, the content of the public statements made by Longtop during the Class Period,

thereby causing the dissemination of the false and misleading statements and omissions of material facts as alleged herein.

264.    As set forth above, Longtop violated Section 10(b) of the Exchange Act by its acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons of Longtop and, as a result of their own aforementioned conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as Longtop is liable under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, to Plaintiffs and other members of the Class who purchased or otherwise acquired Longtop common stock during the Class Period.  Moreover, as detailed above, during the Class Period during which the Individual Defendants served as officers of Longtop, each of the Individual Defendants is responsible for the material misstatements and omissions made by Longtop.

265.    As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's ADSs during the Class Period.

## COUNT III

### Violation of Section 10(b) of the Exchange Act and Rule 10b-5
### Promulgated Thereunder Against DTT

266.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.  This Count is being brought pursuant to Section 10(b) of the Exchange Act, 15 U.S.C. §78(j)(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. 240.10b-5, on behalf of Plaintiffs and all members of the Class against DTT.

267.    Throughout the Class Period, DTT directly and indirectly, by the use of means and instrumentalities of interstate commerce of the United States mail, engaged and participated

in a continuous course of conduct to conceal adverse material information about Longtop, including its true financial results.

268. DTT made untrue and misleading statements of material fact and omitted to state material facts necessary in order to make its statements not misleading. Specifically, DTT knew, or but for its reckless disregard of the truth should have known, that Longtop had fundamentally misrepresented the nature of its business and that its financial statements for the fiscal years ended March 31, 2009 and 2010 were materially misstated and were not presented in conformity with GAAP. In addition, DTT's audit of those financial statements was not performed in accordance with GAAS.

269. The specific false and misleading statements for which DTT is charged with liability under Section 10(b) are certain "expertise" statements contained in Forms 20-F and in the registration statements and prospectuses for Longtop's Secondary Offering, including but not limited to Longtop's financial statements and the notes thereto, as well as DTT's unqualified audit reports on the Company's financial statements issued during the Class Period. As set forth above, for each of Longtop's year-end financial statements issued during the Class Period, DTT stated that it performed its audits in "accordance with the standards of the Public Company Accounting Oversight Board (United States)," that DTT "expressed an unqualified opinion on those financial statements and financial statement schedule," which "present[ed] fairly, in all material respects, the financial position of Longtop. . . . In connection with Longtop's 2009 and 2010 Forms 20-F, DTT also stated that Longtop "maintained, in all material respects, effective internal control over financial reporting."

270. These statements were false and misleading because, *inter alia*, (a) DTT's audits represented an extreme departure from GAAS standards and, therefore, DTT had no reasonable

basis to support its opinion that Longtop's financial statements fairly presented the Company's financial position and results of operations in conformity with GAAP; and (b) DTT had identified material deficiencies in Longtop's internal controls during the Class Period.

271.    In sum, as Longtop's long-time auditor, DTT had unfettered access to Longtop's books and records throughout the audit period, and it certainly had knowledge of GAAP and the requirements of GAAS, as detailed above.  Had DTT conducted its audits in accordance with GAAS, it would have reacted to the numerous, obvious "red flags" set forth above and, in so doing, would have discovered the truth about Longtop's operations.  Instead, DTT ignored those red flags and knowingly or recklessly failed to employ even the most basic procedures designed to detect fraud or to ensure that the financial statements were free from material misstatement.  Thus, in effect, DTT abandoned its role as "independent auditor" and, in the process, knowingly or recklessly issued an unqualified audit opinion on Longtop's materially false and misleading financial statements, which had the effect of artificially inflating Longtop's stock price.  From all of these facts, there is a strong inference that DTT acted with scienter.

272.    Plaintiffs and the members of the Class relied upon either the integrity of the market or upon the statements and reports of DTT in purchasing Longtop ADSs at those artificially inflated prices.

273.    As a direct and proximate result of DTT's conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of Longtop ADSs.  Had Plaintiffs and the other members of the Class known of the material adverse information not disclosed by DTT, or been aware of the truth behind DTT's material misstatements, they would not have purchased Longtop ADSs at artificially inflated prices.

274.   By virtue of the foregoing, DTT has violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder and is liable to Plaintiffs and the members of the Class, each of whom has been damaged as a result of such violation.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

(i)     Determining that this action is a proper class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

(ii)    Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(iii)   Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(iv)    Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated:  March 22, 2013

GRANT & EISENHOFER, P.A.

*D. Elman*

DEBORAH A. ELMAN
DANIEL L. BERGER
485 Lexington Avenue, 29th Floor
New York, NY 10017
(646) 722-8500
(646) 722-8501 (Fax)

*Local Counsel on Behalf of Lead Plaintiffs,*
*Pompano Beach General Employees Retirement*
*System and the Class*


KESSLER TOPAZ MELTZER
    & CHECK, LLP
KIMBERLY A. JUSTICE
JOHN A. KEHOE
JOHN GROSS
280 King of Prussia Road
Radnor, PA 19087
(610) 667-7706
(610) 667-7056 (Fax)

*Lead Counsel on Behalf of Lead Plaintiffs,*
*Pompano Beach General Employees Retirement*
*System and the Class*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE LONGTOP FINANCIAL
TECHNOLOGIES LIMITED SECURITIES
LITIGATION

Civil Action No. 11-cv-3658-SAS

**JURY TRIAL DEMANDED**

**ECF CASE**

### CERTIFICATE OF SERVICE

I hereby certify that on March 22, 2013, copies of the Amended Consolidated Class

Action Complaint were prepared and served pursuant to the Court's March 22, 2013 directive

upon the following counsel of record or *pro se* parties in the action filed in this Court via e-mail:

| | |
|---|---|
| Gary F. Bendinger<br>Gazeena K. Soni<br>SIDLEY AUSTIN LLP<br>787 Seventh Avenue<br>New York, NY 10019<br>gbindinger@sidley.com<br>gsoni@sidley.com<br>*Attorneys for Defendant Deloitte Touche*<br>*Tohmatsu CPA Ltd.* | Derek Palaschuk<br>4326 Dunbar Street<br>P.O. Box 45117 Dunbar<br>Vancouver BC, Canada<br>V6S 2m8<br>*Pro Se* |

D. Elman

Deborah A. Elman