UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————— ——————— ————— X

IN RE LONGTOP FINANCIAL                    OPINION AND ORDER
TECHNOLOGIES LIMITED
SECURITIES LITIGATION                           11 Civ. 3658

———————— ——————— ————— X



SHIRA A. SCHEINDLIN, U.S.D.J.:

## I.    INTRODUCTION

         Lead plaintiffs Danske Invest Management A/S and Pension Funds of

Local No. One, I.A.T.S.E. (collectively, "Lead Plaintiffs"), as well as additional

plaintiff Pompano Beach General Retirement System (together with Lead

Plaintiffs, "Plaintiffs"), bring this putative class action on behalf of themselves and

others similarly situated (the "Class") against Longtop Financial Technologies,

Ltd. ("Longtop"), its former director and CEO Weizhou Lian a/k/a Wai Chau, its

former CFO Derek Palaschuk (together with Weizhou Lian, the "Individual

Defendants"), and its auditor Deloitte Touche Tohmatsu CPA Ltd. ("DTTC").  The

Class consists of all persons and entities who purchased American Depositary

Shares ("ADSs") of Longtop Financial Technologies, Ltd. on the New York Stock Exchange ("NYSE") during the period October 24, 2007 through May 17, 2011, inclusive (the "Class Period"), and who were allegedly damaged thereby. Lead Plaintiffs assert three causes of action for: violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder against Longtop and the Individual Defendants (Count One); violation of Exchange Act Section 20(a) against the Individual Defendants (Count Two); and violation of Section 10(b) and Rule 10b-5 against DTTC (Count Three).

Previously, DTTC successfully moved to dismiss Count Three of the Consolidated Class Action Complaint ("CAC") for failure to state a claim. Lead Plaintiffs subsequently filed the Amended Consolidated Class Action Complaint (the "Amended Complaint"), using discovery obtained from Palaschuk, who had unsuccessfully moved to dismiss prior to DTTC's appearance in the case. At a hearing held on January 8, 2013, DTTC orally moved to dismiss the Amended Complaint on the basis that the use of discovery to support the Amended Complaint violates the Private Securities Litigation Reform Act of 1995 ("PSLRA") stay of discovery, and I denied this motion.[1] Presently before the Court is DTTC's motion to dismiss the Amended Complaint under Federal Rule of

---

[1]     *See* 1/8/13 Hearing Transcript ("Hr'g Tr.") at 6:11-24:23.

Civil Procedure ("Rule") 12(b)(6).  For the following reasons, the motion is granted.

## II.     BACKGROUND

### A.     Procedural Posture

I issued an Opinion and Order (the "Dismissal Opinion") granting DTTC's motion to dismiss Count Three of the CAC on November 14, 2012.[2]  The Dismissal Opinion rested on the grounds that the CAC failed to adequately allege: (1) scienter on the part of DTTC;[3] and (2) that DTTC's Class Period audit opinions contained material misrepresentations of fact, *i.e.*, statements "grounded on a specific factual premise that is false, and that [DTTC] did not 'genuinely or reasonably believe . . . .'"[4]  Lead Plaintiffs were granted leave to amend within thirty days of the Order,[5] and subsequently filed the Amended Complaint, which draws support from documents that Lead Plaintiffs received in response to discovery requests served on Palaschuk.[6]

---

[2]      *See In re Longtop Fin. Techs. Ltd. Secs. Litig.*, No. 11 Civ 3658, 2012 WL 5512176 (S.D.N.Y. Nov. 14, 2012).

[3]      *See id*. at *9.

[4]      *Id*. at *10 (quoting *In re International Bus. Mach. Corp. Secs. Litig.*, 163 F.3d 102, 107 (2d Cir. 1998)).

[5]      *Id*.

[6]      *See* 1/8/13 Hr'g Tr. at 38:15-39:23.

**B.      Summary of Facts Re-Alleged in the Amended Complaint**

This section summarizes factual allegations common to the Amended Complaint and the CAC. These facts were previously described in the Dismissal Opinion,[7] and are presumed to be true for the purposes of this motion.

Claim Three of the CAC charged DTTC with violating Section 10(b) and Rule 10b-5 by issuing unqualified audit opinions on behalf of Longtop between June 29, 2009 and May 17, 2011. During this period, Longtop reported very strong financial results, but these results were inflated by its fraud. Longtop's fraudulent actions included hiring its employees through a shell company, Xiamen Longtop Human Resources ("XLHRS"), in order to hide its true cost of revenue; falsifying its cash position and bank loan balances by manipulating its bank records; and interfering with DTTC's audits.

Beginning on April 26, 2011, Longtop's fraud began to unravel as short-sellers began issuing reports calling Longtop's financial results into question. On May 23, 2011, Longtop announced that DTTC had resigned as its outside auditor. That same day, DTTC released to the public a letter (the "Resignation Letter") revealing that DTTC's attempt to conduct a second round of bank

---

[7]       *See In re Longtop*, 2012 WL 5512176, at *1-3. Familiarity with the Dismissal Opinion is presumed, including its use of short forms to refer to accounting concepts and entities such as the PCAOB.

-4-

confirmations at Longtop had been cut short by Longtop's deliberate interference. The Resignation Letter further stated that Longtop's CEO had admitted that Longtop's books were fraudulent, and that DTTC had resigned due to this admission and Longtop's deliberate interference with its audit.  The letter concluded by suggesting that Longtop investigate its liability under the securities laws.  Subsequently, the NYSE halted trading on Longtop's ADSs on May 27, 2011, began delisting proceedings against Longtop on July 22, 2011, and delisted Longtop on August 29, 2011.

  **C.**  **New Facts Alleged in the Amended Complaint**

    The Amended Complaint lengthens the class period alleged in the CAC by including allegations relating to two additional audit opinions by DTTC. The Amended Complaint also adds four categories of substantive allegations to the CAC, concerning: (1) internal control deficiencies and risk factors at Longtop; (2) confirmation of revenue contract terms; (3) information DTTC received from third parties; and (4) XLHRS and Longtop's social welfare payments.  These additions to the CAC are summarized below.

    **1.**  **Extended Class Period**

    The Amended Complaint adds allegations based on audit opinions of DTTC's that were publicized on October 24, 2007 and July 1, 2008, thereby

lengthening the class period.[8]  Count Three of the Amended Complaint therefore rests on audit opinions issued by DTTC in connection with: (1) Longtop's October 24, 2007 SEC Rule 424(b)(4) prospectus, issued in connection with its initial public offering;[9] (2) Longtop's 2008 Form 20-F, issued on July 1;[10] (3) Longtop's 2009 Form 20-F, issued July 29;[11] (4) Longtop's November 17, 2009 secondary offering;[12] and (5) Longtop's 2010 Form 20-F, issued on July 16.[13]

The circumstances surrounding the October 2007 audit opinion are as follows.  In preparation for Longtop's U.S. IPO, DTTC was engaged in 2006 to audit the consolidated financial results that Longtop had reported, under the Chinese version of GAAP, for the years 2004-2006 and for the three month period ending in March 31, 2007.[14]  Longtop's October 24, 2007 Rule 424(b)(4) prospectus incorporated the results of this audit, including statements by DTTC

---

[8]      *See* Amended Consolidated Class Action Complaint ("Am. Compl.") ¶¶ 10, 33, 40, 95-103, 111, 140, 162-165, 173, 175-176.

[9]      *See id*. at ¶¶ 162-163.

[10]      *See id*. ¶¶ 172-173.

[11]      *See id*. ¶¶ 189-190.

[12]      *See id*. ¶ 202.

[13]      *See id*. ¶¶ 213-215.

[14]      *See id*. ¶ 163.

that "'[it] conducted [its] audits in accordance with the standards of the Public Company Accounting Oversight Board (United States) [("PCAOB")][;]'" and that Longtop's "'consolidated financial statements present fairly, in all material respects, [its] financial position . . . as of December 31, 2006 and 2006 and March 31, 2007, in conformity with [United States GAAP.]'"[15]  The prospectus also quoted DTTC stating that: "'[Longtop] is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting . . . .'"[16]

### 2.   New Substantive Allegations

#### a.   Internal Control Deficiencies and Risk Factors

Plaintiffs alleges that DTTC was aware of internal control deficiencies at Longtop at least as early as 2007, and of "red flags at Longtop that gave rise to a significant risk of management fraud" at least as early as May 2008,[17] but that DTTC nevertheless issued audit opinions on March 31, 2009 and 2010 stating that, in its opinion, Longtop had "'maintained, in all material respects, effective internal control over its financial reporting.'"[18]  The Amended Complaint supports these

---

[15]   *Id*. (quoting 10/24/07 Longtop SEC Rule 424(b)(4) Prospectus).

[16]   *Id*.

[17]   *Id*. ¶ 95.

[18]   *Id*. ¶ 97 (quoting Longtop 2009 and 2010 Forms 20-F).  *See id*. ¶¶ 95-106.

allegations with references to the following documents: (1) an agenda for a May 29, 2007 meeting with Longtop's audit committee at DTTC's offices; (2) draft meeting minutes for a November 15, 2007 Longtop Audit Committee meeting at DTTC's offices; (3-4) management letters prepared by DTTC to be sent to Longtop's Board of Directors, dated June 29 and August 2, 2007; (5) the draft minutes of a February 20, 2008 meeting between Longtop's Audit Committee and DTTC; (6) a presentation that DTTC made to Longtop on May 26, 2008; (7) a presentation that DTTC made to Longtop on May 26, 2009; and (8) a presentation that DTTC made to Longtop on August 12, 2010.[19]

The first four of these documents arose out of the auditing work that DTTC performed in advance of Longtop's U.S. IPO.  Plaintiffs allege that the May 29, 2007 meeting agenda states that "'[m]aterial weaknesses/significant deficiencies may exist' within Longtop's internal controls[,]" and that "'Deloitte will provide [a] management letter'" explaining these potential deficiencies.[20]  It further alleges that the November 15, 2007 draft meeting minutes state that "'[m]aterial weaknesses/significant deficiencies may exist and a lot of work is

---

[19]     *See id.*

[20]     *Id.* ¶ 99 (quoting 5/29/07 Longtop Audit Committee Meeting Agenda).

required.'"[21]  Finally, the June 29 and August 2, 2007 management letters prepared by DTTC to be sent to Longtop's Board of Directors state that DTTC had "'considered [Longtop's] internal controls over financial reporting as a basis for designating audit procedures that are appropriate in the circumstances[,]" and, after this review, had identified "certain matters involving [Longtop's] internal control over financial reporting that [DTTC] consider[ed] to be material weaknesses or significant deficiencies under standards established by the PCAOB[,]" as well as "other control deficiencies involving [Longtop's] internal control over financial reporting as of March 31, 2007."[22]

Plaintiffs allege that, as of Longtop's IPO, DTTC knew of a risk of management override and of problems with Longtop's reporting department, but that "nothing was done to alert the investing public of these deficiencies."[23] However, the Form F-1 filed by Longtop on October 2, 2007 discloses that Longtop was a privately held company, with "limited accounting personnel" prior to its IPO, and that DTTC had identified a "material weakness for 2006[,]" and a

---

[21]     *Id*. (quoting 11/15/07 Longtop Audit Committee Meeting Minutes).

[22]     8/2/07 Letter from DTTC to Longtop Board of Directors (cited in Am. Compl. ¶ 100), Ex. C to 1/25/13 Declaration of Elizabeth L. Howe in Support of Deloitte Touche Tohmatsu CPA Ltd.'s Motion to Dismiss ("Howe Decl."), at 1.

