Derek Palaschuk
4326 Dunbar Street
P.O. Box 45117
Vancouver, British Columbia
Canada  V6S 2M8

*Defendant PRO SE*



USDC SDNY
DOC
ELE
DOC
DATE  FILED   12 / 20 / 13

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE
LONGTOP FINANCIAL
TECHNOLOGIES LIMITED
SECURITIES LITIGATION

Civil Action No. 11-cv-3658-SAS

ECF CASE
Electronically Filed

### DEFENDANT DEREK PALASCHUK'S
### MEMORANDUM OF LAW IN OPPOSITION OF PLAINTIFFS'
### MOTION TO EXCLUDE REPORT AND TESTIMONY OF ALAN D. BELL,
### AND AFFIDAVITS OF DEREK PALASCHUK AND ALAN D. BELL

**Certain Identifying Information Redacted**

## <u>TABLE OF CONTENTS</u>

TAB

DEFENDANT DEREK PALASCHUK'S                                          1
MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS'
MOTION TO EXCLUDE REPORT AND TESTIMONY OF ALAN D. BELL

AFFIDAVIT OF DEREK PALASCHUK                                        2
IN OPPOSITION TO PLAINTIFFS' MOTION
TO EXCLUDE REPORT AND TESTIMONY OF ALAN D. BELL

AFFIDAVIT OF ALAN D. BELL                                           3
IN OPPOSITION TO PLAINTIFFS' MOTION
TO EXCLUDE REPORT AND TESTIMONY

1

Derek Palaschuk
4326 Dunbar Street
P.O. Box 45117
Vancouver, British Columbia
Canada V6S 2M8

*Defendant PRO SE*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE<br>LONGTOP FINANCIAL<br>TECHNOLOGIES LIMITED<br>SECURITIES LITIGATION | Civil Action No. 11-cv-3658-SAS<br><br>ECF CASE<br>Electronically Filed |

## DEFENDANT DEREK PALASCHUK'S
## MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS'
## MOTION TO EXCLUDE REPORT AND TESTIMONY OF ALAN D. BELL

DEC 2 0 2013

PRO SE OFFICE

## <u>TABLE OF CONTENTS</u>

| | | |
|---|---|---|
| TABLE OF AUTHORITIES | | ii |
| 1. | INTRODUCTION | 1 |
| 2. | BACKGROUND | 3 |
| 3. | ARGUMENT | 5 |
| | A. Bell's Report Was Delivered in a Timely Manner | 5 |
| |     I. I Delivered Bell's Report Within the Deadline on Me to Submit a Report On Issues for Which Plaintiffs Bear the Burden of Proof | 5 |
| |     II. I Did Not Delay Delivery of Bell's Report in Bad Faith, and Its Admission Will Not Prejudice Plaintiffs or Disrupt this Case | 6 |
| |         a. If Bell's Report is Not a Rebuttal Report and is Late, I Did Not Delay Its Delivery in Bad Faith or Willfully | 6 |
| |         b. Admitting Bell's Report Will Not Prejudice Plaintiffs or Disrupt the Trial of this Case | 8 |
| | B. Bell is Qualified as an Expert by His Education, Experience, and Knowledge | 8 |
| |     I. Bell is Qualified to Opine on the Standards Applicable to a CFO | 10 |
| |     II. Bell is Qualified to Opine on the Accounting Standards Applicable to a Public Company in Information Technology | 12 |
| | C. Bell's Evidence is Relevant, Reliable and Will Help the Jury | 13 |
| |     I. Except in Relation to the No Longer Impugned XLHRS & Social Welfare Statements, Bell's Evidence is Relevant | 13 |
| |     II. Bell's Evidence on the Still-Contested Issues Will Help the Jury to Understand the Applicable Standards | 14 |
| |     III. Bell's Evidence on the Still-Contested Issues is Reliable | 18 |
| 4. | CONCLUSION | 20 |
| 5. | APPENDIX | 22 |

i

## **TABLE OF AUTHORITIES**

Page(s)

CASES

*Airlines Reporting Corp. v. Belfon*
    2010 U.S. Dist. LEXIS 97349 (D.V.I., September 15, 2010)      15
*ATSI Communs., Inc. v. Shaar Fund, Ltd.*
    493 F.3d 87, 108 (2d Cir. N.Y., 2007)      5
*Berckeley Inv. Group, Ltd. v. Colkitt*
    455 F.3d 195, 218 (3d Cir. 2006)      15
*Casper v. SMG*
    389 F. Supp. 2d 618, 621 (D.N.J. 2005)      15
*Castellano v. Young & Rubicam, Inc.*
    257 F.3d 171, 185 (2d Cir. 2001)      20
*CDX Liquidating Trust ex rel. CDX Liquidating Trustee v. Venrock Assoc.*
    *411 B.R. 571, 588 (N.D. Ill. 2009)*      15
*Crown Cork & Seal Co. v. Credit Suisse First Boston Corp.*
    2013 U.S. Dist. LEXIS 34368 (S.D.N.Y., Mar. 12, 2013)      9
*Gould v. Winstar Communs., Inc.*
    692 F.3d 148, 158 (2d Cir. N.Y., 2012)      2
*Ironshore Ins., Ltd. v. Western Asset Mgmt. Co.*
    2013 U.S. Dist. LEXIS 69404 (S.D.N.Y., Dec. 18, 2009)      5
*Jahn v. Equine Services, PSC*
    233 F.3d 382, 390 (6th Cir. 2000)      12
*Johnson & Johnson Vision Care, Inc. v. Ciba Vision Corp.*
    2006 U.S. Dist. LEXIS 51869 (S.D.N.Y., July 27, 2006)      12
*Lidle v. Cirrus Design Corp.*
    2009 U.S. Dist. LEXIS 118850 (S.D.N.Y., Dec. 18, 2009)      5
*Joseph P. Carroll Ltd. v. Baker*
    2013 U.S. Dist. LEXIS 45884 (S.D.N.Y., Mar. 29, 2013)      18
*Lippe v. Bairnco Corp.*
    2002 U.S. Dist. LEXIS 109 (S.D.N.Y. Jan. 7, 2002)      16
*McKowan Lowe & Co., Ltd. v. Jasmine, Ltd.*
    2005 U.S. Dist. LEXIS 32164 (D.N.J., June 30, 2005)      7
*PFS Distrib. Co. v. Raduechel*
    574 F.3d 580, 597 (8th Cir. 2009)      15
*RMED Int'l. Inc. v. Sloan's Supermarkets, Inc.*
    2002 .S. Dist. LEXIS 32829 (S.D.N.Y., Dec. 11, 2002)      6
*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*
    551 U.S. 308, 31 (2007)      5
*United States v. Bilzerian*
    926 F.2d 1285, 1294 (2d Cir. 1991)      14
*U.S. v. Leo*
    941 F.2d 181, 196-97 (3d Cir. 1991)      15
*In re Zyprexa Prods. Liab. Litig.*
    489 F.Supp.2d 230, 282 (E.D.N.Y., 2007)      12

STATUTES

Federal Rule 26(a)(2)                                              3
Federal Rule of Evidence 401                                     13
Federal Rule of Evidence 403                                     17
Federal Rule of Evidence 702                                      9
Federal Rule of Evidence 704                                     14
Local Rule 56.1 Statement of Material Facts                       3
Sarbanes-Oxley Act of 2002                                        2

I submit this memorandum of law in opposition to Plaintiffs' motion to exclude the report and testimony of Alan D. Bell ("Bell") from the trial in this Action.

## 1.   INTRODUCTION

In the Amended Consolidated Class Action Complaint (the "ACC"), Plaintiffs claim that I violated: (i) Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder (the "10(b) Claims"); and (ii) Section 20(a) of the Exchange Act (the "20(a) Claims"). Plaintiffs assert: (1) in their 10(b) Claims, that I am liable for certain statements that I made personally; and (2) in their 20(a) Claims, that I am liable, as a "control person", for certain statements made on behalf of Defendant Longtop Financial Technologies, Ltd. ("Longtop"). Plaintiffs have alleged, and must still prove, that these statements made by me personally and on behalf of Longtop (together, the "Impugned Statements") were false and misleading (*see* ACC ¶¶ 162-167, 168-169, 170-172, 174-175, 177-197, 199-214, 218-221, 223-230, & 231-234).

In their Memorandum Of Law In Support Of Plaintiffs' Motion To Exclude Report And Testimony Of Alan D. Bell ("Plaintiffs' Memo"), Plaintiffs now advise that they are abandoning any claims based on the Impugned Statements relating to: (1) Longtop's relationship with a third-party staffing company named Xiamen Longtop Human Resources, and (2) Longtop's payment of social welfare contributions on behalf of its employees (together, the "Impugned XLHRS & Social Welfare Statements") (*see* Plaintiffs' Memo p. 25). As a result, because Plaintiffs already have conceded (at the October 21, 2013 Status Conference) that there is no evidence of "conscious misbehavior" on my part in respect of <u>any</u> of the Impugned Statements, I can only be found liable if Plaintiffs can prove that I was reckless in making either:

(1)     my certifications, required by the Sarbanes-Oxley Act of 2002 ("SOX"), relating to

Longtop's internal controls in its 2009 and 2010 Form 20F Annual Reports filed with the

Securities and Exchange Commission (the "SEC") (the "Impugned SOX Statements"); or

(2)     certain representations and certifications, that Longtop's financial results (the "US GAAP

Financial Statements") were reported in accordance with US GAAP (the "Impugned US GAAP

Statements") or that Longtop's business and financial results or its outlook were positive (the

"Impugned Positive Statements").

Plaintiffs must prove that I was reckless in making the Impugned SOX Statements,

Impugned US GAAP Statements, and Impugned Positive Statements (together, the "Remaining

Impugned Statements") because scienter is an essential element of the 10(b) Claims, and a

similar culpable state of mind is an essential element of the 20(a) Claims (see Memorandum Of

Law In Support Of Defendant Derek Palaschuk's Motion For Summary Judgment, pp. 3-5

(Docket No. 172-1)). Accordingly, Plaintiffs bear the burden of showing that I made the

Remaining Impugned Statements in a manner that was "highly unreasonable, representing an

extreme departure from the standards of ordinary care", or after "fail[ing] to review or check

information that [I] had a duty to monitor, or ignor[ing] obvious signs of fraud" (*Gould v.

Winstar Communs., Inc.*, 692 F.3d 148, 158 (2d Cir. N.Y., 2012) (citations omitted)).

Despite this onus on them, Plaintiffs have failed to adduce any evidence of the "standards

of ordinary care" applicable to a Chief Financial Officer ("CFO"), the information that a CFO

ordinarily has a duty to review or check, or even what a CFO would ordinarily recognize as an

obvious sign of fraud (together, the "Recklessness Standard").[1] Plaintiffs, without the assistance

---

[1] Plaintiffs' failure to obtain expert assistance may be responsible for the numerous technical
errors relating to accounting and auditing, some of which I describe in the Appendix attached
after page 21 of this memorandum of law.

of a qualified, reliable, relevant expert, now seek an order that would exclude key evidence on

these issues relating to the Recklessness Standard, namely Bell's testimony and his report dated

September 4, 2013 ("Bell's Report").

Because Plaintiffs bear the burden of proving scienter and culpability, and because expert

evidence is required to prove scienter in analogous cases, I expected that Plaintiffs would be

required to deliver a report on the Recklessness Standard. I consequently engaged Bell to prepare

a responding report within the deadline set by the Court for submitting such rebuttals. Bell's

Report was timely for a rebuttal report; if it does not qualify as a rebuttal report, however, it was

not delayed because of bad faith on my part and its admission will not prejudice Plaintiffs or

disrupt the orderly and efficient trial of this case. Bell is qualified as an expert on the

Recklessness Standard by his knowledge, skill, experience, training, and education. Because his

evidence is reliable and will assist the laypersons on the jury to understand the customs and

standards of a CFO in my position, and how my conduct measured up against such standards,

Bell's Report and his testimony should not be excluded, and Plaintiffs' motion instead should be

dismissed at this time.

## 2.   BACKGROUND[2]

On April 17, 2013, the Court issued an Amended Discovery Plan and Order stipulating

that: "For the party who has the initial burden of proof on the subject matter, the initial Federal

Rule 26(a)(2) disclosure of expert testimony is due on or before August 30, 2013. Rebuttal

expert reports on the same subject matter identified by the other party are due on or before

September 16, 2013. Along with the submission of the expert reports, the Parties shall advise of

---

[2] Plaintiffs' Memo's "Factual Background" presents a distorted version of Longtop's demise. Analysts issued positive reports, concluded the allegations were unsupported and "nothing new", and withdrew or revised negative reports. The New York Stock Exchange also only halted trading in Longtop's shares after I informed them, on my own initiative, of my concerns that the outside audit was being obstructed (*see* Local Rule 56.1 Statement of Material Facts ¶¶ 53-62).

the dates and times of the experts' availability for deposition." At the same time, the Court ordered that: "Expert Discovery in this case shall be completed on or before October 15, 2013."

On August 16, 2013, Plaintiffs delivered their Supplemental Responses and Objections to Defendant Derek Palaschuk's First Set of Interrogatories to Plaintiffs (the "Interrogatories Responses") (*see* Affidavit of Derek Palaschuk, sworn December 18, 2013 ("P.Af"), Ex 1). In the Interrogatories Responses, Plaintiffs did not indicate that their claims based on the Impugned XLHRS & Social Welfare Statements would not be pursued at trial, but instead expressly stated that they were persisting with those claims (*see e.g.* P.Af Ex 1, pp. 5 (Interrogatory No. 1) & 12 (Interrogatory No. 2)).

Although Plaintiffs served the Expert Report on Damages of Gang Hu. Ph.D., CFA ("Hu's Report") on August 30, 2013, Hu's Report expert did not address the Recklessness Standard. On August 31, 2013, I asked Plaintiffs' counsel whether they would be sending "another expert report to deal with accounting issues", but Plaintiffs' counsel advised that Hu's Report would be Plaintiffs' "only expert report" (*see* P.Af Ex 2).

Because of the onus on Plaintiffs to prove scienter and culpability, I had expected them to deliver a report on the Recklessness Standard, and had engaged Bell to review and respond to such a report (*see* P.Af ¶ 3; Ex 3). Because Plaintiffs had given no indication they would be abandoning their claims based on the Impugned XLHRS & Social Welfare Statements, I also understood that Longtop's U.S. GAAP treatment of those matters remained a "live issue", and so chose Bell in part because of his U.S. GAAP expertise (*see* Bell's Report App A).[3]

---

[3] More than 55 paragraphs of the ACC advance claims based on the Impugned XLHRS & Social Welfare Statements. Plaintiffs also did not indicate in the Interrogatories Responses that they would be abandoning their claims that I acted with an "intent to defraud", " conscious misbehavior", or "knowledge", claims that Plaintiffs subsequently conceded at the October 21, 2013 Status Conference are unsupported by any evidence. Both of these now moot issues not

I was shocked when the Friday, August 30, 2013 deadline passed without a germane report from Plaintiffs, but promptly took steps to deliver a report on the Recklessness Standard without further delay. On Wednesday, September 4, 2013, I provided Bell's Report to Plaintiffs' counsel along with Bell's availability for a deposition (*see* P.Af Ex 4). In their correspondence with me, Plaintiffs have not identified any prejudice they claim to have suffered as a result of Bell's Report being served on September 4, 2013 (*see* P.Af ¶ 5). Plaintiffs also did not take any steps to depose Bell, and the deadline to complete Expert Discovery has passed.

