UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------- X

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 6/16/14
```

IN RE LONGTOP FINANCIAL
TECHNOLOGIES LIMITED
SECURITIES LITIGATION

                    OPINION AND ORDER

                    **11-cv-3658**

-------------------------------------------------- X

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.   INTRODUCTION

Lead plaintiffs bring this action on behalf of themselves and others similarly situated against Longtop Financial Technologies, Ltd. ("Longtop" or "LFT"); Longtop's former CEO, Lian Weizhou; Longtop's former CFO, Derek Palaschuk; and Longtop's former auditor, Deloitte Touche Tohmatsu CPA Ltd. ("DTT").[1] The class consists of all persons and entities who purchased Longtop American Depositary Shares ("ADS's") on the New York Stock Exchange

---

[1]      *See* Complaint.

("NYSE") between February 21, 2008 and May 17, 2011, inclusive (the "Class Period").[2]

Plaintiffs brought claims against all of the defendants under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.  They additionally brought claims under Section 20(a) of the Exchange Act against the individual defendants, Lian and Palaschuk.[3]

Palaschuk and DTT separately moved to dismiss.  I denied Palaschuk's motion on June 29, 2012,[4] but granted DTT's motion on April 8, 2013 without leave to amend.[5]  On November 14, 2013, I granted plaintiffs' motion for a default judgment against Longtop and Lian, who failed to appear in this action.[6]

Plaintiffs allege that Palaschuk made materially false and misleading statements during the Class Period regarding: 1) Longtop's cash and loan balances, profit margins, revenue, and other key financial metrics, 2) the effectiveness of

---

[2]     *See In re Longtop Fin. Tech. Ltd. Sec. Litig.,* No. 11 Civ. 3658, 2013 WL 3486990 (S.D.N.Y. July 11, 2013).

[3]     *See* Complaint.

[4]     *See In re Longtop Fin. Tech. Ltd. Sec. Litig.,* No. 11 Civ. 3658, 2012 WL 2512280 (S.D.N.Y. June 29, 2012).

[5]     *See In re Longtop Fin. Tech. Ltd. Sec. Litig.*, 939 F. Supp. 2d 360 (S.D.N.Y. 2013).

[6]     *See* Order Entering Default Judgment, Dkt. No. 164.

Longtop's internal controls, and 3) the accounting irregularity of Longtop's financial statements.[7]  Palaschuk made the allegedly misleading statements on conference calls with investors as well as through Longtop's public filings and press releases.[8]  Plaintiffs alternately seek to hold Palaschuk liable as a control person for false and misleading statements made by Longtop.

Palaschuk now moves for summary judgment.  For the following reasons, his motion is DENIED.

## II.   BACKGROUND

Longtop was founded in 1996 to provide information technology services to the banking and financial industry in China.[9]  Longtop grew from five hundred employees in June of 2006 to over seven thousand employees in March of

---

[7]     *See* Complaint ¶¶ 49, 162–234.  The Complaint also alleged that Palaschuk made materially false statements regarding Longtop's use of a third party entity to avoid paying social welfare benefits on behalf of its employees. However, plaintiffs have now withdrawn those allegations. *See* Memorandum of Law in Support of Plaintiffs' Motion to Exclude Report and Testimony of Alan D. Bell at 25 ("Plaintiffs will not pursue at trial claims against Palaschuk related to Longtop's accounting for XLHRS or the adequacy of its social welfare payments.").

[8]     *See In re Longtop,* 2012 WL 2512280, at *9 (finding Palaschuk to be the "maker" of the signed press release commentary).

[9]     *See* Defendant Derek Palaschuk's Local Civil Rule 56.1 Statement of Material Facts in Support of His Motion for Summary Judgment ("Def. 56.1") ¶ 3. Unless otherwise stated, all citations to Def. 56.1 are admitted by plaintiffs.

