UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------- X

IN RE LONGTOP FINANCIAL
TECHNOLOGIES LIMITED
SECURITIES LITIGATION

**OPINION AND ORDER**

**11-cv-3658**

------------------------------------------------- X

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.    INTRODUCTION

On August 30, 2013, in accordance with the discovery schedule,

plaintiffs served their expert report on the remaining defendant in this case, Derek

Palaschuk.  On September 4, 2013, Palaschuk served a report authored by his own

expert, Alan D. Bell.  Plaintiffs moved to exclude Bell's report and testimony on

November 20, 2013.  The same day, Palaschuk moved for summary judgment[1].

Palaschuk subsequently expressed concern that plaintiffs raised new

arguments in their summary judgment briefing that Bell had not been given the

---

[1]    I denied Palaschuk's motion for summary judgment in an Opinion
dated June 16, 2014.

-1-

opportunity to address.  I granted Palaschuk permission to file a ten-page

supplemental expert report addressing solely those allegations that were not raised

in either the Complaint or plaintiffs' interrogatory responses.[2]  Palaschuk filed his

supplemental report, authored by Roger D. Siefert, on February 14, 2014.  On

February 26, 2014, plaintiffs moved to exclude the report and Siefert's testimony.

      For the reasons that follow, plaintiffs' motions to exclude the reports

and testimony of Bell and Siefert are GRANTED in part and DENIED in part.

## II.   BACKGROUND

### A.   The Bell Report

#### 1.   Bell's Credentials

      Bell is a certified public accountant ("CPA") licensed in Texas.[3]  He

has an undergraduate degree in Petroleum Engineering from Colorado School of

Mines and a Masters in Business Administration from Tulane University.[4]  Bell

---

[2]     Specifically, the supplemental report was permitted to address: "1) whether Palaschuk confirmed Longtop's cash and loan balances in a timely manner, 2) whether Palaschuk properly investigated the October 2010 Needham email, and 3) whether Palaschuk properly investigated the February 2011 email from an investor." 2/16/14 Order, Dkt. No. 193.

[3]     *See* Expert Report of Alan D. Bell (the "Bell Report") at 4.

[4]     *See id.*

worked as an engineer for Chevron Oil Company from 1969 to 1972, and then as an auditor for Ernst & Young LLP ("E&Y") from 1973 to 2006.[5] At E&Y, Bell assisted clients in complying with the Sarbanes-Oxley Act ("SOX") and other public reporting requirements in their initial public offerings, secondary offerings, and periodic financial reports.[6] Bell served as the Chief Restructing Officer in a bankruptcy proceeding in 2009, and currently serves on the board of directors and audit committees of multiple private and public entities.[7] He has been retained as an expert in multiple lawsuits.[8] Bell describes himself as a "retired senior audit partner in the international energy industry, with extensive experience dealing with the Securities and Exchange Commission, working with senior executives and boards of directors of public companies."[9]

Palaschuk states that he selected Bell largely based on his knowledge of Generally Accepted Accounting Principles ("GAAP"), since many of plaintiffs' allegations centered on Longtop's allegedly improper accounting for social welfare obligations and its relationship with a third party entity that directly employed

---

[5]     *See id.*

[6]     *See id.* at 40.

[7]     *See id.* at 4, 40.

[8]     *See id.* at 42.

[9]     *Id.* at 40.

most of Longtop's staff ("XLHRS").[10]   However, plaintiffs have now abandoned

those allegations and do not plan to pursue them at trial.[11]

> **2.   Bell's Opinions**

The Bell Report summarizes various third party audits and reports on

Longtop's finances during the class period, and concludes that it was reasonable

for Palaschuk to "rely" on them.[12]  For example, Bell points out that during almost

the entire Class Period, DTT returned clean audits on Longtop's financial

statements and noted no material weaknesses in internal controls, indications of

fraud, or disagreements between DTT and Longtop's management.[13]  DTT also

certified that Longtop's financial statements were prepared in accordance with

GAAP.[14]

---

[10]    *See* Defendant Derek Palaschuk's Memorandum of Law in Opposition to Plaintiffs' Motion to Exclude Report and Testimony of Alan D. Bell ("Opp. Mem.") at 4.

[11]    *See* Memorandum of Law in Support of Plaintiffs' Motion to Exclude Report and Testimony of Alan D. Bell ("Pl. Mem.") at 25 ("Plaintiffs will not pursue at trial claims against Palaschuk related to Longtop's accounting for XLHRS or the adequacy of its social welfare payments.").