[23]     Am. Compl. ¶ 102.

"significant deficiency and a large number of other deficiencies in [Longtop's]

internal controls" for 2006 and the three months ending in March 31, 2007.[24]

       The remaining documents referenced in this portion of the Amended

Complaint were created after Longtop's IPO.  Plaintiffs allege that the phrase

"[m]aterial weaknesses/significant deficiencies may exist and a lot of work is

required[,]" is repeated in the draft minutes of the February 20, 2008 meeting, and

that these minutes also state that "[s]ignificant work [is] required in [Longtop's]

corporate reporting department."[25]  It further alleges that DTTC's May 26, 2008

presentation states that Longtop was "under significant pressure of [sic]

profitability or trend level expectations of [sic] . . . external parties (particularly

---

[24]     10/2/07 Longtop Form F-1, Prospectus, Ex. C to 1/25/13 Declaration of Gazeena K. Soni in Support of Defendant DTTC's Motion to Dismiss ("Soni Decl."), at 21.  I take judicial notice of the full contents of this SEC filing, which partially forms the basis for the Amended Complaint's claim under the Exchange Act.  For similar reasons, I also take judicial notice of the other documents quoted or referenced in the Amended Complaint that bear on the veracity of the statements that DTTC made in documents publicly filed with the SEC.  *See In re Morgan Stanley Info. Fund Secs. Litig.*, 592 F.3d 347, 355 & 355 n.1 (2d Cir. 2010) (citations omitted).  *See also Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991) ("[A] district court may take judicial notice of the contents of relevant public disclosure documents required to be filed with the SEC as facts 'capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.'  This of course includes related documents that bear on the adequacy of the disclosure as well as documents actually alleged to contain inadequate or misleading statements.") (quoting Fed. R. Evid. 201(b)(2)).

[25]     Am. Compl. ¶ 101 (quotation marks omitted) (alterations in original).

expectations that are unduly aggressive or unrealistic), including expectations created by management[,]"[26] as well as stating that Longtop's "current internal controls may not meet the evolving demands in business, . . . caus[ing] additional management and control risk for [Longtop]," including the "potential risk of management override of control."[27]

Plaintiffs allege that in a follow-up presentation, dated May 26, 2009 and titled "Longtop Technologies Limited [Sarbanes-Oxley ("SarBox")] 404 Attestation Status Update," DTTC noted that its planned response to the audit risks that it had identified at Longtop would be to "[i]ncrease professional skepticism of all personnel involved in the audit engagement."[28]  It further alleges that, despite this planned response, in an August 12, 2010 presentation titled "[Fiscal Year] 2011 Client Service Plan," DTTC identified the same internal control deficiencies and risk factors, and noted that it intended to "perform a test of internal controls or substantive procedures . . . ."[29]  On the basis of these facts, the Amended Complaint alleges that DTTC "should have issued an adverse opinion on

---

[26]    *Id.* ¶ 95 (quotation marks omitted) (emphasis removed).

[27]    *Id.* ¶ 96 (quotation marks omitted).

[28]    *Id.* ¶¶ 103-104.

[29]    *Id.* ¶ 104.

Longtop's internal controls over financial reporting as of March 31, 2009 and 2010, communicated that material weaknesses existed in Longtop's internal controls, and informed investors that the Company's internal control over financial reporting was not effective."[30]

### b.    Confirmation of Revenue Contract Terms

The second category of new allegations in the Amended Complaint relates to DTTC's failure to confirm the terms of Longtop's major revenue contracts.  As an initial matter, the Amended Complaint notes that the August 2 and June 19, 2007 letters that DTTC sent to Longtop stated that "[b]ank reconciliation procedures and review . . . were not documented as part of the accounts closing process[,]" and recommended that "[b]ank reconciliation statements should be prepared and reviewed by an independent supervisor on a timely basis to ensure that cash items are properly recorded."[31]

Plaintiffs then allege that in April 2009, a Longtop officer informed a DTTC employee that obtaining direct confirmation of Longtop's major revenue contracts would unduly delay the filing of Longtop's Form 20-F for the fiscal year

---

[30]    *Id*. ¶ 106.

[31]    *Id*. ¶ 111 (quotation marks omitted) (alterations in original).

ending March 31, 2009.[32]  After a back-and-forth between the Longtop officer, Palaschuk, and the DTTC auditor, during which the DTTC auditor initially insisted that "confirmation is a required procedure[,]" the DTTC auditor eventually acceded to Longtop's request that the revenue contracts be confirmed through alternate revenue testing.[33]

Plaintiffs allege that, had DTTC insisted on directly confirming the revenue contracts, it would have discovered Longtop's fraud.[34]  It supports this allegation with reference to a series of e-mails sent by Palaschuk to Longtop's CEO in 2008, in which Palaschuk states that "Longtop has a culture where they book accounting entries without contracts, which I have never seen [] in a company[,]" and further states that Longtop's accountants "rely upon [invoices] and hand written descriptions" rather than actual contracts in booking revenues, despite the fact that those "documents [could easily] be forged."[35]

### c.   Information from Third Parties

---

[32]    *See id.* ¶ 115.

[33]    *See id.* ¶¶ 115-119.

[34]    *See id.* ¶ 123.

[35]    *Id.* (quotation marks omitted) (alterations in original).

The third category of new allegations in the Amended Complaint relates to three instances where information which allegedly should have put DTTC on notice of Longtop's fraud was brought to DTTC's attention by third parties.[36] *First*, the Amended Complaint alleges that Wedge Partners, a U.S. equity analyst, published three reports (the "Wedge Reports") on February 4, February 11, and March 23, 2010, calling into question Longtop's staffing arrangement with XLHRS.[37]

*Second*, Plaintiffs allege that in October 2010 — several months after the publication of Longtop's 2010 Form 20-F, containing the final Class Period statement made by DTTC — partners in DTTC's Beijing office met with the CFO of YTEC, one of Longtop's chief competitors and a company which had long accused Longtop of over-reporting revenue.[38] At this meeting, YTEC's CFO allegedly informed DTTC's Beijing partners of potential improprieties at Longtop, whereupon the Beijing partners informed DTTC's Shanghai branch, which was tasked with auditing Longtop.[39] The Amended Complaint further alleges that an

---

[36]     *See id.* ¶¶ 124-132.

[37]     *See id.* ¶¶ 125-127.

[38]     *See id.* ¶ 128.

[39]     *See id.*

audit partner at DTTC subsequently told Palaschuk that, because the matter was discussed by DTTC's Beijing Partners, it was "very high profile," and as such, DTTC had to perform "additional [audit] procedures."[40]

　　　　*Third*, Plaintiffs allege that on November 2, 2010, a meeting was held between Longtop and DTTC, and that the meeting minutes reveal that the purpose of the meeting was to discuss "market rumors" that had been brought to Longtop's attention.[41]  These rumors included questions as to Longtop's above market margins, its use of XLHRS, and whether its software development revenue from China Construction Bank ("CCB") was overstated.[42]

　　　　Regarding CCB, the meeting minutes state that "[a] person at CCB had questioned Longtop's more than US$30 million in 2010 fiscal revenue from CCB and said the number was closer to 'Rmb30 million,' Longtop has no standardized software contracts with CCB and that Longtop was not an approved vendor at CCB."[43]  The minutes go on to state that Longtop had arranged for analysts concerned about its relationship with CCB to meet with "CCB people in

---

[40]　　*Id*. (quotation marks omitted) (alterations in original).

[41]　　*Id*. ¶ 129 (quotation marks omitted).

[42]　　*See id*.

[43]　　Minutes from Meeting with [DTTC] on Nov[ember] 2, 2010 at Longtop Xiamen Office ("11/2/10 Meeting Minutes"), Ex. M to Howe Decl., at 0107689.

the Beijing development center," and concludes that "[f]rom an investor relations

point of view, as these allegations are untrue, they will work themselves out."[44]

　　　　　Plaintiffs allege that at the meeting, DTTC suggested that Longtop

hire an independent consultant to investigate Longtop's revenues from CCB, but

that Longtop rejected the suggestion.[45]  The meeting minutes reveal that DTTC

made this suggestion despite the fact that it had "seen no indications of fraud or

that Longtop's revenue from CCB is inaccurate[,]" and that Longtop stated that it

"would confirm with . . . legal counsel whether . . . an investigation was

necessary."[46]

　　　　　Regarding XLHRS, the minutes state that:

> Deloitte was aware of questions in the market over Longtop's use
> of third party outsourcing companies and that Longtop had held
> a conference call with investors in March 2010 to address this
> issue.  There were no accounting issues as this structure had been
> used for almost 4 years, is supported by legal opinions, disclosed
> in the 20F and the agreements are on file with the SEC.  No
> followup required.[47]

---

[44]　　*Id.*

[45]　　*See* Am. Compl. ¶ 130.

[46]　　11/2/10 Meeting Minutes at 107690.

[47]　　*Id.*

Finally, the minutes state that, at the meeting, Longtop's management gave a number of explanations for Longtop's above-market margins, including, *e.g.*, "[a] comprehensive high quality solution offering and a wide customer base allowing the efficient cross selling of solutions[,]" heavy use of modular, proprietary intellectual property, and a back-office in Xiamen (which was cheap relative to Beijing).[48]  Based on these explanations, the meeting minutes state that no follow-up was required regarding Longtop's above-market margins.[49]

### d.    Welfare Payments

The fourth category of new allegations against DTTC in the Amended Complaint relates to Longtop's underpayment of its welfare obligations.[50]  The upshot of these allegations is that DTTC was aware that Longtop was using XLHRS to evade paying its employee welfare obligations under Chinese law, and that it was therefore reckless for not investigating further and ferreting out XLHRS's alleged role in Longtop's fraud.[51]  (In addition, the Amended Complaint

---

[48]     *Id*. at 107691.

[49]     *Id*.

[50]     *See* Am. Compl. ¶¶ 133-161.

[51]     *See id*. ¶ 160 ("Given DTT[C]'s awareness of significant red flags suggesting that Longtop was seeking to use XLHRS to . . . evade its government-mandated welfare obligations, DTT[C]'s failure to undertake any meaningful investigation with respect to these interrelated party transactions with XLHRS . . .

repeats the allegation of the CAC that DTTC was reckless in stating that XLHRS and Longtop were not related parties in audit opinions incorporated in Longtop's 2008, 2009, and 2010 Forms 20-F).[52]

Plaintiffs allege that DTTC knew that Longtop had underpaid its social welfare obligations at least as early as 2007.[53]  It supports this allegation with reference to the agenda prepared for a May 29, 2007 meeting between DTTC and Longtop.[54]  This agenda reveals that Longtop had based its level of welfare payments for the years 2004-2006 — prior to the Class Period — on its interpretation of welfare law, and that, on the basis of this interpretation, it had made welfare payments of $475,000, while accruing a liability of $1,258,000 for its "maximum potential welfare payment[] . . . ."[55]  The agenda further notes that Longtop had transferred approximately eight hundred employment contracts to XLHRS, but had not "accrued for interest or penalties on the basis [that] the likelihood is remote and the amounts are unknown."[56]

was, at the very least, reckless.").

[52]     *See id.* ¶ 133.

[53]     *See id.* ¶ 140.