## 3.   ARGUMENT

### A.   Bell's Report Was Delivered in a Timely Manner

#### I.   *I Delivered Bell's Report Within the Deadline on Me to Submit a Report On Issues for Which Plaintiffs Bear the Burden of Proof*

"It is routine that the party with the burden of proof on a particular issue be the first to submit its expert reports addressing the issue. The other party then is given the opportunity to submit a rebuttal report and, if requested and allowed by the Court, a reply expert report may follow." *Ironshore Ins., Ltd. v. Western Asset Mgmt. Co.*, 2013 U.S. Dist. LEXIS 69404, *5 (S.D.N.Y., May 15, 2013), citing *Sandata Technologies, Inc. v. Infocrossing, Inc.*, 2007 U.S. Dist. LEXIS 85176, *1 (S.D.N.Y., Nov. 16, 2007*); Lidle v. Cirrus Design Corp.*, 2009 U.S. Dist. LEXIS 118850, *4 (S.D.N.Y., Dec. 18, 2009).

Plaintiffs bear "the initial burden of proof on the subject matter" of scienter (*see Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 31 (2007)) and culpability (*see ATSI Communs., Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir. N.Y., 2007)). Although Plaintiffs failed to submit an expert report addressing those issues by the August 30, 2013 deadline, Bell's Report was provided well before the September 16, 2013 deadline for me to provide a report on

---

only impacted the Bell Report but, by my estimate, I have incurred tens of thousands of dollars of unnecessary expense to address these now moot issues.

that same subject matter, and was therefore timely as a rebuttal report on the Recklessness Standard. Plaintiffs should not be allowed to use their own failure to adduce evidence on the Recklessness Standard to exclude all expert evidence on that issue for which they bear the burden of proof.[4]

### II.   *I Did Not Delay Delivery of Bell's Report in Bad Faith, and Its Admission Will Not Prejudice Plaintiffs or Disrupt this Case*

"Exclusion of expert testimony is a 'drastic remedy.' Precluding testimony of an expert, even when there has not been strict compliance with Rule 26, 'may at times tend to frustrate the Federal Rules' overarching objective of doing substantial justice to litigants.' " *RMED Int'l, Inc. v. Sloan's Supermarkets, Inc.*, 2002 U.S. Dist. LEXIS 23829, *11 (S.D.N.Y., Dec. 11, 2002) (emphasis added, citations omitted).

"When determining whether to exclude expert testimony, a court should consider: (1) the prejudice or surprise in fact of the party against whom the excluded witnesses would have testified, (2) the ability of that party to cure the prejudice, (3) the extent to which waiver of the rule against calling unlisted witnesses would disrupt the orderly and efficient trial of the case or of other cases in the court, and (4) bad faith or willfulness in failing to comply with the district court's [scheduling] order." *Id.* *12.

### a.   If Bell's Report is Not a Rebuttal Report and is Late, I Did Not Delay Its Delivery in Bad Faith or Willfully

In order for me to be liable for the Impugned Statements, it will not be enough for Plaintiffs to establish that I was only negligent; I accordingly expected that Plaintiffs would need to provide evidence of the "standards of ordinary care" in order show that my conduct was an "extreme departure" from that Recklessness Standard. Because the Remaining Impugned

---

[4] A plaintiff bearing the burden of proof on an issue, but fearful that the defendant's expert evidence would be more convincing, could, by not preparing a report, tactically and unfairly surprise a defendant into missing a deadline.

Statements are based on Longtop's US GAAP Financial Statements and certifications under SOX of Longtop's internal controls over financial reporting or "ICFR", and because the (now) abandoned claims relating to the Impugned XLHRS & Social Welfare Statements are based on Longtop's application of US GAAP, the claims against me are analogous to those against an auditor, which require the support of expert evidence to succeed. *See McKowan Lowe & Co., Ltd. v. Jasmine, Ltd.*, 2005 U.S. Dist. LEXIS 32164, *44 (D.N.J., June 30, 2005) ("The plaintiffs have provided no expert evidence that [the defendant auditor's] conduct was reckless or egregious, or that no reasonable accountant would have made the same decisions if confronted with the same facts. Without such evidence, the plaintiffs can not make out scienter: "Because laymen are unfamiliar with an auditor's duties, plaintiffs' failure to put forth expert evidence as to how [the defendant auditor's] alleged departure from those duties was so extreme as to constitute recklessness or intentional fraud is fatal to their claim." " (emphasis added)).

I had engaged Bell to review and respond to the anticipated report on the Recklessness Standard (*see* P.Af ¶ 3). When Plaintiffs failed to provide such an expert report by the Court's deadline, however, Bell promptly prepared his report; in case I was mistaken as to the burden imposed on Plaintiffs, Bell's Report was delivered to them without delay (*see* P.Af Ex 4). If Bell's Report is not a rebuttal report under the Court's scheduling order, it was not delayed because of bad faith but because of my misunderstanding of the burden of proof on Plaintiffs, and should not be excluded for being untimely.[5]

---

[5] I find it perplexing that the Plaintiffs did not engage an expert on the Recklessness Standard as I understand this to be a standard practice in cases such as mine involving complicated technical area related to a CFO's responsibility. The logical inference would be that Plaintiffs' expert would have provided further support that I did not make the Impugned Statements recklessly. If the Plaintiffs really did consider the Bell Report due on August 30, 2013, Plaintiffs had sufficient time and could have prepared a rebuttal report which they also elected not to do.

**b.**  **Admitting Bell's Report Will Not**
**Prejudice Plaintiffs or Disrupt the Trial of this Case**

Plaintiffs received Bell's Report on September 4, 2013, only five days, and on the third

workday, after the Court's deadline for opening reports (*see* Plaintiffs' Memo p. 12). Plaintiffs'

Memo does not identify any way in which that delay prejudices them, and they have not

described any such prejudice in their correspondence with me (*see* P.Af ¶ 5). Since Plaintiffs

took no steps to depose Bell (*see* P.Af ¶ 5; *see also* Affidavit of Alan D. Bell, sworn December

16, 2013[6] ("B.Af"), ¶2), it is not clear how they could have been prejudiced. If anyone was taken

by surprise, it was me: (1) I had expected Plaintiffs to provide an expert report on the

Recklessness Standard by the August 30, 2013 deadline; and (2) I did not know that Plaintiffs

would abandon their claims based on the Impugned XLHRS & Social Welfare Statements or that

I acted with an intent to defraud.  I suffered prejudice as a result: (1) I engaged Bell, rather than

another expert, based in part on how his US GAAP expertise would apply to the Impugned

XLHRS & Social Welfare Statements claims and the allegation that I had an intent to defraud;

(2) after learning that Plaintiffs would not provide a report on the Recklessness Standard, Bell

had very limited time to prepare his report; and (3) Bell's Report unnecessarily had to address in

detail the Impugned XLHRS & Social Welfare Statements, which have now been made moot.

Since Plaintiffs' Memo also does not identify any way in which the delay will disrupt this

litigation, the "drastic remedy" of excluding Bell's Report is not warranted in this case.

**B.**  **Bell's Education, Experience, and Knowledge Qualified Him to Be an Expert**

A witness may give expert testimony if the witness possesses the necessary and sufficient

qualifications by "knowledge, skill, experience, training, **or** education." Federal Rule of

---

[6] I respectfully request that the Court consider this affidavit, despite its length exceeding the ten-page limit set by Individual Rule IV(H), given the complexity of the subject matter and the Court's having earlier granted permission to submit affidavits longer than ten pages on the summary judgment motion.

Evidence 702 (emphasis added). "Because experts are granted more latitude than lay witnesses to testify about their opinions, challenges to a proffered expert's qualifications must be resolved as a threshold question. Courts within the Second Circuit have liberally construed expert qualification requirements' when determining if a witness can be considered an expert. In keeping with the 'liberal thrust' of the Federal Rules the standard for qualifying expert witnesses is liberal." *Crown Cork & Seal Co. v. Credit Suisse First Boston Corp.*, 2013 U.S. Dist. LEXIS 34368, *29 (S.D.N.Y., Mar. 12, 2013) (internal quotation marks, ellipses, and citations omitted).

"To determine whether a witness qualifies as an expert, the court must first ascertain whether the proffered expert has the educational background or training in a relevant field. Any one of the qualities listed in Rule 702 — knowledge, skill, experience, training, or education — may be sufficient to qualify a witness as an expert. A court then must compare the area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony." *Id.* (internal quotation marks and citations omitted).

While "[t]he expert's testimony must be related to those issues or subjects within his or her area of expertise", "[i]f the expert has educational and experiential qualifications in a general field closely related to the subject matter in question, the court will not exclude the testimony solely on the ground that the witness lacks expertise in the specialized areas that are directly pertinent. Thus, an expert should not be required to satisfy an overly narrow test of his [or her] own qualifications, and the court's focus should be on whether the expert's knowledge of the subject is such that his [or her] opinion will likely assist the trier of fact in arriving at the truth. Arguments that a proffered expert lacks particular educational or other experiential background, go to the weight, not the admissibility, of [the] testimony. *Id.*, *30 (emphasis added, internal quotation marks and citations omitted).

9

Because Plaintiffs failed to depose Bell with respect to his "knowledge, skill, experience, training, or education," they can only cast aspersions on his qualifications based on two putative *lacunae* in his resume (*see* Plantiffs' Memo p. 2). As a result, while Bell may not have worked himself as a CFO or specifically in the information technology industry, he is nevertheless qualified to provide the opinions set out in Bell's Report (*see generally* B.Af ¶¶ 3-13).

### I.    *Bell is Qualified to Opine on the Standards Applicable to a CFO*

Plaintiffs say that Bell cannot provide an opinion on the Recklessness Standard because he has not served as a CFO (*see* Plaintiffs' Memo p. 14). The Court should reject that challenge to Bell's qualifications because: "[s]imply put, knowledge and expertise need not necessarily be gained by on-the-job experience ... Rule 702 does not require insistence on specific backgrounds or narrow qualifications." *Id.*, *37 (internal citations omitted).

Bell, in fact, has extensive experience assessing CFOs. Working at Ernst & Young LLP ("E&Y") between 1973 and 2006, and particularly as an audit partner beginning in 1982 (*see* B.Af ¶ 4), Bell participated in "hundreds of audit opinions on behalf of E&Y," both as the coordinating partner signing the audit opinion as to whether a company had prepared its financial statements in accordance with US GAAP (*see* B.Af ¶ 5) and as a "second" partner reviewing such an audit (*see* B.Af ¶ 6). Bell also "would regularly perform an independent review of audits of various companies that were undertaken by E&Y's other offices" and participated in peer reviews of the other big four accounting firms, including Deloitte Touche Tohmatsu Limited ("DTT") (B.Af ¶ 7).

As a result, Bell has significant experience in working with the individuals responsible for public companies' finance function and assessing them with respect to US GAAP Financial Statements and ICFR: "[b]ecause the CFO is the member of a company's management responsible for the finance or accounting department, which prepares the US GAAP Financial

Statements, the CFO is the main person in a company that I dealt with as an audit partner when planning and executing an audit" (B.Af ¶ 8). Also, "[s]ince part of an audit partner's responsibility is to assess and audit the ICFR, the CFO and accounting department were evaluated each time [Bell] did an audit, using ICFR and the ability to prepare US GAAP Financial Statements as the basis for that assessment" (B.Af ¶ 8).

"In every audit in which [Bell] was the coordinating partner, and each year as a standard practice under E&Y's internal policies, [Bell] would perform an evaluation of the CFO's abilities to produce accurate US GAAP Financial Statements, the accounting department's ability to produce accurate US GAAP financial statements, and the quality of the company's ICFR" (B.Af ¶ 11). Bell has specific familiarity with the COSO framework used by Longtop (*see* B.Af ¶¶ 9-10) because his audit clients also used that same framework for their ICFR (*see* B.Af ¶ 10).

Bell has also served as chairman of a number of Audit Committees including for US public companies (*see* B.Af ¶ 12; Bell's Report <u>App</u> A). In that capacity, because his "responsibilities include reviewing and approving the quarterly and annual financial statements and approval of the audit committee charter" (Bell's Report ¶14), and because "the CFO is the member of management primarily responsible for the preparation of the US GAAP Financial Statements and ICFR," Bell has been "required to evaluate and assess the CFO' strengths and weaknesses, have regular communication with the CFO, as well as review the accounting department's and the company's ICFR" (B.Af ¶ 12).

Bell accordingly possesses the necessary and sufficient qualifications to provide an expert opinion on the Recklessness Standard, particularly the customs and practices expected of

a CFO for a public company that uses US GAAP and applies the COSO framework to its ICFR. [7]

**II.     *Bell is Qualified to Opine on the Accounting Standards***
**        *Applicable to a Public Company in Information Technology***

Plaintiffs also say that Bell's evidence should be excluded because "it is not apparent that

[he] has any experience auditing or advising companies in the information technology, or IT,

field" (*see* Plaintiffs' Memo p. 2). However, "[i]f the expert has educational and experiential

qualifications in a general field closely related to the subject matter in question, the court will not

exclude the testimony solely on the ground that the witness lacks expertise in the specialized

areas that are directly pertinent." *In re Zyprexa Prods. Liab. Litig.*, 489 F.Supp.2d 230, 282

(E.D.N.Y., 2007) citing *Stagl v. Delta Airlines, Inc.*, 117 F.3d 76, 80 (2d Cir., 1997). It is an

error for a District Court to exclude qualified experts by requiring such a "degree of specificity"

that it "came close to letting that industry indirectly set its own standards." *Stagl*, 82. *See also*

*Jahn v. Equine Services, PSC*, 233 F.3d 382, 390 (6th Cir. 2000) (experts not required to "know

answers to all the questions a case presents"); *Johnson & Johnson Vision Care, Inc. v. Ciba*

*Vision Corp.*, 2006 U.S. Dist. LEXIS 51869, *15 (S.D.N.Y., July 27, 2006) (an expert "should

not be required to satisfy an overly narrow test of his own qualifications").

Plaintiffs present no evidence and proffer no arguments demonstrating that the role of a

CFO in the IT field is substantively different that one in another industry. Bell acknowledges

forthrightly that he "has not been an audit partner on an audit engagement or sat on the Audit

Committee of companies in the [IT] industry," although "many of the companies [Bell has]

audited or on whose Audit Committee [he has] served have used sophisticated IT systems or

operated IT centers" (B.Af ¶ 13). But more importantly, "audit opinions, U.S. GAAS, and ICFR

standards are not industry-specific," and while "[s]ome accounting standards may require

---

[7] Bell also has "extensive experience dealing with the [SEC], working with senior executives and
boards of directors of public companies" (*See* Bell Report App A).

industry-specific knowledge, ... [Bell's] review of the [Longtop-related] material described in [Bell's] Report did not indicate any such U.S. GAAP accounting issues that were specific to the IT industry, such as revenue accounting for software contracts or accounting for research and development costs" (B.Af ¶ 13). Bell accordingly possesses the necessary and sufficient qualifications to provide an expert opinion on the Recklessness Standard applying to a CFO for a company in Longtop's field.

### C.   Bell's Evidence is Relevant, Reliable, and Will Help the Jury
#### I.   Except In Relation to the No Longer Impugned XLHRS &Social Welfare Statements, Bell's Evidence is Relevant

Plaintiffs seek to exclude certain opinions in Bell's Report pursuant to Federal Rule of Evidence 401 (*see* Plaintiffs' Memo pp. 24-25). Given Plaintiffs' sudden announcement that they will not be pursuing claims based on the Impugned XLHRS & Social Welfare Statements, I agree that Bell's analysis relating to those claims, namely a conclusion that Longtop properly accounted for XLHRS and its social welfare costs under US GAAP, is no longer relevant.