2011.[10]  Palaschuk joined Longtop as CFO in September of 2006 and helped the

company complete an initial public offering ("IPO") on October 24, 2007.[11]

Before Palaschuk joined the company, Longtop retained DTT as

outside auditors.[12]  DTT audited Longtop's financial statements and issued

multiple reports throughout the Class Period.  In April of 2009, Palaschuk and his

employee Philip Li exchanged a series of emails with Tony Wen-ping Wang, an

employee from DTT's Shanghai office, regarding an ongoing audit.[13]  Palaschuk

asked Wang to use alternative testing on Longtop's revenue contracts instead of

confirmations as Wang had originally planned.[14]  Wang protested and explained

that "confirmation is a required procedure that we are [sic] difficult to get

around."[15]  Palaschuk responded, "I am absolutely certain it is not a US auditing

standard to confirm terms of revenue contracts.  If it is please send me the auditing

---

[10]     *See id.*

[11]     *See id.* ¶ 8.

[12]     *See id.* ¶ 7.

[13]     *See* 4/20/09 to 4/22/09 email chain between Palaschuk, Li, and Wang
("4/20–22 Email Chain"), Ex. X to Declaration of Plaintiffs' Attorney Kimberly A.
Justice in Support of Plaintiffs' Memorandum of Law in Opposition to Defendant
Derek Palaschuk's Motion for Summary Judgment ("Justice Decl.").

[14]     *See id.* at 4–5.

[15]     *Id.* at 4.

-4-

standard or other SEC requirement."[16]  Wang sent Palaschuk several auditing standards that recommended but did not require the use of revenue confirmations.[17] Palaschuk continued to insist that confirmation of revenue contracts was unnecessary for Longtop, and Wang ultimately agreed to perform alternate testing.[18]

On February 4, 2010, Wedge Partners, an equity analysis firm, issued a report identifying several "red flags" in Longtop's financials: 1) an exodus of employees from Longtop's accounting department, 2) Longtop's use of a third party intermediary employer, and 3) Longtop's rushed and overpriced acquisition of a company called Giantstone.[19]  The report concluded, "[i]n these situations, especially in China, we have found it to be best to trust our instincts and choose not to ignore the red flags. . . ."[20]  Wedge Partners issued another report on March 23, 2010 clarifying that only two employees had left Longtop's finance department,

---

[16]     *Id.*

[17]     *See id.* at 3.

[18]     *See id.* at 1.

[19]     *See* 2/4/10 Wedge Report, Ex. Q to Justice Decl., at 1.

[20]     *Id.*

and for personal reasons.[21]  The report reiterated concerns about Longtop's use of a

third party company to employ staff, as well as the Giantstone acquisition.[22]

In February 2010, Palaschuk emailed Lian and Ruan Cijie, Longtop's

head of business operations,[23] expressing concern about certain members of his

finance department.[24]  He wrote:

> Yingling [Li] is a wonderful and capable person but she cannot
> manage financial operations and financial accounting for a
> company with $300 million in revenue and 7,000 employees with
> international business.  Same goes for Junwei . . . I know there are
> many things that certain people are doing behind my back and I
> am not going to tolerate it anymore.  If you want to put people in
> finance that only both of you "like" rather than based on them
> being trustworthy and competent, then you should start your new
> CFO search as soon as possible.[25]

---

[21]     *See* 3/23/10 Wedge Report, Ex. 4 to Affidavit of Derek Palaschuk in
Support of Reply Memorandum of Law in Further Support of Motion for Summary
Judgment.

[22]     *See id.*

[23]     *See* Def. 56.1 ¶ 6.

[24]     *See* February 2010 email from Palaschuk to Lian and Ruan, Ex. N to
Justice Decl., at 1.

[25]     *Id.*

At the end of August 2010, Palaschuk moved to Vancouver, Canada.[26]

He continued to serve as Longtop's CFO.