[12]    *See, e.g.,* Bell Report at 6 ("It was reasonable for Palaschuk as CFO to place reliance on these audits and quarterly reviews.").

[13]    *See id.* at 6, 9–10, 17–18.

[14]    *See id.* at 6, 9–10.

Bell concedes that DTT's audit for fiscal year 2006 identified deficiencies in Longtop's internal controls, but concludes that any problems must have been corrected because the subsequent audit identified no such deficiencies.[15] He further explains that the problems identified by DTT were not fraud-related red flags for Palaschuk because "it is not uncommon for a company that is preparing to go public to identify internal control weaknesses."[16]  Newly registered companies are given two years to become compliant with SOX, and in Bell's experience "there is always a significant amount of work that is performed from the time that a company plans to go public through the two year transition period until that company has to have an audit opinion on their internal controls."[17]

Bell makes the same point with respect to the "fraud risk factors" DTT identified in 2007 and 2008.  According to Bell, "[t]he identification of risk factors is not an indication of fraud; it is part of the audit process" and therefore did not put Palaschuk on notice of fraud or accounting irregularities.[18]

Bell also addresses plaintiffs' allegations that Longtop failed to conduct sufficient month-end bank reconciliations and lacked effective internal

---

[15]     *See id.* at 16.

[16]     *Id.* at 17.

[17]     *Id.* at 20.

[18]     *Id.* at 21.

controls over cash and loan balances.  According to Bell, DTT did not find any problems with bank reconciliations or control over cash during the class period.[19] In fact, Bell personally reviewed Longtop's bank reconciliation records and affirms that reconciliations were performed.[20]  Although plaintiffs allege that Longtop's internal controls over revenue were grossly inadequate, Bell states that DTT identified no material weaknesses with respect to revenue, and therefore Longtop's internal controls over revenue must have been "working as required."[21]  Bell also cites a due diligence report by DTT Beijing from April 2, 2011 that purports to confirm eighty-five to ninety-three percent of Longtop's cash balances.[22]

While plaintiffs allege that Palaschuk talked DTT out of doing certain revenue contract confirmations that could have uncovered the fraud, Bell explains that confirmation of revenue contracts is not required under Generally Accepted Auditing Standards.[23]  Bell further concludes that, if there had been any disagreement between DTT and Longtop's management over the proper auditing

---

[19]     *See id.* at 21.

[20]     *See id.*

[21]     *Id.*

[22]     *See id.* at 38.

[23]     *See id.* at 24.

procedures, the disagreement would have been noted in DTT's "Required Communications" accompanying the audit opinion.[24]

Plaintiffs argue that DTT's resignation letter acknowledged that Longtop's financial statements, including cash and loan balances, were materially false.  In response, Bell asserts that DTT withdrew the financial statements because it could no longer rely on Longtop's management, not because it concluded that the statements were inaccurate.[25]  In fact, Bell opines that Longtop's financial statements were likely accurate based on the clean audits and the due diligence of investment bankers during Longtop's IPO.[26]  Finally, Bell explains that although Chief Financial Officers ("CFOs") are responsible for certifying financial statements, they typically rely on subordinates to perform internal checks and verify the accuracy of the information contained therein.[27]

### 3.    Plaintiffs' Arguments

---

[24]    *See id.*

[25]    *See id.* at 24–25.  Bell's conclusion is based largely on the arguments in DTT's Reply Memorandum of Law in Support of Its Motion to Dismiss, Dkt. No. 106.

[26]    *See id.*

[27]    *See id.* at 39.

Plaintiffs make four main arguments in support of excluding the Bell Report.  (1) The report is untimely because Palaschuk missed the expert discovery deadline by five days.  They note that Bell also submitted a supplemental expert report in the form of a lengthy affidavit to Palaschuk's reply memorandum of law, which plaintiffs argue is even more untimely and improper. (2) Because Bell has never served as a CFO or advised companies in the Information Technology field, and is not an expert on the legal and regulatory obligations of public company CFOs, he is not qualified to provide an expert opinion.[28]  (3) Much of the Bell Report simply regurgitates record evidence, including summarizing the results of various audit reports in a factual narrative.  Worse, some of Bell's interpretations of the evidence are based solely on Palaschuk's assertions.[29]  (4) Bell usurps the jury's role of deciding the adequacy or recklessness of Palaschuk's conduct, which is both the ultimate legal issue and a quintessential jury question.[30]  Moreover,

---

[28]     *See* Pl. Mem. at 14.