[54]     *See id.*

[55]     *Id.*

[56]     *Id.*

Plaintiffs further allege that, in a memo to file dated July 28, 2008, a Longtop officer noted that Longtop had underpaid its welfare obligations in fiscal years 2004 through 2006, but had accrued additional expenses in case of an investigation by the Chinese government.[57]  This accrued liability was to be written off if a government investigation failed to arise within five years.[58] The Amended Complaint does not allege that DTTC was aware of this memo during the Class Period.

Plaintiffs then allege that in an April 8, 2010 e-mail, Palaschuk inquired of DTTC whether it would be permissible under U.S. GAAP for Longtop, in calculating its 2011 budget, to use the city average salary, rather than the employee's actual salary.[59]  Palaschuk's e-mail further stated that, in practice, most Chinese companies used city average salary rather than actual salary.[60]  An auditor at DTTC replied that, under Xiamen's social welfare regulations, actual salary must be used unless the employee's average monthly salary is less than sixty percent of, or over three hundred percent of, the city average.[61]

---

[57]     *See id.* ¶ 141.

[58]     *See id.*

[59]     *See id.* ¶ 142.

[60]     *See id.*

[61]     *See id.*

Plaintiffs allege that Palaschuk sent an e-mail to DTTC on December 8, 2010, stating that Longtop's welfare payment practices passed the "smell test" because they were similar to those of DTTC's other clients.[62]  Based on meeting minutes, Plaintiffs further allege that on December 13, 2010, DTTC and Longtop met and discussed "ways to reduce Longtop's average welfare rate . . . ."[63]  It also alleges that a redlined draft of these meeting minutes shows that two entries were initially included within, but eventually deleted from, the meeting minutes: (1) "DTTC internally to review" Longtop's assertion that its welfare payments met the "smell test"; and (2) "Longtop to check whether feasible to have a clean certificate from the social welfare bureau with regard to historical welfare payments."[64]

Plaintiffs alleges that during this period, DTTC asked probing questions about Longtop's welfare payment scheme.  For example, around the time of the December 13 meeting, an auditor at DTTC wrote to Longtop inquiring why XLHRS was a net creditor of Longtop.[65]

---

[62]     *See id.* ¶ 144.

[63]     *Id.* ¶ 145.

[64]     *Id.*

[65]     *See id.* ¶ 146.

Plaintiffs next allege that on December 19, 2010, Palaschuk wrote an e-mail to DTTC reiterating that in practice, Chinese companies routinely used employees' average, rather than actual, salaries in order to compute welfare payments, and advising DTTC that Longtop had received a legal opinion stating that its methodology for computing welfare payments was permissible under Chinese law and, therefore, GAAP compliant.[66]  DTTC replied that the legal opinion was ambiguous because it did not specifically address XLHRS, and, in particular, whether Longtop could be jointly liable with XLHRS if XLHRS's welfare liability were increased.[67]  In light of this ambiguity, DTTC requested that Palaschuk send "a separate analysis only on those employees contracted from [XLHRS]."[68]

Plaintiffs allege that DTTC and Longtop subsequently discussed Longtop's welfare payments at a January 28, 2011 meeting with Longtop's Audit Committee.[69]  A draft agenda prepared for this meeting reveals that Longtop had received a legal opinion stating that its arrangement with XLHRS was in accord

---

[66]     *See id.* ¶ 147.

[67]     *See id.* ¶¶ 148-149.

[68]     *Id.* ¶ 149 (quotation marks omitted) (emphasis removed).

[69]     *See id.* ¶ 151.

with Chinese law, and that it had "no [potential for] joint liability to the government or [XLHRS] for any underpa[yment] [of] social welfare . . . ."[70] Plaintiffs further allege that redlines to the January 28, 2011 meeting agenda reveal that DTTC was not satisfied with the legal opinion that Longtop had received: instead, it raised questions about whether Longtop could be liable directly to the employees of XLHRS for XLHRS's underpayments of welfare.[71]

Plaintiffs allege that in a February 18, 2011 e-mail to DTTC, Palaschuk once again stated that Chinese routinely used average salary to compute their welfare payments, but acknowledged that, under U.S. GAAP, Longtop could not rely on such practices if they were inconsistent with the law.[72]  In the same e-mail, Palaschuk proposed obtaining a confirmation from the local Chinese social welfare bureau stating that Longtop's policies complied with Chinese law.[73] Plaintiffs further allege that DTTC replied to Palaschuk that, under U.S. GAAP, Longtop was obligated to record its legal obligation, not its actual payments.[74]  In response, Palaschuk provided DTTC with a draft opinion from its law firm, Global

---

[70]     *Id*. (quotation marks omitted).

[71]     *See id*. ¶ 152.

[72]     *See id*. ¶ 153.

[73]     *See id*.

[74]     *See id*. ¶ 154.

Law Office, and stated that, on the basis of this opinion, Longtop believed it had no liability under U.S. GAAP for social welfare payments.[75]

Plaintiffs allege that on March 8, 2011, DTTC and Palaschuk convened a conference call to discuss Longtop's welfare obligations.[76]  After this conference call, Palschuk sent an e-mail to Longtop executives stating that DTTC had consented to Longtop's use of a confirmation from the welfare bureau, and noting that "[DTTC] said they may want to meet with the welfare bureau but I think we can refuse this request."[77]  In the same e-mail, Palaschuk stated that he was "not 100% sure [DTTC] will accept our treatment but we will try our best."[78] Finally, Plaintiffs allege that DTTC ultimately accepted Longtop's use of a confirmation from the welfare bureau, and that on March 14, 2011, an auditor at DTTC "edited the draft legal opinion that Longtop had obtained from [its law firm]."[79]

Plaintiffs also allege that in July 2010, Longtop's Chairman gifted twenty thousand Longtop shares to defendant Lian's brother, who then worked as a

---

[75]    *See id.*

[76]    *See id.* ¶ 157.

[77]    *Id.* (quotation marks omitted).

[78]    *Id.* (quotation marks omitted).

[79]    *Id.* ¶ 158.

clerk for the local tax bureau.[80]  Plaintiffs insinuate that this gift was a bribe intended to secure for Longtop a confirmation that its welfare practices were in accord with Chinese law,[81] and, based on a May 12, 2011 memo to file by Palaschuk, alleges that Longtop recorded this gift as CEO compensation, rather than disclosing it to the public.[82]  Plaintiffs further allege that "DTTC was seeking to avoid specifically disclosing that the gift was to Lian's brother, and agreed [that] this is a little murky."[83]

## III.   STANDARD OF REVIEW

### A.   Rule 12(b)(6) Motion to Dismiss

A pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."[84]  "Such a statement must [] 'give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.'"[85]  In deciding a motion to dismiss pursuant to Rule 12(b)(6), the court

---

[80]     *See id.* ¶ 155.

[81]     *See id.*

[82]     *See id.* ¶ 155.

[83]     *Id.* (quotation marks omitted) (alteration in original).

[84]     Fed. R. Civ. P. 8(a)(2).

[85]     *See Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512 (2002) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957), *overruled in part on other grounds by Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 561-563 (2007)).

"must accept all non-conclusory factual allegations as true and draw all reasonable inferences in the plaintiff's favor."[86]

For the purposes of such motion, ". . . a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint."[87]  "Limited quotation does not constitute incorporation by reference."[88]  However, the court may consider a document that is not incorporated by reference "where the complaint 'relies heavily upon its terms and effect,' thereby rendering the document 'integral' to the complaint."[89]  Moreover, when a securities fraud complaint alleges that material misstatements or omissions were made in public documents required to be filed

---

[86]    *Simms v. City of New York*, No. 11 Civ. 4568, 2012 WL 1701356, at *1 (2d Cir. May 16, 2012) (citing *Goldstein v. Pataki*, 516 F.3d 50, 56 (2d Cir. 2008)).

[87]    *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (citing *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002)).

[88]    *Cosmas v. Hassett*, 886 F.2d 8, 13 (2d Cir. 1989) (quotation marks, citations, and alteration omitted).  *Accord Sira v. Morton*, 380 F.3d 57, 67 (2d Cir. 2004) (citation omitted).

[89]    *Id*. (quoting *Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006)).  *Accord Global Network Commc'ns, Inc. v. City of N.Y.*, 458 F.3d 150, 156 (2d Cir. 2006).

with the SEC, a court may take judicial notice of such documents, as well as "related documents that bear on the adequacy of the disclosure . . . ."[90]

The court evaluates the sufficiency of the complaint under the "two-pronged approach" suggested by the Supreme Court in *Ashcroft v. Iqbal*.[91]  Under the first prong, a court "'can . . . identify[] pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth.'"[92]  Thus, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to withstand a motion to dismiss.[93]

Under the second prong of *Iqbal*, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief."[94]  A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the

---

[90]     *Kramer*, 937 F.2d at 774.  *Accord Staehr v. Hartford Fin. Servs. Group, Inc.*, 547 F.3d 406, 425 (2d Cir. 2008).

[91]     556 U.S. 662, 678-79 (2009).

[92]     *Hayden v. Paterson*, 594 F.3d 150, 161 (2d Cir. 2010) (quoting *Iqbal*, 556 U.S. at 679).  *Accord Ruston v. Town Bd. for Town of Skaneateles*, 610 F.3d 55, 59 (2d Cir. 2010).

[93]     *Iqbal*, 556 U.S. at 663 (citing *Twombly*, 550 U.S. at 555).

[94]     *Id.* at 679.  *Accord Kiobel v. Royal Dutch Petroleum Co.*, 621 F.3d 111, 124 (2d Cir. 2010).

reasonable inference that the defendant is liable for the misconduct alleged."[95]

Plausibility "is not akin to a probability requirement;" rather, plausibility requires

"more than a sheer possibility that a defendant has acted unlawfully."[96]

### B.   Heightened Pleading Standard under Rule 9(b) and the PSLRA

Private securities fraud claims are subject to a heightened pleading

standard.[97] *First*, Rule 9(b) requires that the circumstances constituting fraud be

alleged with particularity, although "[m]alice, intent, knowledge, and other

conditions of a person's mind may be alleged generally."

*Second*, the PSLRA further heightens the pleading standard in private

securities fraud cases by providing that:

> In any private action arising under this chapter in which the
> plaintiff may recover money damages only on proof that the
> defendant acted with a particular state of mind, the complaint
> shall, with respect to each act or omission alleged to violate this
> chapter, state with particularity facts giving rise to a strong
> inference that the defendant acted with the required state of
> mind.[98]

---

[95]   *Iqbal*, 556 U.S. at 678 (quotation marks omitted).

[96]   *Id.* (quotation marks omitted).

[97]   *See Meridian Horizon Fund, LP v. KPMG (Cayman)*, Nos.
11–3311–cv, 11–3725–cv, 2012 WL 2754933, at *2 (2d Cir. July 10, 2012).

[98]   15 U.S.C. § 74u-4(b)(2).

A plaintiff has alleged facts giving rise to a "strong inference" of scienter "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."[99]  In deciding whether the plaintiff has alleged facts showing a strong inference of scienter, "a court must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff."[100]  The inquiry is holistic, *i.e.* the allegations going to scienter are to be evaluated collectively.[101]

In addition to requiring that scienter be pleaded with specificity, the PSLRA further provides that the complaint in a private securities fraud case must:

> specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, . . . state with particularity all facts on which that belief is formed.[102]

---

[99]   *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007).

[100]   *Id*. at 323-24.

[101]   *See id*. at 326.