The rest of Bell's analysis remains relevant, however. Plaintiffs aver in a footnote (*see* Plaintiff's Memo fn. 17) that Bell's conclusions regarding "Cash and Loan Balances" should be excluded on the grounds they do not relate "to any claims Plaintiffs have asserted against" me. Plaintiffs have repetitively pleaded, though, that my "statements ... were materially false and misleading because they misrepresented and failed to disclose that Longtop had materially inflated its (a) cash and cash equivalents ... and materially understated or omitted disclosure of its (a) loan obligations" (*see e.g.* ACC ¶ 164). Should Plaintiffs concede that Longtop did not materially inflate its cash or loan balances, then the parts of Bell's Report addressing that issue will no longer be needed.

Plaintiffs also say that "Bell's opinions regarding whether Longtop employed 'good accounting practice[s]' ... do not have a tendency to make any 'fact [] of consequence' 'more or

less probably because these opinions relate to Longtop's conduct, not Palaschuk's" (Plaintiffs

Memo fn. 17). Contradictorily, Plaintiffs at the same time stress that "I was responsible for the

finance function at the company," which I wholeheartedly acknowledge (*see* Plaintiffs' Memo p.

6, citing Palaschuk Dep. Trans. 38:10-12). As a consequence, though, the fact that Longtop

"employed 'good accounting practice[s]'" suggests that I was diligent in my finance function

responsibilities and weighs against a finding that, in making the Remaining Impugned

Statements based on the information produced through those good accounting practices, my

conduct was an extreme departure from the Recklessness Standard.

Finally, Plaintiffs mischaracterize portions of Bell's opinion as relating to the claims

against DTT that this Court has dismissed (*see* Plaintiffs' Memo p. 25). These paragraphs of

Bell's Report (¶¶ 9-23 & 40-41) instead explain for a lay, non-accountant juror the role of an

auditor, the role of an audit committee, and the nature of financial statement audits, financial

statement reviews, "clean opinions" on ICFR, and the information an auditor is required to

communicate to an audit committee. The Second Circuit has found that kind of expert testimony

may be helpful to a jury in complex cases, to help the jury "understand unfamiliar terms and

concepts." *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991). Through his testimony,

Bell will help the jury understand how my reliance on DTT's findings and the information

generated by Longtop's (third-part tested) ICFR could militate in favor of finding that I was not

reckless in making the Remaining Impugned Statements.

## II.   *Bell's Evidence on the Still-Contested Issues Will*
## *Help the Jury to Understand the Applicable Standards*

Plaintiffs misconstrue Bell's evidence if they believe it will not help the jury or will usurp

the jury's role as the trier of fact (*see* Plaintiffs' Memo pp. 22-23). While Federal Rule of

Evidence 704 expressly provides that "[a]n opinion is not objectionable just because it embraces

an ultimate issue," Plaintiffs are correct that an expert may not opine on "what the law required." *See Airlines Reporting Corp. v. Belfon*, 2010 U.S. Dist. LEXIS 97349, *94 (D.V.I., September 15, 2010), citing *Casper v. SMG*, 389 F. Supp. 2d 618, 621 (D.N.J. 2005) and *U.S. v. Leo*, 941 F.2d 181, 196-97 (3d Cir. 1991)). "Notwithstanding this admonition, the line between admissible and inadmissible expert testimony as to the customs and practices of a particular industry often becomes blurred when the testimony concerns a party's compliance with customs and practices that implicate legal duties." *Id.*, * 95 citing *Berckeley Inv. Group, Ltd. v. Colkitt*, 455 F.3d 195, 218 (3d Cir. 2006).

"Expert testimony as to business custom and practice is generally admissible." *Id.*, *96. "Thus, in such cases, courts have found it helpful to permit the testimony of experts as to the standards of conduct against which the conduct of boards of directors is measured, without allowing that testimony to stray into the legal question of whether applicable duties were breached. *See, e.g.*, *PFS Distrib. Co. v. Raduechel*, 574 F.3d 580, 597 (8th Cir. 2009) (holding that testimony of accounting expert who opined that accountant acted in compliance with professional accounting standards and bank expert who testified that bank correctly handled relevant file under banking standards were relevant to knowledge or state of mind of accountant and bank vice president and, thus, were admissible in trial on claims against accountant and vice president under Iowa law for conspiracy and aiding and abetting employees' breach of fiduciary duty to employer); *CDX Liquidating Trust ex rel. CDX Liquidating Trustee v. Venrock Assoc.*, 411 B.R. 571, 588 (N.D. Ill. 2009) (holding that while expert may not opine about whether defendants breached their applicable fiduciary duties nor apply the law to specific actions taken in this case, he may testify about defendants' conduct in light of industry practices and standards)." *Id.* (concluding that "[t]o the extent [the expert] testifies as to his understanding of

industry standards, [the defendants'] functional as opposed to titular roles within the corporation, and the fiduciary members of a board of directors generally, his testimony is both relevant and helpful to assist a trier of fact in determining the existence and breach of a fiduciary duty by the various Defendants". *Id.*, *98).

Accordingly, "[a]n expert may properly testify as to the customs and standards of an industry, and opine as to how a party's conduct measured up against such standards." *Lippe v. Bairnco Corp.*, 2002 U.S. Dist. LEXIS 109, *4 (S.D.N.Y. Jan. 7, 2002), which is what Bell has done in his report. Where he states that it was "reasonable for Palaschuk as CFO to place reliance on" certain audits, reviews, reports, documents, or processes (specifically, certain ICFR), Bell is explaining that those practices are customarily what a CFO relies on in the performances of her or his duties (*see* B.Af ¶ 14). Bell also describes whether certain incidents or discoveries would be out of the ordinary for a CFO (*see e.g.* Bell's Report ¶ 48, clarifying that the detection of fraud risk factors is an expected and common result of an audit).[8] Accordingly, while Bell "uses some legal terminology when reaching these conclusions, nothing in the conclusions themselves suggest that he is opining as to an issue of law." *Airlines Reporting*, *98. Bell instead opines on whether specific mechanisms that I used at Longtop, and certain events that I witnessed, are methods usually relied on, or occurrences seen, by a CFO.[9] As a result Bell's Report is not

---

[8] Plaintiffs' Memo fn. 8 is correct that Bell cannot express an expert opinion on what I personally would, or would not, have viewed as a "red flag". Bell can, though, identify what happenings are a common occurrence for a CFO, which would help the jury to decide whether my reaction to a particular event was so "extreme [a] departure from the standards of ordinary care" as to constitute recklessness on my part.

[9] Plaintiffs' Memo fn. 4 misleadingly implies that Bell's opinion is that a "CFO can abdicate his or her responsibilities and duties by simply relying on an outside auditor", even though Bell's Report expressly explains that "[t]he preparation of financial statements is the responsibility of Longtop's management" (¶ 9) and that I, "as CFO, was responsible for certifying the financial statements" (¶ 110). Plaintiffs Memo p.24 also misleadingly implies it is "unclear" on the "purpose" of the reliance even though Bell in various parts of his report uses the words "as CFO".

"vague," "conclusory," or "misleading," and its probative value is certainly not so "substantially outweighed by [its] danger" to make it inadmissible under Federal Rule of Evidence 403.

From his years of experience at E&Y, Bell also provides helpful evidence of the business customs and practices of auditors. While Plaintiffs contend that the "interpretation of the text of [DTT]'s resignation letter [is] an analysis that requires no specialized knowledge or expertise and is not beyond the ken of the average juror", Bell is able to provide a professional's insight: he is "familiar with the communication requirements imposed on a resigning auditor [and is] also acquainted with the various terms that auditors use when resigning, as [he has] had to issue an auditor resignation letter on behalf of E&Y" (B.Af ¶ 21). Bell's expertise will help jurors consider what was left unsaid: "[a]s an auditor, DTT's letter is interesting for what it does not say: it does not identify material errors in Longtop's financial statements or say that its *reported* cash and outstanding debt were materially false" (B.Af ¶ 20). That matters, because "based on [Bell's] experience and understanding of the communication requirements for an auditor's resignation, if an auditor ascertained there were material errors in the financial statements that they had previously audited, this would be an important fact that the resigning auditor would disclose" (B.Af ¶ 24) and "if DTT had found 'falsity' in the previously released U.S. GAAP Financial Statements as opposed to the March 31, 2011 'financial records', I believe they would have indicated such according to industry practice" (B.Af ¶ 26). By explaining the difference between "representations of management" and "*reported* financial statements" (*see* Bell's Report ¶¶59-65; B.Af ¶ 22), and between audits of financial statements (*see* Bell's Report ¶¶10-24) and audits of ICFR (*see* Bell's Report ¶¶ 27-39), Bell's Report can help the jury understand unfamiliar terms and concepts.

### III.   *Bell's Evidence on the Still-Contested Issues is Reliable*

"As the Second Circuit has noted, district courts should presume expert evidence is reliable." *Crown Cork*, * 32 (citation omitted). "Sometimes, expert testimony does not rest on traditional scientific methods. In such cases, where a proposed expert witness bases her testimony on practical experience rather than scientific analysis, courts recognize that experts of all kinds tie observations to conclusions through the use of what Judge Learned Hand called general truths derived from specialized experience. Thus, the *Daubert* factors do not all necessarily apply even in every instance in which reliability of scientific testimony is challenged, and in many cases, the reliability inquiry may instead focus upon personal knowledge and experience of the expert." *Joseph P. Carroll Ltd. v. Baker*, 2013 U.S. Dist. LEXIS 45884, **55 (S.D.N.Y., Mar. 29, 2013) (internal quotation marks and citations to, *e.g. Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 149-50, (1999), omitted).

Bell's Report is based on his personal knowledge and experience (*see* Bell's Report ¶¶ 6-7) in subjects such as US GAAP, US GAAS, SOX, ICFR and the COSO Framework for ICFR[10] (*see e.g.* Bell's Report ¶¶ 28&29) and his testimony would be based on practical experience (*see* B.Af ¶¶ 14&15, summarizing Bell's analysis and assessments). Plaintiffs attack Bell's methodology as unscientific (*see e.g.* Plaintiffs' Memo p. 16), but their criticism disregards the general truths derived from specialized experience. Bell is not "regurgitat[ing] facts", even if some of his conclusions come easily to him; for example, while he does conclude "Mr. Palaschuk's comments actually related to booking vendor invoices not to booking revenues" and "I do not understand how the Plaintiffs construe these comments as a problem with revenue controls" (Bell's Report ¶ 53), he solidly bases that opinion on the evidence (*see* B.Af ¶¶ 16&17, citing document SEC0372038: "As an accountant, it is self-evident that vendor invoices or

---

[10] Encompassing hundreds of internal control processes used to prepare financial statements.

purchase contracts, whether booked as inventory or as fixed assets, necessarily relate to expenditures which are unrelated to revenues. As a result, it is still my professional opinion that the entry described in the email in ¶53, regardless of whether the described entry was booked correctly or not, cannot be construed as a problem with revenue controls").

Plaintiffs ask the Court to reject Bell's review of DTT's audits and reviews because they say: "an analysis of *DTT's* conduct cannot be used to support a conclusion related to Palaschuk or the reasonableness of his actions." As set out in Bell's Report, however, and as Bell can set out for the jury: (1) a CFO would ordinarily rely on audits and reviews by his or her company's "big four" auditor; (2) even if DTT's audits identified "fraud risk factors", that is not the same as uncovering fraud; and (3) DTT's audit of Longtop was not, according to 23-year audit partner, so subpar that its CFO could not have confidence in its conclusions. What DTT found, and did not find, is relevant to the Recklessness Standard, and so to me and to my scienter and culpability.

Without an expert to guide them or the requisite expertise on the matters described in the Bell Report, Plaintiffs proceed to nitpick Bell's report for purportedly not reviewing two documents out of four million pages of discovery, namely: (1) an email I sent to Longtop's CEO in February 2010 regarding a proposed reorganization by the human resources department of the finance function (with which I disagreed and did not allow to take place) (*see* Plaintiffs' Memo p. 19; *see also* Local Rule 56.1 Statement of Material Facts ("SoF") ¶22); and (2) ███████████ ████████████████████████ after I had already warned the NYSE that Longtop staff were not following my instruction to assist DTT, and already written Longtop's Board of

Directors to inform Longtop that I was resigning because of the Longtop's failure to cooperate with DTT (*see* Plaintiffs' Memo p. 20; *see also* SoF ¶¶ 62&63).[11]

As Plaintiffs could have easily ascertained by deposing him, Bell in fact did review those documents, even if he did not refer to them expressly in Bell's Report (*see* B.Af ¶¶ 27-47). In any event, because the ████████████████████ the last of the Remaining Impugned Statements, they cannot be relevant to the question of whether I was reckless in making those statements (see *RMED Int'l*, *6 (S.D.N.Y. Dec. 11, 2002): "Materiality and scienter are determined based on the facts as they existed at the time of the alleged misstatement or omission. *See Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171, 185 (2d Cir. 2001)" (other citations omitted)).

## 4.   CONCLUSION

Plaintiffs have declined to obtain an expert report. Plaintiffs motion to exclude Bell's Report and testimony would accordingly deny the jury important evidence on how my conduct as Longtop's CFO may have departed from the Recklessness Standard. Had Plaintiffs adduced any expert evidence on this issue for which they bear the onus of proof, Bell's Report would have been unquestionably timely as a rebuttal report, and no prejudice or delay will result from its inclusion. Bell is qualified by education, experience, and knowledge, the result of his long service as an E&Y audit partner, to opine on the standards applicable to a CFO, including one in the IT field like Longtop. Bell's evidence will help the jury understand the applicable business customs and practices, terms and concepts. Bell's evidence is relevant to the Recklessness Standard. Bell's evidence is also reliable.

For these reasons, Plaintiffs' motion should be dismissed.

---

[11] If Plaintiffs had engaged an expert, perhaps she or he would have explained for the Court how these two documents show that I failed to review or check information that I had a duty to monitor, or ignored obvious signs of fraud.

Dated: December 18, 2013

Respectfully submitted,

Derek Palaschuk
*Defendant PRO SE*

**APPENDIX**
**to Defendant Derek Palaschuk's Memorandum of Law**
**in Opposition to Plaintiffs' Motion to Exclude Report and Testimony of Alan D. Bell**

Plaintiffs contend that Bell opines on matters that require no specialized knowledge or expertise and are not beyond the ken of the average juror. Despite that assertion, Plaintiffs' pleading is replete with technical errors that demonstrate the importance of expert evidence in this case. For example:

The ACC contains more than 55 paragraphs related to allegations that Longtop improperly accounted under US GAAP for its relationship with XLHRS and its payments for social welfare, which allegations Plaintiffs now tacitly concede are incorrect. Plaintiffs also impliedly abandon their claims, which comprise more than 80 paragraphs of the ACC, that DTT's audits (on which I relied, among other things, in making the Impugned Statements) were not sufficient (*see* Plaintiffs' Memo p. 25).

Plaintiffs claim that DTT decided "not to perform confirmation procedures for the Company's reported accounts receivables and revenues was not appropriate under GAAS" (ACC ¶ 120). That erroneous statement is made despite: (1) documents SEC_0088640 and SEC_0018006, which are lists of accounts receivable confirmations sent by DTT, having been produced to Plaintiffs; (2) GAAS AU 330 not requiring the confirmation of the terms of revenue contracts (*see* Bell Report ¶57; SAS Order pp. 42-44); and (3) the fact DTT did confirm terms of revenue contracts in their fiscal 2008 audit (*See* SAS Order p. 44).