On October 14, 2010, Palaschuk received an email from Jonathan

Maietta, an analyst at Needham & Company, LLC ("Needham"), an investment

banking and asset management firm.  Maietta expressed concern about Longtop's

reported revenues from its largest customer, China Construction Bank ("CCB").

He wrote:

> I just had a meeting with one of CCB's senior IT officials.  This
> person . . . disputed the CCB revenue contribution of $33 million
> that LFT has reported.  While this official did not disclose an
> exact figure, said person implied that the "real" figure was
> substantially less and jokingly said "maybe 33 million RMB, not
> USD." Please advise.[27]

When Maietta declined to give the name of his CCB contact, Palaschuk responded,

"[i]t is impossible for us to rebut these absolutely untrue comments without

knowing who said them and what is the persons [sic] position."[28]

---

[26]   *See* Def. 56.1 ¶ 27.

[27]   10/14/10 email chain between Maietta and Palaschuk ("10/14/10
Email Chain"), Ex. R to Justice Decl., at 2.

[28]   *Id.* at 1.

On October 15, 2010, Needham issued a report downgrading Longtop's status from "buy" to "hold" based on its belief that CCB revenue was likely to decrease significantly.[29]  Needham issued another report on February 1, 2011 concluding, "[i]t appears that [concerns that we had previously about the potential risk of a large customer slowing] will not materialize.  We could potentially take a more favorable stance on LFT shares in the low $30's."[30]

On November 2, 2010, Palaschuk attended a meeting between DTT and Longtop management, including Lian, Ruan, Yingling Li, and Philip Li. According to the meeting minutes, the discussion centered on market rumors that: 1) Longtop had reported inflated revenue from CCB, 2) Longtop's margins were suspiciously higher than its competitors, 3) Longtop had paid unusually "high multiples to acquire companies," and 4) Longtop was using a third party human resources company to employ the vast majority of its staff.[31]

Although DTT indicated that it had seen no indicators of fraud or potential inaccuracy in the CCB revenues, it suggested that Longtop hire an

---

[29]    *See* 10/15/10 Needham Report, Ex. 22 to Affidavit of Derek Palaschuk in Support of Motion for Summary Judgment ("Palaschuk Aff."), at 1–2.

[30]    2/1/11 Needham Report, Ex. 23 to Palaschuk Aff., at 1.

[31]    11/2/10 Minutes of meeting between Longtop and DTT, Ex. Y to Justice Decl., at 1.

independent third party to investigate.[32]   Longtop's management responded: "As
there are no indications of fraud or internal control problems, an independent
investigation is unnecessary."[33]   With respect to the other market rumors, DTT was
persuaded by management's explanations and concluded that no followup was
necessary.[34]

On December 6, 2010, BMO Capital Markets, a financial services
provider, issued a favorable financial report on Longtop.[35]   BMO gave Longtop a
stock rating of "outperform" and concluded that "[s]treet fears that CCB revenues
could [decline] are likely overblown."[36]

On or before February 22, 2011, an investor forwarded Palaschuk an
anonymous report about Longtop from the Internet (the "Anonymous Report").
The author of the Report stated: "I have strong doubts about the accuracy of LFT's
reported financials.   Revenues from top customers cannot be verified and the
company's industry leading margins do not seem possible.   Therefore the earnings

---

[32]   *See id.* at 2.

[33]   *Id.* at 3. However, management agreed to ask Longtop's counsel, Tim
Bancroft, whether an independent investigation was necessary. *See id.*

[34]   *See id.* at 3–4.

[35]   *See* 12/6/10 BMO Report, Ex. 24 to Palaschuk Aff.

[36]   *Id.* at 1, 5.