[29]     *See, e.g.,* Bell Report at 19 (calling plaintiffs' claim that DTT made certain statements "incorrect" based solely on Palaschuk's deposition testimony).

[30]     *See* Pl. Mem. at 22.

Bell's repeated references to the "reasonableness" of Palaschuk's conduct are likely to confuse the jury on the proper legal standard.[31]

### B.     The Siefert Report

#### 1.     Siefert's Credentials

Siefert has been licensed as a CPA for over thirty years.[32]  For the past twenty years, he has served as a litigation consultant and forensic accountant.[33]  He spent ten years of his career conducting audits, including audits of publicly listed multinational companies.[34]  As part of the audit process, Siefert evaluated the internal controls of the subject companies and performed cash and loan confirmations.[35]  He was often asked to assess the performance of internal accounting personnel, including CFOs.[36]  As a result of these experiences, Siefert purports to understand "how CFOs confirm that the cash on the company books

---

[31]      *See* Plaintiffs' Reply Memorandum in Further Support of Their Motion to Exclude Report and Testimony of Alan D. Bell at 5.

[32]      *See* Expert Report of Roger D. Siefert in Response to the 2/6/14 Order (the "Siefert Report") at 1.

[33]      *See id.*

[34]      *See id.*

[35]      *See id.*

[36]      *See id.* at 1–2.

and records agrees with that reported by banks and when and how CFOs should respond in investigative situations."[37]

### 2.     Siefert's Opinions

Siefert's expert report (the "Siefert Report") addresses: 1) whether Palaschuk confirmed Longtop's cash and loan balances in a timely manner, 2) whether Palaschuk properly investigated the October 2010 Needham email, and 3) whether Palaschuk properly investigated the February 2011 "Anonymous Report." Siefert explains the general duties of a CFO, the need for CFO's to delegate certain tasks, and the definition and purpose of internal controls.[38] He also details the various duties of independent auditors and the extent to which unqualified audit opinions would provide "comfort" to a CFO, and did in fact provide comfort to Palaschuk.[39]

According to Siefert, no official standards or protocols govern a CFO's response to allegations of fraud or wrongdoing.[40] Siefert enumerates the actions Palaschuk allegedly took to investigate, based on Palaschuk's affidavit and

---

[37]     *Id.* at 1.

[38]     *See id.* at 2–3.

[39]     *Id.* at 3.

[40]     *See id.* at 4.

Statement of Material Facts.  He then concludes that Palaschuk "evaluated each [allegation] and responded appropriately."[41]

### 3.    Plaintiffs' Arguments

Plaintiffs move to exclude the Siefert Report on multiple grounds.  (1) Siefert is not qualified to issue his opinions because he has never been a CFO and has no specialized knowledge regarding a CFO's responses to allegations of fraud. (2) Siefert's opinions are not reliable because he provides no explanation of the standards used to evaluate Palaschuk's conduct and ignores contradictory record evidence.  (3) Siefert regurgitates Palaschuk's version of the facts rather than citing to the record.  (4) Siefert speculates about third parties' subjective beliefs or states of mind.  (5) Siefert cannot opine that Palaschuk engaged in no conscious wrongdoing, since intent is not the theory of liability in this case and such terminology could confuse the jury.  (6) Siefert's statements about the timeliness or reasonableness of Palaschuk's conduct usurp a quintessential jury function.

## III.   APPLICABLE LAW

The proponent of expert evidence bears the initial burden of establishing admissibility by a "preponderance of the evidence."[42]  For expert

---

[41]    *Id.*

[42]    *United States v. Williams,* 506 F.3d 151, 160 (2d Cir. 2007).

testimony to be admissible under Rule 702, the witness must be "qualified as an expert by knowledge, skill, experience, training, or education[.]"[43]  The court must then "compare the area in which the witness has superior knowledge, education, experience or skill with the subject matter of the proffered testimony."[44]  "Courts within the Second Circuit have liberally construed expert qualification requirements when determining if a witness can be considered an expert."[45]

Furthermore, the expert's knowledge must be of the type that will "help the trier of fact to understand the evidence or to determine a fact in issue[.]"[46]  Thus, expert witnesses are generally not permitted to address issues of fact that a jury is capable of understanding without the aid of expert testimony.[47]  Similarly,

---

[43]    Fed. R. Evid. 702.

[44]    *United States v. Tin Yat Chin,* 371 F.3d 31, 40 (2d Cir. 2004).