[102]   15 U.S.C. § 78u-4(b)(1)(B).  *Cf. Saltz v. First Frontier, L.P.*, 485 Fed. App'x 461, 463 (2d Cir. 2012) ("[W]hile we normally draw reasonable inferences in the non-movant's favor on a motion to dismiss, the PSLRA establishes a more stringent rule for inferences involving scienter because the PSLRA requires particular allegations giving rise to a strong inference of scienter.") (quotation marks and citations omitted).

## IV.   APPLICABLE LAW

### A.   Section 10(b) of the Securities Exchange Act and SEC Rule 10b-5

Section 10(b) of the Securities Exchange Act of 1934 makes it illegal to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe . . . ."[103]  Under Rule 10b-5, promulgated by the SEC under Section 10(b), one may not "make any untrue statement of a material fact or [] omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading . . . in connection with the purchase or sale of any security."[104]  Although Section 10(b) does not expressly provide for a private right of action, courts have long recognized an implied private right of action under Section 10(b) and Rule 10b-5.[105]

---

[103]   15 U.S.C. § 78j(b).

[104]   17 C.F.R. § 240.10b-5.

[105]   *See Kardon v. National Gypsum Co.*, 69 F. Supp. 512 (E.D. Pa. 1946) (first case to recognize implied private right of action under Section 10(b)); *Superintendent of Ins. v. Bankers Life & Cas. Co.*, 404 U.S. 6, 13 n.9 (1971) (noting that "[i]t is now established that a private right of action is implied under [Section] 10(b).").

"To sustain a private claim for securities fraud under Section 10(b), 'a plaintiff must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.'"[106]  There is no secondary liability under Section 10(b),[107] but "secondary actors like accountants may be held liable as primary violators if all the requirements for primary liability are met . . . ."[108]

## 1.    Misstatements or Omissions of Material Fact

In order to satisfactorily allege misstatements or omissions of material fact, a complaint must "state with particularity the specific facts in support of [plaintiffs'] belief that [defendants'] statements were false when made."[109]  "For the purposes of Rule 10b-5, the maker of a statement is the person or entity with

---

[106]    *Ashland Inc. v. Morgan Stanley & Co., Inc.*, 652 F.3d 333, 337 (2d Cir. 2011) (quoting *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008)).  *Accord Erica P. John Fund, Inc. v. Halliburton Co.*, — U.S. — , 131 S.Ct. 2179, 2184 (2011).

[107]    *See Central Bank of Denver N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 191 (1994).

[108]    *Wright v. Ernst & Young LLP*, 152 F.3d 169, 175 (2d Cir. 1998) (quoting *Central Bank*, 511 U.S. at 191).

[109]    *Rombach v. Chang*, 355 F.3d 164, 172 (2d Cir. 2004) (quotation marks omitted).

ultimate authority over the statement, including its content and whether and how to communicate it."[110]

      "'[A] fact is to be considered material if there is a substantial likelihood that a reasonable person would consider it important in deciding whether to buy or sell [securities] . . . .'"[111]  In situations "'[w]here plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information.'"[112]  Mere "allegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim of securities fraud."[113]  "[A]n omission is actionable when the failure to disclose renders a statement misleading."[114]

      **2.    Scienter**

---

[110]    *Janus Capital Grp., Inc. v. First Derivative Traders*, — U.S. —, 131 S.Ct. 2296, 2302 (2011).

[111]    *Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 92–93 (2d Cir. 2010) (quoting *Azrielli v. Cohen Law Offices*, 21 F.3d 512, 518 (2d Cir. 1994)).

[112]    *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 197 (2d Cir. 2008) (quoting *Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000)).

[113]    *Id.  Accord Rothman v. Gregor*, 220 F.3d 81, 90 (2d Cir. 2000).

[114]    *In re Alstom SA*, 406 F. Supp. 2d 433, 453 (S.D.N.Y. 2005) (citing *In re Time Warner Inc. Secs. Litig.*, 9 F.3d 259, 268 (2d Cir. 1993)).

A plaintiff may plead scienter by "alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness."[115] "'Sufficient motive allegations entail concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged.'"[116] "Motives that are generally possessed by most corporate directors and officers do not suffice; instead, plaintiffs must assert a concrete and personal benefit to the individual defendants resulting from the fraud."[117]

"'Where motive is not apparent, it is still possible to plead scienter by identifying circumstances indicating conscious behavior by the defendant, though the strength of the circumstantial allegations must be correspondingly greater.'"[118]

---

[115]   *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007)  (citing *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 168–69 (2d Cir. 2000)). *Accord Dandong v. Pinnacle Performance Ltd.*, No. 10 Civ. 8086, 2011 WL 5170293, at *11 (S.D.N.Y. Oct. 31, 2011) (quoting *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290-91 (2d Cir. 2006)).

[116]   *Campo v. Sears Holdings Corp.*, 371 Fed. App'x 212, 215 (2d Cir. 2010) (quoting *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001)).

[117]   *Kalnit,* 264 F.3d at 139.  *Accord ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009).

[118]   *Kalnit*, 264 F.3d at 142 (quoting *Beck v. Manufacturers Hanover Trust Co.*, 820 F.2d 46, 50 (2d Cir. 1987)).  *Accord South Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 109 (2d Cir. 2009); *In re Novagold Res. Inc.*

Under this theory, a plaintiff must show that the defendant's conduct is "at the least

. . . highly unreasonable and [] represents an extreme departure from the standards

of ordinary care to the extent that the danger was either known to the defendant or

so obvious that the defendant must have been aware of it."[119]  "To state a claim

based on recklessness, plaintiffs may either specifically allege defendants'

knowledge of facts or access to information contradicting defendants' public

statements, or allege that defendants failed to check information they had a duty to

monitor."[120]

        An outside auditor will typically not have an apparent motive to

commit fraud, and its duty to monitor an audited company for fraud is less

demanding than the company's duty not to commit fraud.  Thus, "'the failure of a

non-fiduciary accounting firm to identify problems with [a company's] internal

controls and accounting practices does not constitute reckless[ness].'"[121]  "'For

---

*Secs. Litig.*, 629 F. Supp. 2d 272, 297 (S.D.N.Y. 2009) (quoting *ECA*, 553 F.3d at
198–99).

        [119]   *South Cherry St.*, 573 F.3d at 109 (quotation marks and emphasis
omitted).  *Accord ECA*, 553 F.3d at 203.

        [120]   *In re Gildan Activewear, Inc. Secs. Litig.*, 636 F. Supp. 2d 261, 272
(S.D.N.Y. 2009) (quotation marks and citation omitted).

        [121]   *Stephenson v. PricewaterhouseCoopers, LLP*, 482 Fed. App'x 618,
623 (2d Cir. 2012) (quoting *Novak*, 216 F.3d at 309) (alterations in original).

recklessness on the part of a non-fiduciary accountant to satisfy securities fraud scienter, such recklessness must be conduct that is highly unreasonable, representing an extreme departure from the standards of ordinary care.'"[122]  In a common formulation, such recklessness must "'approximate an actual intent to aid in the fraud being perpetrated by the audited company.'"[123]

Recklessness has been adequately alleged if it appears from the complaint that "'[t]he accounting practices were so deficient that the audit amounted to no audit at all, or an egregious refusal to see the obvious, or investigate the doubtful, or that the accounting judgments which were made were such that no reasonable accountant would have made the same decisions if confronted with the same facts.'"[124]  "A complaint might reach [the] 'no audit at all' threshold by alleging that the auditor disregarded specific 'red flags' that 'would place a reasonable auditor on notice that the audited company was engaged

---

[122]   *Meridian Horizon Fund, LP*, 2012 WL 2754933, at *3 (quoting *Rothman*, 220 F.3d at 98).

[123]   *Id*. (quoting *Rothman*, 220 F.3d at 98).

[124]   *In re Scottish Re Group Secs. Litig.*, 524 F. Supp. 2d 370, 385 (S.D.N.Y. 2007) (quoting *In re Refco, Inc. Secs. Litig.*, 503 F. Supp. 2d 611, 657 (S.D.N.Y. 2007)) (further citations omitted).

in wrongdoing to the detriment of its investors.'"[125] "However, . . . merely alleging that the auditor had access to the information by which it could have discovered the fraud is not sufficient."[126]

### B.    Statute of Repose Applicable to Section 10(b)

A complaint alleging "fraud, deceit, manipulation, or contrivance" under the Exchange Act "may be brought not later than the earlier of . . . 2 years after the discovery of the facts constituting the violation; or . . . 5 years after such violation."[127] "[C]ourts have consistently referred to the . . . longer [time] period as a statute of repose."[128] Specifically, "[c]ourts in this district have treated Section 1658(b)(2) as a statute of repose and [] stated that the five-year period begins to run from the time that the allegedly fraudulent representations were made."[129]

The Second Circuit has stated that:

---

[125]    *In re IMAX Secs. Litig.*,  587 F. Supp. 2d 471, 483 (S.D.N.Y. 2008) (quoting *In re Scottish Re Group Secs. Litig.*, 524 F. Supp. 2d at 385).

[126]    *Id*.

[127]    28 U.S.C. § 1658(b).

[128]    *In re Exxon Mobil Corp. Secs. Litig.*, 500 F.3d 189, 199 (3d Cir. 2007) (citations omitted).

[129]    *Boudinot v. Shrader*, No. 09 Civ. 10163, 2012 WL 489215, at *4 (S.D.N.Y. Feb. 15, 2012).  *Accord McCann v. Hy-Vee, Inc.*, 663 F.3d 926, 930 (7th Cir. 2011) (concluding that Section 1658(b)(2) is a statute of repose, and, in dicta, reasoning that Section 1658(b)(1) is also a statute of repose).

In general, a statute of repose acts to define temporally the right to initiate suit against a defendant after a legislatively determined time period. Unlike a statute of limitations, a statute of repose is not a limitation of a plaintiff's remedy, but rather defines the right involved in terms of the time allowed to bring suit. . . . Therefore, a statute of repose begins to run without interruption once the necessary triggering event has occurred, even if equitable considerations would warrant tolling or even if the plaintiff has not yet, or could not yet have, discovered that she has a cause of action.[130]

In sum, statutes of repose temporally limit plaintiffs' right to bring suit, not the remedies that are available to them, and are not subject to equitable tolling.[131]

## C.    Leave to Amend

Whether to permit a plaintiff to amend its complaint is a matter committed to a court's "sound discretion."[132]  Rule 15(a) provides that leave to

---

[130]    *P. Stolz Family P'ship L.P. v. Daum*, 355 F.3d 92, 102-103 (2d Cir. 2004).  *Accord City of Pontiac Gen. Employees' Ret. Sys. v. MBIA, Inc.*, 637 F.3d 169, 175 (2d Cir. 2011) ("In contrast to a statute of repose, a statute of limitations is intended to prevent plaintiffs from unfairly surprising defendants by resurrecting stale claims.").

[131]    *See Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 363 (1991) (prior to the enactment of Section 1658, holding that three year statute of repose implied into private cause of action under Section 10(b) was not subject to equitable tolling).  *See also Footbridge Ltd. Trust v. Countrywide Fin. Corp.*, 770 F. Supp. 2d 618, 624 (S.D.N.Y. 2011) (holding that plaintiffs' Section 11 and Section 12 claims were extinguished under the three-year statute of repose found in 15 U.S.C. § 77m, and that equitable tolling did not apply to statute of repose).