Plaintiffs also allege that "during the Class Period and Longtop's fail[ed] to conduct month-end bank reconciliation" (ACC ¶ 112), even though various documents were produced to the Plaintiffs indicating bank reconciliations were prepared (*see e.g.* SEC_2688024-32 and SEC1539943-50; Bell's Report ¶¶ 49 – 51).

Plaintiffs claim "Longtop's internal controls related to revenue were grossly inadequate, out of step with industry practice and presented the opportunity for fraud" (ACC ¶ 123) based on document SEC0372038, which is unrelated to revenue controls (*see* Bell Report ¶ 52-54) – in fact, of the over 6,000 words and Chinese characters, the word "revenue" appears less than five times.

Plaintiffs boldly allege that DTT identified material internal control weaknesses at Longtop during the Class Period (*see* ACC ¶¶ 13&95) when no such weaknesses were identified (*see* Bell's Report ¶¶ 40-41 and 2008, 2009, 2010 Longtop 20F Annual Reports).

Again, Plaintiffs are incorrect to state: "DTT resigned and acknowledged publicly that Longtop's financial statements, including its <u>reported</u> cash and outstanding debt, were materially false" (ACC ¶ 14, emphasis added). *See* Bell's Report beginning at ¶ 20.

Plaintiffs also erroneously attribute to DTT my own statement to the Audit Committee about "significant work being required" (ACC ¶ 101), and then combine my statement with a standard risk factor about "management had the ability to override internal controls" in an attempt to manufacture an allegation. (*see* ACC ¶ 102).

Plaintiffs refer to "material deficiencies in its internal controls" (ACC ¶ 110) but there is no such US GAAS or COSO terminology as "material deficiencies". Presumably, Plaintiffs are referring to "material weaknesses in internal control".

Finally, Plaintiffs demonstrate a misunderstanding of something as basic as the meaning of an audit risk factor when they state: "[g]iven DTT's awareness of these fraud risk factors and material deficiencies in Longtop's internal controls, DTT should have issued an adverse opinion" (*see* ACC ¶ 106)  (SAS Order pp. 56-58).

2

Derek Palaschuk
4326 Dunbar Street
P.O. Box 45117
Vancouver, British Columbia
Canada   V6S 2M8

*Defendant PRO SE*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE
LONGTOP FINANCIAL
TECHNOLOGIES LIMITED
SECURITIES LITIGATION

Civil Action No. 11-cv-3658-SAS

**AFFIDAVIT OF DEREK PALASCHUK
IN OPPOSITION TO PLAINTIFFS' MOTION
TO EXCLUDE REPORT AND TESTIMONY OF ALAN D. BELL**

I, Derek Palaschuk, being duly sworn, do hereby swear and affirm under penalty of perjury under the laws of the United States of America that the contents of this Affidavit are true and correct to the best of my knowledge, information, and belief.

1.      A true and correct copy of the Supplemental Responses and Objections to Defendant Derek Palaschuk's First Set of Interrogatories to Plaintiffs that I received on or about August 16, 2013 is attached as Exhibit 1 to this affidavit.

2.      A true and correct copy of email correspondence I exchanged with Kimberly A. Justice , lawyer for the Plaintiffs, on or about August 31, 2013 is attached as Exhibit 2 to this affidavit.

3.      I originally engaged Alan D. Bell to review and respond to an expert report from the Plaintiffs on accounting standards. When I learned that such a report would not be forthcoming from the Plaintiffs, I took steps to have Mr. Bell prepare a report in an expedited fashion.  A true and correct copy of an email I sent to Ms. Justice on or about September 3, 2013, advising her that my report would be sent the following day, is attached as Exhibit 3 to this affidavit.

4.      On or about September 4, 2013, I sent Mr. Bell's report to Ms. Justice, and advised her of his availability for a deposition.  A true and correct copy of my email to that effect is attached as Exhibit 4 to this affidavit.

5.      In their communication with me, the Plaintiffs have not identified any prejudice they have suffered as a result of receiving Mr. Bell's report on September 4, 2013.  The Plaintiffs also did not contact me or, to my knowledge, Mr. Bell to schedule a deposition of him.

I, Derek Palaschuk, being duly sworn, do hereby swear and affirm under penalty of perjury under the laws of the United States of America that the contents of this Affidavit that includes 5 separately numbered paragraphs and that Exhibits 1 through 4 are true and correct to the best of my knowledge, information and belief.


_____
Derek Paschuk


Sworn and affirmed before me this 18th day of December 2013 in Vancouver, British Columbia


JOEL HILL
HAKEMI & RIDGEDALE LLP
Suite 1730, One Bentall Centre
505 Burrard Street, PO Box 26
Vancouver, BC, V7X 1M6 Canada
Tel: 604-601-2020
jhill@hakemiridgedale.com

# Exhibit 1

# Supplemental Responses and Objections to Defendant Derek Palaschuk's First Set of Interrogatories to Plaintiffs

JOEL HILL
HAKEMI & RIDGEDALE LLP
Suite 1730, One Bentall Centre
505 Burrard Street, PO Box 26
Vancouver, BC, V7X 1M6 Canada
Tel: 604-601-2020
jhill@hakemiridgedale.com

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE LONGTOP FINANCIAL TECHNOLOGIES LIMITED SECURITIES LITIGATION | C.A. No. 11-cv-03658-SAS |

## SUPPLEMENTAL RESPONSES AND OBJECTIONS TO DEFENDANT DEREK PALASCHUK'S FIRST SET OF INTERROGATORIES TO PLAINTIFFS

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure and Rule 33.3 of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York ("Local Rules"), Court appointed lead plaintiffs Danske Invest Management A/S and Pension Funds of Local No. One, I.A.S.T.E. ("Lead Plaintiffs") hereby provide the following supplemental responses to defendant Derek Palaschuk's ("Palaschuk") First Set of Interrogatories to Plaintiffs ("Interrogatories"):

## INTRODUCTION

Lead Plaintiffs' responses to these Interrogatories are made for the sole purpose of this action. Each response is subject to all objections as to competence, relevance, materiality, admissibility, privilege, privacy and the like and any and all other objections are reserved and may be interposed at the time of trial.

No incidental, indirect, or implied admissions are intended in Lead Plaintiffs' responses. Lead Plaintiffs' response(s) to all or any part of an Interrogatory should not be taken as an admission that: (a) Lead Plaintiffs accept or admit the existence of any fact(s) set forth or assumed by that Interrogatory; (b) Lead Plaintiffs have in their possession, custody or control any information or documents responsive to that Interrogatory; (c) information or documents

responsive to that Interrogatory exist; or (d) Lead Plaintiffs' response(s) constitute admissible evidence. Lead Plaintiffs' response(s) to all or any part of an Interrogatory is not intended to be and shall not be a waiver by Lead Plaintiffs of all or any part of their objection(s) to that Interrogatory.

While Lead Plaintiffs' pre-filing and subsequent investigative efforts have been substantial, Lead Plaintiffs have not completed (a) their investigation of the facts relating to this case, (b) all discovery in this action, or (c) preparations for trial. Moreover, pursuant to the Amended Discovery Plan and Order entered on April 17, 2013, (the "April 17, 2013 Order") (ECF No. 151), fact discovery will conclude on or before August 16, 2013, and expert discovery will conclude on or before October 15, 2013. Lead Plaintiffs' responses to these Interrogatories are based upon information known at the time of the response(s). Lead Plaintiffs reserve the right to make use of, or to introduce at any deposition, hearing and/or trial, information or documents responsive to the Interrogatories but discovered subsequent to the date of service of these responses, including, but not limited to, any information or documents obtained in discovery herein, and to supplement any responses provided.

## GENERAL OBJECTIONS

1.    Lead Plaintiffs object to the Interrogatories, including the Definitions and Instructions set forth therein, to the extent that they seek to impose any burdens or obligations on Lead Plaintiffs that are not imposed by law, or are otherwise inconsistent with the Federal Rules of Civil Procedure, Local Rules, any Order by the Court, or any other applicable rule of procedure or law.

2.    Lead Plaintiffs object to the Interrogatories to the extent that they seek information that is irrelevant to any claim, defense or subject matter of the litigation, or are not

reasonably calculated to lead to the discovery of admissible evidence, or are beyond the scope of permissible discovery.

3.    Lead Plaintiffs object to the Interrogatories, including the Definitions and Instructions set forth therein, to the extent that they seek or purport to require the disclosure of nondiscoverable confidential or proprietary information, information protected by the attorney-client privilege, the attorney work product doctrine, the joint prosecution or common interest privilege or rules, or any other applicable privilege, protection or immunity.  To the extent Lead Plaintiffs may provide any information in response to the Interrogatories, Lead Plaintiffs do not waive any privileges, protections or immunities.

4.    Lead Plaintiffs object to the Interrogatories, Definitions and Instructions to the extent that they seek information or documents that are not within Lead Plaintiffs' possession, custody or control.

5.    Lead Plaintiffs object to the Interrogatories as unduly burdensome to the extent that they subject Lead Plaintiffs to unreasonable and undue annoyance, oppression, burden and expense or seek: (a) information or documents in the public domain, including the pleadings in this action, as such information or documents is equally available to Palaschuk; or (b) information or documents to which Palaschuk has equal or greater access.

6.    Lead Plaintiffs object to the Interrogatories to the extent that they seek information that is exclusively or predominantly in the possession, custody or control of Defendants, other parties and/or non-parties and thereby impose an undue burden upon Lead Plaintiffs.

7.      Lead Plaintiffs object to the Interrogatories insofar as they are overbroad, vague, or ambiguous, and/or to the extent that the discovery sought is unreasonably cumulative, duplicative, or unduly burdensome.

8.      Lead Plaintiffs object to the Interrogatories to the extent that they seek information that may be related to expert testimony or opinion.  In light of the fact that expert discovery is yet to be completed, such interrogatories are premature.

9.      Lead Plaintiffs object to the Interrogatories to the extent they that they seek the identification of "all facts" as such interrogatories are overbroad and unduly burdensome. Discovery in this action has not yet concluded and therefore Lead Plaintiffs are unable to provide all facts with respect to the subjects of the Interrogatories.

10.     Lead Plaintiffs object to the Definitions and Instructions included in the Interrogatories to the extent that they purport to define terms and/or seek to characterize evidence.  To the extent that Lead Plaintiffs expressly or impliedly adopt any defined term set forth in the Interrogatories, such adoption is specifically limited to these responses and does not constitute an admission of fact or law.

11.     Lead Plaintiffs object to the Interrogatories to the extent that they call for a legal conclusion and/or opinion, including any explanation, advice, or rationale based upon legal analysis.

12.     Lead Plaintiffs object to the definition of "Complaint" set forth in the Definitions as the operative complaint in this action is the Amended Consolidated Class Action Complaint ("Amended Complaint") filed on December 14, 2012.  The paragraph references in Lead Plaintiffs' Specific Responses and Objections below are to the Amended Complaint.

4

## SPECIFIC RESPONSES AND OBJECTIONS

Lead Plaintiffs incorporate by reference the foregoing General Objections in each of the following specific responses and objections as if fully set forth therein. To the extent specific objections appear in the response to a particular Interrogatory, they so appear because they are particularly applicable to that specific Interrogatory; this is not to be construed as a waiver or limitation of any General Objection applicable to such Interrogatory.

**Interrogatory No. 1:**

Identify each Misstatement you contend Palaschuk made that forms the basis of your claims under Sections 10(b) and 20(a) of the Securities Exchange Act. Your answer shall identify each Misstatement chronologically. If any Misstatement is in a document, your answer shall identify the precise words that you contend were false or information you contend was omitted on the date of the statement, the speaker, and the page number of the document on which you contend the Misstatement appears. If the Misstatement is oral, your answer shall identify the date of the statement, the speaker, and the location in which the statement was made and precise false or misleading words spoken or the omissions that you contend rendered the statement false or misleading.

**Response to Interrogatory No. 1:**

In addition to the foregoing General Objections, Lead Plaintiffs specifically object to this Interrogatory to the extent that it is duplicative and seeks information Lead Plaintiffs have provided in response to other discovery requests, the Amended Complaint and/or in Lead Plaintiffs' Initial Disclosure Statement Pursuant to Fed. R. Civ. P. 26(a)(1). Subject to and without waiving the foregoing objections, Lead Plaintiffs respond as follows.

As set forth in the Amended Complaint, Palaschuk made materially false or misleading statements with respect to the related party transactions Longtop Financial Technologies Ltd. ("Longtop" or the "Company") engaged in with Xiamen Longtop Human Resources Services Company ("XLHRS") to avoid certain welfare obligations and the financial condition of the Company. In particular:

(i)      As set forth in ¶¶ 168-69 of the Amended Complaint, Palaschuk signed Longtop's Form 6-K issued on February 21, 2008 which contained materially false and misleading statements in violation of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act");

(ii)     As set forth in ¶¶ 170-71 of the Amended Complaint, Palaschuk signed Longtop's Form 6-K issued on May 18, 2008 which contained materially false and misleading statements in violation of Section 10(b) of the Exchange Act;

(iii)    As set forth in ¶¶ 172-75 of the Amended Complaint, Palaschuk signed Longtop's 2008 Form 20-F filed with the SEC on July 1, 2008 which contained materially false and misleading statements in violation of Section 10(b) of the Exchange Act;

(iv)     As set forth in ¶¶ 177, 179 of the Amended Complaint, Palaschuk signed Longtop's Form 6-K issued on August 12, 2008 which contained materially false and misleading statements in violation of Section 10(b) of the Exchange Act;

(v)      As set forth in ¶¶ 180-82 of the Amended Complaint, Palaschuk signed Longtop's Form 6-K issued on November 16, 2008 which contained materially false and misleading statements in violation of Section 10(b) of the Exchange Act and also made materially false and misleading statements in violation of Section 10(b) of the Exchange Act when commenting on the reported results;

(vi)     As set forth in ¶¶ 183-85 of the Amended Complaint, Palaschuk signed Longtop's Form 6-K issued on February 18, 2009 which contained materially false and misleading statements in violation of Section 10(b) of the Exchange Act and also made materially false and misleading statements in violation of Section 10(b) of the Exchange Act when commenting on the reported results;

(vii)    As set forth in ¶¶ 186, 188 of the Amended Complaint, Palaschuk signed Longtop's Form 6-K issued on May 15, 2009 which contained materially false and misleading statements in violation of Section 10(b) of the Exchange Act;

(viii)   As set forth in ¶¶ 187-88 of the Amended Complaint, Palaschuk signed Longtop's Form 6-K issued on May 27, 2009 which contained materially false and misleading statements in violation of Section 10(b) of the Exchange Act;

(ix)    As set forth in ¶¶ 189-95 of the Amended Complaint, Palaschuk signed Longtop's 2009 Form 20-F filed on June 29, 2009 which contained materially false and misleading statements in violation of Section 10(b) of the Exchange Act;

(x)     As set forth in ¶¶ 194-95, 231-34 of the Amended Complaint, Palaschuk's certification pursuant to the Sarbanes-Oxley Act of 2002 signed in connection with the 2009 Form 20-F was materially false and misleading in violation of Section 10(b) of the Exchange Act;

(xi)    As set forth in ¶¶ 197, 199 of the Amended Complaint, Palaschuk signed Longtop's Form 6-K issued on August 18, 2009 which contained materially false and misleading statements in violation of Section 10(b) of the Exchange Act;