and the cash on the balance sheet could be vastly overstated."[37]  The Report noted

that Longtop had reported gross margins of sixty-nine percent compared to fifteen

to fifty percent among its competitors.[38]  The Report also explained in detail why

Longtop's reported revenues from CCB could not be correct and hypothesized that

Longtop was "simply forging contracts."[39]

      The Anonymous Report also identified several other red flags,

including Longtop's third party staffing model, questionable acquisitions like

Giantstone, and suspicious management stock sales and gifts.[40]  Furthermore, the

Report noted that several members of Longtop's top management had been sued

for unfair business practices in connection with their previous business ventures,

and had paid significant damages.[41]  The Report concluded, "[a] number of []

Chinese frauds have been exposed recently and I think this could be the next one to

fall."[42]

---

[37]    2/22/11 email from Palaschuk to Kyle Weaver, Ex. S to Justice Decl., at 1.

[38]    *See id.* at 2.

[39]    *Id.*

[40]    *See id.* at 3–4.

[41]    *See id.* at 4–5.

[42]    *Id.* at 1.

Between March 11, 2011 and March 21, 2011, Palaschuk exchanged emails with DTT manager Zuzu Zhu regarding DTT's confirmations of Longtop's cash balances. Palaschuk instructed Zhu to obtain bank statements directly from the banks, stating: "If we are committing fraud[,] which we are not, it would be useless for you to look at our accounting records because we make all the accounting records. The only document[s] that you can trust in the case of possible fraud must be documents directly from the bank."[43] Palaschuk pressured Zhu to finish the cash confirmation report on a short timeline (two days).[44]

On April 2, 2011, DTT completed a draft due diligence report on Longtop's cash balances from September 30, 2010 through February 28, 2011. After reviewing bank statements and certificates of deposit, DTT stated that it had succeeded in confirming eighty-five percent to ninety-three percent of Longtop's stated bank balances.[45]

On April 26, 2011, Citron Research ("Citron"), an online stock commentary firm, issued a report on Longtop that echoed many of the concerns

---

[43] March 2011 email chain between Zhu and Palaschuk ("March 2011 Email Chain"), Ex. Z to Justice Decl., at 6.

[44] *See id.* at 1–2.

[45] *See* Def. 56.1 ¶ 57; DTT draft due diligence report on Longtop's cash balances from September 30, 2010 to February 28, 2011 ("DTT Due Diligence Report"), Ex. 26 to Palaschuk Aff., at 4.

contained in the Anonymous Report.  Citron was concerned with Longtop's "spectacularly high margins," unconventional staffing model, implausibly large stock gifts from Longtop management to employees and friends, and problems with revenue recognition from Longtop's largest customers.[46]  Citron was further troubled by the previous high-profile lawsuit against Longtop's top management for unfair business practices.[47]  Citron concluded that Longtop had "[a]ll the markings of a complete stock fraud," and that "every financial statement from [Longtop's] IPO to this date is fraudulent."[48]

On April 27, 2011, Bronte Capital ("Bronte"), a global fund manager, published a report that questioned Longtop's decision to "[go] to market to raise cash" when the company's balance sheets indicated that it was "swimming in

---

[46]   4/26/11 Citron Report, Ex. T to Justice Decl., at 2 ("Citron Report").

[47]   *See id.* at 3–4.  Palaschuk claims that the lawsuit against Longtop's Chariman and CEO "contained no findings of fraud by the court, and the actual damages of approximately $80,000 were much less than the approximately $1.4 million in damages alleged by Citron."  Def. 56.1 ¶ 58.  However, Palaschuk has produced no court documents or other documentary evidence to validate those statements.

[48]   Citron Report at 1.

-12-

[cash]."[49]  Bronte also noted several ways in which Longtop did *not* match the

typical profile of a fraudulent corporation.[50]

On April 28, 2011, Longtop held a conference call for investors to

address the allegations in the Citron report and other market rumors.[51]  Palaschuk

directed the call and unequivocally denied the "absolutely false allegations of fraud

and other alleged wrongdoings" in the analyst reports.[52]

From May 18 through May 20, 2011, Palaschuk had multiple phone

conversations with Lian.[53]  According to Palaschuk's typed notes from the

discussion, Lian told Palaschuk that "the company had been a fraud since 2004.