[45]    *Crown Cork & Seal Co., Inc. Master Ret. Trust v. Credit Suisse First Boston Corp.*, No. 12 Civ. 5803, 2013 WL 978980, at *1 (S.D.N.Y. Mar. 12, 2013) (quotation marks and citations omitted).  *Accord Nimely v. City of New York,* 414 F.3d 381, 395 (2d Cir. 2005) ("It is a well-accepted principle that Rule 702 embodies a liberal standard of admissibility for expert opinions. . . .").

[46]    Fed. R. Evid. 702.

[47]    *See United States v. Escobar,* 462 Fed. App'x 58, 62 (2d Cir. 2012) (noting that expert may not testify to facts "well within the grasp of the average juror") (quotation marks and citations omitted).  *See also United States v. Amuso*, 21 F.3d 1251, 1263 (2d Cir. 1994) ("A district court may commit manifest error by admitting expert testimony where the evidence impermissibly mirrors the testimony offered by fact witnesses, or the subject matter of the expert's testimony is not beyond the ken of the average juror.").

an expert may not offer testimony that simply "regurgitates what a party has told him"[48] or constructs "a factual narrative based on record evidence."[49]

It is also well-established that expert witnesses are not permitted to testify about legal standards or conclusions of law, which are properly the domain of the trial judge and jury.[50]  Generally, "[w]hether a party acted with objective reasonableness is a quintessential common law jury question. By the same token, juries traditionally decide whether an individual acted knowingly, or willfully, or maliciously, or with specific intent, or with any other relevant state of mind."[51]

---

[48]     *Arista Records LLC v. Usenet.com, Inc.,* 608 F. Supp. 2d 409, 424 (S.D.N.Y. 2009).  *Accord United States v. Mejia*, 545 F.3d 179, 197 (2d Cir. 2008) (noting that expert may not "repeat[] hearsay evidence [to the jury] without applying any expertise whatsoever").

[49]     *Highland Capital Mgmt., L.P. v. Schneider,* 379 F. Supp. 2d 461, 469 (S.D.N.Y. 2005).

[50]     *See In re Methyl Tertiary Butyl Ether (MTBE) Prod. Liab. Litig.,* 725 F.3d 65, 114 (2d Cir. 2013)*.  See also Nimely,* 414 F.3d at 397.

[51]     *Kidder, Peabody & Co., Inc. v. IAG Int'l Acceptance Grp., N.V.,* 14 F. Supp. 2d 391, 404 (S.D.N.Y. 1998).  *Accord Crown Cork,* 2013 WL 978980, at *7 (excluding expert opinions regarding parties' knowledge, state of mind, and intent); *In re Xerox Corp. Sec. Litig.*, 746 F. Supp. 2d 402, 415 (D. Conn. 2010) ("Inferences about the intent or motive of parties or others lie outside the bounds of expert testimony.") (quotation marks and citations omitted).

To be admissible, the proposed expert testimony must be based "on a reliable foundation."[52]  In assessing reliability, the trial judge should consider whether:

> (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has reliably applied the principles and methods to the facts of the case.[53]

Although the Supreme Court has instructed district courts to focus "on [the] principles and methodology" employed by the expert and "not on the conclusions that they generate,"[54] "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."[55]

District courts are charged with acting as "'gatekeeper[s] to exclude invalid and unreliable expert testimony'"[56] and are given "broad discretion" to

---

[52]     *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993). *Accord Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147–49 (1999).

[53]     Fed. R. Evid. 702.

[54]     *Daubert*, 509 U.S. at 595.

[55]     *Kumho Tire,* 526 U.S. at 157 (quotation marks and citations omitted).

[56]     *Baldwin v. EMI Feist Catalog, Inc.*, No. 12 Civ. 9360, 2013 WL 6628957, at *3 (S.D.N.Y. Dec. 16, 2013) (quoting *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 449 (2d Cir. 1999)).

-14-

make such determinations.[57]  However, trial courts must consider only the

*admissibility* of expert evidence rather than its weight or credibility.  "As the

Supreme Court has explained, '[v]igorous cross-examination, presentation of

contrary evidence, and careful instruction on the burden of proof are the traditional

and appropriate means of attacking shaky but admissible evidence.'"[58]

## IV.   DISCUSSION

### A.   The Bell Report

#### 1.   Bell's Initial Expert Report Is Admitted

Expert reports were due on August 30, 2013, yet Palaschuk did not

file his report until September 4, 2013 — five days after the deadline.  Plaintiffs

have not demonstrated any prejudice resulting from Palaschuk's relatively minor

delay.  Moreover, Palaschuk's tardiness appears to be the result of his own

confusion regarding the distinction between an expert report and a rebuttal report.