[132]    *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007).

amend a complaint "shall be freely given when justice so requires."  "When a

motion to dismiss is granted, the usual practice is to grant leave to amend the

complaint."[133]  In particular, it is the usual practice to grant at least one chance to

plead fraud with greater specificity when a complaint is dismissed under Rule

9(b).[134]  Leave to amend should be denied, however, where the proposed

amendment would be futile.[135]

## V.     DISCUSSION

The instant motion raises three issues.  *First*, whether Plaintiffs' claim

against DTTC is barred by the statute of repose to the extent that it is based on

DTTC's October 24, 2007 audit opinion.  *Second*, whether the Amended

Complaint adequately alleges scienter, and *third*, whether it adequately alleges a

material misstatement.  Each issue is addressed below.

### A.     Plaintiffs' Claim Arising out of DTTC's October 24, 2007 Audit Opinion Is Barred by the Statute of Repose

DTTC argues that under the five-year statute of repose established by

Section 1658(b)(2), Plaintiffs' claim against it must be dismissed to the extent that

---

[133]     *Hayden v. County of Nassau*, 180 F.3d 42, 53 (2d Cir. 1999).

[134]     *See ATSI*, 493 F.3d at 108.

[135]     *See, e.g., Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals*, 282 F.3d 83, 87 (2d Cir. 2002).

-37-

it is based on DTTC's October 24, 2007 audit opinion, which did not appear in the case until the Amended Complaint was filed on December 14, 2012.[136]  Plaintiffs respond that these allegations should be deemed timely filed under Rule 15(c),[137] and note that relation-back is freely granted in securities fraud cases when the plaintiff "merely adds additional violations to pre-existing causes of action."[138]

Because Plaintiffs ignore the distinction between statutes of repose and statutes of limitations, their argument misses the mark.  The rule that "[w]here no new cause of action is alleged, relation back under Rule 15 is to be liberally granted[]" derives from the principle that, in those circumstances, "'adequate notice of the matters raised in the amended pleadings has been given to the opposing party within the statute of limitations by the general fact[] situation

---

[136]    *See* Defendant Deloitte Touche Tohmatsu CPA Ltd.'s Memorandum in Support of Its Motion to Dismiss the Amended Consolidated Class Action Complaint ("DTTC Mem.") at 24.

[137]    *See* Plaintiffs' Memorandum of Law in Opposition to DTTC's Motion to Dismiss the Amended Consolidated Class Action Complaint ("Opp. Mem") at 25.

[138]    *Id*. (citing *New Jersey Carpenters Vacation Fund v. Royal Bank of Scotland Group, PLC*, 720 F. Supp. 2d 254, 266 (S.D.N.Y. 2010) (granting relation back to securities fraud claim over statute of limitations defense)).

alleged in the original pleading.'"[139]  This principle is inapplicable to statutes of

repose, under which it is irrelevant whether parties have notice of a claim.[140]

A statute of repose may be modified by another statute.  This has been

referred to as "statutory tolling."[141]  Some courts have held that the tolling rule of

*American Pipe & Construction Co. v. Utah*[142] applies even to statutes of repose, on

the grounds that *American Pipe* is based on Rule 23 and is therefore a type of

statutory tolling.[143]  The trend in this District, though, is to hold a period of repose

inviolable unless specifically modified by statute.[144]

I am persuaded by the  reasoning that, when a claim is barred by a

statute of repose, "Rule 15 may not be construed to permit relation back because

such a construction would conflict with the Rules Enabling Act, which provides . .

---

[139]    *New Jersey Carpenters Vacation Fund*, 720 F. Supp. 2d at 266
(quoting *Stevelman v. Alias Research Inc.*, 174 F.3d 79, 86-87 (2d Cir. 1999)).

[140]    *See P. Stolz Family P'ship L.P.*, 355 F.3d at 103 ("[A] repose period
can run to completion even before injury has occurred to a potential plaintiff,
extinguishing a cause of action before it even accrues.").

[141]    *Pace v. DiGuglielmo*, 544 U.S. 408, 417 (2005) (referring to 28
U.S.C. § 2244(d)(2) as an example of "statutory tolling").

[142]    414 U.S. 538 (1974).

[143]    *See Footbridge Ltd. Trust*, 770 F. Supp. 2d at 625 (collecting cases).

[144]    *See id.* at 626 (concluding that *American Pipe* is an equitable tolling
doctrine, and therefore does not apply to the three-year statute of repose applicable
to Section 13 claims).

. that the rules prescribed by the Supreme Court (including Rule 15) 'shall not abridge, enlarge or modify any substantive right.'"[145]   Accordingly, Plaintiffs' Section 10(b) claim against DTTC is barred to the extent that it arises out of DTTC's October 24, 2007 audit opinion.

**B.     The Amended Complaint Does Not Adequately Allege Scienter**

Plaintiffs argue that the Amended Complaint adequately alleges scienter by pleading that DTTC: (1) allowed Longtop to persuade it to conduct alternative revenue testing instead of third-party confirmations of revenue contracts;[146] (2) disregarded information by third parties that should have led it to uncover Longtop's fraud;[147] (3) disregarded fraud risk factors at Longtop of which it was aware, including the possibility for management to override Longtop's internal accounting controls;[148] and (4) failed to heed the red flag allegedly presented by Longtop's interpretation of its social welfare obligations.[149]   Plaintiffs

---

[145]     *In re IndyMac Mortgage-Backed Secs. Litig.*, 793 F. Supp. 2d 637, 643 (S.D.N.Y. 2011) (quoting 28 U.S.C. § 2072(b)).  *Accord Wal-Mart Stores, Inc. v. Dukes*, — U.S. —, 131 S.Ct. 2541, 2561 (2011) (holding that, under the Rules Enabling Act, a class could not be certified contingent on defendant being unable to litigate its statutory defenses).

[146]     *See* Opp. Mem. at 12-14.

[147]     *See id.* at 14-15.

[148]     *See id.* at 15-16.

[149]     *See id.* at 17-18.

-40-

also re-argue several scienter theories that I rejected in the Dismissal Opinion.

These allegations are evaluated respectively below.

> 1.   **DTTC Performing Alternative Revenue Testing Rather than Third-Party Confirmation Was Not Reckless**

Plaintiffs allege that, had DTTC insisted on obtaining third-party

confirmations of Longtop's major revenue contracts in 2009, as it originally

proposed via e-mail, it would have uncovered Longtop's fraud.[150]  Plaintiffs further

allege that performing third-party confirmations of the revenue contracts was a

required procedure under the circumstances,[151] and that Longtop's excuse that this

procedure would delay its 2009 Form 20-F should have increased DTTC's

professional skepticism.[152]  Based on these allegations, Plaintiffs argue that DTTC

was reckless because it agreed to perform "'alternative testing on revenue'" to

---

[150]   *See* Am. Compl. ¶ 123 ("Had DTT gone forward with obtaining confirmations relating to Longtop's three largest revenue contracts in 2009, it would have learned, for example, that Longtop's internal controls related to revenue were grossly inadequate, out of step with industry practice, and presented the opportunity for fraud.").

[151]   *See* Opp. Mem. at 13 n.5 (citing AU § 330.34 ("There is a presumption that the auditor will request the confirmation of accounts receivable during an audit unless [certain circumstances exist] . . . An auditor who has not requested confirmations in the examination of accounts receivable should document how he or she overcame this presumption.").

[152]   *See id*. at 12 (citing AU § 316 (stating that "domineering management behavior" is an example of a "risk factor" that an auditor "should consider" if she "becomes aware of it")).

confirm Longtop's major revenue contracts, rather than obtaining third party confirmations.[153]  Plaintiffs analogize this case to *Gould v. Winstar Communications, Inc.*, which holds that an auditor who "'consistently noticed, protested, and then acquiesced in' financial misrepresentations of an audit client under pressure from client management" is reckless.[154]

These allegations do not withstand close scrutiny.  As DTTC points out, AU § 330.34, upon which Plaintiffs rely, relates to "confirmations of accounts receivable[,]" not the confirmations of *revenue contracts* that form the basis for these allegations.[155]  The Amended Complaint does not allege that DTTC failed to confirm Longtop's accounts receivable, and documents that the Amended Complaint incorporates by reference indicate that DTTC did confirm Longtop's accounts receivable.[156]

---

[153]    *Id*. at 13 (quoting Am. Compl. ¶ 119).

[154]    *Id*. at 12 (quoting *Gould v. Winstar Commc'ns, Inc.*, 692 F.3d 148, 158-59 (2d Cir. 2012)).

[155]    *See* DTTC's Memorandum in Support of Its Motion to Dismiss the Amended Consolidated Class Action Complaint ("Supp. Mem.") at 14.

[156]    *See* 5/29/07 Audit Committee Meeting Minutes, Ex. D to Howe Decl., at 88628 (referencing "confirmation[s]" of "accounts receivable").

Direct confirmation of revenue contracts is not a presumptively required audit step under the GAAS.[157]  The e-mail chain upon which these allegations rest reveals that DTTC initially took the position that third-party confirmation of revenue contracts was required, based on its reading of international auditing standards and a concept release proposed by the PCAOB for notice and comment, but was persuaded by Palaschuk that, under U.S. GAAS, this procedure was not required.[158]

Palaschuk pointed out that conducting third-party confirmations of revenue contracts was not presumptively required under the GAAS, and also gave numerous reasons why it was not necessary under the circumstances.  He noted that Longtop: (1) had no individually material contracts for the 2009 fiscal year, and no long-term material contracts; (2) had never modified a contract; (3) had bad debt of less than 0.5% of its sales; and, (4) had many contracts with, and was therefore under the scrutiny of, large companies, making fraud more difficult.[159]

---

[157]   *See* AU § 316.54 (stating that "[c]onfirming with customers certain relevant contract terms and the absence of side agreements" is something that an auditor "may want to consider[,]" if there is "an identified fraud risk that involves improper revenue recognition").

[158]   See 4/2009 E-mail Chain, Ex. I to Howe Decl.

[159]   *See id*. (4/22/09 Palaschuk e-mail to DTTC at 6:10 p.m.).

DTTC was ultimately persuaded by Palaschuk's argument,[160] but noted that it would need to re-visit the issue if new auditing standards were to be released.[161]   Furthermore, the same e-mail chain reveals that DTTC confirmed the terms of Longtop's revenue contracts in the course of its audit of Longtop's fiscal year ending March 31, 2008,[162] refuting Plaintiffs' allegation that DTTC "fail[ed] to undertake any meaningful investigation to confirm Longtop's revenue contracts throughout the Class Period . . . ."[163]   Based on these facts, this case is distinguishable from *Gould*, where the auditor defendant knew that the audited company had committed serious accounting violations, but nevertheless issued clean audit opinions.[164]

Plaintiffs' argument that Palaschuk's resistance when DTTC proposed conducting client confirmations of revenue contracts was a "significant red flag" is

---

[160]   *Id*. (4/22/09 DTTC e-mail to Palaschuk at 6:20 p.m.) ("Based on the fact that there is no significant individual contract for the year ended March 31, 2009 and the reasons [Palaschuk] mentioned in [his] email, we would perform alternative testing on revenue instead of confirmation.").

[161]   *See id*.

[162]   *See id*. at 1114207.

[163]   Am. Compl. ¶ 122.