(xii)   As set forth in ¶¶ 200-01 of the Amended Complaint, Palaschuk signed Longtop's Form 6-K issued on November 16, 2009 which contained materially false and misleading statements in violation of Section 10(b) of the Exchange Act;

(xiii)  As set forth in ¶¶ 205-07 of the Amended Complaint, Palaschuk signed Longtop's Form 6-K issued on February 10, 2010 which contained materially false and misleading statements in violation of Section 10(b) of the Exchange Act and also made materially false and

misleading statements in violation of Section 10(b) of the Exchange Act when commenting on the reported results;

(xiv)   As set forth in ¶¶ 208-09, Palaschuk participated in a March 31, 2010 conference call during which Philip Li made false and misleading statements in violation of Section 10(b) of the Exchange Act;

(xv)   As set forth in ¶¶ 210, 219 of the Amended Complaint, Palaschuk signed Longtop's Form 6-K issued on May 23, 2010 which contained materially false and misleading statements in violation of Section 10(b) of the Exchange Act;

(xvi)   As set forth in ¶¶ 212, 219 of the Amended Complaint, Palaschuk made materially false and misleading statements in violation of Section 10(b) of the Exchange Act during a May 24, 2010 investor conference call;

(xvii)   As set forth in ¶¶ 213-19 of the Amended Complaint, Palaschuk signed Longtop's 2010 Form 20-F filed on July 16, 2010 which contained materially false and misleading statements in violation of Section 10(b) of the Exchange Act;

(xviii)   As set forth in ¶¶ 218-19, 231-34 of the Amended Complaint, Palaschuk's certification pursuant to the Sarbanes-Oxley Act of 2002 signed in connection with the 2010 Form 20-F was materially false and misleading in violation of Section 10(b) of the Exchange Act;

(xix)   As set forth in ¶¶ 221, 223-24 of the Amended Complaint, Palaschuk signed Longtop's Form 6-K issued on August 18, 2010 which contained materially false and misleading statements in violation of Section 10(b) of the Exchange Act and also made materially false and misleading statements in violation of Section 10(b) of the Exchange Act when commenting on the reported results;

(xx)   As set forth in ¶¶ 225-27 of the Amended Complaint, Palaschuk signed Longtop's Form 6-K issued on November 14, 2010 which contained materially false and misleading statements in violation of Section 10(b) of the Exchange Act and also made materially false and misleading statements in violation of Section 10(b) of the Exchange Act when commenting on the reported results;

(xxi)   As set forth in ¶¶ 228, 230 of the Amended Complaint, Palaschuk signed Longtop's Form 6-K issued on January 31, 2011 which contained materially false and misleading statements in violation of Section 10(b) of the Exchange Act;

(xxii)   As set forth in ¶¶ 49-51 of the Amended Complaint, Palaschuk made materially false and misleading statements in violation of Section 10(b) of the Securities Exchange Act during an April 28, 2011 conference call with investors; and

(xxiii)  As set forth in ¶¶ 262-65, Palaschuk is also liable under Section 20(a) of the Exchange Act with respect to each of the statements referenced above in parts (i)-(xxiii) of Lead Plaintiffs' Response No. 1.

**Interrogatory No. 2:**

For each Misstatement identified in your answer to Interrogatory No. 1, identify all facts existing on or before the date of the Misstatement that demonstrate that Palaschuk made the Misstatement with intent to defraud or with recklessness.

**Response to Interrogatory No. 2:**

In addition to the foregoing General Objections, Lead Plaintiffs specifically object to this Interrogatory to the extent that it is duplicative and seeks information Lead Plaintiffs have provided in response to other discovery requests, the Amended Complaint and/or in Lead Plaintiffs' Initial Disclosure Statement Pursuant to Fed. R. Civ. P. 26(a)(1). Subject to and without waiving the foregoing objections, Lead Plaintiffs respond as follows.

9

As set forth in ¶ 31 of the Amended Complaint, Palaschuk served as Longtop's CFO from September 2006, prior to the first alleged misstatement, until his resignation on or about May 19, 2011. Through his role as Longtop's CFO, as well as his stock ownership, Palaschuk was in a position to control all of the Company's false and misleading statements and omissions, including the content of the Forms 20-F, Forms 6-K and press releases mentioned in Lead Plaintiffs' Response No. 1, directly above. *See, e.g.,* Amended Complaint ¶ 64; *see also, e.g.,* Transcript from August 2, 2013 Deposition of Derek Palaschuk ("Palaschuk Tr.") at 39:3-23.

Palaschuk similarly possessed the power and authority to control the contents of Longtop's presentations to securities analysts, money and portfolio managers and institutional investors, i.e. the market. *See, e.g.,* Amended Complaint ¶ 65. Palaschuk was provided with copies of the Company's reports and press releases alleged to be materially false and misleading prior to, or shortly after, their issuance and had the ability and opportunity to cause them to be corrected, as set forth in the Amended Complaint. *Id.; see also, e.g.,* Reponses and Objections to Lead Plaintiffs' First Requests for Admissions to Derek Palaschuk ("Palaschuk's RFA Responses"), Response Nos. 3, d. (admitting that Palaschuk reviewed copies of Longtop's SEC filings prior to their submission to the SEC); 3, g. (admitting that Palaschuk approved Longtop's press releases in English involving financial results or products); 3, j. (admitting that Palaschuk was involved in preparing the scripts for Longtop's quarterly earnings conference calls); 3, k. (admitting that Palaschuk was involved in preparing and presenting "some" of Longtop's presentations to, *inter alia,* securities analysts, money and portfolio managers and institutional investors prior to their publication and/or dissemination).

Furthermore, due to his position as CFO and his access to non-public information regarding, *inter alia,* Longtop's cash and cash equivalents, accounts receivable, revenue, gross

10

profit, net income, loan obligations, cost of revenues and employee-related expenses and related party transactions, Palaschuk knew and/or recklessly disregarded that the adverse facts referenced in Lead Plaintiffs' Response No. 1, directly above, were being concealed from the public and that his positive representations were materially false and misleading. *See, e.g.,* Amended Complaint ¶¶ 66, 169, 171, 175, 179, 182, 185, 188, 195, 199, 201, 207, 209, 219, 224, 227, 230; *see also, e.g.,* Palaschuk's RFA Responses, Response Nos. 3, b. (admitting that Palaschuk was involved in drafting and preparing Longtop documents to be filed with the SEC, including its financial statements); 3 c. (admitting that Palaschuk was responsible for Longtop's disclosure of related-party transactions in its SEC filings); 3, v. (admitting that Palaschuk approved the loans that were publicly reported in Longtop's U.S. Generally Accepted Accounting Practices ("U.S. GAAP") financial statements); 5 (admitting that, during the Class Period, Palaschuk could and did access Longtop's financial records and books through this personal computer); 6 (admitting that, during the Class Period, Palaschuk had access to Longtop's general ledger system); Palaschuk Tr. at 41:15-45:16; 48:21-50:5; 53:10-54:13. In addition, Palaschuk was aware of the information contained in the Citron Research ("Citron"), Bronte Capital ("Bronte"), OLP Global and Wedge Partners reports as of the respective publication dates of these reports. *See, e.g.,* Amended Complaint ¶¶ 43-45, 47, 53, 58, 125-27.

Palaschuk also demonstrated an "in-depth" involvement with the dissemination of the fraudulent statements discussed in Lead Plaintiffs' Response No. 1, often issuing his own commentary in connection with the Company's results. *See, e.g.,* Amended Complaint ¶¶ 49-51, 75, 181, 184, 209, 212, 223, 226. Additionally, Palaschuk was intimately involved with Longtop's financial reporting and touted his training as a professional accountant and his regular

contact with both Defendant Lian and DTT during an April 28, 2011 investor conference call. *See, e.g.,* Amended Complaint ¶¶ 50, 77.

As further set forth in the Amended Complaint, the Company's gross margins, cash and cash equivalents, accounts receivable, revenues, income, bank loan balances and employee-related costs were so important to Longtop's survival that knowledge regarding the same may rightfully be attributed to the Company and its key officers, including Palaschuk. *See, e.g.,* Amended Complaint ¶ 67. Through his position at Longtop, Palaschuk was also aware that individuals working in the Company's finance department were untrustworthy and incompetent as he informed Lian on February 9, 2010 that:

> I *know* there are many things that certain people are doing behind my back and I am not going to tolerate it *anymore.* If you want to put people in finance that only both of you 'like' rather than based on them being *trustworthy and competent,* then you should start your new CFO search as soon as possible.

PALASCHUK_SEC0046679-81.

With respect to the specific misstatements regarding Longtop's related party transactions with XLHRS and employee welfare contributions referenced in Lead Plaintiffs' Response No. 1 directly above, Palaschuk knew or recklessly disregarded that XLHRS was wholly-owned and controlled by Longtop as evidenced by: XLHRS's shared name with Longtop, its only customer; XLHRS's formation in May of 2007, just months before Longtop's IPO; XLHRS's use of the same email server as Longtop, as evidenced by help wanted ads placed by XLHRS that asked perspective employees to contact them at "longtop.com" and email addresses ending "@longtop.com"; XLHRS's operation out of the same building as Longtop; filings with China's State Administration for Industry & Commerce from 2007, 2008 and 2009 indicating that employees of Longtop's legal department handled and signed off on all XLHRS's filings for that time; and Longtop's ability to immediately terminate its relationship with XLHRS and take all

the employees in-house without any contractual violations, legal action or apparent fees paid to XLHRS when the outsourcing relationship was challenged. *See, e.g.,* Amended Complaint ¶ 72. Palaschuk similarly recklessly disregarded Longtop's failure to comply with Chinese law in making welfare contributions as he acknowledged in an April 8, 2010 email that "the strictest reading of the law would probably suggest using the actual salary instead of the city average salary." PALASCHUK_SEC0487040-41 at 041. Furthermore, as of at least February 17, 2011, Palaschuk also knew that the method Longtop used to calculate it social welfare contributions was "not in accordance with the strict interpretation of the [Chinese] law." PALASCHUK_SEC0525987-92 at 992.

### Interrogatory No. 3:

For each Misstatement identified in your answer to Interrogatory No. 1, identify all facts existing on or before the date of the Misstatement that demonstrate that the statement was false or misleading.

### Response to Interrogatory No. 3:

In addition to the foregoing General Objections, Lead Plaintiffs specifically object to this Interrogatory to the extent that it is duplicative and seeks information Lead Plaintiffs have provided in response to other discovery requests, the Amended Complaint and/or in Lead Plaintiffs' Initial Disclosure Statement Pursuant to Fed. R. Civ. P. 26(a)(1). Subject to and without waiving the foregoing objections, Lead Plaintiffs respond by directing Palaschuk to the information set forth in Lead Plaintiffs' Response No. 1 above, and to the allegations set forth in ¶¶ 49-51, 162-230 of the Amended Complaint.

### Interrogatory No. 4:

For each Misstatement identified in your answer to Interrogatory No. 1, identify all facts existing on or before the date of the Misstatement that demonstrate that the Misstatement was material.

**Response to Interrogatory No. 4:**

In addition to the foregoing General Objections, Lead Plaintiffs specifically object to this Interrogatory to the extent that it is duplicative and seeks information Lead Plaintiffs have provided in response to other discovery requests, the Amended Complaint and/or in Lead Plaintiffs' Initial Disclosure Statement Pursuant to Fed. R. Civ. P. 26(a)(1). Subject to and without waiving the foregoing objections, Lead Plaintiffs respond as follows.

As set forth in the Amended Complaint, the materiality of Palaschuk's misstatements is established by, *inter alia,* the precipitous declines in Longtop's share prices following the respective publications of the April 26, 2011 Citron report, the April 27, 2011 Bronte report and the May 9, 2011 OLP Global report through which the truth about Longtop began to emerge. *See, e.g.,* Amended Complaint ¶¶ 43-46, 47-48, 53-54. Moreover, Longtop's misstated financial results were material in light of Lian's confession which revealed that: Longtop had been a fraud since 2004; the Company never made a profit; Longtop's undisclosed bank loans totaled $85.5 million compared to the $0 of bank debt shown on the Company's March 31, 2011 financial statements; Longtop's actual cash balance was just $131 million compared to the $421 million recorded on the Company's balance sheet as of March 31, 2011; and the Company's net assets were $375.5 million less than what appeared on Longtop's balance sheet as of March 31, 2011, a discrepancy that is more than twice the *net income* that Longtop claimed to have earned throughout the period from October 24, 2007 through May 17, 2011, inclusive. *See, e.g.,* Amended Complaint ¶¶ 69-70.

**Interrogatory No. 5:**

For each Misstatement identified in your answer to Interrogatory No. 1, identify all facts that demonstrate that the revelation of the truth of the Misstatement caused losses in Your Longtop stock.

**<u>Response to Interrogatory No. 5:</u>**

In addition to the foregoing General Objections, Lead Plaintiffs specifically object to this Interrogatory to the extent that it is duplicative and seeks information Lead Plaintiffs have provided in response to other discovery requests, the Amended Complaint and/or in Lead Plaintiffs' Initial Disclosure Statement Pursuant to Fed. R. Civ. P. 26(a)(1). Lead Plaintiffs further object to this Interrogatory because the term "caused" is vague and ambiguous. Finally, Lead Plaintiffs object to this Interrogatory because it prematurely calls for analyses, explanations or testimony that are the province of an expert at a time when expert reports have not been exchanged in this action. Subject to and without waiving the foregoing objections, Lead Plaintiffs respond as follows.

As set forth in the Amended Complaint, the price of Longtop's ADSs was artificially inflated during the Class Period as a direct result of Palaschuk's materially false and misleading statements and omissions. *See* Amended Complaint ¶ 235. When the true facts became known and the risks previously concealed by Defendants materialized through a series of partial corrective disclosures, the price of Longtop's ADSs declined as the artificial inflation was removed, resulting in substantial damages to Lead Plaintiffs and the Class. *See, e.g.,* Amended Complaint ¶¶ 43-46, 47-48, 53-54, 235-38.

On April 26, 2011, Citron questioned the legitimacy of Longtop's financial statements, focusing on the Company's "spectacularly high margins" compared to peer companies and suggested that Longtop's "supersized margins" were the result of the Company's use of XLHRS to transfer the majority if its cost structure off-balance sheet, thereby creating "opportunities for massive accounting fraud." *See, e.g.,* Amended Complaint ¶ 44. Citron reported certain facts related to XLHRS, including, *inter alia*:

- XLHRS shares a name with its only customer, Longtop, and was formed in May 2007 just months before Longtop's IPO;

- Despite being Longtop's largest line item expenditure, XLHRS is not mentioned in Longtop's filings until the July 2008 annual report;

- XLHRS used the same email server as its only client;

- XLHRS was located in the same building as Longtop; and

- When the outsourcing relationship was challenged, Longtop was able to take all employees in-house without any apparent fees or penalties.

*See, e.g.*, Amended Complaint ¶ 44. Following the publication of the Citron report, Longtop's ADSs fell by approximately 13% to $22.24 per share. *See id.*

On April 27, 2011, Bronte published an article that similarly challenged the accuracy of Longtop's financial statements and questioned the Company's need for the Secondary Offering in light of Longtop's purported strong cash position. *See, e.g.*, Amended Complaint ¶ 47. Bronte explained that despite having enough cash to cover all pre-tax operating expenditures for 26 quarters, Longtop "still went to the market and raised more." *See, e.g., id.* Following the publication of the Bronte report, Longtop's ADSs declined an additional 20% to close at $17.73 per share on April 27, 2011. *See id.* ¶ 48.