While the company had reported significant profits, in fact the company had never

really made a profit."[54]  Lian revealed that Longtop had far more debt that what

had been disclosed in financial statements, and that the cash balance was

---

[49]      4/27/11 Bronte Report, Ex. U to Justice Decl., at 1–2.

[50]      *See id.* at 1.

[51]      *See* Transcript of 4/28/11 conference call with investors, Ex. FF to
Justice Decl.

[52]      *Id.* at 3.

[53]      *See* Palaschuk's notes from 5/19/11 and 5/20/11 phone conversations
with Lian ("5/19–20 Notes"), Ex. V to Justice Decl.; Transcript of 5/18/11 call
between Palaschuk and Lian, Ex. CC to Justice Decl.

[54]      5/19–20 Notes at 1.

only $131 million as opposed to the $421 million shown on Longtop's balance sheet as of March 31, 2011.[55]  In fact, about forty percent of the revenue reported in fiscal year 2011 was "not real."[56]  Lian informed Palaschuk that Ruan and Yingling Li were aware of the fraud.[57]

On May 19, 2011, the NYSE halted trading in Longtop's ADS's.[58] The same day, Palaschuk tendered his resignation from Longtop.[59]  On May 22, 2011, DTT resigned as Longtop's auditor due to: "1) the recently identified falsity of [Longtop's] financial records in relation to cash at bank [sic] and loan balances (and also now seemingly in the sales revenue); 2) the deliberate interference by the management in our audit process; and 3) the unlawful detention of our audit files."[60]  In the course of its most recent audit, DTT had discovered "a number of serious defects, including":

---

[55]     *See id.*

[56]     *Id.*

[57]     *See id.*

[58]     *See* 5/19/11 China Economic Review daily briefing, Ex. BB to Justice Decl.

[59]     *See* Def. 56.1 ¶ 62.

[60]     5/23/11 Form 6-K, Ex. W to Justice Decl., at 5, 8.

> [S]tatements by bank staff that their bank had no record of certain
> transactions; confirmation replies previously received were said
> to be false; significant differences in deposit balances reported by
> the bank staff compared with the amounts identified in previously
> received confirmations (and in the books and records of the
> Group); and significant bank borrowings reported by bank staff
> not identified in previously received confirmations (and not
> recorded in the books and records of the Group).[61]

In attempting to follow up on these discrepancies, DTT encountered resistance from Longtop officials, including calls to banks asserting that Deloitte was not Longtop's auditor; seizure of bank confirmation documents on bank premises; threats to stop DTT staff from leaving Longtop's premises unless they turned over their audit files; and seizure of DTT's working papers.[62]

DTT's resignation letter also states that Longtop's Chairman, Jia Xiao Gong, informed a DTT Managing Partner that "there were fake revenue in the past so there were fake cash recorded on the books."[63]  When asked who was involved in the fraud, Jia answered, "senior management."[64]

## III.   SUMMARY JUDGMENT STANDARD

---

[61]    *Id.* at 7.

[62]    *See id.* at 7–8.

[63]    *Id.* at 8.

[64]    *Id.*

Summary judgment is appropriate "only where, construing all the evidence in the light most favorable to the non-movant and drawing all reasonable inferences in that party's favor, there is 'no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law.'"[65] "A fact is material if it might affect the outcome of the suit under the governing law, and an issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[66]

"[T]he moving party has the burden of showing that no genuine issue of material fact exists and that the undisputed facts entitle him to judgment as a matter of law."[67] To defeat a motion for summary judgment, the non-moving party must "show more than 'some metaphysical doubt as to the material facts,'"[68] and "'may not rely on conclusory allegations or unsubstantiated speculation.'"[69]

---

[65]   *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 19 (2d Cir. 2014)  (quoting Fed. R. Civ. P. 56(c)) (some quotation marks omitted).