Because such confusion is understandable for a pro se litigant, and there is no

evidence that Palaschuk acted in bad faith, the Bell Report will not be excluded on

timeliness grounds.

#### 2.   Bell's Supplemental Report Is Excluded

---

[57]     *Louisiana Wholesale Drug Co., Inc. v. Sanofi-Aventis,* No. 07 Civ. 7343, 2008 WL 4580016, at *6 (S.D.N.Y. Oct. 14, 2008) (quoting *McCullock v. HB Fuller Co.*, 61 F.3d 1038, 1042 (2d Cir. 1995)).

[58]     *Amorgianos v. National R.R. Passenger Corp.,* 303 F.3d 256, 267 (2d Cir. 2002) (quoting *Daubert*, 509 U.S. at 596).

Palaschuk attempts to submit a thirty-page affidavit from Bell in the form of an exhibit to his memorandum of law.  Bell's affidavit responds to concerns raised in plaintiffs' memorandum of law and attempts to further bolster his initial opinions.  The deadline for expert discovery passed long ago, and experts may not unilaterally supplement their conclusions months after the deadline.  Therefore, Bell's supplemental report is excluded.

### 3.    Bell's Opinions Are Excluded in Part

Many of Bell's opinions are irrelevant or unreliable.  The parties agree that the portions of the Bell Report addressing Longtop's social welfare payments and use of XLHRS are now moot given that plaintiffs do not plan to pursue those allegations at trial.[59]

Additionally, a significant portion of the Bell Report summarizes the findings of various audit opinions, the actions allegedly taken by Palaschuk, and the contents of other documents in the record.  Bell is precluded from summarizing facts and documents in the record that the jury is capable of understanding on its own.  He is permitted to summarize the contents of technical financial documents only to the extent that the documents would not be comprehensible to the average

---

[59]    *See* Opp. Mem. at 13.

layperson.  Bell may not testify to facts that he learned directly from Palaschuk if he cannot cite to other support in the record.[60]

Bell is also precluded from testifying that Longtop's internal controls and financial statements were free from error based upon the results of DTT's audits.  In its resignation letter, DTT explicitly stated that "continuing reliance should no longer be placed on our audit reports on the previous financial statements."[61]  DTT also attributed its resignation to "the recently identified falsity of [Longtop and its subsidiaries'] financial records in relation to cash at bank and loan balances (and also now seemingly in the sales revenue)," and "decline[d] to be associated with any of the Company's financial communications during 2010 and 2011."[62]  In light of these statements, Bell's opinion that DTT's clean audit opinions established that Longtop's financial statements were accurate and the company's internal controls were operating properly is inherently unreliable and is therefore excluded.

Similarly, Bell's interpretation of DTT's resignation letter is inadmissible.  *First,* the jury can easily read and comprehend the text of the short

---

[60]    *See, e.g.,* Bell Report at 19 (calling plaintiffs' claim that DTT made certain statements "incorrect" based solely on Palaschuk's deposition testimony).

[61]    DTT Resignation Letter, Ex. W to Declaration of Plaintiffs' Attorney Kimberly A. Justice in Support of Plaintiffs' Memorandum of Law in Opposition to Defendant Derek Palaschuk's Motion for Summary Judgment, Dkt. No. 175.

[62]    *Id.*

letter without expert assistance.  *Second*, Bell bases his interpretation of the letter largely on DTT's memorandum of law in support of its motion to dismiss the complaint in this action, which is not record evidence.

Bell devotes a substantial portion of his expert report to DTT's audit procedures.  The sufficiency of those procedures is relevant to Palaschuk's state of mind because a clearly deficient audit might have put a diligent CFO on notice of the need for further inquiry.  Therefore, Bell may opine briefly on the adequacy and propriety of DTT's audit procedures.  However, Bell's lengthy assessment of the technical features of DTT's audit is excessive and unlikely to assist the jury. Because the relevance of such detailed technical testimony is substantially outweighed by the danger of confusing the jury and wasting time, Bell's testimony on the sufficiency of DTT's audit procedures must be limited to an overview of the adequacy of the audit.[63]

### 4.    Bell's Opinions Are Admitted in Part

While many of Bell's opinions are irrelevant or unreliable, Bell is qualified to opine on limited topics.  The standard for expertise in the Second Circuit is permissive, and courts rely on cross-examination to reveal any weaknesses in an expert's background.