[164]   *See Gould*, 692 F.3d at 158-59.

tainted by hindsight.[165]   Once fraud has been revealed, it is always obvious which audit procedures would have revealed the fraud earlier, and resistance to those audit procedures always appears suspicious.  To suggest that every available audit procedure must be conducted, though, is unrealistic.  Time and money are limited, and information comes at a price.  Subject to these constraints, auditors and their clients must necessarily decide whether it is cost-effective to perform audit procedures that are not required.  Given this understanding, a "plausible, nonculpable explanation[] for [] [DTTC's] conduct" is that it was persuaded by Palaschuk to cut costs by not performing an audit procedure that was not required by the relevant standards.[166]  This leads to an inference of, at worst, laziness, but not recklessness.

Finally, Plaintiffs argue that whether DTTC "'appropriately' determined that confirmations were not required by PCAOB[] . . . is a matter for expert testimony [that] cannot be decided on a motion to dismiss."[167]  This argument is not persuasive.  As an initial matter, the case cited by Plaintiffs contradicts its argument that *any* dispute about auditing or accounting standards,

---

[165]   Opp. Mem. at 13-14.

[166]   *Tellabs*, 551 U.S. at 323-24.

[167]   Opp. Mem. at 13 (citing *In re Global Crossing, Ltd. Secs. Litig.*, 322 F. Supp. 2d 319, 339 (S.D.N.Y. 2004)).

however slight, is sufficient to defeat a motion to dismiss.[168]  This is particularly so

when the dispute arises out of the GAAS, rather than the GAAP, because the

GAAS stem from a single source, the PCAOB.[169]  Moreover, there is no dispute

here that "cannot be determined in advance of the development of the record."[170]

DTTC has pointed to authority that the PCAOB, at the relevant time, did not

require confirmation of revenue contracts, and Plaintiffs have not pointed to

contrary authority.  Even in a case not governed by the PSLRA, *ipse dixit*

assertions cannot defeat a motion to dismiss.[171]

　　　　　In sum, DTTC initially suggested that it perform an audit procedure

that was not required by the PCAOB; it was persuaded to forego this procedure by

a reasoned argument; and it nevertheless insisted that it would revisit the issue

should auditing standards change.  In light of these facts, Plaintiffs' allegations

---

[168]　　*See Global Crossing*, 322 F. Supp. 2d at 346 ("Violations of GAAP, standing alone, are insufficient to state a securities fraud claim.").

[169]　　*See id*. at 339 ("'The determination that a particular accounting principle [under GAAP] is generally accepted may be difficult because no single source exists for all principles.'") (quoting *Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 101 (1995)).

[170]　　*Id*.

[171]　　*See, e.g.*, *Simms*, 2012 WL 1701356, at *1 (a district court hearing a motion to dismiss need not credit conclusory allegations).

regarding revenue confirmations do not support the inference that DTTC acted with scienter.

## 2. The Third-Party Information Alleged in the Amended Complaint Does Not Support an Inference of Scienter

Plaintiffs argue that DTTC was reckless because it ignored the Wedge Reports, the information it received from YTEC's CFO, and the market rumors discussed at the November 2, 2010 meeting between Longtop and DTTC.[172]  I will first consider the Wedge Reports, which issued prior to DTTC's final Class Period audit opinion, and then consider the remaining two sources of third-party information.

### a. The Wedge Reports

Plaintiffs acknowledge that the Wedge Reports were "generally positive" about  Longtop, but argue that they nevertheless "should have caused DTT[C] to increase the level of scrutiny it applied to its audits . . . ."[173]  However,

---

[172]     *See* Opp. Mem. at 14-15.

[173]     *Id*. at 14 (citing *In re Health Mgmt., Inc. Secs. Litig.*, 970 F. Supp. 192, 203 (E.D.N.Y. 1997) (holding that "failure to follow up on an analyst letter which alerted [outside auditor] of artificially inflated accounts receivable levels, by contacting the named sources of information about the accounts receivable fraud" constituted evidence of recklessness). *See* 3/23/10 Wedge Partner Reports, Ex. J to Howe Decl, at 39818 ("We continue to take a deeper look at Longtop, and today we met with management. Without undermining our generally positive view of this company[']s business prospects, our concerns on margins and the acquisition remain.").

Plaintiffs do not identify the steps that a non-reckless auditor would have taken under the circumstances.  This lapse is probably explained by the Wedge Reports' lack of specificity.  The analyst reports held to support an inference of scienter in *In re Health Management, Inc. Securities Litigation*, which Plaintiffs cite, named a specific type of fraud and supported this information with named sources.[174]  Following up with those sources would be a natural audit procedure.  By contrast, the Wedge Reports *speculated* that "Longtop may have been delaying payments [to XLHRS][,]" and stated that "there does not seem to be a good business reason to set up a separate, private company to handle this type of benefits management[,]" but deferred drawing conclusions until the conference call scheduled by Longtop for March 31, 2010.[175]  In short, generalized speculations hedged within generally positive reports are not red flags indicative of auditor scienter.

The facts surrounding the Wedge Reports further support the inference that DTTC was not reckless.  The final Wedge Report issued on March 23, 2010.[176]  The next day, Longtop obtained a legal opinion re-confirming the

---

[174]    *See In re Health Mgmt., Inc. Secs. Litig.*, 970 F. Supp. at 203.

[175]    3/23/10 Wedge Partner Reports, at 39818-39819.

[176]    *See* Am. Compl. ¶ 127.

legality of its use of XLHRS, which it then shared with DTTC.[177]  Subsequently, on March 31, 2010, "Longtop convened a conference call for analysts and investors to address 'various questions' that Longtop received regarding its relationship with XLHRS . . . ."[178]  During this call, Longtop explained that: (1) XLHRS used the "Longtop" name to provide employees with a closer affiliation to Longtop; (2) Longtop's relationship with XLHRS did not violate Chinese law; and (3) Longtop was complying with its social welfare obligations.[179]  Wedge Partners attended this meeting, and there are no allegations that their concerns were not allayed by Longtop's explanations.[180]

In sum, the concerns raised by the Wedge Reports were disclosed to the public and artfully addressed by Longtop, whose explanations fooled the SEC, the investing public, and Wedge Partners.  The most compelling inference stemming from the Wedge Reports is that Longtop concealed its fraud from

---

[177]     *See* 3/24/10 Legal Opinion (cited in Am. Compl. ¶¶ 147-148), Ex. K to Howe Decl., at 67963-65; 12/19/10 E-mail from Palaschuk to T. Wang (of DTTC) (cited in Am. Compl. ¶ 147), Ex. L to Howe Decl., at 67960.

[178]     Am. Compl. ¶ 73.

[179]     *See id*.

[180]     *See* 3/23/10 Wedge Partner Reports at 39818 ("On March 31, Longtop will host a meeting for investors in person and by phone with the general manager of Longtop Human Resources, which we will attend in person.").

DTTC, not that DTTC was on notice of Longtop's fraud but, for some unknown reason, chose to allow it to persist.[181]

### b. The Meeting with YTEC's CFO and the November 2, 2010 Meeting

In order to evaluate the remaining allegations regarding third-party information, it is helpful to summarize the time-line involved.  DTTC's final Class Period audit opinion was publicized on July 16, 2010.  The meeting with YTEC's CFO occurred on October 2, 2010, and the meeting between DTTC and Longtop occurred on November 2, 2010.  Subsequently, DTTC issued its Resignation Letter on May 23, 2011.

Based on this time-line, to the extent that a claim arises out of the meeting with YTEC's CFO and/or the November 2, 2010 meeting, this claim must rest on a duty on the part of DTTC to correct its July 16, 2010 audit opinion at some point between the October 2, 2010 meeting with YTEC's CFO and the May 23, 2011 Resignation Letter.  For the reasons that follow, DTTC was not reckless in failing to issue a correction.

---

[181]     *Cf. Meridian Horizon Fund, LP*, 487 Fed. App'x at 641.

Plaintiffs argue that DTTC's duty to correct arose under the GAAS, which required it to "take action to prevent future reliance on its audit report."[182] However, while the GAAS is suggestive of an auditor's duty of care, it is not a source of liability under the Exchange Act.[183] I therefore turn to Second Circuit precedent, which holds that:

> an [auditor] . . . becomes primarily liable under § 10(b) and Rule 10b-5 when it (1) makes a statement in its certified opinion that is false or misleading when made; (2) subsequently learns or was reckless in not learning that the earlier statement was false or misleading; (3) knows or should know that potential investors are relying on the opinion and financial statements; yet (4) fails to take reasonable steps to correct or withdraw its opinion and/or the financial statements; and (5) all the other requirements for liability are satisfied.[184]

---

[182]   Am. Compl. ¶ 132 (citing AU § 561 (stating that, although an auditor has no free-standing duty to investigate, update, or correct an opinion once its report has been released, it has a duty to investigate reliable facts of which it becomes aware after its report is released and that existed prior to its report, and take actions appropriate under the circumstances)).

[183]   *See, e.g., ECA, Local 134 IBEW Joint Pension Trust of Chicago*, 553 F.3d at 200 ("'[A]llegations of . . . accounting irregularities, standing alone, are insufficient to state a securities fraud claim . . . . Only where such allegations are coupled with evidence of corresponding fraudulent intent might they be sufficient.'") (quoting *Novak*, 216 F.3d at 309).

[184]   *Overton v. Todman & Co., CPAs, P.C.*, 478 F.3d 479, 486-87 (2d Cir. 2007).

The Amended Complaint does not allege that DTTC actually learned of Longtop's fraud prior to issuing the Resignation Letter.[185]  Therefore, DTTC acted with scienter only if it was "reckless in not learning that [its July 16, 2010 audit opinon] was false or misleading" based on the meeting with YTEC's CFO and/or the November 2, 2010 meeting.[186]

To the extent that Plaintiffs' allegations are based on DTTC's duty to correct, DTTC benefits from a doubly deferential standard.  Under the PSLRA, and given the facts of the case, it is the Plaintiffs' general burden to allege facts showing that the strongest inference is that DTTC conducted an audit akin to "no audit at all."[187]  And to the extent that Plaintiffs' allegations are based on DTTC's failure to correct its audit opinions, they have the additional burden of pleading facts showing that DTTC was reckless for not learning that its earlier audit opinion was false of misleading.  Moreover, the PCAOB standards proffered by Plaintiffs are triggered by the auditor "subsequently discover[ing] information [that was]

---

[185]    *Cf.* Am. Compl. ¶ 271 ("Had DTT conducted its audits in accordance with GAAS, it would have reacted to the numerous, obvious 'red flags' set forth above and, in so doing, *would have* discovered the truth about Longtop's operations." (emphasis added).

[186]    *Overton*, 478 F.3d at 487.

[187]    *In re Scottish Re Group Secs. Litig.*, 524 F. Supp. 2d at 385 (quotation marks and citations omitted).

found [] to be reliable[;]" and even after discovering such information, require only that "[t]he auditor [] take whatever steps [it] deems necessary to satisfy himself that the client has made the disclosures [appropriate under the circumstances][.]"[188]

Plaintiffs have failed to plead facts creating a strong inference that DTTC was reckless under this test.  The alleged sources of information — the say-so of Longtop's competitor's CFO (a person with a motive to malign Longtop), the hearsay statement of a reputed CCB employee, and vague "market rumors" — were less than reliable, and DTTC's duty to investigate was correspondingly slight.[189]  Notwithstanding this fact, DTTC evidently took the third-party information seriously.