On May 9, 2011, OLP Global issued a report countering the Company's denials regarding XLHRS and disclosing that two Longtop's employees had been administering XLHRS's company filings. *See, e.g.*, Amended Complaint ¶ 53. OLP Global also reported that Longtop, using XLHRS, consistently under-contributed to state social welfare benefit funds, thereby inflating Longtop's margins by millions of dollars. *See, e.g.*, Amended Complaint ¶ 53. On this news, Longtop's ADSs declined further, ultimately settling at $18.93 per share when the

16

NYSE halted trading in Longtop's ADSs on May 17, 2011, citing its inability "to assess the Company's continued listing status in light of undisclosed material corporate developments regarding the Company." *See, e.g.*, Amended Complaint ¶ 54.

The price declines in Longtop's ADSs and the resulting losses are directly attributable to the disclosure of information, set forth above, that was previously misrepresented or concealed by Palaschuk. *See, e.g.*, Amended Complaint ¶ 238. Moreover, had Lead Plaintiffs and other members of the Class been aware of the truth behind Palaschuk's material misstatements or known of the material adverse information Palaschuk failed to disclose, they would not have purchased Longtop ADSs at artificially inflated prices. *See, e.g., id.*

**Interrogatory No. 6:**

If You contend that Palaschuk received information prior to the Misstatement that demonstrates the falsity of any of the statements identified in your answer to Interrogatory No. 1, for each statement identify each such item of information. If the information was contained in a document, identify the document by bates number. If the information was contained in a communication, identify the participants in the communication, the date of the communication, the subject of the communication, and the information communicated that demonstrates the falsity of Palaschuk's statement.

**Response to Interrogatory No. 6:**

In addition to the foregoing General Objections, Lead Plaintiffs specifically object to this Interrogatory to the extent that it is duplicative and seeks information Lead Plaintiffs have provided in response to other discovery requests, the Amended Complaint and/or in Lead Plaintiffs' Initial Disclosure Statement Pursuant to Fed. R. Civ. P. 26(a)(1). Subject to and without waiving the foregoing objections, Lead Plaintiffs respond by directing Palaschuk to the information set forth in Lead Plaintiffs' Response Nos. 1 and 2 above.

**Interrogatory No. 7:**

If You contend that Palaschuk, in his capacity as the CFO of Longtop, failed to disclose information that was required to be disclosed by any law or regulation, identify each omitted

item of information and state the law or regulation that required the disclosure of the omitted item of information.

**Response to Interrogatory No. 7:**

In addition to the foregoing General Objections, Lead Plaintiffs specifically object to this Interrogatory to the extent that it is duplicative and seeks information Lead Plaintiffs have provided in response to other discovery requests, the Amended Complaint and/or in Lead Plaintiffs' Initial Disclosure Statement Pursuant to Fed. R. Civ. P. 26(a)(1). Subject to and without waiving the foregoing objections, Lead Plaintiffs respond as by directing Palaschuk to Lead Plaintiffs' Response No. 1.

**Interrogatory No. 8:**

If You contend Palaschuk violated generally accepted accounting principles ("GAAP") or generally accepted auditing standards ("GAAS") in his capacity as the CFO of Longtop, identify each such violation, the action or failure to act that caused the violation, and the specific GAAP principle or GAAS standard violated.

**Response to Interrogatory No. 8:**

In addition to the foregoing General Objections, Lead Plaintiffs specifically object to this Interrogatory to the extent that it is duplicative and seeks information Lead Plaintiffs have provided in response to other discovery requests, the Amended Complaint and/or in Lead Plaintiffs' Initial Disclosure Statement Pursuant to Fed. R. Civ. P. 26(a)(1). Lead Plaintiffs further object to this interrogatory to the extent that it is vague and ambiguous. Subject to the foregoing objections, Lead Plaintiffs respond as follows.

As set forth in the Amended Complaint, Palaschuk's representations and certifications that Longtop's financial results were prepared and reported accurately and in accordance with U.S. GAAP were materially false and misleading. *See, e.g.*, Amended Complaint ¶¶ 172-75, 189, 192-95, 213-14, 218-19, 231-34; *see also* Lead Plaintiffs' Response No. 1.

**Interrogatory No. 9:**

If You contend that Palaschuk, in his capacity as the CFO of Longtop, failed to exercise the care that a reasonably prudent CFO would have exercised, Identify each action or failure to act by Palaschuk that supports Your contention and explain in detail why Palaschuk's action or failures to act were unreasonable under the circumstances.

**Response to Interrogatory No. 9:**

In addition to the foregoing General Objections, Lead Plaintiffs specifically object to this Interrogatory to the extent that it is duplicative and seeks information Lead Plaintiffs have provided in response to other discovery requests, the Amended Complaint and/or in Lead Plaintiffs' Initial Disclosure Statement Pursuant to Fed. R. Civ. P. 26(a)(1).   Subject to the foregoing objections, Lead Plaintiffs respond by directing Palaschuk to the information set forth in Lead Plaintiffs' Response Nos. 1 and 2 above.

**Interrogatory No. 10:**

Identify each person You have interviewed Concerning Longtop or the Litigation.  Your answer shall include the name of each person, the date of the interview, the purpose of the interview, and the subject matter of the interview.

**Response to Interrogatory No. 10:**

In addition to the foregoing General Objections, Lead Plaintiffs specifically object to this Interrogatory on the ground that it seeks the disclosure of information protected by the attorney-client privilege, the attorney work product doctrine, or any other applicable privilege, protection or immunity.  Lead Plaintiffs further object to the extent that this Interrogatory is duplicative and seeks information Lead Plaintiffs have provided in response to other discovery requests, the Amended Complaint and/or in Lead Plaintiffs' Initial Disclosure Statement Pursuant to Fed. R. Civ. P. 26(a)(1).

Dated: August 16, 2013

KESSLER TOPAZ MELTZER & CHECK, LLP

*/s/ Kimberly A. Justice*
GREGORY M. CASTALDO
KIMBERLY A. JUSTICE
RICHARD A. RUSSO, JR.
MARGARET E. ONASCH
280 King of Prussia Road
Radnor, PA 19087
(610) 667-7706
(610) 667-7056 (Fax)

*Lead Counsel on Behalf of Lead Plaintiffs, Danske Invest Management A/S and Pension Funds of Local No. One, I.A.S.T.E. and the Class*

GRANT & EISENHOFER, P.A.
DANIEL L. BERGER
DEBORAH A. ELMAN
485 Lexington Avenue
29th Floor
New York, NY 10017
(646) 722-8500
(646) 722-8501 (Fax)

*Local Counsel on Behalf of Lead Plaintiffs, Danske Invest Management A/S and Pension Funds of Local No. One, I.A.S.T.E. and the Class*

## CERTIFICATE OF SERVICE

I hereby certify that on August 16, 2013, I served the foregoing Supplemental Responses and Objections to Defendant Derek Palaschuk's First Set of Interrogatories to Plaintiffs via electronic mail:

> Derek Palaschuk
> 4326 Dunbar Street
> P.O. Box 45117 Dunbar
> Vancouver BC, Canada
> V6S 2M8
> palaschukd@gmail.com

/s/Kimberly A. Justice
Kimberly A. Justice

# Exhibit 2

# Email correspondence exchanged between Derek Palaschuk and Kimberly A. Justice August 31, 2013



JOEL HILL
HAKEMI & RIDGEDALE LLP
Suite 1730, One Bentall Centre
505 Burrard Street, PO Box 26
Vancouver, BC, V7X 1M6 Canada
Tel: 604-681-2020
jhill@hakemiridgedale.com

From: **Kimberly A. Justice** <kjustice@ktmc.com>
Date: Sat, Aug 31, 2013 at 9:53 AM
Subject: Re: Longtop Financial Technologies Limited Securities Litigation
To: derek palaschuk <palaschukd@gmail.com>
Cc: Daniel Berger <dberger@gelaw.com>

This is our only expert report.

Kimberly Justice
Kessler Topaz Meltzer & Check, LLP

Sent from my iPhone

On Aug 31, 2013, at 8:49 AM, "derek palaschuk" <palaschukd@gmail.com>
wrote:

> Kimberly
>
> Thanks for this report.  I just want to confirm that you have sent one report
> "LFT Damages Report".  I acknowledge receipt of this report.
>
> Will you be sending along  another  expert report to deal with accounting
> issues or is this your only expert report?
>
> Thanks
>
> Derek

On Fri, Aug 30, 2013 at 7:28 PM, Kimberly A. Justice
<kjustice@ktmc.com> wrote:

> Derek,
>
> Please see the attached expert report.
>
> Regards,
>
> Kimberly
>
> Kimberly A. Justice, Esq.
>  <image001.png>
>
> 280 King of Prussia Rd
> Radnor, PA 19087
> Direct Dial:  (610) 822-2237
> General Firm Phone:  (610) 667-7706
> Fax:  (610) 667-7056
> Email: kjustice@ktmc.com
> Internet:  www.ktmc.com
>
> PRIVILEGED ATTORNEY/CLIENT, ATTORNEY WORK PRODUCT
> The information in this transmittal may include privileged and confidential material and is intended for
> the recipient(s) listed above.  If you are neither the intended recipient(s) nor a person responsible for
> the delivery of this transmittal to the intended recipient(s), you are hereby notified that any distribution
> or copying of this transmittal is prohibited.  If you have received this transmittal in error, please notify
> the sender immediately at Kessler Topaz Meltzer & Check, LLP at (610) 667-7706 or via return e-mail.

Exhibit 3


Email correspondence exchanged between Derek
Palaschuk and Kimberly A. Justice
September 3, 2013



JOEL HILL
HAKEMI & RIDGEDALE LLP
Suite 1730, One Bentall Centre
505 Burrard Street, PO Box 26
Vancouver, BC, V7X 1M6 Canada
Tel: 604-601-2020
jhill@hakemiridgedale.com

From: **derek palaschuk** <palaschukd@gmail.com>
Date: Tue, Sep 3, 2013 at 12:36 PM
Subject: My expert report
To: "Kimberly A. Justice" <kjustice@ktmc.com>


Sept 3,2013

Kimberly

I will provide my accounting expert report to you before the end of the day tomorrow Sept 4th.

Derek


On Fri, Aug 30, 2013 at 6:56 PM, Kimberly A. Justice <kjustice@ktmc.com> wrote:

> Derek,
>
> On a similar note, will you be serving an expert report today as well?
>
> Kimberly Justice
> Kessler Topaz Meltzer & Check, LLP
>
> Sent from my iPhone
>
> On Aug 30, 2013, at 8:11 PM, "derek palaschuk"

<palaschukd@gmail.com> wrote:

> Kimberly
>
> I was wondering whether you had sent your expert reports to me as I did
not receive anything by email yet.    Were they due today?
>
> Thanks and have a nice weekend.
>
> Derek

# Exhibit 4

# Email correspondence exchanged between Derek Palaschuk and Kimberly A. Justice September 4, 2013



JOEL HILL
HAKEMI & RIDGEDALE LLP
Suite 1730, One Bentall Centre
505 Burrard Street, PO Box 26
Vancouver, BC V7X 1M5 Canada
Tel: 604-601-2020
jhill@hakemiridgedale.com

**From:** derek palaschuk [mailto:palaschukd@gmail.com]
**Sent:** Wednesday, September 04, 2013 1:47 PM
**To:** Kimberly A. Justice
**Subject:** My Expert Report - please confirm receipt

Sept 4,2013

Kimberly

Please find my expert report which was due on or before Sept 16,2013.   Please confirm receipt and let me know if you have any questions or comments.

**Mr Bell is available for deposition in September on Sept 24, 26, 27 or 28.   If you would like me to provide October dates let me know.   Mr Bell resides in Dallas Texas.**

**Thanks**

**Derek**

3

Derek Palaschuk
4326 Dunbar Street
P.O. Box 45117
Vancouver, British Columbia
Canada V6S 2M8

*Defendant PRO SE*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE<br>LONGTOP FINANCIAL<br>TECHNOLOGIES LIMITED<br>SECURITIES LITIGATION | Civil Action No. 11-cv-3658-SAS |

**AFFIDAVIT OF ALAN D. BELL
IN OPPOSITION TO PLAINTIFFS' MOTION
TO EXCLUDE REPORT AND TESTIMONY**

I, Alan D. Bell, being duly sworn, do hereby swear and affirm under penalty of perjury under the laws of the United States of America that the contents of this Affidavit are true and correct to the best of my knowledge, information, and belief.

**My Role in this Lawsuit**

1.      I am the author of the Expert Report dated September 4, 2013 ("My Report") in which I analyze and express my professional opinion concerning some of the Plaintiffs' allegations concerning the Defendant Derek Palaschuk ("Palaschuk") in his role as CFO at Longtop Financial Technologies Limited ("Longtop"). I have reviewed the Plaintiffs' memorandum of law ("MOL") dated November 20, 2013 in support of their motion to exclude My Report and my testimony, and I submit this affidavit in response. All "¶" references in this affidavit are to My Report, unless otherwise noted.

2.      At Palaschuk's request, I made myself available on a number of dates in September 2013 for a deposition by the Plaintiffs. I understand that, although my availability was provided to the Plaintiffs, they did not respond. After September 2013 went by without me being deposed by the Plaintiffs, I continued to check in with Palaschuk in October 2013 as to when the Plaintiffs would depose me. Palaschuk informed me that he had not heard anything from the Plaintiffs with respect to deposing me.

**My Qualifications**

3.      The resume attached as Appendix A to My Report accurately describes my education and summarizes my professional experience.

4.      As described in ¶2, I worked at Ernst & Young LLP ("E&Y") between 1973 and 2006, where I was made an audit partner. E&Y is one of the four largest accounting firms in both the United States and the world. In the United States, the largest part of E&Y's business is

performing external audits on company's financial statements. Partners have both ownership of, and responsibility for managing E&Y. At the time I became an audit partner, in or around 1982, an E&Y employee would need at least 12 to 13 years of auditing and business experience, and to be one of the most competent performers in their peer group, before they might be selected by a partnership selection committee. Only a small percentage of the people who work in E&Y's auditing department ever become an audit partner.

5.      As an audit partner for more than twenty years, I was personally responsible for signing hundreds of audit opinions on behalf of E&Y. Most of these audits were completed in accordance with U.S. Generally Accepted Auditing Standards ("GAAS")[1] and required an audit opinion on whether a company had prepared its financial statements in accordance with U.S. Generally Accepted Accounting Principles ("GAAP"). An audit opinion based on GAAS is given in a form prescribed by regulators, who have been the Public Company Accounting Oversight Board ("PCAOB") since 2002. As is the general practice in the industry, I did not sign my own name to an audit opinion, but instead the name of my firm, E&Y. My signature on an audit opinion meant that E&Y had completed the audit described in the audit opinion; as a result, before I could sign an E&Y audit opinion on U.S. GAAP financial statements, it was my responsibility to ensure the audit was properly conducted in accordance with GAAS. As is the general practice in the industry, planning and executing an audit according to GAAS required me to among other things: (a) determine whether we should accept or continue with the engagement;

---

[1] US GAAS – Auditing Standard 1 ¶1 "The Sarbanes-Oxley Act of 2002 authorized the Public Company Accounting Oversight Board ("PCAOB") to establish auditing and related professional practice standards to be used by registered public accounting firms. PCAOB Rule 3100, *Compliance with Auditing and Related Professional Practice Standards,* require the auditor to comply with all applicable and related professional practice standards of the PCAOB." Prior to the Sarbanes-Oxley Act of 2002, GAAS was governed by the American Institute of Certified Public Accountants'. Auditing Standard 1 ¶2.