[66]   *Windsor v. United States*, 699 F.3d 169, 192 (2d Cir. 2012), *aff'd*, 133 S. Ct. 2675 (2013) (quotations and alterations omitted).

[67]   *Coollick v. Hughes*, 699 F.3d 211, 219 (2d Cir. 2012) (citations omitted).

[68]   *Gioia v. Forbes Media LLC*, 501 Fed. App'x 52, 54 (2d Cir. 2012) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)) (some citations omitted).

[69]   *Robinson v. Allstate Ins. Co.*, 508 Fed. App'x 7, 9 (2d Cir. 2013) (quoting *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998)).

In deciding a motion for summary judgment, "[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried."[70] "'Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences'" are jury functions, not those of a judge.[71]

## IV.   APPLICABLE LAW

### A.   Section 10(b) of the Exchange Act and Rule 10b-5

Section 10(b) of the Exchange Act prohibits using or employing, "in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance. . . ."[72]  Rule 10b-5, promulgated thereunder, makes it illegal to "make any untrue statement of a material fact or to omit to state a material fact . . . in connection with the purchase or sale of any security."[73]  To sustain a claim for securities fraud under Section 10(b), "a plaintiff must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a

---

[70]     *Cuff ex rel. B.C. v. Valley Cent. School Dist.*, 677 F.3d 109, 119 (2d Cir. 2012) (quotation marks and citations omitted).

[71]     *Barrows v. Seneca Foods Corp.,* 512 Fed. App'x 115, 117 (2d Cir. 2013) (quoting *Redd v. New York Div. of Parole*, 678 F.3d 166, 174 (2d Cir. 2012)).

[72]     15 U.S.C. § 78j(b) (2014).

[73]     17 C.F.R. § 240.10b-5 (2014).

security; (4) reliance upon the misrepresentation or omission; (5) economic loss;

and (6) loss causation."[74] "For the purposes of Rule 10b-5, the maker of a

statement is the person or entity with ultimate authority over the statement,

including its content and whether and how to communicate it."[75]

      The required level of scienter under Section 10(b) is either "intent to

deceive, manipulate, or defraud"[76] or "reckless disregard for the truth."[77]  Plaintiffs

may meet this standard by "alleging facts (1) showing that the defendants had both

motive and opportunity to commit the fraud or (2) constituting strong

circumstantial evidence of conscious misbehavior or recklessness."[78]

      Under the latter theory, plaintiffs must allege that the defendants have

engaged in "conduct which is highly unreasonable and which represents an

---

[74]    *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008).

[75]    *Janus Capital Grp., Inc. v. First Derivative Traders*, 131 S.Ct. 2296, 2302 (2011).

[76]    *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 (1976).

[77]    *South Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 109 (2d Cir. 2009) ("By reckless disregard for the truth, we mean 'conscious recklessness — *i.e.*, a state of mind *approximating actual intent*, and *not merely a heightened form of negligence*.'" (quoting *Novak v. Kasaks,* 216 F.3d 300, 312 (2d Cir. 2000)) (emphasis in original)).

[78]    *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007).

extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it."[79] "To state a claim based on recklessness, plaintiffs may either specifically allege defendants' knowledge of facts or access to information contradicting defendants' public statements, or allege that defendants failed to check information they had a duty to monitor."[80] Mere "allegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim of securities fraud."[81] An inference of scienter "must be more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."[82]

### B.   Section 20(a) of the Exchange Act

---

[79]    *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, No. 12 Civ. 4355, 2014 WL 1778041, at *6 (2d Cir. May 6, 2014) (quoting *Novak*, 216 F.3d at 308, 312).

[80]    *In re Gildan Activewear, Inc. Secs. Litig.*, 636 F. Supp. 2d 261, 272 (S.D.N.Y. 2009) (quotation marks and citation omitted). *Accord Novak,* 216 F.3d at 308, 311.