---

[63]    *See* Fed. R. Evid. 403.

Bell has over thirty years of experience auditing financial records and internal controls and is a licensed CPA, which qualifies him to testify about auditing and accounting practices. For example, Bell may explain what normally occurs when an auditor identifies "fraud risk factor[s]."[64] He may also explain how common it is for a company to have weaknesses in its internal controls during the first two years as a registered public company.[65]

Similarly, Bell may evaluate the operations of Longtop's finance department based upon his own review of the relevant documents. For example, he may state that Longtop conducted month-end reconciliations if he personally reviewed the reports. He may also testify that Longtop's monthly reports were consistent with the company's publicly released financial statements if he personally examined both sets of documents. However, any such opinions must be reliable. Bell may not testify that Longtop's internal reports *established* the accuracy of the financial statements, since the process involved no external corroboration. Moreover, as previously stated, Bell may not base his opinions on DTT's audits or Palaschuk's unsubstantiated version of the facts unless phrased as a hypothetical.

---

[64]     Bell Report at 21.

[65]     *See id.* at 20.

Bell may also explain the common duties of a public company CFO, as well as which tasks are frequently delegated to subordinates.  Bell may not state whether Palaschuk's behavior was "reasonable" or "reckless," as that is the ultimate legal conclusion for the jury.  Nor may he opine that it was reasonable for Palaschuk to "rely" on the DTT audits.  Instead, he may explain what procedures a CFO is generally expected to undertake, in accordance with industry standards, to corroborate the accuracy of a company's financial statements and to prevent fraud. He may also explain, in his experience, what steps a CFO would *not* normally undertake in the face of a clean audit report.  The jury will ultimately decide whether Palaschuk's behavior constituted an "extreme departure from the standards of ordinary care" under the circumstances.[66]

## B.    The Siefert Report

Like Bell, Siefert is qualified as an expert by his ten years as an auditor and thirty years as a CPA.  As such, Siefert may explain accounting and auditing terms like "internal controls," "unqualified audit opinions," "confirmations," and "reconciliations," as well as who normally performs each procedure.

---

[66]    *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, No. 12 Civ. 4355, 2014 WL 1778041, at *6 (2d Cir. May 6, 2014) (quoting *Novak v. Kasaks,* 216 F.3d 300, 308, 312 (2d Cir. 2000)).

However, Siefert may not testify about any party's state of mind, as such testimony would be speculative.  He may not testify that Longtop's management considered its finance employees to be competent, or that the clean audits gave Palaschuk comfort, or that Palaschuk's response to the Needham report was "antithetical to [that] of someone attempting to cover up wrongdoing."[67]

Additionally, Siefert may not testify that Palaschuk or his employees took certain steps, particularly if his conclusion is based solely on those individuals' affidavits.[68]  Instead, Siefert may explain what steps he would consider prudent for a CFO to take in response to various analyst reports or red flags.  He may also answer hypothetical questions about whether certain investigative responses by a CFO would be sufficient or appropriate in accordance with industry standards.  He may not say whether Palaschuk in fact took those steps, or whether Palaschuk's responses were "reasonable" or "reckless."

## V.   CONCLUSION

For the foregoing reasons, plaintiffs motions to exclude the reports and testimony of Bell and Siefert are GRANTED in part and DENIED in part.  The Clerk of Court is directed to close these motions (Dkt. Nos. 166, 198).

---

[67]     Siefert Report at 3, 8.

[68]     *See id.* at 4, 7, 8.

SO ORDERED

Shira A. Scheindlin
U.S.D.J.

Dated:  New York, New York
    July ⅃, 2014

**-Appearances-**

**Counsel for Lead Plaintiffs:**

Kimberly A. Justice, Esq.
Gregory M. Castaldo, Esq.
Richard A. Russo, Esq.
Margaret E. Onasch, Esq.
John A. Kehoe, Esq.
John J. Gross, Esq.
Kessler Topaz Meltzer & Check, LLP (PA)
280 King of Prussia Road
Radnor, Pennsylvania 19087
(610) 667-7706

Daniel L. Berger, Esq.
Deborah A. Elman, Esq.
Jeff A. Almeida, Esq.
Reena S. Liebling, Esq.
Grant & Eisenhofer, P.A. (NY)
485 Lexington Avenue, 29th Floor
New York, New York 10017
(646) 722-8500

**Defendant:**

Derek Palaschuk, Pro Se
4326 Dunbar Street
Box 45117
Vancouver, Canada
Email: palaschukd@gmail.com