After its meeting with YTEC's CFO, DTTC informed Palaschuk that it had to perform "additional [audit] procedures[]" based on the CFO's hearsay statements.[190]  And the November 2 meeting minutes referenced in the Amended Complaint further support the point that DTTC did not recklessly ignore the third-

---

[188]    AU § 561.

[189]    *See id.* (stating that the auditor's duty upon receiving information after issuing an opinion varies with the reliability of that information).

[190]    Am. Compl. ¶ 128 (quotation marks omitted) (alteration in original). *Accord* 11/8/10 Email from [DTTC] to Palaschuk (cited in Am. Compl. ¶ 128), Ex. N to Howe Decl, at 4000858 (stating that "normally Deloitte [would] not pay attention to hearsay, but because this was discussed with partners in Beijing it is very high profile. Internally they must do some additional procedures").

-53-

party information.  At this meeting, Longtop convincingly answered the market rumors relating to its above-market margins and XLHRS.[191]  Furthermore, DTTC suggested that Longtop hire an independent investigator to look into the hearsay allegation that its revenue from CCB contracts had been misstated, despite the fact that DTTC had "seen no indications of fraud or that Longtop's revenue from CCB is inaccurate. . . ."[192]  In response, Longtop stated that it would "would confirm with . . . legal counsel whether [it] thought an investigation was necessary."[193]

Plaintiffs argue that DTTC was reckless because it "did not undertake an investigation of its own."[194]  But there is no indication that a diligent auditor would have done more under the circumstances.  The applicable auditing standards require an auditor to correct its opinions only upon discovering *reliable* information and instructs the auditor, in determining whether information is reliable, to "discuss the matter with [its] client . . . and request cooperation in whatever investigation may be necessary."[195]  Here, despite the fact that the sources of information were *unreliable*, and contradicted by information that DTTC had

---

[191]    *See* 11/2/10 Meeting Minutes (summarized above).

[192]    *Id*. at 107690.

[193]    *Id*.

[194]    Opp. Mem. at 15 (citing Am. Compl. ¶¶ 130-131).

[195]    AU § 561.

seen first-hand, DTTC raised the issue with Longtop management and suggested an investigation.  Given that there was no indication that something was amiss with Longtop's CCB contracts, DTTC's failure to conduct an independent investigation does not bespeak recklessness.

These facts are a far cry from *Overton v. Todman & Co., CPAs, P.C.*, in which the defendant auditor failed to investigate the fact that the audited company's payroll taxes, its largest single line-item expenditure in one year, had dropped to zero in the following two years, despite being aware that "plainly people were working and payroll taxes were due . . . ."[196]  Here, the alleged third-party sources of information were unreliable, but DTTC nevertheless suggested additional audit procedures based on them.  Compared to recklessness, it is a more compelling inference that DTTC attempted to discharge its auditing duties upon receiving the alleged third-party information, but was duped by Longtop as to is import.  Accordingly, DTTC was not "reckless in not learning" that its audit opinions were false or misleading based on the alleged third-party information.[197]

### 3.   DTTC Did Not Recklessly Disregard Internal Control Deficiencies and Risk Factors at Longtop

---

[196]    *Overton*, 478 F.3d at 481 (quotation marks omitted).

[197]    *Id*. at 487.

Plaintiffs argue that DTTC was reckless because, from 2007 to 2010, it noted actual or potential problems with Longtop's internal controls, as well as risk factors at Longtop, but nevertheless issued audit opinions certifying Longtop's financial statements.[198]  The crux of Plaintiffs' argument is that the instances where DTTC pointed out problems at Longtop bespeak recklessness, because DTTC "disregard[ed]" these problems.[199]  In support of this argument, Plaintiffs cite precedents holding that a compelling inference of auditor recklessness exists when the auditor is either aware of and disregards information indicative of fraud,[200] or has a relationship with the audited company such that it may be inferred that it reviewed materials indicative of fraud.[201]  For the four following reasons, Plaintiffs' argument is not persuasive.

---

[198]   *See* Opp. Mem. at 15-16 (citing Am. Compl. ¶¶ 95-104; 111-114).

[199]   *Id*. at 15.

[200]   *See id*. (citing *Varghese v. China Shenghuo Pharm. Holdings, Inc.*, 672 F. Supp. 2d 596, 610 (S.D.N.Y. 2009) (holding that allegations that auditor was aware of information indicating fraud supported a strong inference of recklessness)).

[201]   *See id*. (citing *In re IMAX Secs. Litig.*, 587 F. Supp. 2d at 484 (finding that, unlike typical outside auditor, defendant auditor was extensively involved in creating and maintaining accounting policy that gave rise to the alleged fraud, leading to the inference that audited company reviewed documents containing red flags, and, on the basis of this finding, holding that auditor was reckless for purposes of motion to dismiss)).

*First*, DTTC's audit of Longtop's December 31, 2006 financial statements suggests that it was not reckless during its later auditing engagements. During this audit, DTTC was not required to audit Longtop's internal controls.[202] Despite this fact, it identified one "material weakness" and one "significant deficien[cy]" in Longtop's internal controls during the course of this audit.[203]  It then communicated these problems to Longtop management,[204] which disclosed them to the public in its 2007 Form F-1.[205]  As DTTC points out, it is unlikely that an auditor would investigate, discover, and disclose internal control deficiencies when it had no obligation to do so, only to turn a blind eye to them after being engaged to ferret them out.[206]

*Second*, Plaintiffs do not allege facts showing that DTTC was on notice of Longtop's fraud.  Instead, they equivocate between the accounting concept of a fraud risk factor and the legal concept of notice of actual fraud.  The

---

[202]  *See* Am. Compl. ¶ 163 (quoting 10/24/07 Longtop SEC Rule 424(b)(4) Prospectus).

[203]  *Id*. ¶¶ 99-100.

[204]  *See id*.

[205]  10/2/07 Longtop Form F-1 at 21.  Longtop's public SEC filings reveal that it subsequently took steps to correct the problems identified by DTTC.  *See* 10/24/07 Longtop Form 424(b)(4), Ex. B to Soni Decl., at 22.

[206]  *See* Supp. Mem. at 6.

GAAS states that "[f]raud risk factors do not necessarily indicate the existence of fraud[,]"[207] and the risk factors that DTTC identified at Longtop are similar to those commonly disclosed by reputable companies.[208]   DTTC's awareness of the generic risk factors alleged in the Amended Complaint does not indicate that it was on notice of *actual* fraud at Longtop.

*Third*, Plaintiffs do not allege facts showing that DTTC turned a blind eye to the problems it identified at Longtop.   Instead the facts show that, year after year, DTTC identified problems with Longtop's financial reporting, and then made plans to address those problems.[209]   This describes a *diligent* audit, not "no audit at all . . . ."[210]

Plaintiffs argue that, for the purposes of this motion, this Court must infer that DTTC never "actually performed any of the enhanced audit procedures"

---

[207]   AU § 316.31.

[208]   *See* Supp. Mem. at 13 (citing 6/26/12 Form 10-K of Oracle Corporation, Ex. G to Soni Decl., at 79 (identifying risk of "management override of the controls"); 3/15/12 Form 10-K of Build-A-Bear Workshop, Inc. at 40 (same)).

[209]   *See* Am. Compl. ¶¶ 96-104.  *See also, e.g.,* 5/26/09 Sarbanes-Oxley 404 Attestation Status Update (cited in Am. Compl. ¶ 103), Ex. G to Howe Decl., at 63294 (listing numerous specific, planned responses to various categories of auditing risks).

[210]   *In re Scottish Re Group Secs. Litig.*, 524 F. Supp. 2d at 385 (quotation marks and citations omitted).

that it planned, because it "raised the very same deficiencies and fraud risk factors year after year . . . ."[211]  This argument ignores that, under the PSLRA, "'a court must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff.'"[212]  Beyond the bare fact that Longtop was eventually found to be engaged in fraud, and despite having access to copious discovery, Plaintiffs have not alleged any facts showing that DTTC failed to perform the audit procedures that it planned.  Nor have they alleged facts showing that the failure to perform these audit procedures — if there was any such failure — amounted to recklessness.  For these reasons, DTTC's identification of risk factors at Longtop does not create a strong inference of recklessness.[213]

*Finally*, DTTC disclosed to the public that there was a risk of management override at Longtop during the only two years in which it rendered an opinion on Longtop's internal controls.[214]  This disclosure negates Plaintiffs'

---

[211]    Opp. Mem. at 16.

[212]    *Meridian Horizon Fund, LP*, 2012 WL 2754933, at *2 (quoting *Tellabs*, 551 U.S. at 323-24).

[213]    I further note that drawing an adverse inference from DTTC's attempts to strengthen Longtop's financial controls would be inconsistent with the policy animating Federal Rule of Evidence 407, which prohibits using subsequent remedial measures as evidence of liability.

[214]    *See* 6/29/09 Longtop Form 20-F at 99 ("Because of the inherent limitations of internal control over financial reporting, including the possibility of

allegation that DTTC did "nothing . . . to alert the investing public" of the internal control risk at Longtop.[215]  Moreover, the Amended Complaint does not allege facts sufficient to show that DTTC was required to make greater disclosures than it did during the Class Period.

In the final analysis, the present allegations could have been drawn from the auditing engagements of any of a thousand reputable companies. Plaintiffs argue, at core, that identifying risk factors at a company ultimately discovered to be engaged in fraud should expose auditors to legal liability.  But this is not the law.  The "animating purpose of the Exchange Act[] [is] to insure honest securities markets and thereby promote investor confidence."[216]  Plaintiffs' argument would vitiate this purpose, by exposing an auditor to liability when that auditor identifies risk factors at a company later found to be engaged in fraud, but fails to catch its fraud.  For this reason,  and for the reasons stated above, DTTC's identification of risk factors and internal control deficiencies at Longtop does not

---

collusion or improper management override of controls, material misstatements due to error or fraud may not be prevented or detected on a timely basis."); 7/16/10 Longtop Form 20-F at 97 (same).

[215]    Am. Compl. ¶ 102.

[216]    *United States v. O'Hagan*, 521 U.S. 642, 658 (1997) (citation omitted).

create an inference of scienter that is stronger and more compelling than the strongest competing inference.

### 4. Longtop's Interpretation of Its Welfare Obligations Was Not a Red Flag that DTTC Recklessly Disregarded

The Dismissal Opinion rejected the argument that Longtop's relationship with XLHRS presented a red flag.[217]  Plaintiffs now advance a variant of that argument, namely that DTTC was reckless because it "failed to investigate the true relationship between [Longtop and] XLHRS and the impact of that relationship and Longtop's welfare underpayments on the company's financial statements . . . ."[218]  This argument is not persuasive.

As an initial matter, I note that Longtop accrued a liability equal to its maximum expected welfare payment.[219]  This implies that DTTC was not reckless for failing to investigate Longtop's welfare payments: based on the facts alleged, such an investigation merely would have revealed that Longtop had, based on a seemingly-reasonable interpretation of the law, paid a certain amount of social

---

[217]    *See In re Longtop*,  2012 WL 5512176, at *8 (holding that the fact that XLHRS's relationship with Longtop was disclosed to the investing public for years prior to Longtop's fraud unraveling negated inference that this relationship presented a red flag) (citations omitted).

[218]    Opp. Mem. at 17.

[219]    *See* Am. Compl. ¶ 140.

welfare, while accruing against the possibility that its interpretation would not hold up.