(b) identify risk factors, the type of audit procedures we should perform, when the audit procedures should be performed, how the audit procedures should be performed, and how the engagement should be staffed; (c) assess Internal Controls over Financial Reporting ("ICFR") and my client's compliance with GAAP; (d) ensure the audit work was properly completed; and (e) determine what we could conclude based on the results of our audit.[2]

6.     As is common practice in the industry, all E&Y's audit engagements had both a coordinating partner, who signed the audit opinion and was responsible for the day-to-day execution of the audit, and a "second" partner who would review that audit. As a result, I served as a second partner on hundreds of audit engagements in addition to those in which I was the coordinating partner.

7.     As an audit partner, I was also involved in E&Y's quality assurance procedures, which were common in the industry and are described at ¶10. I would regularly perform an independent review of audits of various companies that were undertaken by E&Y's other offices. My responsibility was to ensure the E&Y internal procedures as well as GAAS were being followed. E&Y also participates in peer reviews with the other large accounting firms, Deloitte Touche Tohmatsu Limited ("DTT"), Pricewaterhouse Coopers LLP, and KPMG Inc. It was in this capacity that, as recounted at ¶10, "I have performed a peer review at Deloitte & Touche and observed firsthand the audit quality control procedures that are in place" at that firm.

8.     As a result of executing hundreds of financial statement audits, both as a coordinating and "second" partner, I have significant experience in working with and assessing the individuals

---

[2] US GAAS sets standards for planning and executing an audit, including Auditing Standard No. 9 which codified previous requirements, and AU Sections 110, 150, and 230, among others. E&Y also had internal policies regarding audit planning and execution.

responsible for public companies' finance function [3] (the "CFO") with respect to the US GAAP

Financial Statements and ICFR. As I stated at ¶9, "[t]he preparation of financial statements is the

responsibility of management"[4] and, the audit opinions such as those issued by DTT for Longtop

contain that exact statement (see ¶15). Because the CFO is the member of a company's

management responsible for the finance or accounting department, which prepares the US

GAAP Financial Statements, the CFO is the main person in a company that I dealt with as an

audit partner when planning and executing an audit.

9.       As I mentioned at ¶28, "[i]nternal controls over financial reporting (ICFR) are the

processes used by a company to provide reasonable assurances regarding the reliability of

financial reporting and the preparation of financial statements." The COSO Framework that

Longtop followed, and that is common in the industry, sets out "five interrelated components of

internal control" described at ¶ 29, including "control environment, risk assessment, control

activities, information and communication and monitoring". "The three objectives of good

internal control, established in the COSO Internal Control – Integrated Framework (1992), are:

(a) accuracy of financial reporting; (b) compliance with laws and regulations; and (c) effective

and efficient operations. The COSO control components are designed to assist an organization in

achieving those objectives. Effective internal control requires a strong control environment under

which the other components are implemented. The underlying principles of good control and

---

[3] US GAAS – Auditing Standard 5 ¶42 "The auditor should test the design effectiveness of
controls by determining whether the company's controls, if they are operated as prescribed by
persons possessing the necessary authority and competence to perform the control effectively".
[4] This a PCAOB requirement: see e.g. US GAAS Auditing Standard No. 5 ¶85 (a) (requiring an
auditors' report to include "[a] statement that management is responsible for maintaining
effective internal control over financial reporting and for assessing the effectiveness of internal
control over financial reporting") and ¶87 (requiring audit opinion to contain the statement that
the "[c]ompany's management is responsible for these financial statements"); see e.g. AU
Section 110 ¶.03 ("The financial statements are management's responsibility" and "management
is responsible for establishing and maintaining internal control.").

commitment to adhering to sound control compliance must be present to ensure a healthy interactive control structure. "Risk assessment" is the basis for determining where internal control activities are needed. An effective risk assessment will enable an organization to focus on those risks that are important to its overall success in meeting its control and operating objectives. Collecting and communicating information resulting from the exercise of internal controls keeps key leaders informed of potential problems. Ensuring that the feedback from control operation is captured is a vital part to the overall organization's ability to respond to issues in a timely manner. An effective monitoring system oversees the design, implementation, and effectiveness of controls in mitigating risks. Effective monitoring can be structured as an ongoing assessment program or as a point in time program when a point in time assessment is required."[5]

10.      In applying the COSO framework (¶29) there are ordinarily hundreds of ICFR in a company and many of these ICFR are present in the finance or accounting function. Some examples of ICFR under COSO (the "COSO ICFR Examples") include: (a) ensuring there is proper documentation to support transactions such as bank statements, invoices, or contracts; (b) accurately recording transactions in the general ledger; (c) reviewing and approving transactions, (d) safeguarding assets such as cash and fixed assets; (e) controlling the preparation of accurate financial statements; (f) ensuring ICFR are properly documented; (g) implementing information technology processing; (h) maintaining entity level controls ("Entity Level Controls"), such as a complied-with code of conduct, whistleblower procedures, board conduct, the organizational structure, human resource policies, management review, and approval controls, including budgeting;  (i) ensuring proper segregation of duties  and (j) ensuring accounting staff including the CFO have the requisite accounting knowledge, competence and abilities. Because many

---

[5] See COSO.ORG

companies have hundreds or thousands of employees, management including the CFO must rely on others in creating an effective ICFR structure.

11.      Since part of an audit partner's responsibility is to assess and audit the ICFR, the CFO and accounting department were evaluated each time we did an audit, using ICFR and the ability to prepare US GAAP Financial Statements as the basis for that assessment. In many of these audits, my clients used the COSO framework so I am familiar with COSO. In every audit in which I was the coordinating partner, and each year as a standard practice under E&Y's internal policies, I would perform an evaluation of the CFO's abilities to produce accurate US GAAP Financial Statements, the accounting department's ability to produce accurate US GAAP financial statements, and the quality of the company's ICFR. On at least one audit engagement, I recommended to the company that the CFO be terminated, because of my concerns that CFO was not competent to produce accurate US GAAP financial statements.

12.      As I indicated in ¶3, I am or have been chairman of five Audit Committees. As I mentioned in ¶14, the "AC's [Audit Committee's] responsibilities include reviewing and approving the quarterly and annual financial statements and approval of the audit committee charter". Since the CFO is the member of management primarily responsible for the preparation of the US GAAP Financial Statements and ICFR, to discharge my responsibilities as an Audit Committee member, I am required to evaluate and assess the CFO' strengths and weaknesses, have regular communication with the CFO, as well as review the accounting department's and the company's ICFR. I would only serve on an Audit Committee if I had confidence that the CFO was competent to manage an accounting department that can accurately prepare US GAAP Financial Statements.

13.     Although I have not been an audit partner on an audit engagement or sat on the Audit Committee of companies in the information technology ("IT") industry, audit opinions, U.S. GAAS, and ICFR standards are not industry-specific. Some accounting standards may require industry-specific knowledge, but my review of the material described in My Report did not indicate any such U.S. GAAP accounting issues that were specific to the IT industry, such as revenue accounting for software contracts or accounting for research and development costs. In any event, many of the companies I have audited or on whose Audit Committee I have served have used sophisticated IT systems or operated IT centers.

**My Analysis**

14.     I have applied my expertise in My Report, and attempted to describe both the ordinary practices of a CFO in the position of Palaschuk and, based on the documents I reviewed and the facts I was asked to assume (which are described in my report), how Palaschuk measured up to those standards at Longtop. As I stated in ¶7, "[m]y opinions are based on my experience, the work that I have done in this case and the documents that I have reviewed"; also "[i]n forming my opinions I have considered and/or reviewed" the various documents specified in ¶6. As a result, none of the opinions in My Report were meant to be read in isolation, but should be considered in connection with the methodology I described in ¶¶6-7 and through the "work that I have done in this case" that included the following analysis and assessments:

   a.   "In accordance with Securities and Exchange Commission (SEC) regulations and NYSE registration requirements, Longtop's financial statements were required to be examined by an independent auditing firm which would express an opinion on the fairness of the presentation of the financial statements" (¶10).

8

b.   DTT is an "independent auditing firm", "one of the four largest international accounting firms in the world", "has policies and procedures in place to provide assurance that its' audit work is performed at reasonably high standards", and, in the course of my role as an "audit partner", I have "observed firsthand the audit quality control procedures that are in place" at that firm (¶10).

c.   "Management is responsible for the financial statements" (¶9)[6].

d.   "Audits are important for stakeholders (i.e. shareholders, bankers, investors, management) to have reasonable assurance from an independent third party as to the reliability of the financial information given by management of the company in order to make sound business decisions" (¶11).

e.   "An independent external audit is a set of procedures under which the financial records and supporting documentation of a company are examined and inspected closely to make a determination, an opinion, as to whether those financial statements are being presented fairly, and with no material misstatements" (¶11). "An audit requires more extensive procedures such as confirmation of various accounts with third parties, examining support documentation and testing of balances. An important part of an audit also involves testing internal controls over the financial reporting process" (¶12). "The standards that the auditing firm follows for both audits and reviews are known as generally accepted auditing standards (GAAS). An audit requires more extensive procedures such as confirmation of various accounts with third parties, examining support documentation and testing of balances. An important part of an audit also

---

[6] See also US GAAS – AU Section 110 ¶03.

involves testing internal controls over the financial reporting process" (¶12).
"DTT conducted their audits in accordance with the standards of the PCAOB,
which require that an auditor plan and perform the audit to obtain reasonable
assurance about whether the financial statements are free of material misstatement"
(¶15).

f.   "An unqualified opinion means that DTT did not find any material errors in the
Company's financial statements" (¶15).

g.   "A review involves less work such as analyzing financial information,
performing inquiries and determining that the internal controls are functioning"
(¶12). "During the quarterly reviews, DTT would have performed a number of
procedures such as inspecting source documents - sales contracts, purchase
contracts and banking documents, doing analytical review, reviewing the financial
statements and obtaining a representation letter" (¶17).

h.   "As part of the requirements of being a public company in the United States,
Longtop also had an Audit Committee (AC) in place. An AC has to be comprised
of at least three independent board members who are not part of Longtop's
management. The AC's responsibilities include reviewing and approving the
quarterly and annual financial statements, approval of the audit committee charter"
(¶14).

i.   "In connection with Longtop's annual audit and under US generally accepted
auditing standards, DTT was also required to provide certain communications to
the Audit Committee of the Company ("Required Communications") on an
annual basis with quarterly updates" (¶13), the scope of the eight Required

Communications (¶13), "Required Communications enable us to assess what DTT encountered during their audits" (¶13), and "AICPA Standard AU 325 Communications About Control Deficiencies in an Audit of Financial Statements" (¶32).

j.   "After becoming a public company, Longtop was also required to have an internal audit team which reported to the Audit Committee. Internal auditors are a part of a company's internal controls; typically, internal audit plays a significant monitoring role. Internal Audit generally plays an important role in management's evaluation of the effectiveness of ICFR. As an independent function reporting to the top management and the AC, internal auditors are able to assess the internal control systems implemented by the organization and contribute to ongoing effectiveness" (¶23).

k.   "Internal controls over financial reporting (ICFR) are the processes used by a company to provide reasonable assurances regarding the reliability of financial reporting and the preparation of financial statement" (¶28).

l.   "For Longtop's fiscal years prior to March 31, 2009, DTT was not required to audit or express an audit opinion on Longtop's internal controls. In planning and performing the audit of the consolidated financial statements of Longtop, DTT considered Longtop's internal control over financial reporting as a basis for designing audit procedures that were appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of Longtop's internal control over financial reporting. DTT's consideration of internal control over financial reporting was for the limited purpose described in the preceding

11

sentence and would not necessarily identify all deficiencies that an audit over internal control over financial reporting might identify as significant deficiencies or material weaknesses" (¶34).

m.   "SOX established requirements for companies to perform an annual assessment of the company's internal controls over financial reporting (ICFR) and to report on the results of this assessment" and "many companies were required to have the external auditor audit, in accordance with PCAOB standards, the company's internal control over financial reporting based on certain recognized criteria" (¶27). "The requirement to audit internal controls over financial reporting meant that the Company had to determine which internal controls had to be improved and to develop a significant amount of documentation regarding the internal controls and maintain the documentation so that the internal controls could be tested" (¶27). "The SEC requires management use a "suitable, broadly recognized control framework." Like most companies, Longtop based its evaluation of the effectiveness of its ICFR on the COSO Framework (¶28). "Beginning with the financial statements for the fiscal year ended March 31, 2009, DTT was required to express an audit opinion on Longtop's ICFR" (¶36).

n.   "In order for Longtop to have included DTT's opinion on the financial statements, Longtop had to obtain DTT's "consent" which granted Longtop the authority to include DTT's audit opinion in the Prospectus and the amendments to the Prospectus" (¶24). " I have been involved in numerous "going public transactions.The review procedures that are performed by a public accounting firm in a situation like this are extensive" (¶24). "DTT issued consents for the

12

Prospectus and related amendments and a comfort letter to the underwriters which would have been subject to extensive reviews by DTT's audit staff and DTT executives that were experts in U.S. reporting requirements." (¶26).

o. "Once the IPO Prospectus was approved by the SEC" (¶25). DTT was required to deliver a "comfort letter" to the underwriters (¶25). "DTT's comfort letter included negative assurance on long-term debt, net current assets, and revenues." (¶26). "DTT issued consents for the Prospectus and related amendments and a comfort letter to the underwriters which would have been subject to extensive reviews by DTT's audit staff and DTT executives that were experts in U. S. reporting requirements." (¶26).

p. "While Mr. Palaschuk, as CFO, was responsible for certifying the financial statements, based on my experience as an audit partner, an audit committee chair and the chief restructuring officer of a company, he has to rely on other people as well as accounting systems and processes" (¶110).

15. In various part of My Report, I describe what the various documents that I reviewed indicated such as:

a. DTT audited Longtop's US GAAP Financial Statements from 2005 to 2010 and "expressed unqualified audit opinions" (¶15).

b. "For fiscal years March 31, 2009 and March 31, 2010, DTT audited and expressed an unqualified opinion on Longtop's ICFR for the years ended March 31, 2009 and 2010" (¶36).

c. "DTT performed review procedures on each quarter's financial statements from July 1, 2007 to December 31, 2010 prior to Longtop releasing its financial statements" (¶17).

d. "These fifteen Required Communication presentations prepared by DTT indicate that for the financial statements from July 1, 2007 to December 31, 2010, which was the last publicly released financial statements, that DTT either audited the year-end financial statements (March 31, 2008, 2009 and 2010) or reviewed the fourteen quarterly financials" (¶20).

e. "These Required Communications indicate that DTT did not encounter any problems in performing their audits, that there were no disagreements between DTT and management and that they were not aware of any Fraud or illegal acts" (¶20).

f. "AC minutes indicate that the AC met on a quarterly basis with management and DTT to review and approve the quarterly and annual financial statements that were being filed with the SEC, and as is required by auditing standards, DTT also met with the AC committee without management" (¶22).

g. "During my review of the AC minutes, I did not see any indication that there were any unresolved problems or issues with any of the reviews or audits" (¶22).

h. "The Internal Audit team did a presentation to the Audit Committee for each of the eleven quarters ending from June 30, 2008 to December 31, 2010" (¶23). "I reviewed this material and did not observe any indications of Fraud, financial statement errors or material weaknesses in internal controls" (¶23).

    i.    As I also set out in My Report, DTT's reviews (¶17) or audits (¶15), the Audit Committee review and approvals (¶22), and the reports of internal audit (¶23), were, as is common in the industry, completed before Longtop's management publicly filed its US GAAP Financial Statements and SOX Certifications with the SEC.