[81]    *Novak,* 216 F.3d at 309.

[82]    *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 314 (2007). *Accord Sawabeh Info. Servs. Co. v. Brody*, 832 F. Supp. 2d 280, 295 (S.D.N.Y. 2011) (noting that "the tie . . . goes to the plaintiff" (quotation marks and citations omitted)).

Section 20(a) of the Exchange Act creates a cause of action against "control persons" of the primary violator.[83]  "To establish a prima facie case of control person liability, a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud."[84]  Where there is no primary violation, there can be no "control person" liability under Section 20(a).[85]

## V.    DISCUSSION

Palaschuk moves for summary judgment on the Section 10(b) and 20(a) claims on the grounds that plaintiffs have raised no genuine issue of material fact regarding his scienter at the time the statements were made.[86]  Plaintiffs seek to hold Palaschuk liable under a theory of recklessness rather than intent.[87]

---

[83]    *See* 15 U.S.C. § 78t(a).

[84]    *ATSI*, 493 F.3d at 108.

[85]    *See id. See also In re eSpeed, Inc. Sec. Litig.*, 457 F. Supp. 2d 266, 297–98 (S.D.N.Y. 2006).

[86]    Palaschuk does not contest the materiality or falsity of the statements or his status as a "control person" of Longtop within the meaning of Section 20(a).

[87]    At a court conference on October 21, 2013, plaintiffs represented that they would pursue a theory of recklessness rather than intent to defraud. *See* 10/21/13 Transcript 14:20–23, Ex. C to Justice Decl.

Palaschuk has presented a good deal of evidence in his favor.  For example, independent auditors from DTT repeatedly approved the accuracy of Longtop's financial statements, and even completed a due diligence report claiming to have confirmed eighty-five percent to ninety-three percent of Longtop's stated bank balances.[88]  Moreover, Palaschuk personally instructed DTT to obtain original bank statements in March of 2011, since "[t]he only document[s] that you can trust in the case of possible fraud must be documents directly from the bank."[89]  Palaschuk contends that he reasonably relied on DTT's conclusions and cannot be held liable for doing so.

Palaschuk also argues that plaintiffs have not identified specific steps that he could have taken to uncover the fraud.  However, a reasonable jury could find that Palaschuk failed to adequately investigate cash balances and reported CCB revenues in light of multiple analyst reports challenging those metrics.[90]  For

---

[88]  *See* Def. 56.1 ¶ 57; DTT Due Diligence Report at 4.

[89]  March 2011 Email Chain at 6.

[90]  Palaschuk argues that his last allegedly false statement was made on January 31, 2011, and most of the analyst reports were published *after* that date.  *See* Memorandum of Law in Support of Defendant Palaschuk's Motion for Summary Judgment at 20.  However, plaintiffs have also presented evidence that Palaschuk made materially false statements to investors during a conference call on April 28, 2011.  *See* Complaint ¶ 49; Plaintiffs' Memorandum of Law in Opposition to Defendant Derek Palaschuk's Motion for Summary Judgment at 6.  Moreover, a jury could infer recklessness solely from the information available to

example, a jury could find that Palaschuk was reckless in failing to obtain original bank statements, or asking DTT to do so, long before March of 2011.[91]

Similarly, Palaschuk was aware of multiple reports that CCB revenues were inflated, including a personal email from a Needham analyst who claimed to have spoken directly with multiple members of CCB management.[92]  There is no evidence that Palaschuk attempted to verify Longtop's reported revenue by cross-checking with CCB – a seemingly simple procedure.  Instead, Palaschuk immediately denied the Needham analyst's allegations before attempting to investigate them.[93]  With respect to both cash balances and CCB revenues, a jury could well find that Palaschuk recklessly "failed to check information [he] had a duty to monitor."[94]

---

Palaschuk prior to January 31, 2011.