Furthermore, the allegations summarized above reveal that, throughout its auditing engagement with Longtop, DTTC asked probing questions about Longtop's accounting treatment of XLHRS, and demanded answers.[220]  This pattern is exemplified by the fact that, *after* its final Class Period audit opinion had been released, DTTC required a confirmation from the Chinese government regarding Longtop's welfare payments, insisted that it be able to discuss the legal opinion with Longtop's outside law firm, and pressed for further analysis beyond this opinion.[221]  In response to this scrutiny, Longtop desperately attempted to throw DTTC off the scent.[222]  These facts reinforce the conclusion of the Dismissal Opinion that "the strongest inference is that DTTC was duped by Longtop, not that it recklessly enabled them."[223]

---

[220]     *See id.* ¶¶ 133-157.

[221]     *See id.* ¶ 157.

[222]     *See id.* ("'[DTTC] said they may want to meet with the welfare bureau but I think we can refuse this request . . . . [N]ot 100% sure [DTTC] will accept our treatment but we will try our best.'") (quoting Palaschuk e-mail to Longtop management).

[223]     *In re Longtop*, 2012 WL 5512176, at *9.

Ultimately, Plaintiffs' argument that Longtop's interpretation of its welfare obligations shows that DTTC was reckless depends on the proposition that a company's attempts to reduce its costs by seeking a favorable interpretation of the law should put an auditor on notice of fraud.  In reality, of course, reputable companies routinely attempt to reduce their governmental liabilities to the extent legally permissible.  Longtop's attempts to do so here were not a red flag of fraud, and DTTC's probing questions about these attempts support the inference that it was not reckless.

Relatedly, Plaintiffs argue that "Lian's July 2010 gift of 20,000 Longtop shares to his brother" supports an inference of scienter, because this gift was made "just prior to Longtop's receipt of the social welfare confirmation."[224] Because the facts alleged do not support Plaintiffs' insinuation that this gift had anything to do with Longtop's welfare obligations, I reject this argument.  In fact, for the following four reasons, the gift does not suggest any impropriety on DTTC's part at all.

*First*, Lian's brother was at  the *tax* bureau, not the *welfare* bureau, and the Amended Complaint does not allege he had any involvement with the

---

[224]     Opp. Mem. at 18 n.7.

confirmation sought by Longtop.[225]  *Second*, the Amended Complaint does not
allege that DTTC was aware of the Chairman's gift when it issued its 2010 audit
opinion; nor does it allege facts showing that DTTC was reckless in not correcting
that opinion when it learned of the gift.  *Third*, Palaschuk's May 12, 2011 memo
expressly states that the Chairman's brother "does not work on or have any
involvement in the review of any of Longtop's tax filings[,]"[226] negating any
potential impropriety relating to Longtop's tax liability.  Finally, DTTC's comment
that "this is a little murky" pertained not to the propriety or purpose of the gift, but
rather the technical question of how a gift of shares to the Chairman's relative
should be accounted for.[227]

### 5.   Plaintiffs' Remaining Allegations Do Not Create a Strong Inference of Scienter

Plaintiffs reassert their previously rejected argument that the
magnitude of Longtop's fraud, and the alleged rapidity and ease with which it was
discovered, indicate that DTTC acted with scienter.[228]  However, the basis for

---

[225]    *Cf. id.*

[226]    5/12/11 Memo from D. Palaschuk to File, Ex. O to Howe Decl., at
0140781.

[227]    5/13/11 E-mail from Palaschuk to T. Bancroft, Ex. M to Soni Decl., at
0149405.

[228]    *See* Opp. Mem. at 18-19.

rejecting these arguments remains the same as it did in the Dismissal Opinion.

Like the CAC, the Amended Complaint reveals that DTTC was a target of

Longtop's fraud, and that DTTC ultimately uncovered Longtop's fraud, and noisily

resigned.[229]  And like the CAC, the Amended Complaint does not allege facts

showing that, prior to its resignation, DTTC "'fail[ed] to conduct a thorough and

objective audit . . . .'"[230]  Therefore, the Dismissal Opinion's conclusion that the

fraud's magnitude and mode of discovery do not create a strong inference of

scienter remains intact.[231]

      The remaining allegations of the Amended Complaint mostly amount

to a stew of accounting and auditing standards.[232]  The violation of such standards

establishes, at most, negligence.[233]  Moreover, the facts alleged do not suggest that

---

[229]    *See* Am. Compl. ¶ 57.

[230]    Opp. Mem. at 19 (quoting *Global Crossing*, 322 F. Supp. 2d at 347).

[231]    *See In re Longtop*, 2012 WL 5512176, at *9.

[232]    *See, e.g.,* Am. Compl. ¶¶ 83-85 (alleging that an auditor must exercise "due professional care and professional skepticism") (citing AU § 230).

[233]    *See Novak*, 216 F.3d at 309 ("[A]llegations of GAAP violations or accounting irregularities, standing alone, are insufficient to state a securities fraud claim . . . . Only where such allegations are coupled with evidence of corresponding fraudulent intent might they be sufficient.") (quotation marks and citations omitted).  *See also ECA, Local 134 IBEW Joint Pension Trust of Chicago*, 553 F.3d at 201 (holding that failure to classify entity as related-party did not give rise to an inference of recklessness).

DTTC violated applicable auditing standards.  Instead, as explained above,

Plaintiffs' arguments generally rest on the proposition that there *must* have been

auditing violations, because DTTC failed to detect Longtop's fraud earlier.  For the

reasons stated in the Dismissal Opinion, such allegations are insufficient to state a

claim against an independent auditor under the PSLRA.  I have considered the

remaining scienter allegations of the Amended Complaint and find them to be

meritless.

### 6.    Plaintiffs' Allegations Fail to Create a Strong Inference of Scienter

Although the Amended Complaint adds copious factual allegations

against DTTC, the deficiencies animating the Dismissal Opinion's holding persist.

Like the CAC, the Amended Complaint "does little more than allege that, had

DTTC performed a better audit, Longtop's fraud would have been uncovered

sooner[;]" accordingly, the most compelling inference is still that "DTTC was

duped by Longtop, not that it recklessly enabled [it]."[234]

In fact, this inference is *strengthened* by the Amended Complaint.

The Amended Complaint reveals that DTTC identified risk factors at Longtop,

even when it had no obligation to do so; disclosed to the public problems at

Longtop of which it was aware, and planned appropriate responses; asked probing

---

[234]    *In re Longtop*, 2012 WL 5512176, at *9.

questions about Longtop's welfare policies, even though its audit opinion had already been released; and took third-party allegations seriously, despite their dubious reliability.  In light of these facts, it is reasonable to infer that the reports that ultimately led DTTC to uncover Longtop's fraud came about as a result of DTTC's efforts during the Class Period.  That Longtop stayed one step ahead of DTTC during the Class Period does not justify the assertion of liability over DTTC.  In short, because the facts alleged fall far short of showing that DTTC conducted "no audit at all,"[235] Plaintiffs have not adequately alleged that DTTC was reckless.

### C.    The Amended Complaint Does Not Adequately Allege that DTTC Made Material Misstatements

When a Section 10(b) claim is alleged against an independent auditor without a motive to commit fraud on the basis of its audit opinions, the inquiry with respect to scienter is "substantially the same[]" as the inquiry with respect to whether the auditor made a material misstatement.[236]  Plaintiffs' arguments that DTTC made false or misleading statements are identical to their arguments that

---

[235]    *In re Scottish Re Group Secs. Litig.*, 524 F. Supp. 2d at 385 (quotation marks and citations omitted).

[236]    *In re Lehman Bros. Secs. and Erisa Litig.*, 799 F. Supp. 2d 258, 302 (S.D.N.Y. 2011).

DTTC acted with scienter.[237]  Therefore, for the reasons stated above, and for substantially the reasons given in the Dismissal Opinion, the Amended Complaint does not adequately allege that DTTC's audit opinions contained material misstatements.[238]

### D.    Leave to Amend

The Second Circuit has committed the decision of whether to grant leave to amend a complaint that is deficient under the PSLRA to the sound discretion of the district courts.[239]  Rule 15(a) creates a policy favoring amendment, but leave to amend should be denied where the proposed amendment would be futile.[240]

The only circuit courts to address the issue have held that, by heightening the pleading burden and imposing a stay of discovery, the PSLRA restricts the circumstances in which amendment should be granted.[241]  I concur.

---

[237]    *See* Opp. Mem. at 19-25.

[238]    *See In re Longtop*, 2012 WL 5512176, at *10.

[239]    *See Campo*, 371 Fed. App'x at 218.

[240]    *See Dougherty*, 282 F.3d at 87.

[241]    *See Miller v. Champion Enters. Inc.*, 346 F.3d 660 (6th Cir. 2003) (stating that "we think it is correct to interpret the PSLRA as restricting the ability of plaintiffs to amend their complaint, and thus as limiting the scope of [Rule 15(a)]"); *In re NAHC Inc. Secs. Litig.*, 306 F.3d 1314, 1332 (3d Cir. 2002) (affirming district court's denial of leave to amend, and stating that "the PSLRA

Because the PSLRA increases the probability that a proposed amendment will be futile, I conclude that amendment should be granted less freely when a complaint subject to the PSLRA is dismissed.

Unlike most plaintiffs subject to the PSLRA, the Plaintiffs have had access to copious discovery in crafting the Amended Complaint. Despite this fact, their claim against DTTC still falls well short of stating a claim. Moreover, the Amended Complaint still suffers from the same defects laboriously identified in the Dismissal Opinion; principal among them, fraud by hindsight. In these circumstances, granting further leave to amend would be futile. Accordingly, leave to amend is denied.

### E.    Findings Under Rule 11

The PSLRA provides for mandatory findings under Rule 11, with a presumption that the appropriate sanction for violations of that Rule is an award of fees and costs.[242] These findings are to be made "upon final adjudication of the action . . . ."[243] That time has not yet come. Accordingly, I defer making findings under Rule 11 until this action has been finally adjudicated.

---

limits the application of [Rule] 15 in securities fraud cases").

[242]    *See* 15 U.S.C. § 78u-4(c).

[243]    *Id*. § 78u-4(c)(1).

## V.   CONCLUSION

For the foregoing reasons, defendant DTTC's motion to dismiss is granted.  The Clerk of Court is directed to close this motion (Docket No. 128).

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:        New York, New York
              April 8, 2013

-70-

**-Appearances-**

**Counsel for Lead Plaintiffs:**

Kimberly A. Justice, Esq.
John A. Kehoe, Esq.
John J. Gross, Esq.
Kessler Topaz Meltzer & Check, LLP (PA)
280 King of Prussia Road
Radnor, Pennsylvania 19087
(610) 667-7706

Daniel L. Berger, Esq.
Jeff A. Almeida, Esq.
Deborah A. Elman, Esq.
Reena S. Liebling, Esq.
Grant & Eisenhofer, P.A. (NY)
485 Lexington Avenue
29th Floor
New York, New York 10017
(646) 722-8500

**Counsel for DTTC:**

Gary F. Bendinger, Esq.
Gazeena K. Soni, Esq.
Sidley Austin LLP
787 Seventh Avenue
New York, New York 10019
(212) 839-5300

Michael Dana Warden, Esq.
Sidley Austin LLP
1501 K Street, N.W.
Washington, D.C. 20005

(202) 736-8080

David Andrew Gordon, Esq.
Sidley Austin LLP
One South Dearborn
Chicago, Illinois 60603
(312) 853-7159