## My Knowledge of Industry Practices Meant
## Certain of My Conclusions Were Straightforward

### *Inventory and Fixed Assets Are Distinct from Revenue*

16.    Some of the conclusions in My Report are, in light of industry practices, obvious ones to reach. For example, when I was asked to review the Plaintiffs' allegations concerning certain October and November 2008 emails, I wrote in ¶53: "Mr. Palaschuk's comments actually related to booking vendor invoices not to booking revenues" and "I do not understand how the Plaintiffs construe these comments as a problem with revenue controls." I stand by that opinion, which I reached after reading document SEC0372038 which included the words:

> "PROBLEM: The company lost a VAT refund of around Rmb 1.1. million because it incorrectly booked $1.2 million inventory as fixed assets in Q1 2009.
>
> This entry was for $1.2 million in inventory purchased by SPT the Hong Kong holding company.
>
> The entry was made by an accountant who put the inventory into fixed assets."

17.    As an accountant, it is self-evident that vendor invoices or purchase contracts, whether booked as inventory or as fixed assets, necessarily relate to expenditures which are unrelated to revenues. As a result, it is still my professional opinion that the entry described in the email in ¶53, regardless of whether the described entry was booked correctly or not, cannot be construed as a problem with revenue controls.

*Some Processes Necessarily Relate to ICFR*

18.      Some of the conclusions in My Report relating to ICFR were straightforward, given standard industry practices:

> a.  in ¶105, I referred to Longtop's preparation of a "monthly reporting package, called the "F1 Report" for December 31, 2010 ... and the "F1 Report" for March 31, 2011 ... which includes the financial statements during the Class Period. I noted the reporting package figures agree to the financial statements that were released publically. I also noted that the F1 report had detailed breakdowns and analysis of the financial statements."
>
> b.  in ¶106, I referred to Longtop's preparation of Cash Deposits Schedules, after "I reviewed some of Longtop's own schedules which detail cash term deposits and interest accruals at December 31, 2010.... I also reviewed a similar schedule prepared as at February 28, 2011."
>
> c.  in ¶107, I referred to Longtop's preparation of Bank Loan Schedules, after "I reviewed some reports prepared by Longtop that included information on bank loans at the end of each quarter during the Class Period."

19.      Based on standard industry practices, and the definition of ICFR in ¶28 and of COSO in ¶¶28-29, the Monthly Reporting Package in ¶105, the Cash Deposits Schedules in ¶106, and the Bank Loan Schedules in ¶107 would each have had been part of the ICFR at Longtop that had been tested and found working by both DTT and internal audit. "For fiscal years March 31, 2009 and March 31, 2010, DTT audited and expressed an unqualified opinion on Longtop's ICFR for the years ended March 31, 2009 and 2010" (¶36). "DTT expressed a clean opinion on 2009 and 2010 internal controls. This is evidence that the internal controls over [...] were working as

required for a US public company" (¶53).[7] "While Mr. Palaschuk, as CFO, was responsible for certifying the financial statements, based on my experience as an audit partner, an audit committee chair and the chief restructuring officer of a company, he has to rely on other people as well as accounting systems and processes" (¶110).

**My Knowledge of Industry Practices Meant My Conclusions Regarding DTT's Resignation Letter Focused on What DTT Did _Not_ Say**

20.      My experience as an auditor similarly informs how I understand DTT's resignation letter (which I describe beginning at ¶59, and a true and correct copy of which is attached as **Exhibit 1** to my affidavit). As an auditor, DTT's letter is interesting for what it does not say: it does not identify material errors in Longtop's financial statements or say that its _reported_ cash and outstanding debt were materially false.

21.      Based on my time as an audit partner, I am familiar with the communication requirements imposed on a resigning auditor. I am also acquainted with the various terms that auditors use when resigning, as I have had to issue an auditor resignation letter on behalf of E&Y. Some of the things an auditor must consider when resigning include fraud, lack of independence, disagreements with management, and difficulties encountered in the audit.

22.      As I explain in ¶¶59-65, DTT's resignation letter does not identify errors in the previously-audited financial statements, but instead describes certain actions by management which resulted in DTT being "no longer able to place reliance on the representations of management which is an essential element of the audit process." Based on GAAS - AU Section 333 - Management Representations, and on my experience as an audit partner, the term "representations of management" has a meaning distinct from _reported_ financial statements. "This section establishes a requirement that the independent auditor obtain written

---

[7] US GAAS – Auditing Standard No. 5 ¶2 states that "If one or more material weaknesses exist the company's internal controls over financial reporting cannot be considered effective."

representations from management as part of an audit of financial statements… During an audit, management makes many representations to the auditor, both oral and written or through the financial statements. Such representations are part of the evidential matter the independent auditor obtains."[8] Because auditors do not prepare a company's financial statements (see ¶9, management prepares financial statements), and cannot check every supporting document used to prepare the financial statements (see ¶12, the audit requires testing of balances) without making the issuance of an audit opinion prohibitively expensive, auditors must and always do rely on the company's management. This reliance includes, but is not limited to relying on management to provide the auditors with accurate and reliable information related to the preparation of the financial statements. This information is referred to as management representation" or "representations of the management". Another way of saying this is that DTT must have trust in management, which includes Palaschuk as CFO, and the finance department for them to believe management's representations.

23.     As a standard procedure, some of the more important management representations are given formally by management to the auditors by way of a written "representation letter"[9]. In a public company audit, management representations must include management's "acknowledgment of its responsibility for the fair presentation in the financial statements", "management's belief that the financial statements are fairly presented in conformity with GAAP", "completeness of information" such as "financial records and related data" and "absence of unrecorded transactions" and "tailored to include additional appropriate

---

[8] US GAAS – AU Section 333 Management Representations ¶¶.01–.02
[9] US GAAS - ¶75 states "[i]n an audit of internal control over financial reporting, the auditor should obtain written representations from management" and ¶76 states "[t]he failure to obtain written representations from management, including management's refusal to furnish them, constitutes a limitation on the scope of the audit."

representations".[10] As an audit partner, if I could not rely on the management representations, I would advise E&Y to resign or I would not accept the engagement in the first place.

24.     In its letter, and described at ¶63, DTT provided the "Reasons for our resignation" which undermined their ability to rely on Longtop's management's representations. DTT does not say, though, that the previously released financial statements were materially misstated. DTT's "Reasons for our resignation" are dealt with under US GAAS: "[i]f a representation by management is contradicted by other audit evidence, the auditor should consider whether his or her reliance on management's representations relating to other aspects of the financial statements is appropriate and justified"[11]. Based on my experience and understanding of the communication requirements for an auditor's resignation, if an auditor ascertained there were material errors in the financial statements that they had previously audited, this would be an important fact that the resigning auditor would disclose.

25.     As noted at ¶62, DTT was, according to its letter, working on the March 31, 2011 audit when it resigned. It is standard practice in the industry, and compliance with GAAS requires, that confirmation of cash and loan balances be undertaken at the specific reporting date, which in Longtop's case was March 31, 2011. As a standard practice for external auditors, the March 31, 2011 bank confirmations would only provide information about cash or loan balances at March 31, 2011 and would not contain information about cash or loan balances at a different date. Checking the cash and loan balances at a specific date is an accepted practice in the industry, because the audit opinion on the balance sheet which contains the cash and loan balances is only given as at the year end date.

---

[10] US GAAS – AU Section 333 Management Representations ¶¶06 and 07.
[11] – AU Section 333 Management Representations ¶¶04

26.     As a result, when DTT stated in its resignation letter that it had recently identified "falsity" connected with Longtop's "financial records in relation to cash at bank and loan balances (and also now seemingly in the sales revenue)", it could only be referring to the March 31, 2011 cash and loan balances and thus DTT's reference was to the "financial records" as of March 31, 2011, as opposed to previously released U.S. GAAP Financial Statements. Again, if DTT had found "falsity" in the previously released U.S. GAAP Financial Statements as opposed to the March 31, 2011 "financial records", I believe they would have indicated such according to industry practice.

**My Review of Certain Documents that the Plaintiffs Say I Ignored**

*I Did Consider the Email Relied on by the Plaintiffs*

27.     Despite a contrary aspersion in footnote 13 on page 20 of the Plaintiffs' MOL, I did consider the document Bates-numbered PALASCHUK_SEC0046679-81 while preparing My Report. As described in Appendix F of My Report, I reviewed "Plaintiffs deposition of Palaschuk on Aug 2,2013 (including Exhibits)", which meant that I read the email in question which is included as Exhibit 11 in Palaschuk's deposition. A true and correct copy of SEC0046679-81 is attached to this affidavit as **Exhibit 2** along with a true and correct copy of pages 142 to 151 of the deposition transcript. I did not believe it was necessary to discuss document SEC0046679-81 or the related deposition testimony in My Report because as an audit partner and audit committee chairman, I did not believe Exhibit 2 was inconsistent with any of my opinions.

28.     The segregation of duties between Operational Finance and Financial Reporting[12] is a very important and fundamental internal control practice under COSO, because it precludes

---

[12] Palaschuk testified at his Deposition on page 146 line 9-11 "So the HR proposal was that—or—so what human resources had sent me is that both the financial operations team and the corporate accounting team would report to Ms Li. Yingling".

those who have custody of assets from recording transactions related to those assets as it could make it easier for the persons with custody of the assets to conceal improper transactions. Palaschuk at his deposition on page 146 line 13-18 testified that "the segregation of duties is important because the operational people have you can say custody of the assets. Example, they are able to make bank transactions and you want the people recording those transactions to be independent and that's called segregation of duties." If Longtop's Human Resources department was proposing that "Yingling" be responsible for both "financial operations" and "financial accounting", a CFO would be right to reject that proposal based on the importance of segregation of duties where Operational Finance, which had "custody of the assets" should have no responsibility for accounting and "Financial Reporting is responsible for making and maintaining the accounting records". Applying the COSO framework (see ¶29), improper segregation of duties between operational finance and accounting could have resulted in a material weaknesses in Longtop's ICFR. In my experience, it is not unusual for a CFO to try and stop organizational changes with which he or she disagrees, and it is important for them to do so when the changes can affect ICFR. Palaschuk testified at his deposition on page 146 line 20 and 21 with respect to the human resources proposal "It had not been implemented, period, and it was not implemented while I was the CFO" and on page 151 lines 2-4 that "So the result was that human resources went back to my organizational chart and the announcements were made in Chinese that I requested".

29.     Under an effective ICFR system, balancing employees' work loads based on their abilities is important because, if people, who are an integral part of ICFR, are overworked, the ICFR may break down as some ICFR such as entering or reviewing transactions may need to be performed multiple times a day. Applying the COSO framework (see ¶29), overworked

employees could have resulted in both a material weaknesses in Longtop's ICFR and a material error in the US GAAP Financial Statements. It would accordingly not be unusual and would be a good ICFR practice for a CFO to speak up if he believed an employee was going to be given more than he could handle,  Longtop's Operational Finance and Financial Reporting appear to have been divided into various areas based on functionality, such as finance operations, taxation and treasury, revenue, accounts payable, taxation, etc., which is also a desirable internal control under the COSO framework. This allows for segregation of duties and staff to specialize in certain areas, making ICFR more scalable and accurate.

30.    Competent employees are required to run an ICFR system[13] and produce US GAAP Financial Statements, especially in a company as large as Longtop which had as many as 5,000 employees during the Class Period and had to process thousands of transactions per month. Again, there are ordinarily hundreds of ICFR in a company, such as the COSO ICFR Examples above, and many of these ICFR are present in the finance or accounting function.

31.    As I set out at ¶¶10 -13, while management, including the CFO, may believe or represent that a company's ICFR have no material weaknesses, that the US GAAP Financial Statements are accurate, and that their employees are competent and trustworthy, the SEC requires that every US-listed public company of Longtop's size must have a firm, independent from management, to conduct its own auditing and assessment of the ICFR14 and the US GAAP Financial Statements. This applied to Longtop. Because according to the PCAOB imposes strict standards for DTT (they must be experienced in auditing and accounting, independent of

---

[13] US GAAS – Auditing Standard 5 ¶42 "The auditor should test the design effectiveness of controls by determining whether the company's controls, if they are operated as prescribed by persons possessing the necessary authority and competence to perform the control effectively"
[14] US GAAS – Auditing Standard 5 ¶42 "The auditor should test the design effectiveness of controls by determining whether the company's controls, if they are operated as prescribed by persons possessing the necessary authority and competence to perform the control effectively"

management, and complete their audits in accordance with the requirements of the PCAOB which is GAAS, which includes informing the Audit Committee of fraud or illegal acts noted during DTT's review or audit) DTT's audit work can be used to assess whether the finance department staff were incompetent15 or untrustworthy.

32.    My review of the documents described in Appendix F of My Report indicated that Longtop was paying DTT approximately Rmb8.6 million or US$1.4 million each year for its audit; based on my experience, that would mean that DTT spent thousands of hours auditing Longtop's ICFR and the US GAAP Financial Statements. As I explained at ¶ 13, GAAS would require DTT to determine whether there was "fraud or illegal acts noted during DTT's review or audit", and a standard part of DTT's ICFR audit deals with Entity Level Controls which would include an assessment of whether Longtop's accounting staff had the requisite accounting knowledge, competence, and abilities. [16] Furthermore, US GAAS requires that Entity Level Controls, which deal with employee-related issues such as "incompetence and dishonesty", be audited. In the US GAAP Financial Statements and 20F Annual Reports filed with the SEC that I reviewed, DTT did not identify either material weaknesses in Longtop's ICFR or material errors in its US GAAP Financial Statements, and DTT also did not indicate that they had found Longtop's finance department employees to be incompetent or untrustworthy. [17]

---

[15] US GAAS – Auditing Standard 5 ¶44 provides that "[w]hen assessing the competence of personnel responsible for a company's financial reporting and associated controls, the auditor may take into account the combined competence of company personnel and other parties that assist with functions relating to financial reporting."

[16] US GAAS – Auditing Standard 5 ¶¶22-27 address "Identifying Entity-Level Controls", and ¶42 provides that "[t]he auditor should test the design effectiveness of controls by determining whether the company's controls, if they are operated as prescribed by persons possessing the necessary authority and competence to perform the control effectively."

17 DTT also relied on management's representations during the Class Period.

33.     Similarly, Longtop's internal audit and SOX department, who were also independent of management, appear to have spent approximately 30,000 hours auditing Longtop's ICFR. I found no indication in their reports to the Audit Committee that the finance department employees had been identified as incompetent or untrustworthy.

34.     As I also set out at ¶ 22, prior to publicly releasing the US GAAP Financial Statements each quarter, Longtop's audit committee, who was independent from management and was required to have financial expertise, reviewed and approved the US GAAP Financial Statements. I found no indication in the audit committee minutes that the audit committee felt that Longtop's finance department employees were incompetent or untrustworthy. The audit committee also reviewed management's own assessment that there were no material weaknesses in ICFR, as is evident from the sections of Longtop's 2009 and 2010 20F annual reports entitled "Management's Report on Internal Control over Financial Reporting," which state "Our management has reviewed its assessment [over ICFR] with our audit committee" without indicating that the finance department employees were incompetent or untrustworthy.

*I Did Consider the CEO's Statements*

35.     Despite the assertion to the contrary in the Plaintiffs' MOL at page 21,