[91]     Relatedly, plaintiffs have presented evidence that Palaschuk resisted DTT's proposed auditing procedures with respect to revenue contract confirmations.  *See* 4/20–22 Email Chain.

[92]     10/14/10 Email Chain at 2.

[93]     *See id.* at 1.

[94]     *Gildan Activewear,* 636 F. Supp. 2d at 272 (quotation marks and citation omitted).  *Accord Novak,* 216 F.3d at 308, 311.

Even if Palaschuk presents a strong case, the question of his scienter

is for the jury to decide.[95]  In the words of Judge William Young of the District of

Massachusetts:

> Too often, judges substitute their own judgment for that of the
> jury. These judges decide that no reasonable juror could view the
> evidence in a manner different from the judge's own conclusion.
> This cognitive illiberalism has been rightly condemned as a form
> of judicial arrogance. . . . Juries have not only the duty, but also
> the right to decide cases. Encroaching upon the province of juries
> to decide questions of fact, such as the determination of a
> defendant's state of mind, violates not only the constitutional
> rights of the parties in a suit, but also the constitutional rights of
> the jurors themselves.[96]

A court may grant summary judgment only where the facts are so one-sided that

reasonable parties could not disagree on the outcome.  This case does not present

such facts.

Palaschuk relies heavily on his own sworn affidavit and the affidavits

of two former employees, Christina Zhang and Philip Li, to explain the ways he

allegedly investigated the analyst reports, including initiating internal audits and

---

[95]     *See S.E.C. v. EagleEye Asset Mgmt.*, 975 F. Supp. 2d 151, 159 (D.
Mass. 2013) ("Few things seem more appropriately the province of a jury than the
inference of a defendant's mental state.").

[96]     *Id.* at 159–60.

-23-

asking independent parties to complete due diligence.[97]   However, he has produced little documentary evidence in support, and the jury is free to disregard the testimony of those affiants at trial if it finds them not credible.[98]   Because credibility determinations fall squarely within the province of the jury, Palaschuk's overwhelming reliance upon witness testimony further supports the conclusion that summary judgment is inappropriate in this case.

Because a reasonable jury could find that Palaschuk was reckless in failing to properly investigate Longtop's revenues, cash balances, and other financial metrics, the motion for summary judgment must be denied.   While Palaschuk may very well prevail at trial, that decision is one for the fact-finder and not the court.

## VI.   CONCLUSION

For the foregoing reasons, Palaschuk's motion for summary judgment is denied.   The Clerk of Court is directed to close this motion (Docket No. 172).   A conference is scheduled for July 7, 2014 at 4:30 pm.

---

[97]   *See* Def. 56.1 ¶¶ 56–57.

[98]   Palaschuk's 56.1 statement cites almost exclusively to his own affidavit.   *See* Def. 56.1.

-24-

SO ORDERED:

_____
Shira A. Scheindlin
U.S.D.J.

Dated:      New York, New York
            June 16 , 2014

-**Appearances**-

**Counsel for Lead Plaintiffs:**

Gregory M. Castaldo, Esq.
Kimberly A. Justice, Esq.
Richard A. Russo, Esq.
Margaret E. Onasch, Esq.
John A. Kehoe, Esq.
John J. Gross, Esq.
Kessler Topaz Meltzer & Check, LLP (PA)
280 King of Prussia Road
Radnor, Pennsylvania 19087
(610) 667-7706

Daniel L. Berger, Esq.
Deborah A. Elman, Esq.
Jeff A. Almeida, Esq.
Reena S. Liebling, Esq.
Grant & Eisenhofer, P.A. (NY)
485 Lexington Avenue, 29th Floor
New York, New York 10017
(646) 722-8500

**Defendant (Pro Se):**

Derek Palaschuk
4326 Dunbar Street
Box 45117
Vancouver, Canada
Email: palaschukd@gmail.com